# 11-3361-cv

# United States Court of Appeals

## for the

## Second Circuit

RENEE MIHALIK,

*Plaintiff-Appellant,*

– v. –

CREDIT AGRICOLE CHEUVREUX NORTH AMERICA, INCORPORATED,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF and SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

SCHWARTZ & PERRY, LLP
*Attorneys for Plaintiff-Appellant*
295 Madison Avenue
New York, New York 10017
(212) 889-6565

## TABLE OF CONTENTS

**SUBJECT**                                                                      **PAGE**

TABLE OF AUTHORITIES                                                                iii

STATEMENT OF THE ISSUES PRESENTED                                                    1

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION                                                           1

STATEMENT OF THE CASE                                                                2

STATEMENT OF FACTS                                                                   4

SUMMARY OF ARGUMENT                                                                 11

THE REDUCED BURDEN OF SEXUAL HARASSMENT
VICTIMS IN OPPOSING SUMMARY JUDGMENT                                                12

ARGUMENT

POINT I      MIHALIK ESTABLISHES A CLAIM OF
             SEXUAL HARASSMENT UNDER THE
             NEW YORK CITY HUMAN RIGHTS LAW                                         15

    A.       The Williams Standard For Reviewing Claims
             Of Sexual Harassment Under The City Law                               15

        1.   The Restoration Act Requires A Broad
             Analysis For Claims Brought Under The
             City Law                                                               15

        2.   The Analysis Under The City Law Is Broader
             Than The Federal Standard, Which Permits
             A Level Of Discrimination To Exist                                     17

    B.       The Lower Court Failed To Apply The
             Williams Analysis                                                      21

C.    Mihalik Presents A Valid Claim Under
The <u>Williams</u> Analysis                  21

D.    The Lower Court Improperly Applied The
Narrow Affirmative Defense Of The City Law    31

E.    The Quid Pro Quo Analysis Is
Incompatible With The City Law            34

POINT II  THE LOWER COURT'S DISMISSAL
OF MIHALIK'S RETALIATION CLAIM
SHOULD SIMILARLY BE REVERSED      37

A.    Mihalik Establishes A Prima Facie Case
Of Retaliation                    38

    1.    Mihalik Engaged In Protected Activities
Of Which Cheuvreux Was Aware      38

    2.    Mihalik Suffered Adverse Employment
Action                        41

    3.    Peacock's Retaliation Was Causally
Connected To Mihalik Protesting
Sexual Harassment              43

B.    The Record Confirms That Cheuvreux's
Proffered Explanation Is A Pretext      47

CONCLUSION                            53

# TABLE OF AUTHORITIES

<u>**CASE**</u>                                                                 <u>**PAGE**</u>

<u>Albunio v. City of New York</u>,
    16 N.Y.3d 472 (2011)                                    1, 12, 16, 38,
                                                             40, 43, 46

<u>Aulicino v. New York City Dept. of Homeless Servs.</u>,
    580 F.3d 73 (2d Cir. 2009)                               14, 26, 46

<u>Brightman v. Prison Health Serv., Inc.</u>,
    62 A.D.3d 472 (1st Dept. 2009)                           16

<u>Carlton v. Mystic Transp., Inc.</u>,
    202 F.3d 129 (2d Cir. 2000)                              13

<u>Carrero v. New York City Hous. Auth.</u>,
    890 F.2d 569 (2d Cir. 1989)                              34

<u>Chertkova v. Connecticut Gen. Life Ins.</u>,
    92 F.3d 81 (2d Cir. 1996)                                31

<u>Cifra v. General Elec. Co.</u>,
    252 F.3d 205 (2d Cir. 2001)                              44, 46

<u>Danzer v. Norden Sys. Inc.</u>,
    151 F.3d 50 (2d Cir. 1998)                               14, 49

<u>Distasio v. Perkin Elmer Corp.</u>,
    157 F.3d 55 (2d Cir. 1998)                               13-14

<u>Duch v. Jakubek</u>,
    588 F.3d 757 (2d Cir. 2009)                              41

<u>Fairbrother v. Morrison</u>,
    412 F.3d 39 (2d Cir. 2005)                               28

Father Belle Cmty. Ctr. v. New York State Div. of Human Rights,
    221 A.D.2d 44 (4th Dept. 1996)         39

Faul v. Potter,
    355 Fed.Appx. 527 (2d Cir. 2009)        51-52

Feingold v. New York,
    366 F.3d 138 (2d Cir. 2004)         38

Ferrante v. American Lung Assoc.,
    90 N.Y.2d 623 (1997)         14

Gallagher v. Delaney,
    139 F.3d 338 (2d Cir. 1998)         32

Gordon v. New York City Board of Education,
    232 F.3d 111 (2d Cir. 2000)         47

Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.,
    252 F.3d 545 (2d Cir. 2001)        36, 45, 46

Gorzynksi v. Jetblue Airways Corp.,
    596 F.3d 93 (2d Cir. 2010)        30-31

Grant v. Bethlehem Steel Corp.,
    622 F.2d 43 (2d Cir. 1980)        36

Green v. Continuum Health Partners, Inc.,
    __ A.D.3d ___,
    930 N.Y.S.2d 449 (1st Dept. 2011)        20

Holcomb v. Iona College,
    521 F.3d 130 (2d Cir. 2008)        47

Ibok v. Securities Indus. Automation Corp.,
    369 Fed.Appx. 210 (2d Cir. 2010)        13, 48

Kaytor v. Electric Boat Corp.,
    609 F.3d 537 (2d Cir. 2010)          26, 30

Loeffler v. Staten Island University Hospital,
    582 F.3d 268 (2d Cir. 2009)          12-13, 28

Nelson v. HSBC Bank USA,
    __ A.D.3d __,
    929 N.Y.S.2d 259 (2d Dept. 2011)          21

Papelino v. Albany Coll. of Pharmacy of Union Univ.,
    633 F.3d 81 (2d Cir. 2011)          36

Patane v. Clark,
    508 F.3d 106 (2d Cir. 2007)          27-28

Petrosino v. Bell Atlantic,
    385 F.3d 210 (2d Cir. 2004)          27

Preda v. Nissho Iwai American Corp.,
    128 F.3d 789 (2d Cir. 1997)          43

Quinn v. Green Tree Credit Corp.,
    159 F.3d 759 (2d Cir. 1998)          37

Reed v. A.W. Lawrence & Co., Inc.,
    95 F.3d 1170 (2d Cir. 1996)          46

Richardson v. N.Y.S. Dept. of Corr. Serv.,
    180 F.3d 426 (2d Cir.1999)          13, 25

Rosen v. Thornburgh,
    928 F.2d 528 (2d Cir. 1991)          12-13

Schwapp v. Town of Avon,
    118 F.3d 106 (2d Cir. 1997)          31

Short v. Deutsche Bank Sec., Inc.,
        79 A.D.3d 503 (1st Dept. 2010)                    20-21

Speller v. Sears, Roebuck and Co.,
        100 N.Y.2d 38 (2003)                              47

Terry v. Ashcroft,
        336 F.3d 128 (2d Cir. 2003)                       44

Treglia v. Town of Manlius,
        313 F.3d 713 (2d Cir. 2002)                       36, 37, 44, 45

Weiss v. JPMorgan Chase & Co.,
        332 Fed.Appx. 659 (2d Cir. 2009)                  14, 48

Whidbee v. Garzarelli Food Specialties, Inc.,
        223 F.3d 62 (2d Cir. 2000)                        25, 28

Williams v. New York City Housing Auth.,
        61 A.D.3d 62 (1st Dept. 2009)                     *passim*

## STATUTES & OTHER AUTHORITIES

Administrative Code of the City of New York, Title 8, §8-107(7)    1,16,38,41-42

Administrative Code of the City of New York, Title 8, §8-130       15-16

Craig Gurian, A Return to Eyes on the Prize: Litigating
Under the Restored New York City Human Rights Law,
        33 FORDHAM URB. L.J. 255 (2006)                            16

## STATEMENT OF THE ISSUES PRESENTED

1.      Did the lower court fail to apply the analysis for sexual harassment cases brought under the New York City Human Rights Law following the Restoration Act of 2005 that the First Department clearly articulated in <u>Williams v. New York City Housing Authority</u>, 61 A.D.3d 62 (1st Dept. 2009), where the lower court erroneously found an "absence of any guidance on an alternate framework for applying the NYCHRL" and improperly applied the federal analysis?

2.      Did the lower court fail to construe Plaintiff's retaliation claim under the New York City Human Rights Law "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" as held by the New York State Court of Appeals in <u>Albunio v. City of New York</u>, 16 N.Y.3d 472, 477-78 (2011), where the lower court improperly made findings of fact and failed to view the facts in the light most favorable to the Plaintiff?

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Plaintiff-Appellant Renee Mihalik ("Mihalik") commenced this action against Defendant-Appellee Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux") in the Supreme Court of New York, New York County, on January 21, 2009, asserting claims of gender discrimination and retaliation in violation of Chapter 1, Title §8-107(1)(a) and Title §8-107(7) of the Administrative Code of New York City

("the New York City Human Rights Law" or "City Law"). Mihalik did not assert any claims under federal or state human rights laws. Cheuvreux removed this action to the Southern District of New York on February 11, 2009, based on diversity.

On July 28, 2011, the Honorable Deborah A. Batts of the Southern District of New York granted Cheuvreux's motion for summary judgment, which was a final order and was not reported, though it was published by Lexis as 2011 U.S. Dist. LEXIS 84790 (S.D.N.Y. July 28, 2011). Mihalik filed and served a Notice of Appeal on August 17, 2011. On August 29, 2011, Mihalik filed and served a Civil Pre-Argument Statement, Civil Appeal Transcript Information and Acknowledgment and Notice of Appearance. On September 8, 2011, the Court filed an Order setting November 29, 2011, as the brief/joint appendix filing date. This Court has jurisdiction pursuant to 28 U.S.C. §1291 and Federal Rule of Appellate Procedure 3.

## STATEMENT OF THE CASE

From the time she commenced her employment with Cheuvreux in June 2007, Mihalik was sexually harassed by Ian Peacock ("Peacock"), the CEO of Cheuvreux and the most senior person in the New York City office, where Mihalik worked. (R. CA-491).[1] Mihalik and the other women in the office were subjected to humiliating

---

[1] Citations to the Non-Confidential Appendix, Volumes I and II, are cited as "A-__;" citations to the Confidential Appendix, Volumes I, II and III, are cited as "CA-__; and citations to the Special Appendix, which contains the decision of the

comments about their bodies and dress, Peacock permitted the men to view pornography in the workplace on a regular basis and Mihalik was told to "respect" a newly hired employee because he was "male and more powerful" than she was. (R. A-99-100, A-102). Peacock even went so far as to blatantly proposition Mihalik on two separate occasions in December 2007, both of which Mihalik rejected. (R. A-243).

After Mihalik made clear that she would not give in to Peacock's sexual demands, Peacock became increasingly hostile towards Mihalik, degrading her in front of her co-workers and baselessly attacking her performance. (R. A-247, A-243). Mihalik was ultimately terminated moments after she further protested Peacock's unlawful conduct. (R. A-266-270).

The lower court improperly granted summary judgment on Mihalik's gender discrimination and retaliation claims, failing to acknowledge the broad intent and purpose of the New York City Human Rights Law, as articulated by the First Department in Williams v. New York City Housing Authority, 61 A.D.3d 62 (1st Dept. 2009). The lower court was only able to grant summary judgment by ignoring the New York City Human Rights Law and by making credibility determinations that are the sole province of the a jury.

―――――――――――――――

lower court, are cited as "SPA-__."

## STATEMENT OF FACTS

Mihalik was recruited to join Cheuvreux in June 2007, having had ten years of experience in the financial community. (R. A-206-207, CA-575). Cheuvreux, a subsidiary of the Credit Agricole Group, a French financial institution, is a full-service broker-dealer engaged in performing customized research, sales and execution services for international clients. (R. A-206-207, CA-575).

At the time Mihalik was interviewed, Cheuvreux was seeking an individual to assist it in expanding its Alternative Execution Services to the United States market. (R. A-205, CA-576). Cheuvreux had previously focused on the European market using its status as a subsidiary of a French bank to obtain clients. Mihalik was part of a new endeavor for Cheuvreux in the United States market. (R. A-205-206, CA-576).

Mihalik was interviewed by Ian Peacock ("Peacock"), the CEO of Cheuvreux, among others. (R. A-204-205, CA-576). Peacock stated at the time that he felt Mihalik "would be a great asset, and fit to the team" (R. CA-576, CA-600, CA-620). Peacock testified that Mihalik's references described her as "knowledgeable" and "diligent" and that she went "above and beyond." (R. CA-577, CA-597, CA-625).

Mihalik was hired into a work environment where women were viewed as sexual objects. At the time Mihalik was hired, there was only one other woman on

4

Mihalik's sales team, in a support position.  Peacock sent an email to this woman following Mihalik's hire, stating "another lady on the team for you."  (R. CA-577, CA-598, CA-630).  Khaled Beydoun ("Beydoun"), Head of Research Sales and now the CEO of Cheuvreux North America, sent an email regarding Mihalik's hiring that stated, "New girl just hired at Cheuvreux (5'6 good shape) . . ."  (R. CA-577, CA-628).

Soon after Mihalik started at Cheuvreux, Peacock made it clear that his interest in Mihalik was far more than professional.  Peacock asked Mihalik to arrange her travel to Europe to coincide with his so that, Peacock said, they could travel together and "enjoy each other" and "get to know each other," clearly indicating that he desired to have a sexual relationship with Mihalik. (R. A-224, CA-580).  Peacock regularly connected Mihalik's appearance to her ability to perform her job by making comments such as "You should dress like that every day.  You might get more clients, in turn." (R. A-236, CA-579-580).  Peacock also made comments to Mihalik such as: "You look very sexy today" and "Oh, I really like those shoes," insinuating that Mihalik was promiscuous because she wore red shoes.  (R. A-237, CA-580). Peacock humiliated Mihalik by asking her if she "fancied dogging,"[2] which was a reference

---

[2]  The lower court did not identify this allegation directly, softening it by stating that Peacock merely asked Mihalik if she "enjoyed a particular sexual position."  (R. SPA-7).

to a degrading sexual situation. (R. A-238, CA-580).  Peacock would also refer to

Mihalik as a "cougar" (R. A-251), which the lower court recognized to be a "middle-

aged woman seeking a romantic relationship with a younger man."  (R. SPA-6 n.2).

Peacock also made inappropriate comments about Mihalik's personal life, such as

"How old are you?" and "Why aren't you married?"  (R. CA-579).

Peacock made his comments on a regular basis, despite Mihalik's protests. (R.

A-246, CA-579).  Mihalik could not escape or avoid Peacock, since she sat right next

to him on the trading desk.  (R. CA-599).  Peacock humiliated Mihalik by degrading

her in front of her peers, which, given Peacock's position as the CEO of Cheuvreux,

essentially destroyed her credibility within the company.  (R. A-247, CA-584-585).

Mihalik repeatedly informed Peacock that his sexual comments and conduct

were inappropriate and unwelcome, but he continued, nonetheless.  (R. A-246, CA-

581-582).  Mihalik began to change how she dressed in order to minimize Peacock's

interest, but this only led to Peacock complaining that Mihalik was wearing pant suits

and flat shoes instead of skirts and high heels.  (R. A-237, CA-581).

It is undisputed that for much of the time that Mihalik was subjected to

Peacock's sexual harassment, Peacock was responsible for Human Resources.  (R.

CA-582, CA-631, CA-632).  Mihalik complained about Peacock to Dave Zack

("Zack"), the Chief Compliance Officer of Cheuvreux, yet Zack failed to take any

action whatsoever to address her complaint, telling Mihalik, "If you complain, more than likely he's going to get angry and you'll probably be let go." (R. A-398, A-249-51, CA-582-583, CA-611, CA-616, CA-786-787).

Peacock created an environment where the men in the office infused sex into the workplace. The men would frequently discuss the female employees in the office, including Mihalik, and state who they thought looked best on any given day. (R. CA-578). Peacock and the other men in the office would regularly talk about going to strip clubs and trying to pick up models. (R. A-229, CA-578). Additionally, Peacock commented to Aurelie Drexler ("Drexler"), who was a new mother and was nursing, "Oh, there you are, I couldn't see you your . . . breasts were in the way." (R. CA-578-579). Peacock also said to Drexler, "If this job doesn't work out, Scores is hiring," referring to a strip club. (R. CA-578-579).

Peacock permitted the male employees to view pornography on their computers, send pornographic images to each other and discuss the images in front of Mihalik. (R. CA-578). Revealingly, in his Declaration, Peacock does not deny that he viewed at least one explicit pornographic image on his computer and that he forwarded it to the male members of the sales team. (R. CA-496, CA-229-30). On one occasion, Mihalik observed Peacock laughing at something on his computer which she could not see. (R. A-225). Mihalik asked Peacock what was so funny and

7

Peacock showed Mihalik that he was looking at a pornographic image on his computer screen, which was disgusting and unwelcome to her. (R. A-225-26).

Peacock told Mihalik that she should "respect" a newly hired employee because he was "male and more powerful" than she was. (R. A-232, CA-589). Revealingly, this allegation is not mentioned in Judge Batts' decision.

Peacock, who ran the office where Mihalik worked, flat-out propositioned her for sex on two separate occasions in December 2007. (R. A-293, CA-580, CA-584). Mihalik rejected Peacock each time, telling him that she had no interest in a personal relationship with him and reminding him that he is married. (R. A-243, CA-584). Peacock appeared insulted and angered by Mihalik's rejection of him. (R. A-243, CA-584). On one of the two occasions, Peacock invited Mihalik to have a drink with him after work and stay overnight with him in a flat that he claimed was maintained by the company, but which Cheuvreux says it does not maintain. (R. A-243). Peacock's propositioning Mihalik to return to the non-existent "company flat" confirms that he was using the authority given to him by Cheuvreux to pressure Mihalik into sleeping with him.

After Mihalik rejected Peacock's sexual advances in December 2007, his behavior and demeanor towards her changed dramatically. (R. A-228, CA-584). Peacock began to treat Mihalik with open hostility and disdain. (R. A-247, CA-584).

Peacock even stopped sitting next to Mihalik on the trading desk and instead retreated to his private office, which he had rarely used prior to Mihalik's rejection. (R. A-228, CA-584).

The hostile and aggressive manner in which Peacock spoke to Mihalik following her rejection of him included, among other things, telling Mihalik that she has "no fucking clue" in meetings in front of her male counterparts on several occasions (R. A-247, CA-585); that she "add[s] nothing of value;" and commenting regarding Mihalik's work that "a fucking 12-year old could have written this." (R. A-263, CA-585).

Peacock's conduct indicated that he wanted Mihalik out of the workplace. The terms of Mihalik's offer letter, however, stated that if Mihalik was terminated without cause, she was entitled to severance. (R. CA-588, CA-634). As a result, Peacock set out to manufacture a basis to terminate Mihalik for cause.

Despite the obstacles put in front of her, Mihalik performed well. Since she was responsible for Cheuvreux's new venture in the United States, it was not expected that she would be able to generate many sales. (R. CA-592, CA-601). Peacock testified that Mihalik did not have a "hard target" on sales because "she was coming from a standing start" (R. CA-601), which meant that Mihalik would be judged based on building relationships with clients, not on the sales she generated.

9

Zack testified that it could take up to ten months for a new client to generate revenue. (R. CA-783).

Further confirming Mihalik's positive performance is the fact that she received a bonus of $75,000 in March 2008. (R. CA-590, CA-634). Cheuvreux had the right to withhold this bonus if Mihalik was not performing the essential functions of her position, yet the company did not challenge this bonus. (R. CA-590, CA-634).

When Mihalik did not leave, Peacock intensified his efforts to force Mihalik out of the workplace. On March 20, 2008, Peacock directed Mihalik to perform a "cold calling" assignment that required Mihalik to have 140 "quality" conversations in 7 days, with Peacock being the arbiter of what was "quality." (R. A-260, CA-586, CA-681). Mihalik tried to meet Peacock's unreasonable demand, while satisfying all of her other duties. Peacock acknowledged at his deposition that the cold calling assignment was "supplementary" to Mihalik's other responsibilities. (R. CA-606).

On April 10, 2008, Mihalik obtained another new client for Cheuvreux. (R. A-266, CA-586, CA-640). When Mihalik emailed Peacock to tell him about this positive development, Peacock replied by demanding Mihalik meet with him in his office later that day. In his Declaration, Peacock stated that at this meeting, he planned to speak with Mihalik about the cold-calling assignment and, "if her explanation was inadequate, to give her the written warning," specifically omitting

10

any intention of terminating Mihalik. (R. CA-495). When Mihalik entered Peacock's office, Peacock threw the cold calling assignment email at her, began yelling at her and handed her a document entitled "Formal Warning," which was dated the following day, April 11, 2008. (R. A-267, CA-641).

While Mihalik was reading the warning, Peacock suddenly said "This is not working out," though Peacock did not terminate Mihalik or indicate that he was going to do so. (R. A-268-69, CA-587). Mihalik stated, "What's not working out? Me and you or me at the company?," obviously referring to her rejection of Peacock's sexual advances. (R. A-268, CA-587). Peacock responded by cursing at Mihalik and firing her, saying, "I'm getting rid of you." (R. A-269-70, CA-587). Peacock acknowledged that Mihalik was not terminated for poor performance. (R. CA-588, CA-820).

## SUMMARY OF ARGUMENT

It is remarkable that the lower court granted summary judgment in a case where the lower court found that the plaintiff made "numerous allegations of sexually-related conduct" (R. SPA-5), was subjected to "certainly boorish and offensive" conduct (R. SPA-26). A jury could certainly find that because Mihalik was forced to work in an environment filled with unwelcome sexual advances and pornography, comments about her body and clothing to the point that Mihalik actually began to change how she dressed, and because Mihalik was told by her supervisor that she

should "respect" a newly hired employee because he was "male and more powerful" than she, that the terms and conditions of her employment were less favorable because of her gender. The lower court was only able to grant summary judgment by failing to properly apply the broad standards of the New York City Human Rights Law, as articulated in Williams v. New York City Housing Authority, 61 A.D.3d 62 (1st Dept. 2009).

The lower court improperly granted summary judgment on Mihalik's retaliation claim, failing to construe the City law broadly "to the extent that such a construction is reasonably possible." Albunio, 16 N.Y.3d at 477-78. Instead, the lower court improperly accepted Cheuvreux's reasons for terminating Mihalik, even though doing so required the lower court to make credibility determinations. The impact of the lower court's decision is to disregard the unique language and goals of the New York City Human Rights Law mandated by the City Council though the Restoration Act.

## THE REDUCED BURDEN OF SEXUAL HARASSMENT VICTIMS IN OPPOSING SUMMARY JUDGMENT

It is not surprising that Cheuvreux denies that it discriminated against Mihalik. As this Court held in Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991):[3]

---

[3] Mihalik properly relies on federal authority to demonstrate the floor of what is protected under the human rights laws. As this Court recognized in Loeffler v. Staten Island University Hospital, 582 F.3d 268, 278 (2d Cir. 2009), quoting the Restoration Act, "There is now a one-way ratchet: 'Interpretations of

12

> [E]mployment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a "smoking gun," such as a notation in an employee's personnel file, attesting to a discriminatory intent . . . Consequently, in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate.

See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000) (noting that "an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file.").

Courts are directed to be particularly cautious when deciding summary judgment in sexual harassment cases. See Richardson v. N.Y.S. Dept. of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999) (recognizing that analysis of a sexual harassment claim is "a mixed question of law and fact" involving "the application of a legal standard to a particular set of facts . . . Such mixed questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue."); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63 (2d Cir. 1998) ("Summary judgment should be used sparingly when, as

---

New York state or federal statues with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall.'" See also Ibok v. Securities Indus. Automation Corp., 369 Fed.Appx. 210, 214 (2d Cir. 2010) (recognizing that the City Law "must be applied at least as broadly as its federal counterpart.").

is often the case in sexual harassment claims, state of mind or intent are at issue.").

The Second Circuit reviews "a grant of summary judgment de novo and [will] affirm only if the record, viewed in the light most favorable to the non-moving party and drawing all inferences in favor of the non-moving party, reveals no genuine issue of material fact." Weiss v. JPMorgan Chase & Co., 332 Fed.Appx. 659, 661 (2d Cir. 2009). Mihalik was not required to persuade the lower court that she would win at trial in order to survive summary judgment. All Mihalik was required to do was demonstrate that are genuine issues of material fact in dispute. See Danzer v. Norden Sys. Inc., 151 F.3d 50, 54 (2d Cir. 1998) (holding that as "our courts have made clear, summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial."); Ferrante v. American Lung Assoc., 90 N.Y.2d 623, 630 (1997) ("Generally, a plaintiff is not required to *prove* his claim to defeat summary judgment.") (emphasis in original).

A court must not only view the facts in the light most favorable to the plaintiff, but must also view those facts using an analysis most favorable to the plaintiff. See Aulicino v. New York City Dept. of Homeless Servs., 580 F.3d 73, 83 (2d Cir. 2009) (reversing summary judgment where the analysis of the lower court "dilute[d]" the strength of the plaintiff's claims and did not "appear to us to consider the record evidence *in the light most favorable to the plaintiff,* as it is required to do.").

14

**ARGUMENT**

**POINT I**

**MIHALIK ESTABLISHES A CLAIM OF SEXUAL HARASSMENT
UNDER THE NEW YORK CITY HUMAN RIGHTS LAW**

The lower court, in analyzing Mihalik's sexual harassment claims under the

City Law, failed to properly apply the standard set forth by the First Department in

Williams v. New York City Housing Authority, 61 A.D.3d 62 (1st Dept. 2009).

**A.     The *Williams* Standard For Reviewing Claims
Of Sexual Harassment Under The City Law**

In Williams, the First Department held that a plaintiff asserting a claim of

sexual harassment under the City Law must establish only that "she has been treated

less well than other employees because of her gender." Id. at 78.

*1.     The Restoration Act Requires A Broader Analysis
For Claims Brought Under The City Law*

The Williams court addressed, for the first time, the Local Civil Rights

Restoration Act of 2005, Local Law No. 85 of City of New York (2005) (hereinafter

referred to as "the Restoration Act"), which amended the City Law to state:

> The provisions of this title shall be construed liberally for
> the accomplishment of the uniquely broad and remedial
> purposes thereof, regardless of whether federal or New
> York State civil and human rights laws, including those
> laws with provisions comparably-worded to provisions of
> this title have been so construed.

15

Administrative Code of the City of New York, Title 8, §8-130; see also Albunio, 16 N.Y.3d at 477-78 (holding that "we must construe Administrative Code §8-107(7), like other provisions of the City's Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."); Brightman v. Prison Health Serv., Inc., 62 A.D.3d 472,472 (1st Dept. 2009) (noting that the New York City Human Rights Law "is more liberal than either its state or federal counterpart.").

The Williams court recognized that "the intent of the Restoration Act was to 'ensure construction of the City's human rights law in line with the purposes of the fundamental amendments to the law enacted in 1991,' and to reverse the pattern of judicial decisions that had improvidently 'narrowed the scope of the law's protections.'" 61 A.D.3d at 67, quoting Report of Committee on General Welfare, 2005 N.Y. City Legis. Ann., at 536.

The Restoration Act was a "declaration of independence" that was to redefine the scope of what was actionable under the City Law, "including the parameters of actionable sexual harassment." 61 A.D.3d at 78 n.25, quoting Craig Gurian, A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33 FORDHAM URB. L.J. 255, 258 (2006). The Williams court held that, with the Restoration Act, the City Council made an "explicit legislative policy choice" that

16

"courts be sensitive to the distinctive language, purposes, and method analysis required by the City HRL, requiring an analysis more stringent than that called for under either Title VII or the State HRL."  61 A.D.3d at 65-66.

The First Department reminded the judiciary that "whether or not [the City Council's] desire is wise as a matter of legislative policy, our judicial function is to give force to legislative decisions." Id. at 68-69.  As the court noted in Williams, "It is not that frequent that legislation is enacted to remind, empower, and require judges to fulfill their essential role as active and zealous agents for the vindication of the purposes of the law." Id. at 79, n.28.

As a result of the Restoration Act, courts analyzing claims under the City Law must first ask, "What interpretation would fulfill the broad and remedial purposes of the City's Human Rights Law?" Id. at 74-75 (citations omitted).  The court also cited testimony that "in the end, regardless of federal interpretations, the primary task of a judge hearing a City Human Rights Law claim is to find the interpretation for the City Law that most robustly furthers the purpose of the City Statute." Id. at 75 n.20.

> 2.    *The Analysis Under The City Law Is Broader*
> *Than The Federal Standard, Which Permits*
> *A Level Of Discrimination To Exist*

The Williams court turned to the question of what analysis should apply to claims of sexual harassment brought under the City Law.  The court rejected adopting

17

the "severe or pervasive" test that exists under federal law because the court determined it violated the policy expressed by the City Council.  See id. at 75-76. The First Department found that the federal analysis, by protecting only against conduct that is "severe or pervasive," does not go far enough to satisfy the broad outlines of the City Law.  The federal standard, the court found, "says bluntly" that an employee who is experiencing unwanted gender-based conduct that is not severe or pervasive "is experiencing essentially the same terms and conditions of employment as the worker whose employer has created a workplace free of unwanted gender-based conduct."  Id.  The court recognized that "the two workers described above do not have the same terms and conditions of employment."  Id. at 76.

The Williams court concluded that, following the Restoration Act, "[t]he City HRL is now explicitly designed to be broader and more remedial than the [United States] Supreme Court's 'middle ground,' a test that had sanctioned a significant spectrum of conduct demeaning to women."  Id.  Contrary to the federal analysis, the court held, the Restoration Act directed that a plaintiff who presents a claim that falls within the "wide spectrum of harassment cases," between the "severe or pervasive" standard and a "merely" offensive utterance, be permitted to reach a jury.

The Williams court, therefore, formulated an analysis that would accord with the City Law's goal of "zero tolerance" of discrimination, noting that both the

language of the City Law and the Committee Report accompanying the Restoration Act "say the analysis of the City HRL must be guided by the need to make sure that discrimination plays *no* role" in an employee's workplace. Id. (emphasis in original). The court found this principle to be "much more consistent with a rule by which liability is normally determined simply by the existence of unwanted gender-based conduct." Id.

The First Department identified the straightforward analysis demanded by the City Law:

> For HRL liability, therefore, the primary issue for a trier of fact in harassment cases, as in other terms-and-conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender. At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred. Id. at 78.

The court found that this rule, "by which liability is normally determined simply by the existence of differential treatment," both "maximizes the law's deterrent effect" and "better serves the statute." Id. at 76-77.

The First Department recognized that this standard is so broad that "a single comment" can establish a claim under the City Law, holding, "One can easily imagine a single comment that objectifies women being made in circumstances where that

19

comment would, for example, signal views about the role of women in the workplace and be actionable."  61 A.D.3d at 79 n.28.

The court acknowledged the Restoration Act's admonition that, when considering motions for summary judgment, courts must err on the side of permitting claims to go to a jury.  The court noted that the question of whether a woman was treated "less well" or not should rarely be determined on summary judgment and that summary judgment should be denied "if there exist triable issues of fact as to whether such conduct occurred."  Id. at 78.  The Williams court cautioned courts against "shortcuts" like summary judgment, recognizing that "the City HRL has been structured to emphasize the vindication of civil rights over shortcuts that reduce litigation volume . . . " Id. at 79.

The analysis for sexual harassment claims brought under the City Law, therefore, is well-settled.  The First Department has subsequently affirmed and applied the Williams standard to claims brought under the City Law.  See, e.g., Green v. Continuum Health Partners, Inc., __ A.D.3d ___, 930 N.Y.S.2d 449, 450 (1st Dept. 2011) (analyzing plaintiff's claims on whether "he was treated less well than other employees because of his gender."); Short v. Deutsche Bank Sec., Inc., 79 A.D.3d 503, 505-06 (1st Dept. 2010) ("A claim under [the City Law] lies when it is 'proven by a preponderance of the evidence that she [the plaintiff] has been treated less well

20

than other employees because of her gender."), quoting Williams, 61 A.D.3d at 78.

The Second Department adopted Williams in Nelson v. HSBC Bank USA, __ A.D.3d __, 929 N.Y.S.2d 259 (2d Dept. 2011).

## B.  The Lower Court Failed To Apply The *Williams* Analysis

Even though the lower court cited Williams in its decision, it clearly and deliberately chose to ignore the Williams standard for sexual harassment claims under the City Law, such as this.  This fact is confirmed by the lower court's finding that there is an "absence of any guidance on an alternate framework for applying the NYCHRL" (R. SPA-15), despite the analysis that Williams clearly establishes.

Instead of recognizing that Williams created an entirely new analysis, the lower court improperly utilized the federal analysis and relegated Williams to a series of "special considerations."  (R. SPA-16).  The lower court failed to ask, as it must, "What interpretation would fulfill the broad and remedial purposes of the City's Human Rights Law?"  Williams, 61 A.D.3d at 74-75.  The impact of the lower court's decision is to dilute the City Law and effectively nullify Williams.  The lower court must be reversed so that the district courts of this Circuit properly apply the City Law.

## C.  Mihalik Presents A Valid Claim Under The *Williams* Analysis

Mihalik certainly satisfies the Williams standard that she "has been treated less well than other employees because of her gender."  Even the lower court recognized

that Mihalik made "numerous allegations of sexually-related conduct at Cheuvreux" (R. SPA- 5) and that the conduct Mihalik alleges was "certainly boorish and offensive . . . " (R. SPA-26). The abusive and degrading environment that Mihalik describes would be actionable under any standard, including the federal standard, and is certainly actionable under the City Law.

From the commencement of her employment, it became clear that Peacock's true goal was to have a personal, sexual relationship with Mihalik. Peacock, who was married, progressed from intrusive personal questions, comments about Mihalik's body and dress, to telling Mihalik that she should travel with him so they could "get to know each other" and "enjoy each other." (R. A-224, CA-580). Peacock went so far as to flat-out proposition Mihalik her for sex, inviting her to return to the "company flat," confirming that he was using the authority given to him by Cheuvreux to pressure Mihalik into sleeping with him.[4] (R. A-243, CA-580).

The lower court improperly characterized Peacock's sexual advances as "two isolated instances of propositioning." (R. SPA-26). A fact-finder could certainly determine that Mihalik should not have been subjected to unwelcome propositions for sex as part of her job. A jury could further find that Peacock viewed Mihalik's

---

[4] The fact that Cheuvreux says that it does not maintain a "company flat" (R. CA-492) only shows Peacock's manipulative and unlawful abuse of the authority given to him by Cheuvreux.

submission to his sexual desires to be a term of her employment because, when she refused, he sought to and did remove her from the workplace. The lower court usurped the role of the fact-finder and should be reversed.

In addition to his propositions, Peacock repeatedly subjected Mihalik to degrading and humiliating comments about her body and dress in the workplace, such as repeatedly telling Mihalik, "You look very sexy today," "Why aren't you married?" and "Oh, I really like those shoes," referring to a pair of red shoes and insinuating that Mihalik was promiscuous. (R. A-237, CA-580). Peacock's comments were not simply random remarks, but demonstrated his belief that women in the workplace were sexual objects, telling her on more than one occasion, "you should dress like that every day, you might get more clients in turn." (R. A-236, CA-579-580). Mihalik was so impacted by Peacock's harassment that she actually began to change how she dressed. (R. A-237, CA-581). This only led to Peacock complaining that Mihalik was wearing pant suits and flat shoes instead of skirts and high heels. (R. A-242). Clearly, this is the exact kind of conduct that the City Law was intended to protect against.

Peacock's telling Mihalik that she should "respect" a newly hired employee because he was "male and more powerful" than she was (R. A-99-100, A-102), exemplifies the "single comment" that the First Department held in Williams could

"easily" present an actionable claim, since Peacock telling her that she should be submissive to another employee because he is "male and more powerful" signals his discriminatory view about the role of women in the workplace. 61 A.D.3d at 79 n.28.

The lower court's reference to Peacock's conduct as "isolated" and "sporadic" (R. A-466) is a back-handed reference to the federal standard of "pervasiveness." Williams specifically rejected this analysis in favor of a standard that found "a single comment" to be actionable. Id. In any event, a jury could find that Peacock's conduct was far from "sporadic."

Revealingly, Peacock does not deny sexually harassing Mihalik, stating, in his Declaration that he did not "perceive" that he engaged in sexual harassment. (R. CA-491, CA-574). Moreover, Peacock, in his Declaration, did not deny propositioning Mihalik. (R. CA-492). Because there are triable issues of fact as to whether this conduct occurred in this case, summary judgment should be denied.

The lower court acknowledged that Peacock's comments "are certainly boorish and offensive," but dismissed them as "not so grave or objectionable that they would have altered the terms and conditions of Mihalik's employment." (R. SPA-26). The fact is, under the City Law, unwanted gender discrimination inherently alters the terms and conditions of the victim's employment. As the First Department recognized in Williams, "It would be difficult to find a worker who viewed a job

24

where she knew she would have to cope with unwanted gender-based conduct (except what is severe or pervasive) as equivalent to one free of unwanted gender-based conduct." Id. at 76 n.22. Peacock's harassment, as well as the harassment by others that he permitted, added an entirely new and less favorable aspect to the terms and conditions of Mihalik's employment.

The lower court essentially found that Mihalik was not sexually harassed "enough," a standard that the Restoration Act overruled. Id. at 77-78 (citing testimony during the deliberations of the Restoration Act that noted that "women who have been sexually harassed are routinely thrown out of court without getting a chance to have a jury hear their claims because a judge uses the federal standard that they have not been harassed enough").

Even under the federal analysis, Mihalik need not prove that her work environment was "unendurable" or "intolerable." As the Second Circuit held in Whidbee v. Garzarelli Food Specialties, Inc., reversing summary judgment, "The bar is not set so high." 223 F.3d 62, 70 (2d Cir. 2000); see also Richardson, 180 F.3d at 439 ("There is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.").

25

The fact that Peacock stopped his sexual comments and propositions of Mihalik after she clearly rejected him in December 2007 does not detract in any way from the hostility and harassment that Mihalik had endured through that period. The lower court, therefore, had no basis to rely on the fact that "Plaintiff does not contend that any further comments or intrusive behavior took place during the four months afterwards" (R. SPA-26) in granting summary judgment. The lower court failed to utilize an analysis most favorable to Mihalik. See Aulicino, 580 F.3d at 83.

Additionally, Peacock created and permitted an environment where women were sexual objects. The men in the office regularly commented on the appearance of the women in the office, saying who they thought looked best on any given day, and talked about going to strip clubs. (R. A-229, CA-578). When Mihalik was hired, Peacock sent an email to the only other woman on the sales team, who was in a support position, stating "another lady on the team for you." (R. CA-577, CA-598, CA-630). Peacock also said to Drexler, a new mother who was nursing, "Oh, there you are, I couldn't see you . . . your breasts were in the way" and, "If this job doesn't work out, Scores is hiring," inappropriately referring to a strip club. (R. CA-579). See Kaytor v. Electric Boat Corp., 609 F.3d 537, 548 (2d Cir. 2010) (finding that the lower court, in assessing a hostile environment, improperly disregarded evidence "such as [the perpetrator] making fun of other women and discussing their bodies");

26

Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) (reversing summary judgment because "a reasonable jury could conclude that the persistent sexually offensive remarks at the Edgewater Garage and the graffiti at outdoor work sites were particularly insulting to women because these actions case women in a demeaning role: as objects of sex-based ridicule and subjects for sexual exploitation."). The record shows that from the time she was hired, Mihalik was viewed as a sexual objected, as confirmed by the fact that Beydoun, now the CEO of Cheuvreux North America, stated an email following Mihalik's hire, "New girl just hired at Cheuvreux (5'6 good shape) . . . "  (R. CA-229, CA-577).

The fact that Mihalik was subjected to a workplace where men were permitted to regularly view pornography also demonstrates that she was treated less well because of her gender.  Pornography was so rampant in Cheuvreux's workplace that Mihalik saw it on the computers of her male colleagues approximately 10-15 times in the first six months of her employment.  (R. A-226-227, CA-578).  Peacock, in his Declaration, did not deny that he viewed at least one explicit pornographic image and that he forwarded it to the male members of the sales team. (R. CA-496, CA-578).

The Second Circuit has repeatedly recognized the impact pornography can have on a woman's work environment.  In Patane v. Clark, 508 F.3d 106, 114 (2d Cir. 2007), the plaintiff alleged that she regularly saw her supervisor watching

27

pornographic videos.  The Second Circuit reversed summary judgment, finding:

> This Court has specifically recognized that the mere presence of pornography in a workplace can alter the "status" of women therein and is relevant to assessing the objective hostility of the environment.

Id.; Fairbrother v. Morrison, 412 F.3d 39, 50-51 (2d Cir. 2005) (reversing summary judgment where pornography was present in the plaintiff's workplace).  Given this "floor" of federal law, Mihalik's claims certainly meet the broad standards of the City Law.  See Loeffler, 582 F.3d at 278.

The lower court tried to distinguish Patane because, in that case, the Second Circuit noted that, in addition to her supervisor viewing pornography, the plaintiff had also handled pornographic videotapes and saw that pornography had been viewed on her computer.  However, these additional facts added to the hostility in the plaintiff's workplace and do not detract from the Court's recognition that "the mere presence" of pornography can impact a work environment.  See Whidbee, 223 F.3d at 70 ("We have reminded district courts, however, that the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.") (citation omitted).  Furthermore, the Court in Patane viewed the pornography "[c]ombined with Plaintiff's other allegations . . . " Id.  In this case, when Mihalik's allegations regarding pornography are combined with her other allegations, including

28

Peacock's sexual advances, comments about her body and dress and telling her to "respect" an employee because he was "male and more powerful," it is clear that summary judgment should have been denied.

The lower court completely distorted the facts by making it appear as if Mihalik asked to view pornography – which she did not. Mihalik's facts, which must be taken as true, are that Mihalik saw Peacock laughing at his screen and, not knowing what he was looking at, asked Peacock what was so funny. (R. A-226-29). Peacock then revealed that he was viewing pornography, which was unwelcome to Mihalik. (R. A-225-26). The lower court's blatant misrepresentation – that "Mihalik concedes that she asked to view the images in question on at least one occasion" (R. A-465) – demonstrates how it viewed the facts in Cheuvreux's favor and improperly granted summary judgment. If anything, Mihalik not being able to ask her supervisor what he was laughing at without the risk of being exposed to pornography confirms the less favorable terms and conditions of her employment.

The lower court improperly criticized Mihalik for presenting "no details about the circumstances of the other occasions" of pornography. As a preliminary matter, it was improper for the lower court to expect Mihalik to identify the specifics of the pornography she witnessed to defeat summary judgment. The lower court's criticism that Mihalik only detailed one instance (R. SPA-25), which Peacock concedes

29

occurred, demonstrates that the lower court improperly looked to the severity of the conduct, a component of the federal analysis.

In any event, Mihalik need not recall details of each act of harassment to survive summary judgment. As this Court held in Kaytor, 609 F.3d at 550, "Although Kaytor at her deposition could not recall dates or details of other instances, her testimony that in fact there were many such instances would be admissible at trial," and noted that the defendant's challenges to plaintiff's memory "is a matter for the factfinder at trial . . . and the district court was not entitled to question the credibility of Kaytor's testimony that there were many such instances." In this case, the lower court's criticisms go to the weight of the evidence, so that, as in Kaytor, summary judgment was not proper.

Viewing the totality of Mihalik's work environment, which included sexual comments directed at her and other women, pornography in the workplace and her supervisor making sexual advances to her, a jury could certainly find that Mihalik was treated less well because of her gender. As this Court held in Gorzynksi v. Jetblue Airways Corp., 596 F.3d 93 (2d Cir. 2010), reversing summary judgment:

> Assuming arguendo that no single one of the comments or instances of physical conduct was sufficiently egregious on its own, when taken together they do describe a work environment in which a jury could find that men, including [plaintiff's] supervisor, were able to – and did at will –

30

> comment inappropriately on women as sexual objects. The
> evidence does not reveal a 'mere offensive utterance,' but
> a pattern in which female employees such as [plaintiff]
> could expect sexual remarks and other harassment at any
> time. Id. at 102.

See also Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) ("The district

court's failure to consider the totality of the circumstances in this case, including

selective treatment of the evidence in the record, was error and necessitates

reversal."); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 90 (2d Cir.

1996) (noting that "the effect of a number of adverse conditions in the workplace is

cumulative.").

On these facts, the lower court should not have granted summary judgment

under the City Law, as a jury could clearly find that Mihalik was treated less well

because of her employment. The lower court's decision was a distortion of not only

the City Law, but also of the clear precedent of this Circuit, and must be reversed.

**D.    The Lower Court Improperly Applied The**
**Narrow Affirmative Defense Of The City Law**

The lower court distorted the narrow affirmative defense that the First

Department recognized in Williams. The Williams court only discussed the

affirmative defense after devoting significant efforts to narrowly define it, holding:

> Our task, however, is not yet completed because, while the
> City HRL has been structured to emphasize the vindication

31

of civil rights over shortcuts that reduce litigation volume, we recognize that the broader purposes of the City HRL do not connote an intention that the law operate as a "general civility code." The way to avoid this result is not by establishing an overly restrictive "severe or pervasive" bar, but by recognizing an affirmative defense whereby defendants can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider "petty slights and trivial inconveniences." 61 A.D.3d at 79-80.

The First Department clarified that this affirmative defense was intended to "narrowly target concerns about truly insubstantial cases, while at the same time avoiding improperly giving license to the broad range of conduct that falls between 'severe or pervasive' on the one hand and 'petty slights and trivial inconveniences' on the other." Id. The Williams court, therefore, recognized that cases falling under the affirmative defense is a very narrow portion of the "wide spectrum" of sexual harassment cases.

Furthermore, the Williams court held that the question of whether or not a defendant proves the affirmative defense is best left to a jury. Citing the Second Circuit, the court noted that "in general, 'a jury made up of a cross section of our heterogenous communities provides the should be characterized as sexual harassment and retaliation.'" Id., quoting Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir. 1998). Any reasonable reading of Williams, therefore, must start with the clear limits

32

that the First Department placed on this affirmative defense.

The lower court, however, ignored the First Department's efforts to limit the affirmative defense, making it appear as if the purpose of the affirmative defense was to dismiss cases that lower courts dislike. The lower court essentially created a false choice between "severe or pervasive" and "petty slights and trivial inconvenience," ignoring the "wide spectrum" of cases that exist between those two extremes. The lower court ignored that Cheuvreux must "prove" the affirmative defense, instead treating it as a catch-all for discriminatory conduct that it did not want to recognize.

The fact that the lower court found Peacock's conduct to be "demeaning and inappropriate" and "certainly boorish and offensive" (R. SPA- 26) removes this matter from the "truly insubstantial cases" that the affirmative defense was "narrowly" targeted to address. This Court should reverse the lower court and reaffirm the limited use of the affirmative defense set forth in Williams.

In granting summary judgment, the lower court stated that the City Law is not a "general civility code" (SPA-23-26), citing Williams. Any reasonable reading of Williams confirms that the lower court took that phrase out of context and used it as a cover to ignore the Restoration Act. In fact, in the very same sentence where the First Department used the phrase "general civility code," the court recognized that the City Law was "structured to emphasize the vindication of civil rights over shortcuts

33

that reduce litigation volume . . . " 61 A.D.3d at 79. The lower court turned the affirmative defense into a "shortcut" that the First Department was specifically trying to avoid. The fact is, Mihalik's claims clearly rise beyond matters of "general civility" or common manners, so that the lower court had no reason to cite this phrase as a basis for granting summary judgment.

Furthermore, the standard for the affirmative defense is whether "a reasonable victim of discrimination" – not a court or the company or a bystander – would find the conduct complained of to be "petty slights and trivial inconveniences." The burden of establishing this affirmative defense is extremely high.

Cheuvreux has failed to prove that "a reasonable victim of discrimination" would consider that what Mihalik endured to be nothing more than "petty slights and trivial inconveniences." The lower court, therefore, was wrong to apply that affirmative defense to this case and should be reversed.

### E. The *Quid Pro Quo* Analysis Is Incompatible With The City Law

The *quid pro quo* analysis is inappropriate under the City Law because it requires a showing that a "tangible job benefit or privilege" was impacted. Carrero v. New York City Hous. Auth., 890 F.2d 569, 579 (2d Cir. 1989). The First Department, in Williams, specifically rejected any requirement that a sexual

34

harassment victim under the City Law establish a "tangible" employment action.  The court held that "a focus on unequal treatment based on gender – regardless of whether the conduct is 'tangible' (like hiring or firing) or not – is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statue."  61 A.D.3d at 79.

Despite the clear language of the First Department, the lower court granted summary judgment because Mihalik "failed to present evidence that she suffered a tangible employment action."  (R. SPA-19).  The fact that the lower court used "tangible job detriment" and Williams in the same sentence – when Williams rejected a showing of a tangible action – confirms that it did not apply Williams properly.  Here, the appropriate inquiry to be "most faithful" to the statute, therefore, is on unequal treatment, not on whether Mihalik suffered a "tangible" employment action.

Even if the *quid pro quo* analysis did apply to Mihalik's claim, summary judgment would still be inappropriate, since Peacock began treating Mihalik with hostility and disdain after Mihalik rejected his advances in December 2007 and then terminated her just over 3 months later.  The court incorrectly served as fact-finder, determining that a period of a little more than three months between Mihalik's rejection and her termination was too great, even though a fact-finder could also take into account the events that occurred between those two dates, including Peacock's

35

personal attacks against Mihalik and fabricating a baseless "cold calling" assignment. See Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (denying summary judgment where the adverse actions took place "within a few months" of the plaintiff's complaints); Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 555 (2d Cir. 2001) (reversing summary judgment where "only three months" elapsed between the plaintiff's protected activity and their termination), citing Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (finding that an eight-month gap between the plaintiff's complaint and the retaliatory action suggested a causal relationship).

The lower court relied on the fact that Peacock did not explicitly make "suggestions that continued employment depended on submitting to those advance," (R. SPA-18), essentially requiring Mihalik to present the proverbial "smoking gun," something that will not generally not be present in a discrimination case. The fact that Mihalik's advances were met with a striking change in demeanor and accusations of poor performance confirms the link. See Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 90 (2d Cir. 2011) (permitting plaintiff to present her *quid pro quo* claims to a jury where the plaintiff rejected sexual advances and the harasser "initiated Honor Code proceedings against [the plaintiff] soon thereafter").

The fact that Cheuvreux's explanation for terminating Mihalik – an issue that is separate and apart from Mihalik's gender discrimination claim – is a pretext is addressed in Point II, section B, below.

## POINT II

### THE LOWER COURT'S DISMISSAL OF MIHALIK'S RETALIATION CLAIM SHOULD SIMILARLY BE REVERSED

After Mihalik made it clear to Peacock that she would have a sexual relationship with him, he turned on her, berating her in the workplace and baselessly criticizing her performance, all of which is reasonably likely to deter an individual from engaging in protected activity. Mihalik was then terminated just moments after further protesting Peacock's sexual harassment.  Summary judgment on Mihalik's retaliation claim, therefore, should have been denied.

Mihalik need not succeed on her gender discrimination claim to present her retaliation claim to a jury.  See Treglia, 313 F.3d at 719 ("At the outset, we note that Treglia's decision not to appeal his federal discrimination claim does not affect his ability to pursue his federal retaliation claim."), citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (holding that the plaintiff "need not establish that she successfully described in [her] complaint conduct amounting to a violation of Title VII" to present a retaliation claim).

**A.    Mihalik Establishes A Prima Facie Case Of Retaliation**

Mihalik establishes a *prima facie* claim of retaliation, which requires: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection existed between the protected activity and the adverse action." Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004); Richardson, 180 F.3d at 443.

> 1.    *Mihalik Engaged In Protected Activities*
> *Of Which Cheuvreux Was Aware*

The New York City Human Rights Law defines a protected activity as "oppos[ing] any practice forbidden under this chapter . . ." Administrative Code of the City of New York, §8-107(7).  In Albunio, the New York State Court of Appeals recognized that, following the Restoration Action, "we must construe Administrative Code §8-107(7), like other provisions of the City's Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  16 N.Y.3d at 477-78.

Mihalik's complaints to Peacock and telling him that his conduct was unwelcome were protected activities.  Furthermore, construing §8-107(7) "to the extent that such a construction is reasonably possible," Mihalik's rejection of Peacock's sexual advances was also protected activity, as a jury could find that both

Mihalik and Peacock each knew that Mihalik was opposing Peacock's unlawful conduct. Given that Peacock was in charge of Human Resources and handling sexual harassment complaints (R. CA-582, CA-631-632), Mihalik had few alternatives besides complaining directly to her harasser. See Father Belle Cmty. Ctr. v. New York State Div. of Human Rights, 221 A.D.2d 44, 54 (4th Dept. 1996) (recognizing that "there is no opportunity to make a complaint to upper-level management where the supervisor is the highest ranking supervisor. Moreover, requiring the complainant in that instance to notify the corporate directors is unfair and impractical.").

Mihalik also protested Peacock's unlawful conduct in the moments before she was terminated. On April 10, 2008, Peacock called Mihalik into a meeting with the intention to, at most, issue Mihalik a written warning. (R. A-268-269, CA-586). During the meeting, Peacock threw the cold calling assignment email at her and began yelling at her. (R. A-414, CA-586). While Mihalik was reading the warning, Peacock suddenly said, "This is not working out," though Peacock did not terminate Mihalik or indicate that he was going to do so. (R. A-268-269, CA-587). Mihalik then stated, "What's not working out? Me and you or me at the company?," opposing Peacock's unlawful conduct. (R. A-268-269, CA-587). Peacock responded by cursing at Mihalik and firing her, saying, "I'm getting rid of you." (R. A-269-270, CA-587). Peacock acknowledged that Mihalik was not fired for poor performance.

39

(R. CA-588, CA-820).

Mihalik responding to Peacock's warning by stating, "What's not working out? Me and you or me at the company?," is a protected activity under the City Law. In Albunio, the plaintiff, Albunio, had her responsibilities taken from her because she hired a gay employee, named Sorrenti. Id. at 476. Albunio was subsequently removed from her position for utilizing "poor judgment" for hiring Sorrenti, the gay employee. Id. Albunio responded by saying, "If I had to do it all again, I would have recommended Sorrenti again." Id. The Court found that even though Albunio neither filed a discrimination complaint nor explicitly accused anyone of discrimination, Albunio nonetheless engaged in a protected activity, holding:

> While she did not say in so many words that Sorrenti was a discrimination victim, a jury could find that both [the perpetrator] and Albunio knew that he was, and that Albunio made clear her disapproval of that discrimination by communicating to [the perpetrator], in substance, that she though [the perpetrator's] treatment of Sorrenti was wrong. Id. at 479.

The Court concluded that "[b]earing in mind the broad reading that we must give to the New York City Human Rights Law, we find that Albunio could be found to have 'opposed' the discrimination against" the gay employee. Id.

In this case, as in Albunio, a jury could find that both Peacock and Mihalik knew that she was communicating that Peacock's sexual harassment was wrong by

stating, "What's not working out? Me and you or me at the company?" The fact that Peacock fired her immediately thereafter, even though he had no intention of firing Mihalik during this meeting, confirms that Mihalik's termination was motivated by retaliation. Summary judgment, therefore, should have been denied.

Mihalik also complained to Zack, the Chief Compliance Officer, yet Zack failed to take any action whatsoever to address her complaint, telling Mihalik, "If you complain, more than likely he's going to get angry and you'll probably be let go." (R. A-398, CA-582-583). The determination as to whether Zack actually told Peacock about Mihalik's complaint, a factual question strictly within Cheuvreux's control, should be reserved for a jury.[5]

## 2. _Mihalik Suffered Adverse Employment Action_

Unlike federal law, Mihalik need _not_ suffer a materially adverse action to establish her retaliation cause of action. The Restoration Act of 2005 specifically amended the anti-retaliation provision of the New York City Human Rights to state:

> The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with

---

[5] Cheuvreux actually tries to distort Zack's failure to take any action on Mihalik's behalf as a basis for its defense. It is improper for Cheuvreux to rely on its failure to protect Mihalik from unwelcome sexual harassment in seeking dismissal of her claims. See, e.g. Duch v. Jakubek, 588 F.3d 757, 766 (2d Cir. 2009) (recognizing that "purposeful ignorance" will not shield an employer from liability).

> respect to employment, . . . or in a materially adverse
> change in the terms and conditions of employment . . .
> provided, however, that the retaliatory or discriminatory act
> or acts complained of must be reasonably likely to deter a
> person from engaging in protected activity.  §8-107(7).

In <u>Williams</u>, the First Department noted that this provision in the Restoration Act was

enacted "with the purpose of giving force to the earlier proscription on retaliation 'in

any manner.'" 61 A.D.3d at 70.  The court recognized that "the language of the City

HRL does not permit *any* type of challenged conduct to be categorically rejected as

nonactionable."  <u>Id</u>. at 71 (emphasis added).

Peacock treating Mihalik with hostility and disdain after she refused his

advances, in addition to suddenly challenging her performance, was adverse

employment action that would be reasonably likely to deter a person from engaging

in protected activity.  Peacock refused to sit next to Mihalik on the trading desk,

which sent a message to the entire office that she had done something wrong.  (R.

CA-584).  When Peacock did speak to Mihalik, it was to insult her, telling her, in

front of her co-workers, that she had "no fucking clue," she "add[s] nothing of value"

and saying that "a fucking 12-year-old could have written this," none of which was

true.  (R. A-247, A-263, CA-585).  Construing §8-107(7) broadly, "to the extent that

such a construction is reasonably possible," all of this conduct from the CEO would

be reasonably likely to deter a person from engaging in a protected activity.

42

Mihalik being excluded from meetings in which she normally would have been included, even with clients that she had brought to Cheuvreux, is adverse employment action.  (R. A-262, CA-585).  See Albunio, 16 N.Y.3d at 476 (affirming that the plaintiff suffered adverse employment action when he was "shunned and excluded from meetings" by his supervisor); Preda v. Nissho Iwai American Corp., 128 F.3d 789, 791 (2d Cir. 1997) (reversing summary judgment where the plaintiff alleged that "he was excluded from all departmental meetings and client outings" and that "his job duties and responsibilities were downgraded in retaliation.").

Ultimately, the question of whether Peacock's actions in response to Mihalik's rejection of his advances was retaliation should properly be reserved for a jury.  See Williams, 61 A.D.3d at 71 (holding that "it is important that the assessment be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of the retaliatory conduct in light of those realities.").

Mihalik was ultimately terminated on April 10, 2008, which is obviously adverse employment action, so that Mihalik clearly satisfies this prong.

3. *Peacock's Retaliation Was Causally Connected To Mihalik Protesting Sexual Harassment*

The fact that Peacock responded to Mihalik's rejection by attacking her, which

43

he had not done before, demonstrates the causal connection. In <u>Treglia</u>, 313 F.3d at 720, the Second Circuit reversed summary judgment where the plaintiff was terminated one month after his protected activity, noting, "We have held that a close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse actions can be sufficient to establish causation." <u>See also</u> <u>Cifra v. General Elec. Co.</u>, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

The lower court erroneously found that "time lag" between Mihalik's rejection of Peacock's advances and her termination "undermines any inference of causality." (R. SPA-28). However, the lower court improperly failed to consider each of Mihalik's protected activities, including the one in the moments before Mihalik was terminated. In <u>Treglia</u>, 313 F.3d at 721, the Second Circuit noted that looking only at the time between the plaintiff's first complaint and subsequent adverse employment action "ignores [plaintiff's] protected activity between those two dates." <u>See also</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 143 (2d Cir. 2003) (holding that summary judgment was not appropriate where the plaintiff was transferred two years after he made an EEO complaint because "[t]his ignores the fact that [plaintiff] had filed other EEO complaints").

Using an analysis most favorable to Mihalik, a jury could find that Peacock did not immediately fire Mihalik after her rejection because doing so would require him to breach Mihalik's employment agreement. (R. CA-634). A fact-finder could determine that instead of having to pay Mihalik the four months notice provided for in her offer letter, Peacock sought to fabricate a reason to terminate Mihaik "for cause." (R. CA-634).

In any event, the short temporal proximity between Mihalik's rejection of Peacock in December 2007 and her termination on April 10, 2008, especially when considering what happened during the intervening time, is sufficient to create a question of fact. See Treglia, 313 F.3d at 720 (denying summary judgment where the adverse actions took place "within a few months" of the plaintiff's complaints); Gorman-Bakos, 252 F.3d at 555 (reversing summary judgment where "only three months" elapsed between the plaintiff's protected activity and their termination).

Mihalik was also terminated just moments after she engaged in another protected activity, responding to Peacock's warning by stating, "What's not working out? Me and you or me at the company?" Remarkably, the lower court ignored what happened in the moments before Mihalik's termination, finding that "[f]or the purposes of the decision, disputes about the details of this meeting are not relevant." (R. SPA-9, n. 4). These facts create a triable issue in and of themselves and the lower

45

court presented no explanation for why it found them to be "not relevant."  Viewing the facts in the light most favorable to Mihalik, Mihalik's termination occurred immediately after she engaged in a protected activity.  See Gorman-Bakos, 252 F.3d at 555 (reversing summary judgment because "[t]aking these facts in the light most favorable to plaintiffs, only a few days passed between" their complaints and the adverse employment action); Cifra, 252 F.3d at 217 (reversing summary judgment where the plaintiff was terminated just 20 days after her protected activity), citing Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (holding that the plaintiff "easily proved" her prima facie case where she was terminated "a mere twelve days" after her protected activity).

By failing to consider both Peacock's conduct after Mihalik's rejection of his sexual advances in December 2007 *and* the disputed facts in the moments before Mihalik's termination, the lower court improperly diluted Mihalik's claim and failed to use an analysis most favorable to her.  See Aulicino, 580 F.3d at 83-84 (reversing summary judgment where the analysis of the lower court "dilute[d]" the strength of the plaintiff's claims and did not "appear to us to consider the record evidence *in the light most favorable to the plaintiff,* as it is required to do.") (emphasis in original).

**B.    The Record Confirms That Cheuvreux's
Proffered Explanation Is A Pretext**

Mihalik, as a matter of law, is not required to *prove* that Cheuvreux's proffered

reasons were false.  As noted in <u>Gordon v. New York City Board of Education</u>, 232

F.3d 111, 117 (2d Cir. 2000), "It is therefore now settled that a plaintiff in a Title VII

action need not disprove a defendant's proffered rationale for its adverse actions in

order to prevail."   Rather, Mihalik need only show that discrimination was a

motivating factor, not the only factor.  <u>See</u> <u>Williams</u>, 61 A.D.3d at 78 n.27; <u>Holcomb</u>

<u>v. Iona Coll.</u>, 521 F.3d 130, 141 (2d Cir. 2008) (recognizing that a plaintiff "needs

only to prove that the decision was partly so motivated to prevail on the ultimate

merits of the claim."); <u>Speller v. Sears, Roebuck and Co.</u>, 100 N.Y.2d 38, 44 (2003)

(rejecting a defendant's argument that summary judgment should be granted because

the plaintiff was unable to refute the defendant's theory because such a practice

"misinterprets the court's role in adjudicating a motion for summary judgment, which

is issue identification, not issue resolution.").

The lower court barely acknowledges the fact that Peacock's criticisms of

Mihalik's performance arose only *after* Mihalik twice rejected his sexual advances.

This fact, in and of itself, raises questions about Peacock's true motive and intent.

The lower court ignored this key piece of evidence and improperly accepted

47

Cheuvreux's self-serving assertions at face value.

Cheuvreux's reliance on the subjective opinion of Peacock, the alleged harasser, is particularly inappropriate, since it permits Peacock to mask discrimination. In Weiss v. JPMorgan Chase & Co., 332 Fed.Appx. at 661, this Court recognized that:

> In employment discrimination cases, courts must give particular scrutiny to subjective evaluations because (1) any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case and (2) a discriminatory consideration such as age could play into the formation of subjective impressions.

The Second Circuit reversed summary judgment, holding that to affirm, "this Court would necessarily have to accept as true [defendants's] subjective assessment" of plaintiff's performance, which plaintiff controverted. 332 Fed.Appx. at 665. In this case, as in Weiss, the grant of summary judgment should be reversed because the lower court was only able to grant summary judgment by accepting Peacock's subjective assessment.[6] See also Ibok, 369 Fed.Appx. at 214 (reversing summary judgment where the defendants did not retain the plaintiff because of his disciplinary record, since "much of this record is potentially tainted by retaliatory animus.").

---

[6] The lower court improperly accepted Cheuvreux's self-serving and unsupported claim that Mihalik's April 9, 2008, presentation was "not 'cogent.'" (R. SPA-9). Only a jury can make the decision to believe Cheuvreux's credibility.

The lower court repeatedly rejected Mihalik's factual assertions, making the credibility determination that they were "unsupported." It is well-settled that on summary judgment, a non-movant may properly rely on her own testimony. As the Second Circuit recognized in Danzer, 151 F.3d at 57:

> To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because self-serving) insufficient to fend off summary judgment would be to thrust the courts – at an inappropriate stage – into an adjudication of the merits. Such a radical change in the court's role would be inappropriate not just in the discrimination context, but everywhere.

The lower court improperly disregarded Mihalik's testimony, which reveals that there are questions of fact that can only be resolved by a jury.

Viewing the facts in the light most favorable to Mihalik, the record presents questions about the legitimacy of Cheuvreux's criticisms of Mihalik's performance. Significantly, in March 2008, just one month before her termination, Mihalik received a bonus of $75,000. (R. CA-590, CA-634). Cheuvreux had the right to withhold the bonus if she was not "performing the essential functions of [her] position" (R. CA-634), yet granted Mihalik this bonus. A jury could clearly find, therefore, that Mihalik was performing capably as of March 2008.

Peacock conceded at his deposition that Mihalik was not fired for poor performance. (R. CA-588, CA-820). The first time that Peacock ever spoke to

Mihalik about her performance was at the meeting where he fired her, creating questions about the legitimacy of Cheuvreux's claim that she was fired for performance.  (R. A-268).  Further undercutting Cheuvreux's claims of poor performance is the fact that Mihalik requested a performance review in February 2008 (R. A-268), which a jury could find she would not have done had she been the terrible employee that Cheuvreux alleges.  If anything, Cheuvreux would have given her a review if she was genuinely not performing her duties.

In fact, despite the obstacles put in front of her, Mihalik brought in many significant clients to the company and was able to have Cheuvreux included on the Blackrock platform and had just signed another new client right before she was fired. (R. A-221-23, CA-590-591).

Although the lower court accepted Cheuvreux's claim that Mihalik was fired because she "maintained a poor sales record throughout her tenure at the Company" (R. SPA- 20), the record confirms that Mihalik was not fired because of her sales. The record is replete with reasons why Cheuvreux did not criticize Mihalik's sales performance during her employment.  For example, Mihalik was hired when Cheuvreux had no marketing materials for the United States and that Mihalik needed time to build business before revenue would be expected.  (R. A-205, CA-601). Peacock acknowledged that Mihalik was hired at a "standing start." (R. CA-591, CA-

50

601). Most striking is the lower court's complete disregard of the testimony of Zack, the Chief Compliance Officer, who testified that it could take up to ten months for a new client to generate revenue, though Mihalik was fired just nine months after she was hired. (R. CA-591, CA-783). The lower court disregarded Zack's compelling testimony as "too attenuated" (R.SPA-21), although a jury could find that this same testimony confirms that Mihalik was terminated before she had a chance to succeed.

The lower court relied on its own interpretation of the documentary evidence, instead of allowing a jury to make its own determinations. For example, the lower court cited an email that Mihalik wrote on February 26, 2008, stating that she has "BRUTAL clients/prospects." (R. CA-216). In context, however, this email shows Mihalik's significant efforts, as she wrote, "so many things awaiting either contract or something else, but no trading as of yet . . . p-me off too . . . makes me look like am slacking but am certainly not . . ." (R. CA-216). The lower court failed to draw inferences in Mihalik's favor and usurped the jury's role of interpreting the documentary evidence. All of this evidence confirming that Mihalik was measured by the clients she brought in, as opposed to the sales those clients generated, refutes the lower court's finding of fact that Mihalik's sales commissions were "a key measure of performance" for Mihalik. (R. SPA-21). See Faul v. Potter, 355 Fed.Appx. 527, 529 (2d Cir. 2009) (reversing summary judgment because "[w]hile

the district court plainly appreciated the gravamen of [plaintiff's] pretext argument . . . , it resolved the ambiguities in the record that tended to support those arguments in the [defendant's] favor rather than in [plaintiff's].").

The lower court improperly compared the revenue of Mihalik, who was trying to build a business from scratch, to her co-workers who already had the benefit of an and established client base and an established product. (R. SPA-3). For example, Cheuvreux compares Mihalik to Timothy Randall, who had been working for Cheuvreux for years and had an established book of business, and Dominic Romano, who joined Cheuvreux from a sister company and also brought an established book of business. (R. CA-591, CA-639). Mihalik, on the other hand, was coming from a "standing start," as Peacock acknowledged, and it would take many months for her efforts to result in consistent and significant revenues. (R. CA-591, CA-601).

The lower court completely distorted the unreasonable "cold calling" assignment that Peacock gave to Mihalik. Revealingly, Peacock, in his Declaration accompanying Cheuvreux's motion, acknowledges that he never intended to fire Mihalik for not completing the cold calling assignment, only that he intended to give her a written warning if her explanation was "inadequate" during the April 10 meeting. (R. CA-495). A jury could find that Mihalik was only fired because she protested Peacock's harassment during that meeting.

52

Alternatively, a jury could find that the cold calling assignment was unreasonable and was an obvious effort to set Mihalik up to fail. The assignment required Mihalik to complete the herculean task of cold calling and have 140 "quality" conversations in 7 days. Since Peacock was in charge of the subjective determination of what as to be considered a "quality" conversation, Mihalik had no hope of succeeding. Peacock acknowledged at his deposition that the cold calling assignment was "supplementary" to Mihalik's other duties, confirming that Mihalik had little hope of actually succeeding. (R. CA-606).

There is ample evidence surrounding the legitimacy of Mihalik's termination. The lower court failed to acknowledge this evidence, so that it must be reversed.

## CONCLUSION

For the foregoing reasons, Mihalik respectfully requests that the lower court's Order granting Cheuvreux's motion for summary judgment be reversed, that the case be remanded for a jury trial and for such relief as this Court deems just and proper.

SCHWARTZ & PERRY, LLP
*Attorneys for Plaintiff-Appellant*

By: _____
        BRIAN HELLER
        295 Madison Avenue
        New York, New York 10017
        (212) 889-6565

53

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **12,910 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using WordPerfect 12 in 14-point Times New Roman font.

Dated:    New York, New York
          November 29, 2011

**SCHWARTZ & PERRY, LLP**
*Attorneys for Plaintiff-Appellant*

By: _____
     BRIAN HELLER
     295 Madison Avenue
     New York, New York 10017
     (212) 889-6565

54

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Memorandum and Order of the Hon. Deborah A. Batts,
Dated July 28, 2011, Appealed From.....................................SPA-1

Civil Judgment, Dated July 29, 2011 ........................................SPA-30

Notice of Appeal, Dated August 17, 2011 .................................SPA-36

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
RENEE MIHALIK,

          Plaintiff,

    - against -

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

          Defendant.
--------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/27/11

09 Civ. 1251 (DAB)
MEMORANDUM AND ORDER

DEBORAH A. BATTS, United States District Judge.

    Plaintiff Renee Mihalik ("Mihalik") brings this diversity
action against her former employer, Defendant Credit Agricole
Cheuvreux North America, Inc. ("Cheuvreux" or the "Company"),
for gender discrimination and retaliation pursuant to the New
York City Human Rights Law ("NYCHRL"). Plaintiff alleges that
Cheuvreux maintained a hostile work environment, altered the
terms of her employment after she rejected her supervisor's
sexual advances, and retaliated against her for protesting the
way she was treated. Defendant now moves to strike Plaintiff's
Rule 56.1 Counter-statement and Affidavit and also moves for
summary judgment on each of Plaintiff's claims. For the
following reasons, Defendant's Motion to Strike is DENIED, and
its Motion for Summary Judgment is GRANTED on all counts.

**SPA-2**

## I.   BACKGROUND

Except where noted, the following facts are undisputed.
Cheuvreaux is a Delaware corporation engaged in the business of
securities brokerage, research and execution.  (Def.'s 56.1
Stmt. ¶ 1.)  In June 2007, Mihalik, a citizen of New Jersey,
interviewed for a position as a salesperson at Cheuvreux's
Alternative Execution Services ("AES") desk in New York.[1]   (Id.
¶¶ 4-5.)  The responsibilities of the position involved
recruiting institutional clients for Cheuvreux and selling the
firm's trade-execution services to them.  (Id.)

At the time of Mihalik's interview, Cheuvreux had
approximately 45 employees in its New York office, including 5
employees at its AES desk.  (Id. ¶ 8.)  The Company did not have
strong name recognition in the United States, and according to
Mihalik, Cheuvreux's Chief Executive Officer told her that the
Company's efforts in the U.S. market were in their infancy.
(Pl.'s 56.1 Stmt. ¶ 127; Affidavit of Renee Mihalik ("Mihalik
Aff.") ¶ 9.)  During her interview, Mihalik stated that she had
senior contacts at major potential clients, including Galleon,
Legg Mason, BlackRock and LibertyView, and was prepared to use
those contacts if she came to work for the Company.  (Def.'s

---

[1]   The AES division (or "desk") offers clients a non-
traditional method of conducting equity trading, including
algorithmic, program or direct market access trading.  (Def.'s
56.1 Stmt. ¶ 4.)

2

56.1 Stmt. ¶ 6.)  However, the Company understood that Mihalik
was "coming from a standing start", since her contacts would not
move to Cheuvreux immediately and it would take time to build a
revenue-generating base of customers.  (Pl.'s 56.1 Stmt. ¶ 18.)
Cheuvreux ultimately hired Mihalik as Vice President of AES,
with an annual salary of $190,000.00 and a potential bonus of
$175,000.00, and she began work on July 9, 2007.  (Def.'s 56.1
Stmt. ¶ 7.)

A.    Mihalik's Performance at Cheuvreux

Mihalik recruited a number of new accounts for the AES desk
during her tenure at Cheuvreux, including Galleon, Legg Mason,
BlackRock and LibertyView.  (Pl.'s 56.1 Stmt. ¶ 18.)  However,
while Mihalik's new accounts were all considered clients
formally, only LibertyView conducted any actual business through
the desk.  Moreover, even LibertyView conducted little activity
with the desk, generating only $22,700.00 in commissions during
Mihalik's nine-month tenure with the Company.  (Def.'s 56.1
Reply Stmt. ¶ 18(2); 131.)  Mihalik's commissions compared
unfavorably against those of the two other salespersons on the
AES desk, who had worked with Cheuvreux-related clients for
several years, and brought in monthly commissions ranging from
$96,811.00 to $438,498.00 throughout the period of Mihalik's
employment.  (See AES Sales Report, Attached as Ex. B to

Declaration of Melissa Franzen in Supp. of Def.'s Mot. Summ.
J.).  On February 26, 2008, Mihalik emailed to a colleague that
she had "so many things awaiting either contract or something
else, but no trading as of yet . . . p-me off too . . . makes me
look like am slacking but am certainly not . . . BRUTAL
clients/prospects."  (See Email of Renee Mihalik, Attached as
Ex. 78 to Declaration of Barbara M. Roth in Supp. of Def.'s Mot.
Summ. J. ("Roth Decl.").) (Elipses and emphasis in original.)

        During her tenure at the Company, Mihalik did not follow up
on several sales leads in a timely fashion.  On July 30, 2007,
Ian Peacock, Cheuvreux's Chief Executive Officer and head of its
AES desk, referred sales leads for three potential clients to
Mihalik and another salesperson, Dominic Romano. (Def.'s 56.1
Reply Stmt. ¶ 16; Pl.'s 56.1 Stmt. ¶ 16).  After Peacock
requested a status update on these leads nine days later,
Mihalik emailed Romano, asking "Do you know anything about these
accounts Ian keeps asking us about?"  (Def.'s 56.1 Stmt. ¶ 24;
Pl.'s 56.1 Stmt. ¶ 24.)  Romano replied that he had been working
on two of the leads, and Mihalik took the third lead at that
point.  (Id.)  On October 17, 2007, Peacock forwarded Mihalik a
sales lead from Patrick Egan of TradingScreen.  Nearly one-and-
a-half months later, on November 29, Mihalik emailed Egan about
the lead, asking "How are you?!?!?! I havent spoken to you in so

4

long! . . . Do you remember what this is all about?" (Email of
Renee Mihalik, Attached as Ex. 29 to Roth Decl.)   Mihalik claims
she had spoken to Egan about the potential lead prior to her
November 29 email, but does not cite any evidence to support
this assertion.   (Pl.'s 56.1 Stmt. ¶ 64.)   Finally, a week after
Mihalik returned from a European business trip, on January 30,
2008, Peacock emailed Mihalik stating that a Cheuvreux colleague
in Europe was "upset that you didn't get back to [a potential
client] when you promised."   (Def.'s 56.1 Stmt. ¶ 103.)   Mihalik
then contacted the European colleague, apologized and explained
that she had not spoken to the potential client yet because her
luggage (which contained her notes and business cards) had been
misplaced by her airline during her journey back to New York.
(Id. ¶ 104.)

B.   Evidence Relating to Sexual Harassment

Mihalik presents numerous allegations of sexually-related
conduct at Cheuvreux, but the Company disputes virtually all of
the allegations.   Mihalik testified that Peacock showed her
pornographic images "once or twice a month."   (Def.'s 56.1 Stmt.
¶ 140; Deposition Transcript of Renee Mihalik ("Mihalik Tr.")
111, 126.)   Some of the incidents began when Peacock
spontaneously laughed at his computer, and when Mihalik inquired
about the object of his laughter, Peacock would show her

5

pornographic images on the computer. (Def.'s 56.1 Stmt. ¶ 141,
Mihalik Tr. 110-11.)  Cheuvreux disputes this allegation
implicitly, acknowledging only that Peacock forwarded one
pornographic email to male salespersons at Cheuvreux on August
10, 2007.  (Def.'s 56.1 Reply Stmt. ¶ 138.)

    Mihalik also alleges that Peacock asked her intrusive
personal questions and made unwelcome comments about her
appearance from July through December 2007.  Specifically, when
Mihalik started work in July 2007, she alleges that Peacock
asked whether she was married, if she was dating, how old she
was, and if she was a "cougar." [2]  (Id. ¶ 79.)  Mihalik asserts
that Peacock commented on her appearance and dress frequently
during this period, telling her she looked "very sexy" once a
week, remarking "You should dress like that every day. You might
get more clients in turn," and making comments about "how a
shirt accentuated [her] cleavage."  (Id.; Mihalik Tr. 133, 149,
159.)  Peacock also told Mihalik that he liked her red shoes,
and implicitly suggested that the color of the shoes indicated
she was promiscuous.  (Def.'s 56.1 Stmt. ¶ 79; Mihalik Aff. ¶
27.)  Finally, Mihalik alleges that Peacock asked her if she

---

[2]    Neither party has provided a useful definition for the term
"cougar", but it can be understood as "a middle-aged woman
seeking a romantic relationship with a younger man."  See
Merriam Webster's  Online Dictionary, at http://www.merriam-
webster.com/dictionary/cougar (last visited July 27, 2011).

Case 1:09-cv-01251-DAB Document 52    Filed 07/29/11    Page 7 of 29

enjoyed a particular sexual position and propositioned her twice in December 2007, inviting her to stay overnight with him at the "Cheuvreux flat". (Id. ¶¶ 75; 79.)

It is undisputed that Mihalik complained about Peacock to Chief Compliance Officer David Zack on four occasions starting in December 2007. (Pl.'s 56.1 Stmt. ¶ 81.) At first, she only complained about Peacock's difficult management style and "demeaning" criticism of her performance. (Mihalik Tr. 178-90.). But Mihalik asserts that she subsequently complained to Zack about Peacock's critiques of her appearance and his comments about her private life.[3] (Mihalik Tr. 178.) There is no evidence that Mihalik made any complaints to Zack about Peacock's use of pornography and his December 2007 propositions.

C.    Mihalik's Termination

On March 20, 2008, Peacock emailed Mihalik an assignment to cold-call potential clients:

> I am out next week and I want to focus on stirring up new business and to identify a client list of US brokers . . . . I want you to concentrate o[n] US clients trading US markets and prospect, call and make <u>actual contact</u> to 20 [potential clients] per day. That's 20 quality conversations (not attempts

---

[3]    Defendant argues that Mihalik never introduced testimony to support this assertion. However Mihalik's testimony concerning her complaints to Zack is evident in the transcript. (<u>See</u> Mihalik Tr. 178.) Regardless, for reasons discussed below, any disputes about this issue of fact are immaterial.



Case 1:09-cv-01251-DAB Document 52   Filed 07/29/11   Page 8 of 29

or voicemails) x 7 days until I'm back on [April 2] and hopefully that will stir up a few prospects. This is a firm objective I'm sure you can achieve with focus and determination."

(Email of Ian Peacock, Attached as Ex. V to Affidavit of Matthew T. Schatz Opp. Def.'s Mot. Summ. J. ("Schatz Aff.")) (emphasis in original). Peacock also told Mihalik to maintain a list of contacts and the outcome of each cold-call so that the two of them could review the results. (Id.) Mihalik did not follow Peacock's instruction, and spoke with only 17 potential clients during the 7-day period instead of 140. (Def.'s 56.1 Stmt. ¶ 126.)

Around this time, Mihalik showed Zack a draft email she was preparing to send to Peacock, stating:

I just want to make sure that you realize that the confrontations we have on the desk in front of all my colleagues are very unprofessional and behavior unbefitting a manager . . . . I will be happy to provide you with all the clients I am currently working on signing and the progress I am making with each. To constantly belittle me by saying I am not working or trying, or by saying that I should not think this is "a free ride" isn't appropriate or professional aside from the fact that it is an inaccurate statement.

(Draft Email of Renee Mihalik dated April 2, 2008, Attached as Ex. 164 to Roth Decl.) Zack counseled Mihalik against sending this email, and Mihalik ultimately decided not to send it.

On April 9, 2008, Mihalik was scheduled to present her
business plan to the AES team at a monthly meeting, but she
improvised a presentation that was not "cogent", and several
members of the team noted her lack of preparedness and
complained to Peacock.  (Def.'s 56.1 Stmt. ¶ 130.)  On April 10,
2008, Peacock met with Mihalik, confronted her about her failure
to complete his cold-call assignment, and terminated her.[4]

## II.  DISCUSSION

Before turning to Cheuvreux's Motion for Summary Judgment,
it is necessary to address the Company's Motion to Strike, which
challenges portions of Mihalik's Affidavit and her 56.1 Counter-
Statement submitted in opposition to the Company's Motion for
Summary Judgment.

---

[4]   Specific details of this meeting are disputed.  Cheuvreux
states that Mihalik initially lied about completing the cold-
call assignment, and only admitted that she hadn't completed it
when confronted with a telephone log of her calls.  (Def.'s 56.1
Stmt. ¶132.)  According to Cheuvreux, Mihalik then told Peacock
"What are you going to do about it?" and Peacock discharged her.
(Id.)  According to Mihalik, she did not lie about completing
the cold-call assignment.  (Pl.'s 56.1 Stmt. ¶132.)  Instead,
Peacock immediately confronted her with the telephone call log
and "began yelling at her saying 'You didn't even come close to
what I told you to do' and 'This is fucking unacceptable.'"
(Id.)  Peacock then told her "This is not working out." and
Mihalik replied "What's not working out. Me and you or me at the
company?" (Id.)  According to Mihalik, Peacock then started to
get very aggravated and said "This isn't working out. I am
letting you go. I'm getting rid of you." (Id.)  For purposes of
the decision, disputes about details of this meeting are not
relevant.

A.   Motion to Strike

Local Rule 56.1(a) provides that a party moving for summary
judgment must file a "short and concise statement . . . of the
material facts as to which the moving party contends there is no
genuine issue to be tried." The purpose of the Rule 56.1
Statement is to "streamline the consideration of summary
judgment motions by freeing district courts from the need to
hunt through voluminous records without guidance from the
parties." Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir.
2001). A party opposing summary judgment must then submit a
counter-statement of material facts responding to each assertion
that the moving party made. See Local Rule 56.1(b). While a
"district court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules",
all assertions in a moving party's statement and an opposing
party's counter-statement must be supported by admissible
evidence. See Local Rule 56.1(d); Holtz v. Rockefeller & Co.,
Inc., 258 F.3d 62, 74 (2d Cir. 2001). Where the record does not
support the assertions made in a statement or counter-statement,
those assertions should be disregarded and the record reviewed
independently. Id.

10

With respect to affidavits offered on summary judgment,
Rule 56(e) of the Federal Rules of Civil Procedure provides that
the affidavits "must be made on personal knowledge, set out
facts that would be admissible in evidence, and show that the
affiant or declarant is competent to testify on the matters
stated." Fed. R. Civ. P. 56(e). Accordingly, "[a] court may .
. . strike portions of an affidavit that are not based upon the
affiant's personal knowledge, contain inadmissible hearsay or
make generalized and conclusory statements." Hollander v.
American Cyanamid Co., 172 F.3d 192, 198 (2d Cir.1999).
However, nothing in the Federal Rules or the Local Rules
requires a court to engage in the time-consuming, cumbersome
process of formally striking such evidence. See Sauerhaft v.
Board of Educ. of the Hastings-on-Hudson Union Free Sch. Dist.,
05 Civ. 09087(PGG), 2009 WL 1576467 at *7-8 (S.D.N.Y. June 2,
2009). Instead, a court may "simply disregard the allegations
that are not properly supported." Id.

Cheuvreux has moved to strike certain portions of Mihalik's
Affidavit and Rule 56.1 Counter-Statement. Cheuvreux offers
various reasons for its motion, including that the referenced
statements lack support in the record, are based on inadmissible
hearsay, contain legal argument, and contain conclusory
assertions. Cheuvreux also argues that several portions of

11

Mihalik's Affidavit contradict her previous deposition testimony
and are not based on personal knowledge.

Although many of Mihalik's assertions in her Counter-
Statement and Affidavit are improper, the Court declines to
engage in the time-consuming task of formally striking each
statement at issue.  Instead, following the practice of several
other courts in the district, this Court will disregard any
statements that lack support or are otherwise inadmissible.
Thus where Mihalik has denied or objected to a fact asserted by
Cheuvreux, the Court will deem that fact disputed only where
Mihalik has provided admissible evidence to support its
objection.  To the extent that Mihalik's 56.1 Statement or
Affidavit uses conclusory or argumentative language, the Court
will not make the suggested inferences simply because Plaintiff
has suggested them.  Such measures will protect Defendant's
concerns adequately, and accordingly, the Court DENIES
Cheuvreux's Motion to Strike.

B.  Legal Standards

     1.  Summary Judgment

     A district court should grant summary judgment when there
is "no genuine issue as to any material fact," and the moving
party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56 (c); see also Hermes Int'l v. Lederer de Paris Fifth Ave.,

12

Inc., 219 F.3d 104, 107 (2d Cir. 2000). A party moving for
summary judgment "bears the initial responsibility of informing
the district court of the basis for its motion," and of drawing
the court's attention to the materials "which it believes
demonstrate the absence of a genuine issue of material fact."
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the
moving party has made this showing, the non-movant "must set
forth specific facts showing that there is a genuine issue for
trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250
(1986).

Genuine issues of material fact cannot be created by mere
conclusory allegations. Heublein v. United States, 996 F.2d
1455, 1461 (2d Cir. 1993). While a court must always "resolv[e]
ambiguities and draw [] reasonable inferences against the moving
party," the non-movant may not rely upon "mere speculation or
conjecture as to the true nature of the facts to overcome a
motion for summary judgment" and "there must be more than a
'scintilla of evidence' in the non-movant's favor." Id.; Knight
v. U.S. Fire Ins. Co., 804 F.2d 9, 11-12 (2d Cir. 1986).

The Second Circuit has advised district courts to be
"particularly cautious about granting summary judgment to an
employer in a discrimination case when the employer's intent is
in question." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d
Cir. 1997). Since direct evidence of an employer's

13

discriminatory intent will "rarely be found, 'affidavits and
depositions must be carefully scrutinized for circumstantial
proof which, if believed, would show discrimination.'"  Id.
(citations omitted).  Nevertheless "the salutary purposes of
summary judgment-avoiding protracted, expensive and harassing
trials-apply no less to discrimination cases than to . . . other
areas of litigation", and summary judgment is still the time for
plaintiffs to "put up or shut up" by pointing to specific
evidence supporting their position.  Weinstock v. Columbia
Univ., 224 F.3d 33, 41 (2d Cir. 2000).

      2. New York City Human Rights Law

      Under the NYCHRL, an employer is prohibited from
discriminating or retaliating against its employees.  See N.Y.
City Admin. Code §§ 8-107 et seq.  Although the standard for
NYCHRL discrimination claims was traditionally identical to the
standard for federal discrimination claims, recent amendments to
the NYCHRL require courts to construe the statute more generally
in order to accomplish its "uniquely broad and remedial
purposes."  Williams v. New York City Hous. Auth., 61 A.D.3d 62,
74-75 (1st Dep't 2009).  In short, "the text and legislative
history [of the Amendment] represent a desire that the City HRL
'meld the broadest vision of social justice with the strongest
law enforcement deterrent.'"  Id. at 68 (citing Craig Gurian, A

14

Return to Eyes on the Prize: Litigating Under the Restored New
York City Human Rights Law, 33 Fordham Urb. L.J. 255, 262
(2008)). See also Spiegel v. Schulmann, 604 F.3d 72, 83 (2d
Cir. 2010). Thus while federal discrimination caselaw is still
applicable to NYCHRL claims, it should be considered as a "floor
below which the City's Human Rights Laws cannot fall, rather
than a ceiling above which the local law cannot rise." 61
A.D.3d at 66-67. See also Woodard v. TWC Media Solutions, Inc.,
09 Civ. 3000 (BSJ)(AJP), 2011 WL 70386 at *9 (S.D.N.Y. January
4, 2011) (holding that prima facie case for sexual harassment
under NYCHRL may be established based on conduct "less
egregious" than that required to support a Title VII claim).

        Discrimination claims based on sexual harassment are
typically evaluated under quid pro quo or hostile work
environment frameworks. See Le Prevost v. New York State, 2009
WL 856999 (S.D.N.Y. 2009) (citing Karibian v. Columbia Univ., 14
F.3d 773, 777 (2d Cir. 1994)). Williams held that courts should
not restrict NYCHRL claim analysis to the traditional analytical
frameworks for sexual harassment, and that courts should examine
broadly whether "different terms, conditions and privileges of
employment [were imposed] based, inter alia, on gender." 61
A.D.3d at 75. However, in the absence of any guidance on an
alternate framework for applying the NYCHRL, the Court will

15

begin with the traditional quid pro quo and hostile work

environment analyses, and then incorporate the special

considerations articulated by Williams.  See Diagne v. New York

Life Ins. Co., 09 Civ. 5157(GBD)(GWG), 2010 WL 5625829, at *16-

17 (S.D.N.Y. Dec. 8, 2010)(holding that NYCHRL claims should be

reviewed under Title VII analytical framework); Winston v.

Verizon Services Corp., 633 F.Supp.2d 42, 48 (S.D.N.Y. 2009)

(noting lack of clarity about contours for the application of

the NYCHRL post-Williams and applying Title VII framework).

C.    Quid Pro Quo Harassment

To establish a prima facie claim for quid pro quo sexual

harassment, plaintiffs must present evidence that they were

subject to unwelcome sexual conduct, and that their reaction to

the conduct affected the compensation, terms, conditions or

privileges of their employment.  Fitzgerald v. Henderson, 251

F.3d 345, 356 (2d Cir. 2001) (quoting Karibian v. Columbia

University, 14 F.3d 773, 777 (2d Cir.), cert. denied, 512 U.S.

1213 (1994)).  In short, a plaintiff must establish that a

"tangible job benefit or privilege [was] conditioned on an

employee's submission to sexual blackmail and that adverse

consequences follow[ed] from the employee's refusal."  Carrero

v. New York City Hous. Auth., 890 F.2d 569, 579 (2d Cir. 1989).

16

A plaintiff can demonstrate a causal connection between sexual advances and subsequent adverse employment actions with evidence that a supervisor explicitly threatened or warned the plaintiff that failure to accede to sexual conduct would result in adverse action. Messer v. Fahnestock & Co . Inc., 03 Civ. 4989 (ENV) (JMA), 2008 WL 4934608 at *15 (E.D.N.Y. Nov. 18, 2008). See also Hamilton v. Bally of Switzerland, 03 Civ. 5685 (GEL), 2005 WL 1162450 (S.D.N.Y. May 17, 2005) (rejecting quid pro quo claim brought under Title VII where alleged harasser did not threaten adverse employment action if plaintiff failed to succumb to advances); Hwang v. DQ Marketing and Public Relations Group, No. 102524/08, 2009 WL 3696604 (Sup. Ct. N.Y. Co. Sept. 30, 2009) (same, for claim brought under NYCHRL post-Williams). Alternatively, a plaintiff can establish causality by demonstrating that an adverse employment action followed closely in time after rejection of a supervisor's sexual advances. Messer, 2008 WL 4934608 at *15 (collecting cases finding causal connection where adverse action occurred two months or less after incident and rejecting link for period greater than three months).

If a plaintiff establishes a prima facie case of harassment, the burden then shifts to the defendant, who must proffer some legitimate nondiscriminatory reason for the adverse action at issue. Spiegel, 604 F.3d at 80. "If the defendant

17

proffers such a reason, the presumption of discrimination . . .
drops out of the analysis, and the defendant will be entitled to
summary judgment . . . unless the plaintiff can point to
evidence that reasonably supports a finding of prohibited
discrimination."  Id.  The plaintiff may do this by
demonstrating that the legitimate reason offered by the
defendant is actually a pretext for discrimination.  Id.

Here, Mihalik fails to establish a prima facie case for
quid pro quo harassment because she presents no evidence of any
linkage between her rejection of Peacock's alleged sexual
advances in December 2007 and her termination in April 2008.
Mihalik has neither alleged nor testified that Peacock's
advances were accompanied by suggestions that continued
employment depended on submitting to those advances.  Moreover,
while there is no bright line time limitation for establishing
causality, the passage of over three months between the advances
at issue and Mihalik's termination is significant, and
undermines Plaintiff's suggestion that these two events were
linked.

Mihalik argues that she suffered more immediate employment
consequences after she rejected Peacock's advances.
Specifically, Mihalik argues that Peacock added menial tasks to
her job responsibilities, criticized her performance publicly,
and excluded her from meetings after she rejected his advances.

18

However, Mihalik's only support for her contention that she was tasked with menial jobs is Peacock's March 20, 2008 cold-calling assignment, and she conceded in her testimony that this assignment was not menial. (See Mihalik Tr. 219-20.) Peacock's criticisms of Mihalik's performance also do not constitute tangible job detriments. See Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004) ("A tangible employment action . . . 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'") (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998); Bonnano v. Verizon New York, 06 Civ. 6671 (DAB), 2011 WL 832855 at *7 (S.D.N.Y. March 4, 2011) (acknowledging "special considerations" of NYCHRL and Williams, but granting summary judgment where defendant's actions did not affect plaintiff's pay, job status or title).

Finally, Mihalik only cites evidence of one specific meeting from which she was excluded, and does not provide any timeframe to link this alleged exclusion to her rejection of Peacock's advances. As a result, even under the liberal standards of Williams, Mihalik has failed to present evidence that she suffered a tangible job detriment sufficient to establish a quid pro quo claim.

19

Even if Plaintiff could establish a prima facie case, Cheuvreux has proffered a legitimate, nondiscriminatory reason for Mihalik's termination, supported by ample evidence and unrefuted apart from conclusory allegations.  As described above, Mihalik failed to follow up on several sales leads, failed to follow a direct instruction to complete a cold-calling assignment, and maintained a poor sales record throughout her tenure at the Company.  Mihalik's poor sales record is especially significant, and reinforced by her own email of February 26, 2008, in which she states that she "has no trading as of yet", that she had "BRUTAL clients/prospects", and that she was worried about how this would be perceived by the Company.

Mihalik argues that Cheuvreux's stated reasons for terminating her are pretextual.  Specifically, she challenges the significance of her sales record, arguing that her performance should have been evaluated based on the new clients she signed to Cheuvreux, even if those client did not generate immediate revenue for the Company.  She states that "monthly revenue is not a proper indicator of performance" because it took time for clients to begin using Cheuvreux's AES services and generating commissions after they signed up with the Company.  (Pl.'s 56.1 Stmt. ¶ 18.)  As support, Mihalik cites her own affirmation and testimony from Zack, who testified that

20

it could "possibly" take up to ten months before a client started trading after they had signed with the Company. (Mihalik Aff. ¶¶ 67-69; Deposition Transcript of David Zack 38). However, Zack's testimony is far too attenuated to support Mihalik's assertion.

More importantly, Mihalik has not introduced any evidence to support her contention that commission revenue was an improper indicator of performance. In contrast, Defendant has produced evidence that salespersons were credited for clients only when those clients actually traded through the Company and generated commissions for the Company. (Def.'s 56.1 Reply Stmt. ¶ 18.) Thus while Mihalik may disagree with the method by which performance was measured, she has failed to counter the Company's demonstration that sales commissions were, in fact, a key measure of performance. See Hamilton, 2005 WL 1162450 at *10-11 (declining to "second-guess" the business judgment of employer in Title VII case where employee was terminated for poor sales record, even though she had received positive customer feedback and supervised some of her company's top performers). Accordingly, the Court finds no basis to conclude that the Company's proffered non-discriminatory reasons for terminating Mihalik's employment were false.

Mihalik's sales job was doubtlessly difficult, given that Cheuvreux had little name recognition in the U.S. market and

21

that she could not draw on an existing client list, as established AES salespersons at the Company could. However, Mihalik has introduced insufficient evidence to explain why the Company's explanation for her termination was pretextual, and the Court is left only with Mihalik's unsupported assertions about performance measurement. These assertions can be characterized as a "scintilla of evidence", and are insufficient to present a disputed issue of fact. See also Weinstock, 224 F.3d at 42 ("A plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'""). As a result, Plaintiff has not presented sufficient evidence of gender discrimination under a quid pro quo theory to survive summary judgment.

D.    Hostile Work Environment

To establish a prima facie claim for sexual harassment under a hostile work environment theory, a plaintiff must proffer evidence from which a reasonable trier of fact could conclude that the defendant's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [the

22

plaintiff's] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted). Determining "whether sexual harassment alters the conditions of employment 'is not, and by its nature cannot be, a mathematically precise test [and] can be determined only by looking at all the circumstances.'" Id., 510 U.S. at 23. However, a plaintiff must persuade the factfinder that "the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse." Schiano v. Quality Payroll Svs., Inc., 445 F.3d 597, 604-05 (2d Cir. 2006).

In Williams, the First Department considered the recent amendments expanding the NYCHRL's scope, and held that the inquiry for sexual harassment claims under the NYCHRL should "focus on unequal treatment based on gender" and prevent "too much unwanted gender-based conduct to continue befouling the workplace." Id. at 79. Accordingly, the court held that plaintiffs were no longer required to establish "severe and pervasive" conduct to establish liability under the NYCHRL and that summary judgment should generally be denied in "borderline" cases. 61 A.D.3d at 75, 80. Nevertheless, the court noted that the NYCHRL was not a "general civility code" and that "petty

23

slights and trivial inconveniences" were still non-actionable
under the law.  Id. at 78-80.  As a result, district courts
applying the NYCHRL in hostile work environment cases have
granted summary judgment for defendants when "the incidents
alleged amount[ed] to only sporadic insensitive comments."
Fullwood v. Assoc. for the Help of Retarded Children, Inc., 08
Civ. 6739 (DAB), 2010 WL 3910429, at *9 (S.D.N.Y. Sept. 28,
2010) (granting summary judgment for defendants where plaintiff
alleged that defendant made offensive racial comments on four
separate occasions over a two-year period).  See also Diagne v.
New York Life Ins. Co., 2010 WL 5625829, at *16-17 (S.D.N.Y.
Dec. 8, 2010) (granting summary judgment for defendant where
plaintiff alleged that defendant made racial slurs "[s]ometimes"
because the evidence was "of such a minimal character and
supported by such inconclusive and vague evidence that a
reasonable jury would have to conclude that it represents, at
best, 'petty slights or trivial inconveniences.'"); Wilson  v.
N.Y.P. Holdings, Inc., 05 Civ. 10355 (LTS), 2009  WL  873206
(S.D.N.Y. Mar. 31, 2009) (granting summary judgment on hostile
work environment claim where plaintiffs' supervisors commented
over a number of years that "training females [was] like
training dogs" and that "women need to be horsewhipped", and
referred to female celebrities as "whores" and "sluts").

24

Here, Mihalik's gender discrimination claim revolves around her testimony that Peacock showed her pornographic images, made objectifying comments, and initiated sexual overtures. For the reasons discussed below, this testimony does not present evidence of a hostile work environment sufficient to withstand Defendant's Motion for Summary Judgment.

First, Mihalik testified that Peacock showed her pornography once or twice a month from July through December 2007. However, Mihalik concedes that she asked to view the images in question on at least one occasion, and presents no details about the circumstances of the other occasions. Based on this limited showing, the pornographic displays are properly categorized as "trivial inconveniences" that are non-actionable under Williams. Mihalik relies on Patane v. Clark, 508 F.3d 106, 114 (2d Cir. 2007), for the proposition that the presence of pornography in the workplace supports a hostile work environment claim, but the plaintiff in Patane was required to handle pornographic videotapes for her supervisor regularly and discovered that her supervisor was viewing pornographic websites on the plaintiff's own computer, and is therefore distinguishable.

Mihalik also testified that Peacock commented repeatedly on her appearance in an objectifying and demeaning manner and

25

propositioned her twice in December 2007.  Specifically, Mihalik
testified that Peacock commented she looked "very sexy" once a
week and made other sporadic comments from July through December
2007, including one remark suggesting that Mihalik was
promiscuous and one question about whether she enjoyed a
particular sexual position.  These comments are certainly
boorish and offensive, but are not so grave or objectionable
that they would have altered the conditions of Mihalik's
employment.  Additionally, the alleged sexual advances involved
two isolated instances of propositioning in December 2007, and
Plaintiff does not contend that any further comments or
intrusive behavior took place during the four months afterwards.

    Therefore, considering the totality of circumstances and
bearing in mind the Williams court's admonition that the NYCHRL
is not a "general civility code", the Court finds that Peacock's
alleged conduct, while demeaning and inappropriate, did not
create a hostile work environment actionable under the NYCHRL.
Since Plaintiff has failed to present sufficient evidence to
support a hostile work environment or any other type of gender
discrimination, Defendant's Motion for Summary Judgment on
Plaintiff's gender discrimination claim is GRANTED.

E.    Retaliation Claim

    To establish a prima facie claim for retaliation under the
NYCHRL, a plaintiff must adduce sufficient evidence to permit a
trier of fact to find that: (1) the plaintiff engaged in a
protected activity; (2) the employer knew of this activity; (3)
the employer took adverse action against the plaintiff; and (4)
a causal connection existed between the protected activity and
the adverse action.  Woodard, 2011 WL 70386 at *9.  Under the
NYCHRL, protected activities include "oppos[ing] any practice
forbidden under this chapter. . ." and retaliation is
prohibited "in any manner." N.Y.C. Admin. Code § 8-107(7).
Thus "[t]he retaliation . . . need not result in an ultimate
action with respect to employment . . . or in a materially
adverse change in the terms and conditions of employment." Id.
See also Williams, 61 A.D.3d at 69-72.  Once the plaintiff
establishes a prima facie case of retaliation, the burden shifts
to the employer to establish a legitimate, non-discriminatory
reason for the alleged retaliation.  Woodard, 2011 WL 70386 at
*9.  If the employer meets its burden, then the burden shifts
back to the plaintiff to show that the proffered legitimate
reason is a pretext.  Id.

    Here, Mihalik argues that she engaged in three instances of
protected activity and was terminated as a result.  First,

27

Mihalik argues that she brought Peacock's alleged harassment to Zack's attention.  However, Plaintiff has presented no evidence establishing a link between her conversations with Zack and her termination by Peacock, and Defendant has presented undisputed evidence that Zack did not repeat Mihalik's complaints to Peacock.  (Def.'s 56.1 Stmt. ¶ 81.)  Accordingly, there is no evidence of any causality between the complaints at issue and the termination.  Plaintiff also argues vaguely that she complained directly to Peacock, but does not cite any evidence in the record to support her assertion.

Mihalik argues alternatively that her rejection of Peacock's sexual advances constituted a protected activity. However, even assuming that the rejections did constitute a protected activity, the time lag between the alleged sexual advances and Plaintiff's termination undermines any inference of causality.  Moreover, as discussed above, Defendant has offered legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff has failed to show that these reasons are pretextual.

Therefore, Plaintiff has failed to present sufficient evidence to support her retaliation claim, and Defendant's Motion for Summary Judgment on the claim is GRANTED.

SPA-29

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED on all counts.  The Clerk of Court is directed to CLOSE the docket in this case.

SO ORDERED.


Dated: July 28, 2011

New York, New York


*Deborah A. Batts*

Deborah A. Batts

**SPA-30**

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____              │
│ DATE FILED: __7/29/11__          │
└─────────────────────────────────┘
```

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

RENEE MIHALIK,

                              Plaintiff,                    09 **CIVIL** 1251 (DAB)

            -against-                                       **JUDGMENT**

CREDIT AGRICOLE CHEUVREUX NORTH
AMERICA, INC.,

                              Defendant.
-----------------------------------------------------------X


        Defendant having moved to strike Plaintiff's Rule 56.1 Counter-statement and Affidavit,

and also having moved for summary judgment, and the matter having come before the Honorable

Deborah A. Batts, United States District Judge, and the Court, on July 28, 2011, having rendered

its Memorandum and Order denying Defendant's motion to strike, and granting its motion for

summary judgment on all counts, it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum and Order dated July 28, 2011, Defendant's motion to strike is denied, and

its motion for summary judgment is granted on all counts; accordingly, the case is closed.

**Dated:** New York, New York
       July 29, 2011

                                                    **RUBY J. KRAJICK**
                                              _____
                                                     **Clerk of Court**

                                      **BY:**  _____
                                                     **Deputy Clerk**


                                              THIS DOCUMENT WAS ENTERED
                                              ON THE DOCKET ON _____

Case 1:09-cv-01251-DAB   Document 53-1    Filed 07/29/11   Page 1 of 5

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

Date:

In Re:

-v-

Case #:                 (        )

Dear Litigant,

Enclosed is a copy of the judgment entered in your case.

Your attention is directed to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, which requires that if you wish to appeal the judgment in your case, you must file a notice of appeal within 30 days of the date of entry of the judgment (60 days if the United States or an officer or agency of the United States is a party).

If you wish to appeal the judgment but for any reason you are unable to file your notice of appeal within the required time, you may make a motion for an extension of time in accordance with the provision of Fed. R. App. P. 4(a)(5). That rule requires you to show "excusable neglect" or "good cause" for your failure to file your notice of appeal within the time allowed. Any such motion must first be served upon the other parties and then filed with the Pro Se Office no later than 60 days from the date of entry of the judgment (90 days if the United States or an officer or agency of the United States is a party).

The enclosed Forms 1, 2 and 3 cover some common situations, and you may choose to use one of them if appropriate to your circumstances.

The Filing fee for a notice of appeal is $5.00 and the appellate docketing fee is $450.00 payable to the "Clerk of the Court, USDC, SDNY" by certified check, money order or cash. **No personal checks are accepted.**

**Ruby J. Krajick, Clerk of Court**

by: _____

, Deputy Clerk

Case 1:09-cv-01251-DAB    Document 53-1    Filed 07/29/11    Page 2 of 5

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

------------------------------------------------X

                                              **NOTICE OF APPEAL**

            -V.-

                                  civ.         (  )

------------------------------------------------X

       Notice is hereby given that _____
                                                 (party)
hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment [describe it]

entered in this action on the _____ day of _____ , _____ .
                                (day)                (month)        (year)

                                       _____
                                           (Signature)

                                       _____
                                           (Address)

                                       _____
                                   (City, State and Zip Code)

Date: _____           (  )_____-_____
                                            (Telephone Number)

**Note:** You may use this form to take an appeal provided that it is <u>received</u> by the office of the Clerk of the District Court within 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

FORM I

### United States District Court
### Southern District of New York
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

```
--------------------------------------X
                                      |
                                      |    MOTION FOR EXTENSION OF TIME
                                      |    TO FILE A NOTICE OF APPEAL
        -V-                           |
                                      |
                                      |       civ.        (   )
                                      |
--------------------------------------X
```

Pursuant to Fed. R. App. P. 4(a)(5), _____ respectfully

(party)

requests leave to file the within notice of appeal out of time. _____

(party)

desires to appeal the judgment in this action entered on _____ but failed to file a

(day)

notice of appeal within the required number of days because:

[Explain here the "excusable neglect" or "good cause" which led to your failure to file a notice of appeal within the required number of days.]

<br><br><br><br>

_____
(Signature)

_____
(Address)

_____
(City, State and Zip Code)

Date: _____         (    ) _____ - _____
                                         (Telephone Number)

**Note:** You may use this form, together with a copy of Form 1, if you are seeking to appeal a judgment and did not file a copy of Form 1 within the required time.  If you follow this procedure, these forms must be received in the office of the Clerk of the District Court no later than 60 days of the date which the judgment was entered (90 days if the United States or an officer or agency of the United States is a party).

Case 1:09-cv-01251-DAB   Document 53-1   Filed 07/29/11   Page 4 of 5

FORM 2

# United States District Court
## Southern District of New York
### Office of the Clerk
### U.S. Courthouse
### 500 Pearl Street, New York, N.Y. 10007-1213

```
------------------------------------------X
                                          |
                                          |      NOTICE OF APPEAL
                                          |           AND
              -V-                         |   MOTION FOR EXTENSION OF TIME
                                          |
                                          |      civ.         (   )
                                          |
------------------------------------------X
```

1.     Notice is hereby given that _____ hereby appeals to

                                       (party)

the United States Court of Appeals for the Second Circuit from the judgment entered on _____ .
                                                [Give a description of the judgment]

2.     In the event that this form was not received in the Clerk's office within the required time

_____ respectfully requests the court to grant an extension of time in
               (party)

accordance with Fed. R. App. P. 4(a)(5).

      a.     In support of this request, _____ states that
                                               (party)

this Court's judgment was received on _____ and that this form was mailed to the
                                      (date)

court on _____ .
           (date)

                              _____
                                      (Signature)

                              _____
                                      (Address)

                              _____
                             (City, State and Zip Code)

Date: _____            (   ) _____-_____
                                    (Telephone Number)

**Note:** You may use this form if you are mailing your notice of appeal and are not sure the Clerk of the District Court will receive it within the 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

FORM 3

### United States District Court
### Southern District of New York
#### Office of the Clerk
#### U.S. Courthouse
#### 500 Pearl Street, New York, N.Y. 10007-1213

————————————————————X
                                    |
                                    |        **AFFIRMATION OF SERVICE**
                                    |
        -V-                         |
                                    |
                                    |        civ.            (   )
                                    |
————————————————————X

I, _____, declare under penalty of perjury that I have

served a copy of the attached _____

_____

upon _____

_____

whose address is: _____

_____

Date: _____
         New York, New York

                                              _____
                                                        (Signature)

                                              _____
                                                        (Address)

                                              _____
                                                   (City, State and Zip Code)

**SPA-36**

U.S. DISTRICT COURT
FILED

AUG 17 2011

D.S.
S.D. OF N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
RENEE MIHALIK,                                                          09-CV-01251 (DAB)

           *Plaintiff,*

     -against-                                                      **NOTICE OF APPEAL**

CREDIT AGRICOLE CHEUVREUX NORTH
AMERICA, INC.,

           *Defendant.*
-----------------------------------------------------------X

     **PLEASE TAKE NOTICE THAT**  Renee Mihalik, Plaintiff in the above named case,

hereby appeals to the United States Court of Appeals for the Second Circuit from the Memorandum

and Order of Judge Deborah A. Batts entered in this action on the 29th day of July, 2011 granting

Defendant's Motion For Summary.

Dated: New York, New York
      August 17, 2011
                                        **SCHWARTZ & PERRY, LLP**
                                        *Attorneys for Plaintiff*

                                        By:
                                        MATTHEW T. SCHATZ
To:   **THE CLERK OF THE COURT**                BRIAN HELLER
       UNITED STATES DISTRICT COURT        295 Madison Avenue
       SOUTHERN DISTRICT OF NEW YORK    New York, New York 10017
       500 Pearl Street                      (212) 889-6565
       New York, New York 10007

       **HOGAN LOVELLS**
       *Attorneys for Defendant*
       875 Third Avenue
       New York, New York 10022

**SPA-37**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

RENEE MIHALIK,                                          09-CV-01251 (DAB)

          *Plaintiff,*

    -against-                                    **AFFIDAVIT OF SERVICE**

CREDIT AGRICOLE CHEUVREUX NORTH
AMERICA, INC.,

          *Defendant.*
-----------------------------------------------------------X
COUNTY OF NEW YORK  )
                  )ss:
STATE OF NEW YORK    )

      I, Steven Pallonetti, being sworn, say: I am not a party to this action, am over 18 years of age, and reside in New York, New York 10309.

      On August 17, 2011, I served the within Notice of Appeal by depositing a true copy thereof in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to Barbara Roth, Esq at the following address:

        HOGAN LOVELLS
        875 Third Avenue
        New York, New York 10022

                             *Steven Pallonetti*
                             STEVEN PALLONETTI

Sworn to me this 17th
day of August 2011

*Julie D Tucker*
NOTARY PUBLIC

Julie D Tucker
Notary Public, State of New York
No. 02TU6206961
Qualified in New York County
Commission Expires June 8, 20 13