# 11-3361-cv

## United States Court of Appeals

### for the

### Second Circuit

RENEE MIHALIK,

*Plaintiff-Appellant,*

– v. –

CREDIT AGRICOLE CHEUVREUX NORTH AMERICA, INCORPORATED,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## NON-CONFIDENTIAL JOINT APPENDIX
### Volume I of II (Pages A-1 to A-284)

HOGAN LOVELLS US LLP
*Attorneys for Defendant-Appellee*
875 Third Avenue
New York, New York 10022
(212) 918-3000

SCHWARTZ & PERRY, LLP
*Attorneys for Plaintiff-Appellant*
295 Madison Avenue
New York, New York 10017
(212) 889-6565

i

# Table of Contents

**Page**

Civil Docket Sheet for Case No. 1:09-cv-01251-DAB ............... A-1

Notice of Removal of Defendant Credit Agricole Cheuvreux
    North America, Inc., Dated February 11, 2009 ..................... A-10

    Exhibit A to Notice of Removal -
    Summons and Verified Complaint,
    Dated January 21, 2009 ........................................................... A-13

    Exhibit B to Notice of Removal -
    Public Records Search Report Reflecting Plaintiff's
    Residential History ................................................................. A-33

Answer, Dated February 19, 2009, with Annexed Affidavit
    of Service ................................................................................ A-36

Confidentiality Agreement and Order,
    Dated August 26, 2009 ........................................................... A-43

Notice of Motion, by Defendant, for an Order Granting
    Summary Judgment, Dated November 1, 2010 ..................... A-50

Local Rule 56.1 Statement of Undisputed Facts by Defendant
    Credit Agricole Cheuvreux North America, Inc.,
    Dated November 1, 2010[*]
    (Reproduced in the Confidential Appendix
    at pp. CA-1–CA-38)

Declaration of Barbara M. Roth, for Defendant, in Support of
    Motion for Summary Judgment, Dated November 1, 2010 .... A-52

    Exhibit 1 to Roth Declaration -
    Summons and Verified Complaint, Dated January 21, 2009
    (Reproduced herein at pp. A-13–A-33)

    Exhibit 2 to Roth Declaration -
    Answer, Dated February 19, 2009
    (Reproduced herein at pp. A-36–A-42)

    Exhibit 3 to Roth Declaration -
    Excerpts of the Deposition of Renee Mihalik, Plaintiff,
    Taken February 1, 2010 .......................................................... A-79

---

[*] Pursuant to the Order dated August 26, 2009, these exhibits are confidential and filed under seal.

ii

**Page**

Exhibit 4 to Roth Declaration -
Excerpts of the Deposition of Altan Yenicay, M.D.,
Taken May 19, 2010................................................................ A-114

Exhibit 5 to Roth Declaration -
Excerpts of the Confidential Portions of the Deposition
of David E. Zack, Taken June 14, 2010[*]
(Reproduced in the Confidential Appendix
at pp. CA-39–CA-44)

Exhibit 6 to Roth Declaration -
Excerpts of the Confidential Portions of the Deposition
of Ian Peacock, Taken June 16, 2010[*]
(Reproduced in the Confidential Appendix
at pp. CA-45–CA-57)

Exhibit 7 to Roth Declaration -
Excerpts of the Deposition of Mark R. Powers,
Taken June 29, 2010................................................................ A-126

Exhibit 8 to Roth Declaration -
Excerpts of the Deposition of Citi Group by Tracy Platt
Beach, Taken July 16, 2010, and September 17, 2010 ........... A-138

Exhibits 9–165 to Roth Declaration[*] -
(Reproduced in the Confidential Appendix
at pp. CA-58–CA-490)

Declaration of Ian Peacock, for Defendant, in Support of
Motion for Summary Judgment, Dated October 30, 2010,
with Exhibits A–H[*]
(Reproduced in the Confidential Appendix
at pp. CA-491–CA-509)

Declaration of David Zack, for Defendant, in Support of
Motion for Summary Judgment, Dated October 28, 2010 ...... A-155

Exhibit A to Zack Declaration -
Transcript of Mihalik Recorded Calls[*]
(Reproduced in the Confidential Appendix
at pp. CA-510–CA-568)

---

[*] Pursuant to the Order dated August 26, 2009, these exhibits are confidential and filed under seal.

iii

**Page**

Declaration of Melissa Franzen, for Defendant, in Support of
   Motion for Summary Judgment, Dated October 29, 2010,
   with Exhibits A–B[*]
   (Reproduced in the Confidential Appendix
   at pp. CA-569–CA-573)

Declaration of John Palazzo, for Defendant, in Support of
   Motion for Summary Judgment, Dated October 27, 2010...... A-157

Declaration of Timothy Randall, for Defendant, in Support of
   Motion for Summary Judgment, Dated October 28, 2010...... A-160

Declaration of Dominic Romano, for Defendant, in Support of
   Motion for Summary Judgment, Dated October 26, 2010...... A-162

Declaration of Frank Boer, for Defendant, in Support of
   Motion for Summary Judgment, Dated October 29, 2010...... A-164

Affidavit of Service of Motion, Supporting Declarations, and
   Local Rule 56.1 Statement, Dated November 1, 2010............ A-166

Affidavit of Renee Mihalik, Plaintiff, in Opposition to Motion
   for Summary Judgment, Sworn to December 15, 2010[*]
   (Reproduced in the Confidential Appendix
   at pp. CA-574–CA-594)

   Exhibits Annexed to Mihalik Affidavit:

      Excerpts from the Deposition of Renee Mihalik,
      Taken February 1, 2010...................................................... A-200

      Excerpts from the Deposition of Ian Peacock,
      Taken June 16, 2010[*]
      (Reproduced in the Confidential Appendix
      at pp. CA-595–CA-607)

      Excerpts from the Deposition of David Zack,
      Taken June 14, 2010[*]
      (Reproduced in the Confidential Appendix
      at pp. CA-608–CA-619)

      Excerpts from the Deposition of Altan Yenicay, M.D.,
      Taken May 19, 2010........................................................... A-273

---

[*] Pursuant to the Order dated August 26, 2009, these exhibits are confidential and filed under seal.

iv

**Page**

Excerpts from the Deposition of Citi Group by Tracy
Platt Beach, Sworn to July 16, 2010 ................................... A-279

Excerpts from the Deposition of Mark R. Powers,
Taken June 29, 2010........................................................... A-283

Affidavit of Matthew Schatz, for Plaintiff, in Opposition to
Motion for Summary Judgment, Sworn to December 16,
2010.................................................................................... A-285

Exhibit A to Schatz Affidavit -
Summons and Complaint, Dated January 21, 2009
(Reproduced herein at pp. A-13–A-33)

Exhibits B–FF to Schatz Affidavit[*] -
(Reproduced in the Confidential Appendix
at pp. CA-620–CA-708)

Plaintiff's Response to Defendant's 56.1 Statement of
Undisputed Facts, Dated December 16, 2010[*]
(Reproduced in the Confidential Appendix
at pp. CA-709–CA-759)

Certificate of Service of Affidavits in Opposition, Counter 56.1
Statement and Memorandum of Law, Dated
December 16, 2010 ................................................................ A-289

Reply Declaration of Elisa Perez, for Defendant, in Further
Support of Motion for Summary Judgment, Dated
January 14, 2011 ................................................................... A-290

Reply Declaration of Ian Peacock, for Defendant, in Further
Support of Motion for Summary Judgment, Dated
January 11, 2011 ................................................................... A-292

Reply Declaration of Melissa Franzen, for Defendant, in
Further Support of Motion for Summary Judgment,
Dated January 14, 2011[*]
(Reproduced in the Confidential Appendix
at pp. CA-760–CA-761)

---

[*] Pursuant to the Order dated August 26, 2009, these exhibits are confidential and filed under seal.

v

**Page**

Defendant Credit Agricole Cheuvreux North America, Inc.'s
    Reply Statement of Material Facts Pursuant to Local Rule
    56.1, Dated January 18, 2011[*]
    (Reproduced in the Confidential Appendix
    at pp. CA-762–CA-781)

Notice of Motion, by Defendant, for an Order Striking Portions
    of Plaintiff's Response to Defendant's 56.1 Statement of
    Disputed Facts (Docket No. 38), and the Affidavit of Renee
    Mihalik (Docket No. 35), Dated January 18, 2011 ................ A-293

Declaration of Christopher N. Franciose, for Defendant, in
    Support of Motion to Strike and in Further Support of
    Motion for Summary Judgment, Dated January 17, 2011 ...... A-295

    Exhibit A to Franciose Declaration -
    Color-Coded Strike-Out of Plaintiff's 56.1
    Counterstatement.................................................................... A-298

    Exhibit B to Franciose Declaration -
    Table of "Paragraphs In Which Mihalik's Cited Evidence
    Fails to Create a Dispute as to Cheuvreux's Assertion" ......... A-348

    Exhibit C to Franciose Declaration -
    Excerpts from the Deposition of Renee Mihalik,
    Taken February 1, 2010 ........................................................ A-356

    Exhibit D to Franciose Declaration -
    Excerpts from the Deposition of Altan Yenicay, M.D.,
    Taken May 19, 2010............................................................... A-428

    Exhibit E and F to Franciose Declaration[*] -
    (Reproduced in the Confidential Appendix
    at pp. CA-782–CA-824)

    Exhibit G to Franciose Declaration -
    Excerpts of the Deposition of Mark R. Powers,
    Taken June 29, 2010............................................................... A-437

Certificate of Service of Plaintiff's Opposition to Defendant's
    Motion to Strike, Dated February 1, 2011 ............................. A-440

---

[*] Pursuant to the Order dated August 26, 2009, these exhibits are confidential and filed under seal.

vi

**Page**

Memorandum and Order of the Hon. Deborah A. Batts,
    Dated July 28, 2011, Appealed From...................................... A-441

Civil Judgment, Dated July 29, 2011 ......................................... A-470

Notice of Appeal, Dated August 17, 2011 .................................. A-476

CLOSED, APPEAL, ECF

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:09-cv-01251-DAB

| | |
|---|---|
| Mihalik v. Credit Agricole Cheuvreux North America, Inc. | Date Filed: 02/11/2009 |
| Assigned to: Judge Deborah A. Batts | Date Terminated: 07/29/2011 |
| Case in other court: State Court - Supreme, 100808-09 | Jury Demand: Plaintiff |
| Cause: 28:1441 Notice of Removal | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Diversity |

**Plaintiff**

**Renee Mihalik**                          represented by **Matthew Thomas Schatz**
                                                           Schwartz & Perry LLP
                                                           295 Madison Avenue
                                                           New York, NY 10017
                                                           212 889 6565
                                                           Fax: 212 779 8208
                                                           Email: mschatz@schwartzandperry.com

                                                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Credit Agricole Cheuvreux North**        represented by **Barbara M. Roth**
**America, Inc.**                                          Hogan Lovells US LLP (nyc)
                                                           875 Third Avenue
                                                           New York, NY 10022
                                                           (212)918-3000
                                                           Fax: (212)918-3100
                                                           Email: barbara.roth@hoganlovells.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Christopher Nicholas Franciose**
                                                           Hogan & Hartson L.L.P.(NYC)
                                                           875 Third Avenue
                                                           New York, NY 10022
                                                           (212) 918-3000
                                                           Fax: (212) 918-3100
                                                           Email:
                                                           christopher.franciose@hoganlovells.com

                                                           *ATTORNEY TO BE NOTICED*

                                                           **Dori Ann Hanswirth**

Hogan Lovells US LLP (nyc)
875 Third Avenue
New York, NY 10022
(212) 918-3000
Fax: (212) 918-3100
Email:
dori.hanswirth@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Nicole Civita**
Hogan Lovells US LLP (nyc)
875 Third Avenue
New York, NY 10022
(310)-785-4600
Fax: (310)-785-4601
Email: Nicole.Civita@hoganlovells.com

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2009 | 1 | NOTICE OF REMOVAL from State Supreme Court, County of New York. Case Number: 100808-09. (Filing Fee $ 350.00, Receipt Number 679136).Document filed by Credit Agricole Cheuvreux North America, Inc. (Attachments: # 1 exhibit A, # 2 exhibit Part B)(ama) (Entered: 02/13/2009) |
| 02/11/2009 | | Magistrate Judge Henry B. Pitman is so designated. (ama) (Entered: 02/13/2009) |
| 02/11/2009 | | Case Designated ECF. (ama) (Entered: 02/13/2009) |
| 02/11/2009 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Credit Agricole S.A. as Corporate Parent. Document filed by Credit Agricole Cheuvreux North America, Inc.(ama) (Entered: 02/13/2009) |
| 02/18/2009 | 3 | DEMAND for Trial by Jury. Document filed by Renee Mihalik(Schatz, Matthew) (Entered: 02/18/2009) |
| 02/19/2009 | 4 | ANSWER to Complaint. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Attachments: # 1 Affidavit Of Service)(Roth, Barbara) (Entered: 02/19/2009) |
| 03/02/2009 | 5 | NOTICE OF APPEARANCE by Matthew Thomas Schatz on behalf of Renee Mihalik (Schatz, Matthew) (Entered: 03/02/2009) |
| 04/17/2009 | 6 | SCHEDULING ORDER: This case is to be tried to a jury. Discovery due by 12/4/2009. Motions due by 1/8/2010. Joint Pretrial Order due by 1/29/2010. ENDORSEMENT: Plaintiff letter to Court that she is amenable to going forward with me as the Judge. (Signed by Judge Deborah A. Batts on 4/17/2009) (jpo) Modified on 4/23/2009 (jpo). (Entered: 04/17/2009) |
| 08/27/2009 | 7 | CONFIDENTIALITY AGREEMENT AND ORDER...regarding procedures to |

|  |  | be followed that shall govern the handling of confidential material.... (Signed by Judge Deborah A. Batts on 8/26/2009) (jpo) (Entered: 08/27/2009) |
|---|---|---|
| 11/04/2009 | 8 | JOINT MOTION for Extension of Time *for Discovery*. Document filed by Renee Mihalik, Credit Agricole Cheuvreux North America, Inc..(Roth, Barbara) (Entered: 11/04/2009) |
| 11/05/2009 | 9 | AMENDED MOTION for Extension of Time *for Discovery (Joint Motion)*. Document filed by Renee Mihalik, Credit Agricole Cheuvreux North America, Inc..(Roth, Barbara) (Entered: 11/05/2009) |
| 11/10/2009 | 10 | MEMO ENDORSEMENT on re: 8 Motion for Extension of Time; terminating 9 Motion for Extension of Time. ENDORSEMENT: Granted. So Ordered. (Signed by Judge Deborah A. Batts on 11/10/2009) (jfe) (Entered: 11/10/2009) |
| 11/10/2009 |  | Set/Reset Deadlines: Discovery due by 1/3/2010. Motions due by 3/5/2010. Pretrial Order due by 3/5/2010. Responses due by 3/19/2010 (jfe) (Entered: 11/10/2009) |
| 11/13/2009 | 11 | ENDORSED LETTER addressed to Judge Deborah A. Batts from Barbara M. Roth dated 11/13/2009 re: Requesting clarification of the Court's Order, dated November 10, 2009, in response to the parties' joint request for an extension of the discovery period. ENDORSEMENT: Granted. Discovery extend by 60 days. (Signed by Judge Deborah A. Batts on 11/13/2009) (jpo) (Entered: 11/16/2009) |
| 02/16/2010 | 12 | ENDORSED LETTER addressed to Judge Deborah A. Batts from Matthew T. Schatz dated 2/11/10 re: counsel for plaintiff requests that the end date for all discovery be extended to 5/14/10 and that the date for dispositive motions be extended to 6/30/10. ENDORSEMENT: Granted. Parties must follow Court's Individual Rules regarding premotion conference for dispositive motion. (Signed by Judge Deborah A. Batts on 2/16/10) (dle) (Entered: 02/16/2010) |
| 02/16/2010 |  | Set/Reset Deadlines: Discovery due by 5/14/2010. Motions due by 6/30/2010. (dle) (Entered: 02/16/2010) |
| 04/02/2010 | 13 | NOTICE OF CHANGE OF ADDRESS by Nicole Civita on behalf of Credit Agricole Cheuvreux North America, Inc.. New Address: Hogan & Hartson LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, California, USA 90067, 310-785-4600. (Civita, Nicole) (Entered: 04/02/2010) |
| 04/08/2010 | 14 | ENDORSED LETTER addressed to Judge Deborah A. Batts from Barbara M. Roth dated 4/8/2010 re: As counsel to the Defendant, we write respectfully to request a two-month extension of discovery, from May 14 to July 16. ENDORSEMENT: Granted. No further extensions absent extraordinary circumstances. SO ORDERED. (Signed by Judge Deborah A. Batts on 4/8/2010) (tve) (Entered: 04/09/2010) |
| 04/09/2010 |  | Set/Reset Deadlines: Discovery due by 7/16/2010. (tve) (Entered: 04/09/2010) |
| 05/07/2010 | 15 | NOTICE OF CHANGE OF ADDRESS by Christopher Nicholas Franciose on behalf of Credit Agricole Cheuvreux North America, Inc.. New Address: Hogan Lovells US LLP, 875 Third Avenue, New York, New York, USA 10022, 212 918-3000. (Franciose, Christopher) (Entered: 05/07/2010) |

| 05/07/2010 | 16 | NOTICE OF CHANGE OF ADDRESS by Nicole Civita on behalf of Credit Agricole Cheuvreux North America, Inc.. New Address: Hogan Lovells US LLP, 1999 Avenue Of The Stars, Suite 1400, Los Angeles, CA, USA 90067, (310) 785-4600. (Civita, Nicole) (Entered: 05/07/2010) |
| --- | --- | --- |
| 05/10/2010 | 17 | NOTICE OF APPEARANCE by Christopher Nicholas Franciose on behalf of Credit Agricole Cheuvreux North America, Inc. (Franciose, Christopher) (Entered: 05/10/2010) |
| 05/10/2010 | 18 | NOTICE of Change of Firm Name and E-Mail Address. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 05/10/2010) |
| 08/20/2010 | 19 | ENDORSED LETTER addressed to Judge Deborah A. Batts from Barbara M. Roth dated 8/17/2010 re: Cheuvreux respectfully requests that the Court permit it to complete the Citi deposition to authenticate and inquire about the documents that Citi belatedly produced after it was deposed on July 16. ENDORSEMENT: granted. (Signed by Judge Deborah A. Batts on 8/20/2010) (tro) (Entered: 08/23/2010) |
| 09/17/2010 | 20 | ORDER; that the Court is in receipt of and has reviewed Defendant's letter dated August 30, 2010 and Plaintiff's letter dated September 13, 2010. The Court hereby GRANTS Defendant's request to file a summary judgment motion against Plaintiff Renee Mihalik. Defendant shall file and serve its moving papers within 45 days of the date of this Order. Plaintiff shall respond within 45 days of being served with Defendant's moving papers; and Defendant may reply within 30 days of being served with Plaintiff's response, at which time the motion will be fully- submitted. (Signed by Judge Deborah A. Batts on 9/17/10) (pl) (Entered: 09/17/2010) |
| 11/01/2010 | 21 | MOTION for Summary Judgment. Document filed by Credit Agricole Cheuvreux North America, Inc..(Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 22 | MEMORANDUM OF LAW in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 23 | RULE 56.1 STATEMENT. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 24 | DECLARATION of Barbara M. Roth in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit |

| | | |
|---|---|---|
| | | 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70, # 71 Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73, # 74 Exhibit 74, # 75 Exhibit 75, # 76 Exhibit 76, # 77 Exhibit 77, # 78 Exhibit 78, # 79 Exhibit 79, # 80 Exhibit 80, # 81 Exhibit 81, # 82 Exhibit 82, # 83 Exhibit 83, # 84 Exhibit 84, # 85 Exhibit 85, # 86 Exhibit 86, # 87 Exhibit 87, # 88 Exhibit 88, # 89 Exhibit 89, # 90 Exhibit 90, # 91 Exhibit 91, # 92 Exhibit 92, # 93 Exhibit 93, # 94 Exhibit 94, # 95 Exhibit 95, # 96 Exhibit 96, # 97 Exhibit 97, # 98 Exhibit 98, # 99 Exhibit 99, # 100 Exhibit 100, # 101 Exhibit 101, # 102 Exhibit 102, # 103 Exhibit 103, # 104 Exhibit 104, # 105 Exhibit 105, # 106 Exhibit 106, # 107 Exhibit 107, # 108 Exhibit 108, # 109 Exhibit 109, # 110 Exhibit 110, # 111 Exhibit 111, # 112 Exhibit 112, # 113 Exhibit 113, # 114 Exhibit 114, # 115 Exhibit 115, # 116 Exhibit 116, # 117 Exhibit 117, # 118 Exhibit 118, # 119 Exhibit 119, # 120 Exhibit 120, # 121 Exhibit 121, # 122 Exhibit 122, # 123 Exhibit 123, # 124 Exhibit 124, # 125 Exhibit 125, # 126 Exhibit 126, # 127 Exhibit 127, # 128 Exhibit 128, # 129 Exhibit 129, # 130 Exhibit 130, # 131 Exhibit 131, # 132 Exhibit 132, # 133 Exhibit 133, # 134 Exhibit 134, # 135 Exhibit 135, # 136 Exhibit 136, # 137 Exhibit 137, # 138 Exhibit 138, # 139 Exhibit 139, # 140 Exhibit 140, # 141 Exhibit 141, # 142 Exhibit 142, # 143 Exhibit 143, # 144 Exhibit 144, # 145 Exhibit 145, # 146 Exhibit 146, # 147 Exhibit 147, # 148 Exhibit 148, # 149 Exhibit 149, # 150 Exhibit 150, # 151 Exhibit 151, # 152 Exhibit 152, # 153 Exhibit 153, # 154 Exhibit 154, # 155 Exhibit 155, # 156 Exhibit 156, # 157 Exhibit 157, # 158 Exhibit 158, # 159 Exhibit 159, # 160 Exhibit 160, # 161 Exhibit 161, # 162 Exhibit 162, # 163 Exhibit 163, # 164 Exhibit 164, # 165 Exhibit 165)(Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 25 | DECLARATION of Ian Peacock in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 26 | DECLARATION of David Zack in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Attachments: # 1 Exhibit A)(Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 27 | DECLARATION of Melissa Franzen in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 28 | DECLARATION of John Palazzo in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 29 | DECLARATION of Timothy Randall in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 11/01/2010) |

| 11/01/2010 | 30 | DECLARATION of Dominic Romano in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 11/01/2010) |
|---|---|---|
| 11/01/2010 | 31 | DECLARATION of Frank Boer in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 32 | CERTIFICATE OF SERVICE. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 11/01/2010) |
| 11/01/2010 | 33 | SEALED DOCUMENT placed in vault.(nm) Modified on 11/2/2010 (nm). (Entered: 11/02/2010) |
| 12/16/2010 | 34 | MEMORANDUM OF LAW in Opposition re: 21 MOTION for Summary Judgment.. Document filed by Renee Mihalik. (Heller, Brian) (Entered: 12/16/2010) |
| 12/16/2010 | 35 | AFFIDAVIT of Renee Mihalik in Opposition re: 21 MOTION for Summary Judgment.. Document filed by Renee Mihalik. (Attachments: # 1 Exhibit Mihalik Depo Part A, # 2 Exhibit Mihalik Depo Part B, # 3 Exhibit Peacock Depo, # 4 Exhibit Zack Depo, # 5 Exhibit Yenicay Depo, # 6 Exhibit Citi Depo, # 7 Exhibit Powers Depo)(Heller, Brian) (Entered: 12/16/2010) |
| 12/16/2010 | 36 | AFFIDAVIT of Matthew T. Schatz in Opposition re: 21 MOTION for Summary Judgment.. Document filed by Renee Mihalik. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit J, # 9 Exhibit K, # 10 Exhibit L, # 11 Exhibit M, # 12 Exhibit N, # 13 Exhibit O, # 14 Exhibit P, # 15 Exhibit Q, # 16 Exhibit R, # 17 Exhibit S, # 18 Exhibit T, # 19 Exhibit U, # 20 Exhibit V, # 21 Exhibit W, # 22 Exhibit X, # 23 Exhibit Y, # 24 Exhibit Z, # 25 Exhibit AA, # 26 Exhibit BB, # 27 Exhibit CC, # 28 Exhibit DD, # 29 Exhibit EE, # 30 Exhibit FF)(Heller, Brian) (Entered: 12/16/2010) |
| 12/16/2010 | 37 | AFFIDAVIT of Matthew T. Schatz in Opposition re: 21 MOTION for Summary Judgment.. Document filed by Renee Mihalik. (Attachments: # 1 Exhibit F, # 2 Exhibit I)(Heller, Brian) (Entered: 12/16/2010) |
| 12/16/2010 | 38 | COUNTER STATEMENT TO 23 Rule 56.1 Statement. Document filed by Renee Mihalik. (Heller, Brian) (Entered: 12/16/2010) |
| 12/16/2010 | 39 | CERTIFICATE OF SERVICE of Opposition to Motion for Summary Judgment served on Defendant, Credit Agricole Cheuvreux on December 16, 2010. Service was made by Mail. Document filed by Renee Mihalik. (Heller, Brian) (Entered: 12/16/2010) |
| 01/18/2011 | 40 | REPLY MEMORANDUM OF LAW in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 01/18/2011) |
| 01/18/2011 | 41 | DECLARATION of Elisa Perez in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 01/18/2011) |

| 01/18/2011 | 42 | DECLARATION of Ian Peacock in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 01/18/2011) |
| --- | --- | --- |
| 01/18/2011 | 43 | DECLARATION of Melissa Franzen in Support re: 21 MOTION for Summary Judgment.. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 01/18/2011) |
| 01/18/2011 | 44 | NOTICE of Defendant Credit Agricole Cheuvreux North America, Inc.'s Reply Statement Of Material Facts Pursuant To Local Rule 56.1 re: 40 Reply Memorandum of Law in Support of Motion. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 01/18/2011) |
| 01/18/2011 | 45 | MOTION to Strike Document No. [35 and 38]. Document filed by Credit Agricole Cheuvreux North America, Inc..(Roth, Barbara) (Entered: 01/18/2011) |
| 01/18/2011 | 46 | DECLARATION of Christopher N. Franciose, Esq. in Support re: 21 MOTION for Summary Judgment., 45 MOTION to Strike Document No. [35 and 38].. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Roth, Barbara) (Entered: 01/18/2011) |
| 01/18/2011 | 47 | SEALED DOCUMENT placed in vault.(cb) (Entered: 01/19/2011) |
| 01/19/2011 | 48 | MEMORANDUM OF LAW in Support re: 45 MOTION to Strike Document No. [35 and 38].. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 01/19/2011) |
| 02/01/2011 | 49 | MEMORANDUM OF LAW in Opposition re: 45 MOTION to Strike Document No. [35 and 38].. Document filed by Renee Mihalik. (Attachments: # 1 Exhibit Exhibit 1)(Schatz, Matthew) (Entered: 02/01/2011) |
| 02/01/2011 | 50 | CERTIFICATE OF SERVICE of Opposition to Motion to Strike served on Barbara Roth Esq on 2/1/11. Service was made by Overnight Delivery. Document filed by Renee Mihalik. (Schatz, Matthew) (Entered: 02/01/2011) |
| 02/14/2011 | 51 | REPLY MEMORANDUM OF LAW in Support re: 45 MOTION to Strike Document No. [35 and 38].. Document filed by Credit Agricole Cheuvreux North America, Inc.. (Roth, Barbara) (Entered: 02/14/2011) |
| 07/29/2011 | 52 | MEMORANDUM AND ORDER. For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED on all counts. The Clerk of Court is directed to CLOSE the docket in this case. Granting 21 Motion for Summary Judgment. (Signed by Judge Deborah A. Batts on 7/28/11) (rjm) (Entered: 07/29/2011) |
| 07/29/2011 | | Transmission to Judgments and Orders Clerk. Transmitted re: 52 Order on Motion for Summary Judgment to the Judgments and Orders Clerk. (rjm) (Entered: 07/29/2011) |
| 07/29/2011 | 53 | CLERK'S JUDGMENT That for the reasons stated in the Court's |

| | | |
|---|---|---|
| | | Memorandum and Order dated July 28, 2011, Defendant's motion to strike is denied, and its motion for summary judgment is granted on all counts; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 7/29/11) (Attachments: # 1 notice of right to appeal)(ml) (Entered: 07/29/2011) |
| 08/17/2011 | 54 | NOTICE OF APPEAL from 53 Clerk's Judgment, 52 Order on Motion for Summary Judgment. Document filed by Renee Mihalik. Filing fee $ 455.00, receipt number 465401014354. (tp) (Entered: 08/18/2011) |
| 08/18/2011 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 54 Notice of Appeal. (tp) (Entered: 08/18/2011) |
| 08/18/2011 | | Transmission of Notice of Appeal to the District Judge re: 54 Notice of Appeal. (tp) (Entered: 08/18/2011) |
| 08/18/2011 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 22 Memorandum of Law in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 26 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 21 MOTION for Summary Judgment filed by Credit Agricole Cheuvreux North America, Inc., 49 Memorandum of Law in Opposition to Motion filed by Renee Mihalik, 36 Affidavit in Opposition to Motion, filed by Renee Mihalik, 38 Counter Statement to Rule 56.1 filed by Renee Mihalik, 50 Certificate of Service Other filed by Renee Mihalik, 43 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 20 Order, 11 Endorsed Letter, Set Deadlines/Hearings, 48 Memorandum of Law in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 3 Jury Demand filed by Renee Mihalik, 39 Certificate of Service Other filed by Renee Mihalik, 5 Notice of Appearance filed by Renee Mihalik, 23 Rule 56.1 Statement filed by Credit Agricole Cheuvreux North America, Inc., 40 Reply Memorandum of Law in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 44 Notice (Other), Notice (Other) filed by Credit Agricole Cheuvreux North America, Inc., 35 Affidavit in Opposition to Motion, filed by Renee Mihalik, 33 Sealed Document, 28 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 1 Notice of Removal, filed by Credit Agricole Cheuvreux North America, Inc., 17 Notice of Appearance filed by Credit Agricole Cheuvreux North America, Inc., 10 Order on Motion for Extension of Time, 9 AMENDED MOTION for Extension of Time *for Discovery (Joint Motion).* filed by Credit Agricole Cheuvreux North America, Inc., Renee Mihalik, 53 Clerk's Judgment, 6 Order, Set Deadlines/Hearings, 45 MOTION to Strike Document No. [35 and 38] filed by Credit Agricole Cheuvreux North America, Inc., 32 Certificate of Service Other filed by Credit Agricole Cheuvreux North America, Inc., 46 Declaration in Support of Motion, filed by Credit Agricole Cheuvreux North America, Inc., 41 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 42 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 30 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 12 Endorsed Letter, 18 Notice (Other) filed by Credit Agricole Cheuvreux North America, Inc., 19 Endorsed Letter, 16 Notice of Change of Address filed by Credit Agricole Cheuvreux North America, Inc., 14 Endorsed Letter, Set Hearings, 8 |

| | JOINT MOTION for Extension of Time *for Discovery* filed by Credit Agricole Cheuvreux North America, Inc., Renee Mihalik, 52 Order on Motion for Summary Judgment, 25 Declaration in Support of Motion, filed by Credit Agricole Cheuvreux North America, Inc., 29 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 7 Protective Order, 37 Affidavit in Opposition to Motion filed by Renee Mihalik, 24 Declaration in Support of Motion, filed by Credit Agricole Cheuvreux North America, Inc., 4 Answer to Complaint filed by Credit Agricole Cheuvreux North America, Inc., 54 Notice of Appeal filed by Renee Mihalik, 51 Reply Memorandum of Law in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 34 Memorandum of Law in Opposition to Motion filed by Renee Mihalik, 15 Notice of Change of Address filed by Credit Agricole Cheuvreux North America, Inc., 2 Rule 7.1 Corporate Disclosure Statement filed by Credit Agricole Cheuvreux North America, Inc., 27 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc., 13 Notice of Change of Address filed by Credit Agricole Cheuvreux North America, Inc., 31 Declaration in Support of Motion filed by Credit Agricole Cheuvreux North America, Inc. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/18/2011) |
|---|---|

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/21/2011 10:38:58 | | |
| **PACER Login:** at0090 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 1:09-cv-01251-DAB |
| **Billable Pages:** 6 | **Cost:** | 0.48 |

A-10

Barbara Roth (BR 1982)
Dori Ann Hanswirth (DAH 9728)
Nicole Civita (NC 0727)
Hogan & Hartson LLP
875 Third Avenue
New York, NY  10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
*Attorneys for Defendant*
*Credit Agricole Cheuvreux North America, Inc.*



JUDGE BATTS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
RENEE MIHALIK,

                        Plaintiff,

     – against –

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.

                        Defendant.
--------------------------------------------------------------X

**'09 CIV 1251**

Case No.: _____

## NOTICE OF REMOVAL OF DEFENDANT
## CREDIT AGRICOLE CHEUVREUX NORTH AMERICA, INC.

TO:    CLERK, UNITED STATES DISTRICT COURT FOR THE
        SOUTHERN DISTRICT OF NEW YORK

        Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant Credit Agricole Cheuvreux North

America, Inc. ("Cheuvreux"), by its undersigned counsel, hereby files this Notice of Removal of

the action styled *Renee Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, Index

Number 100808/09, currently pending in the Supreme Court of the State of New York, County

of New York (the "State Court Action"), and states as follows:

        1.    Plaintiff Renee Mihalik ("Plaintiff") filed a Summons and Verified Complaint

(the "Complaint") with the Supreme Court of the State of New York, County of New York on

January 21, 2009.  A true and correct copy of the Summons and Complaint are attached hereto as Exhibit A.

2.    The Summons and Complaint were served on Cheuvreux's registered agent for service of process, CT Corporation Systems, by personal service on January 22, 2009.  Upon information and belief, at the time of this Notice, no other defendant has been named, served or joined in this action.

3.    Cheuvreux, at the time this action was filed and as of the date of this Notice, was and is a corporation incorporated under the laws of the State of Delaware, with offices in New York and California.

4.    Plaintiff, at the time this action was filed and as of the date of this Notice, was and is a citizen of the State of New Jersey.  A true and correct copy of a public records search report reflecting Plaintiff's residential history and redacted to prevent disclosure of personal information is attached hereto as Exhibit B.

5.    The amount in controversy in this action, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00).  In the Complaint, Plaintiff alleges violations of the New York City Human Rights Law ("NYCHRL") and seeks compensatory damages in the amount of Five Million Dollars ($5,000,000.00) and punitive damages in the amount of Five Million Dollars ($5,000,000.00).  (Complaint ¶¶ 51 – 53.)

8.    This court has original jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1332, because Plaintiff and Cheuvreux, the only named and/or served defendant in this action, were and are citizens of different states and the amount of controversy is in excess of $75,000.00, exclusive of interests and costs.

9.    This action is properly removed to the United States District Court for the

Case 1:09-cv-01251-DAB   Document 1   Filed 02/11/09   Page 3 of 3

Southern District of New York, pursuant to 28 U.S.C. § 1441(a), in that said District Court embraces the state court where the State Court Action was filed.

10.    Cheuvreux desires to remove this action to this Court and submits this Notice, along with all other process, pleadings and orders that have been served upon it. *See* Exhibit A. Cheuvreux has not filed an appearance, answer or other pleadings in the State Court Action. Cheuvreux is not aware of any other process, pleadings, or orders filed in the State Court Action.

11.    Written notice of the filing of this Notice of Removal is being given to Plaintiff. A copy of this Notice of Removal and supporting papers are being filed with the Supreme Court of the State of New York, County of New York, as required by 28 U.S.C. § 1446(d).

12.    This Notice is filed with this Court within 30 days after Cheuvreux was formally served with a Summons in this case. Removal is, therefore, timely pursuant to 28 U.S.C. § 1446(b) and *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

13.    Cheuvreux does not waive any objections it may have to service, jurisdiction, or venue, and any other defenses or objections to this action.

WHEREFORE, Defendant Credit Agricole Cheuvreux North America, Inc. prays that the State Court Action be removed to this Court.

Dated: February 11, 2009

Respectfully submitted,

HOGAN & HARTSON LLP

By: _____
Barbara Roth (BR 1982)
Dori Ann Hanswirth (DAH 9728)
Nicole Civita (NC 0727)
Hogan & Hartson LLP
875 Third Avenue
New York, NY  10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
*Attorneys for Defendant*
*Credit Agricole Cheuvreux North America, Inc.*

3

Case 1:09-cv-01251-DAB   Document 1-2   Filed 02/11/09   Page 2 of 21

B199— Summons without notice, Supreme Court.
personal or substituted service, 12 pt type, 4-94

©1993 Blumberg Excelsior, Inc , Publisher, NYC 10013
www.blumberg.com

# Supreme Court of the State of New York

## County of      NEW YORK

RENEE MIHALIK,

*Plaintiff(s)*

*against*

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC

*Defendant(s)*

Index No. *100808/09*
Date purchased *1-21-09*

Plaintiff(s) designate(s)

NEW YORK
County as the place of trial.

The basis of the venue is
   Defendants place of business

# Summons

Plaintiff(s) reside(s) at

County of

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within    20    days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated,        January 21, 2009

Defendant's address:

   CREDIT AGRICOLE CHEUVREUX
   NORTH AMERICA, INC
   C/O C T CORPORATION SYSTEM
   111 Eighth Avenue
   New York, New York 10011

Attorney(s) for Plaintiff

Office and Post Office Address

SCHWARTZ & PERRY, LLP
295 Madison Avenue
New York, New York 10017
(212) 889-6565

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X
RENEE MIHALIK,                                                                              Index #: *100808/09*

                                  *Plaintiff,*

                    -against-                                                         **VERIFIED COMPLAINT**

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

                                  *Defendant.*
-----------------------------------------------------------------------X

      Plaintiff, Renee Mihalik, as and for her Verified Complaint, respectfully alleges, all upon

information and belief, as follows:


### RELEVANT BACKGROUND

    1.    At all relevant times herein and at the present time, Plaintiff, Renee Mihalik

("Mihalik"), was employed by Credit Agricole Cheuvreux North America, Inc., in its offices located

in the County, City, and State of New York.


    2.    Defendant, Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux"), is a

corporation duly organized and existing under the laws of the State of Delaware and is authorized

to do business in the State of New York with its place of business at 1301 Avenue of the Americas

in the County, City and State of New York from which Mihalik performed her services.


    3.    At all relevant times herein, Cheuvreux, a full service broker engaged in performing

customized research, sales and execution services for international clients, operated and still operates

in the County, City and State of New York.

## **BACKGROUND RELEVANT TO ALL CAUSES OF ACTION**

4.     Mihalik commenced her employment with Cheuvreux on July 9, 2007 as Vice President-Alternative Execution Services, and remained employed in that capacity until her unlawful termination on April 10, 2008.

5.     At all relevant times mentioned herein, Ian Peacock ("Peacock") was and remains employed by Cheuvreux as its Chief Executive Officer.

6.     At all relevant times mentioned herein, Mihalik reported directly to Peacock in the course of her employment as Vice President of Cheuvreux, so that Peacock was in a position of control and authority over Mihalik.

7.     Throughout the course of her employment with Cheuvreux, until her unlawful termination, Mihalik was qualified for her position and performed her duties effectively, as evidenced by the praise, bonuses and the increased duties and responsibilities assigned to her.

8.     Peacock knowingly allowed pornography in the office and on employee computers, creating a threatening and demeaning environment, which, due to its widespread viewing by the male employees, was impossible for Mihalik to escape.

9.      Cheuvreux was fully aware of the hostile, threatening and discriminatory environment that existed in its workplace, but ignored it, to such an extent, that Cheuvreux condoned and ratifyied the discrimination and gender hostility that existed in the office of Cheuvreux during the period of Mihalik's employment.

10.   .  In July 2007, Peacock began making inappropriate and unwelcome sexual comments and advances toward Mihalik, which included, among other things, but was not limited to, engaging in at least the following discriminatory and sexually inappropriate conduct:

- Telling business associates "how sexy [Mihalik's] dress and cleavage is," encouraging the associates to make similarly sexually degrading comments, which made Mihalik feel like a sexual object, instead of a business professional.

- Displaying pornography, pictures of nude woman and other sexually explicit images on his computer, including a man hanging upside-down from his genitals, which made Mihalik feel threatened and intimidated in her work environment.

- Intimidating and humiliating Mihalik by repeatedly commenting on Mihalik's appearance in the work place, stating on one occasion, "That dress makes you look goooood" and "You should dress like that every day; you might get more clients in turn," indicating that Mihalik could only get more clients based on her looks and not her competence, which was degrading to Mihalik.

- Degrading Mihalik by saying to her "Love the red shoes!," "You know what wearing red shoes means, right?" to insinuate that Mihalik was promiscuous.

- Asking Mihalik "Do you know what dogging is" and then "Do you fancy dogging?" to express his desire for a sexual relationship with Mihalik, which Peacock knew was unwelcome to Mihalik.

3

- Making comments about "pussy" in front of business associates and Mihalik at a group outing in London, which was demeaning to her.

- Making inappropriate comments about Mihalik's personal life, humiliating her in front of her coworkers, including statements such as "Why aren't you married?" and suggesting that she must be a "cougar," referring to a woman who aggressively pursues much younger men for sexual relations, knowing that his comments were unwelcome to her.

- Humiliating Mihalik by suggesting that she should appear more feminine, stating on one occasion "Are *pants suits* a US thing? They are very masculine."

- Telling Mihalik, "You look very sexy today."

- Repeatedly returning from afternoon meetings in a drunken state, especially around the December holidays, then propositioning Mihalik to stay in a hotel room, with Peacock, which was maintained by Cheuvreux.

- Telling Mihalik to schedule her trip to Europe to coincide with his so that they can "travel together", causing Mihalik significant anxiety and fear about having to spend that much time alone with Peacock.

- Encouraging foreign business associates to be disrespectful toward Mihalik, often leading to inappropriate conduct including borrowing Mihalik's pen and then telling her that they "stuck her pen in their ass."

- Asking Mihalik personal questions including "How old are you" and "Do you have a boyfriend?", although Peacock knew that Mihalik did not desire to share this personal information with Peacock.

The conduct mentioned above is not all-inclusive, but instead represents examples of the many reprehensible and humiliating acts that Cheuvreux permitted Peacock to commit against Mihalik during the period mentioned herein, which were intimidating, threatening and created an intensely

4

hostile and frightening workplace for Mihalik.

11.    Peacock repeatedly used his actual and apparent authority as CEO to engage in the harassment, intimidating and threatening conduct towards Mihalik.

12.    Despite Mihalik's fears that reporting the sexual harassment and retaliation of the Chief Executive Officer would result in some form of punishment or her termination, Mihalik protested the sexual harassment to Dave Zack ("Zack"), Cheuvreux's Compliance Officer.

13.    Zack and other senior management at Cheuvreux failed to take any corrective or remedial action to ensure that Peacock's sexual harassing conduct would stop, even though it knew it was threatening to Mihalik, but instead, Cheuvreux ratified and condoned the conduct of Peacock and made it its own.

14.    Zack told Mihalik that he "didn't feel comfortable" with Peacock's harassing conduct and that "it wasn't proper business practice," but feared if he said anything, "Peacock would fire [Mihalik] for complaining about [Peacock's harassing conduct]."

15.    Zack further explained to Mihalik that other employees would not support Mihalik's complaints against Peacock, for fear of being retaliated against by Peacock.

16.     Mihalik was made aware, therefore, that she would be standing alone against Peacock and would be the target of Peacock's retaliation.

17.     Cheuvreux did not have a Human Resources department, making it very difficult for Mihalik to discuss and address the sexual harassment of Peacock.

18.     Peacock was repeatedly permitted to sexually harass and demean Mihalik in a manner that was readily observed by other Cheuvreux employees and made known to Cheuvreux management, but the conduct was ignored, so that it became evident to Peacock that the harassment was accepted and condoned by Cheuvreux and that Mihalik would continue to be unprotected.

19.     Despite Cheuvreux's confirmed awareness of the intensified sexual harassment that Mihalik was suffering at the hands of Peacock, Cheuvreux failed to conduct any meaningful investigation into the conduct that had been reported by Mihalik.

20.     After Mihalik rejected Peacock's repeated advances and made it clear to Peacock that she was not interested in establishing any personal relationship with him, Peacock became hostile toward her, often responding with demeaning and inappropriate conduct, causing her to suffer even further adverse employment action.

21.     Mihalik's continuous rejection of Peacock's advances and her complaints to Zack became known to Peacock and he began to retaliate against Mihalik for reporting his conduct.

6

22.     After Mihalik rejected Peacock's repeated advances and complained of the harassment

and discriminatory conduct that she was being subject to by Peacock, the conduct intensified by way

of acts of retaliation against Mihalik, causing her to suffer even further, which included, among other

things, and only by way of example, at least the following conduct engaged in by Peacock:

- Assigning Mihalik to absurd tasks to ensure her failure and create performance issues that could satisfy a termination "for cause," including a one-week assignment impossible to complete in such a short time frame.

- Forcing Mihalik to call and organize her own meetings, which involved "cold calling" clients in Germany, where most clients are not English-speaking, while other salespeople would set up meetings for international clients in their native country, adversely effected Mihalik's work performance, and all of which was intended to create a pretext for her termination.

- Taking work away from Mihalik and instead giving her menial tasks.

- Directing the team to disregard Mihalik's accounts and taking a new male employee along instead of her to introduce clients to him, making it more difficult for Mihalik to succeed in the male dominated chauvinistic workplace.

- Repeatedly reprimanding Mihalik for her work performance, making her feel worthless, stating on one occasion, "You never have anything to say that adds value," which was untrue as confirmed by the fact that she continued to generate important business accounts and her competence was recognized by others in the work place.

- Refusing to recognize Mihalik's work accomplishments, including a threat that if Mihalik won the company brand contest, Peacock "will make sure [Mihalik] is awarded nothing."

- Using profanities to degrade Mihalik's work, including, "Have you ever written a business plan before because a fucking

7

twelve-year-old could have written this," when comments such as this were never made by Peacock before Mihalik refused his advances;

- Degrading and speaking negatively of Mihalik in front of her coworkers, saying, "You have no idea what you are talking about... if 'it' existed, then how come 'we' [referring to five other men in the meeting] don't know about it?"

- Becoming more and more demanding of Mihalik's work and stating that her "efforts are unacceptable and frankly not as good" as her male peers.

- Stating that Mihalik, an American, was much less intelligent and, "If [Mihalik] had a British accent she would sound more sophisticated and people might take her seriously," although Mihalik's accent had never before been a problem.

- Singling out Mihalik as the only Cheuvreux employee not to receive a performance review, so that Mihalik was not given formal notice of any performance problems so that she could improve upon her work performance and receive her bonus.

- Degrading Mihalik in front of her colleagues using profanities by calling Mihalik "a fucking liar" and telling her "this is fucking unacceptable."

- Questioning Mihalik's abilities by saying "What do you need, three fucking years?" when Mihalik informed Peacock she needed a few months to produce the revenue he requested.

- Claiming Mihalik did not have the contacts or relationships she promised in her interview, which was patently untrue since Mihalik had signed three of the major players Peacock wanted, and scheduled meetings with the others.

- Mihalik's first bonus check was handed to her in physical form on payday (not direct deposit) because Peacock was trying to avoid paying her subsequent bonuses by terminating her employment prior to the next bonus eligibility date.

The acts mentioned above are only examples of the many acts of retaliation that took place during the

period mentioned herein and were a direct result of Mihalik engaging in activities protected under the Human Rights Law, which were causally linked to and meant to punish Mihalik for her complaints regarding sexual harassment by Peacock.

23.    The offensive, unwelcome, and discriminatory conduct occurred on such a regular and frequent basis that Mihalik never knew when the harassment would occur next, so that Mihalik's work environment became hostile, intimidating, and threatening to her.

24.    On April 10, 2008, Peacock had a meeting with Mihalik, at which time Peacock presented Mihalik with a post-dated warning letter and told her she was not performing up to standards, which was not true.

25.    During the meeting, Peacock's berated Mihalik in an inappropriate, demeaning, and unprofessional manner with abusive statements.

26.    Peacock threatened Mihalik with the fact that her "termination" would be documented on her U5 if they (Peacock and Mihalik) did not come to an immediate "agreement" or "settlement" because they were not "working out" and Peacock did not want Mihalik at Cheuvreux anymore.

27.    Mihalik was unlawfully terminated by Cheuvreux, on April 10, 2008, which was causally connected to her protests of the sexual harassment and discrimination she was subjected to by Peacock and Cheuvreux, which were protected activities under the New York City Human Rights

Law.

28.    Mihalik has suffered from the adverse effects of the harassment and retaliation and the quality of her life has been irreparably damaged and her self-esteem, self-respect and well-being have been irreversibly harmed because she was subjected to the intimidating and threatening type of conduct described herein, all of which will continue into the future and remain a source of humiliation, anguish, and financial loss to Mihalik, so that the quality of Mihalik's life has been significantly damaged solely as a result of the harassment and retaliation she was forced to endure by Cheuvreux.

29.    The acts of Cheuvreux were so clearly done with reckless and indifference in the face of a perceived risk that its action would violate Mihalik's protected rights under the New York City Human Rights Law, that, in addition to all the damages inflicted upon Mihalik and in addition to all the measures of relief to which she may properly be entitled herein, Cheuvreux should also be required to pay punitive damages as punishment for its discriminatory conduct and to deter Cheuvreux and others similarly situated from engaging in such unlawful conduct in the future.

**AS AND FOR THE FIRST CAUSE OF ACTION ON BEHALF OF MIHALIK AGAINST CHEUVREUX FOR GENDER DISCRIMINATION IN VIOLATION OF CHAPTER I, TITLE 8, §8-107(1)(a) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK**

30.    Mihalik repeats, re-alleges and incorporates in full paragraphs 1 through 29 of this Complaint, as though fully set forth at length.

10

31.     Throughout the time of her employment with Cheuvreux, Mihalik was fully qualified for her position and  performed the duties and functions of her employment in a fully satisfactory fashion.

32.     At the time that Cheuvreux allowed and condoned the sexually hostile environment and gender discrimination that Mihalik was forced to suffer simply because of her gender, she was, in fact, protected against such conduct under the New York City Human Rights Law.

33.     The conduct, words and actions that Cheuvreux took against Mihalik that form the basis of this cause of action were unwelcome to her, a fact which Cheuvreux knew, or should have known, as a result of Mihalik's complaints and the actual nature of the conduct, all of which were ignored by Cheuvreux in that, among other things, Cheuvreux failed to take any genuine remedial action.

34.     Cheuvreux is liable to Mihalik for the sexually hostile, abusive environment and gender discrimination she suffered in her workplace, because unlawful conduct was engaged in by Cheuvreux's management, who allowed and condoned a workplace permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive so as to alter the terms, conditions and privileges of Mihalik's employment and create an abusive, threatening and hostile work environment.

35.     Cheuvreux was obligated to maintain a workplace free of hostility and to prevent its employees from violating any laws designed to prevent unlawful discrimination in employment, and,

therefore, is legally responsible and liable to Mihalik for the acts of its supervisory employees toward her that resulted in an adverse employment action against Mihalik in violation of the New York City Human Rights Law.

36.    Mihalik was caused to suffer injuries resulting in emotional injuries, all of which humiliated and otherwise intimidated and degraded Mihalik because of Cheuvreux's outrageous conduct in violation of Mihalik's human rights, all of which impacted upon her health, well-being and the quality of her life.

37.    The aforementioned acts of Cheuvreux constitute unlawful gender discrimination against Mihalik in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(1)(a) (referred to as The New York City Human Rights Law), which provides, *inter alia*, that:

> It shall be unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the . . . gender . . . of any person to discriminate against such person in compensation or in terms, conditions or privileges of employment.

38.    As a result of Cheuvreux's violation of the New York City Human Rights Law, Cheuvreux is liable to Mihalik pursuant to § 8-502(a) of said statute for "damages, including punitive damages," and pursuant to §8-(502)(f) of said statue for "costs and reasonable attorney's fees" based on the lodestar method as judicially established and accepted when attorney's fees are provided by the law.

39.   As a proximate result of Cheuvreux's conduct, Mihalik has been adversely affected in her employment, her well-being, in the quality of her life and in her normal life's pursuits, and Mihalik believes Cheuvreux's conduct complained of herein has and will continue to have an irreparably devastating effect upon her career, effects which Mihalik alleges to be in the amount of Two Million Dollars ($2,000,000).

40.   Here, the acts of Cheuvreux were so egregious and were done so clearly with malice and/or reckless indifference in the face of a perceived risk that its actions will violate Mihalik's protected rights under the New York City Human Rights Law, that, in addition to all the damages inflicted upon Mihalik and in addition to all the measure of relief to which Mihalik may properly be entitled herein, Cheuvreux should also be required to pay punitive damages to punish it for its discriminatory conduct in the further amount of Three Million ($3,000,000), in order to deter it and others similarly situated from engaging in such conduct in the future.

41.   Mihalik, therefore, seeks, including, among other things, monetary losses and the emotional harm inflicted upon her in the sum of Two Million Dollars ($2,000,000), and the additional and further sum of Three Million Dollars ($3,000,000) for punitive damages, making a total of Five Million Dollars ($5,000,000), plus the costs of this action as well as reasonable attorney's fees on this cause of action based on the lodestar method as has been judicially established and accepted when attorney's fees are provided by the law.

13

**AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF
OF MIHALIK AGAINST CHEUVREUX FOR RETALIATION IN
VIOLATION OF CHAPTER I, TITLE 8, §8-107(7) OF THE
ADMINISTRATIVE CODE OF THE CITY OF NEW YORK**

42.     Mihalik repeats, re-alleges and incorporates in full paragraphs 1 through 29 of this Complaint, as though fully set forth at length herein.

43.     Each time that Mihalik complained about the gender-based discriminatory treatment that she was subjected to by Cheuvreux, she engaged in a protected activity under the New York City Human Rights Law, of which Cheuvreaux was aware.

44.     Following each of Mihalik's complaints, she was subjected to further retaliation and further abuse, which involves, among other things and only by way of example, the conduct described in paragraphs herein, all of which adversely and severely impacted upon her position, career and well being and was designed to punish her for having complained about the humiliating, sexually harassing treatment she was forced to endure.

45.     The retaliatory conduct and actions taken by Cheuvreux were causally connected to Mihalik's protected activity, *i.e.*, protesting the sexual harassment and gender discrimination created by Cheuvreux and to which Mihalik was subjected by Cheuvreux.

46.     Cheuvreux failed to effectively remedy or prevent and, indeed, exacerbated the hostility, vindictiveness and degrading nature of Mihalik's work environment, although it knew, or in the

14

exercise of reasonable care, should have known of the retaliation and its causal effect upon Mihalik.

47.    The hostile, abusive, demeaning and humiliating work environment resulting from the pattern and practice of retaliation to which Mihalik was subjected, unreasonably interfered with Mihalik's work and, therefore, altered the terms, conditions and privileges of her employment.

48.    Mihalik was caused to suffer and continues to suffer from the adverse effects of Cheuvreux's prolonged course of humiliation and degradation, and Cheuvreux's retaliation, because she opposed the sexual harassment to which she was subjected by Cheuvreux, in violation of Mihalik's human rights under the law.

49.    The aforementioned acts of Defendant constitute unlawful retaliation against Mihalik in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(7) of the New York City Human Rights Law, which provides, *inter alia*, that:

> It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . .

50.    As a direct and proximate result of Cheuvreux's violation of the New York City Human Rights Law, Defendant is liable to Mihalik pursuant to §8-502(a) of said statute for "damages, including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," based on lodestar method as has been judicially established and accepted as a means of calculating attorney's fees, when they are properly available under the law, as they are here.

51.    As a direct and proximate result of Cheuvreux's conduct complained of herein, and as alleged in this cause of action, as well as the conduct set forth in this Complaint, Mihalik has been adversely affected in her employment and in her life's normal pursuits, and Mihalik believes that the injuries inflicted upon her as direct result of the occurrences complained of herein have, and will continue to have, an irreparably devastating effect upon her well-being and the quality of her life, effects which Mihalik alleges to be in the amount of Two Million Dollars ($2,000,000).

52.    Here, the acts of Cheuvreux were so egregious and were done so clearly with malice and/or reckless indifference in the face of a perceived risk that its actions will violate Mihalik's protected rights under the New York City Human Rights Law, that, in addition to all the damages inflicted upon Mihalik and in addition to all the measure of relief to which Mihalik may properly be entitled herein, Cheuvreux should also be required to pay punitive damages to punish it for its discriminatory conduct in the further amount of Three Million ($3,000,000), in order to deter it and others similarly situated from engaging in such conduct in the future.

53.    Mihalik, therefore, seeks compensatory damages in the second cause of action, including, among other things, for the physical and emotional harm inflicted upon her in the sum of Two Million ($2,000,000) Dollars, and the additional and further sum of Three Million ($3,000,000) Dollars for punitive damages, making a total of Five Million ($5,000,000) Dollars, plus the cost of this action as well as reasonable attorney's fee on this cause of action based on the lodestar method as has been judicially established and accepted when attorney's fees are provided under the law.

16

WHEREFORE, Plaintiff Renee Mihalik demands judgment against Defendant Credit Agricole Cheuvreux North America, Inc. on the First Cause of Action, in the sum of Two Million Dollars ($2,000,000) in compensatory damages and the further and additional sum of Three Million Dollars ($3,000,000) in punitive damages for a total of Five Million Dollars ($5,000,000), plus pre-judgment interest , the costs of this action and reasonable attorney's fees under the lodestar method, as is permitted under the law; on the Second Cause of Action in the additional sum of Two Million Dollars ($2,000,000) in compensatory damages and the further additional sum of Three Million Dollars ($3,000,000) in punitive damages, for a total of Five Million Dollars ($5,000,000), plus pre-judgment interest, the costs of this action and reasonable attorney's fees under the lodestar method, as is permitted under the law; so that for the First and Second Causes of Action, Mihalik seeks a total of Ten Million Dollars ($10,000,000) as specifically identified above, plus the costs of this action, prejudgment interest and reasonable attorney's fees, calculated under the lodestar method, as permitted under the law, and for such relief as this Court deems just and proper.

SCHWARTZ & PERRY, LLP
*Attorneys for Plaintiff*

By: _____
MURRAY SCHWARTZ
MATTHEW T. SCHATZ
295 Madison Avenue
New York, New York 10017
(212) 889-6565

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
RENEE MIHALIK,                                                            Index No.:

                    Plaintiff,

                                                                                    VERIFICATION
        -against-

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.

                    Defendant.
-----------------------------------------------------------X


STATE OF NEW YORK                    )
                                                    )ss:
COUNTY OF BRONX                      )


        RENEE MIHALIK, being duly sworn, says:

        I am the Plaintiff in the within action; I have read the foregoing Complaint and know the

contents thereof; the same is true to my knowledge, except as to the matters therein stated to be alleged

on information and belief, and as to those matters, I believe them to be true.


                                                        _Renee S. Mihalik_
                                                          RENEE MIHALIK


Sworn to me this  12
day of January 2009

_Matthew Schatz_
NOTARY PUBLIC

                            MATTHEW SCHATZ
                        Notary Public, State of New York
                                No. 02SC6129535
                            Qualified in Queens County
                        Commission Expires June 27, 200 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RENEE MIHALIK,

Plaintiff,

-against-


CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

Defendant.

## SUMMONS AND VERIFIED COMPLAINT

LAW OFFICES
SCHWARTZ
& PERRY

Attorneys for **Plaintiff**

Office and Post Office Address, Telephone

295 MADISON AVENUE
NEW YORK, NY 10017
(212) 889-6565

| To | Signature (Rule 130-1-a) |
|---|---|
| Attorney(s) for | Print Name Below |
| | **MATTHEW T. SCHATZ** |

Service of a copy of the within                                                     is hereby admitted.

Dated,

...............................................................................................

Attorney(s) for

Sir:— Please take notice

☐ NOTICE OF ENTRY

that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on

☐ NOTICE OF SETTLEMENT

that an order                                          of which the within is a true copy will be presented for
settlement to the Hon.                                                        one of the judges

Yours, etc.
SCHWARTZ
& PERRY

Attorneys for

Office and Post Office Address

295 MADISON AVENUE
NEW YORK, NY 10017

To

Attorney(s) for

Important:  The Public Records and commercially available data sources used on reports have errors.  Data is sometimes entered poorly, processed incorrectly and is generally not free from defect.  This system should not be relied upon as definitively accurate.  Before relying on any data this system supplies, it should be independently verified.  For Secretary of State documents, the following data is for information purposes only and is not an official record.  Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use:  undefined
Your GLBA Permissible Use:  undefined

## Comprehensive Report

**Comprehensive Report**
**Date:** 01/30/09
**Reference Code:** 32057-000002

**Report Legend:**
**S** - Shared Address
**D** - Deceased
✔ - Probable Current Address

**Report processed by:**
Hogan & Hartson L.L.P.
555 13th St NW
Washington, DC 20004-1109
202-637-5600 Main Phone
202-637-5910 Fax

### Subject Information

**Name:** RENEE S MIHALIK
**Date of Birth:** ■■■■■■
**Age:** 35
**SSN:** ■■■■■■■■■■■■■

View All SSN Sources

### AKAs (Names Associated with Subject)

RENEE MIHALIK
SSN: ■■■■■■■
RENEE E MIHALIK
SSN: ■■■■■■■

### Indicators

Bankruptcy: ■■
Property: ■■
Corporate Affiliations: ■■

## Address Summary

✔ 109 JACKSON ST APT 3B, HOBOKEN NJ 07030-6076, HUDSON COUNTY (Jan 2002 - Jan 2009)

✔ 109 JACKSON ST APT 00003B, HOBOKEN NJ 07030-6076, HUDSON COUNTY (Jan 2002 - Jan 2009)

✔ 109 JACKSON ST APT 115, HOBOKEN NJ 07030-6074, HUDSON COUNTY (Mar 2004)

✔ 109 JACKSON ST APT P 19, HOBOKEN NJ 07030-6074, HUDSON COUNTY (Jan 2002 - 2004)
Phone at address: ■■■■■■■■■ MIHALIK RENEE

✔ 109 JACKSON ST APT 119, HOBOKEN NJ 07030-6074, HUDSON COUNTY (Mar 2002)

31 CLIFF TRL, KINNELON NJ 07405-3107, MORRIS COUNTY (Feb 1995 - Jan 2009)

109 115 JACKSON ST 3B, HOBOKEN NJ 07030, HUDSON COUNTY (Jan 2002 - Jan 2008)

310, BUTLER NJ 07405, MORRIS COUNTY (Nov 2000)

PSC 1008 BOX 3025, FPO AA 34051-3025 (May 1995)

B 3025 US MILITARY APT 1008, FPO AA 34051 (Dec 1993 - Jan 1995)

PO BOX 3025, FPO AA 34051 (Dec 1993)

## Comprehensive Report Summary: (Click on Link to see detail)

**Bankruptcies:**

**Liens and Judgments:**

**UCC Filings:**

**People at Work:**
Name: RENEE S MIHALIK
SSN:
Company:
Address:
Phone: ✔
FEIN:
Dates:

**Driver's License Information:**

**Active Address(es):**   View All Address Variation Sources
✔ 109 JACKSON ST APT 3B, HOBOKEN NJ 07030-6076, HUDSON COUNTY (Jan 2002 - Jan 2009)
   Current Residents at Address:
      RENEE S MIHALIK

✔ 109 JACKSON ST APT 00003B, HOBOKEN NJ 07030-6076, HUDSON COUNTY (Jan 2002 - Jan 2009)

1/30/2009



✔ 109 JACKSON ST APT 115, HOBOKEN NJ 07030-6074, HUDSON COUNTY (Mar 2004)

✔ 109 JACKSON ST APT P 19, HOBOKEN NJ 07030-6074, HUDSON COUNTY (Jan 2002 - 2004)
   MIHALIK RENEE

✔ 109 JACKSON ST APT 119, HOBOKEN NJ 07030-6074, HUDSON COUNTY (Mar 2002)

## Previous And Non-Verified Address(es):    View All Address Variation Sources

31 CLIFF TRL, KINNELON NJ 07405-3107, MORRIS COUNTY (Feb 1995 - Jan 2009)
   Current Residents at Address:
      MICHAEL W MIHALIK
      FRANCES M MIHALIK
      RENEE S MIHALIK

109 115 JACKSON ST 3B, HOBOKEN NJ 07030, HUDSON COUNTY (Jan 2002 - Jan 2006)

310, BUTLER NJ 07405, MORRIS COUNTY (Nov 2000)

PSC 1008 BOX 3025, FPO AA 34051-3025 (May 1995)

B 3025 US MILITARY APT 1008, FPO AA 34051 (Dec 1993 - Jan 1995)

PO BOX 3025, FPO AA 34051 (Dec 1993)

Barbara M. Roth
Dori Ann Hanswirth
Nicole Civita
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022
Tel: (212) 918-3000
FAX: (212) 918-3100
*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                      :
RENEE MIHALIK,                                        :
                                                      :
                          Plaintiff,                  :      Case No. 09 Civ. 1251
                                                      :
             -against-                                :      **ANSWER**
                                                      :
CREDIT AGRICOLE CHEUVREUX NORTH          :
AMERICA, INC.,                                        :
                                                      :
                          Defendant.                  :
                                                      :
-------------------------------------------------------------------X

     Defendant Credit Agricole Cheuvreux North America, Inc., by its attorneys Hogan &

Hartson LLP, as and for its Answer to plaintiff's Verified Complaint, states as follows:

     1.    Denies the allegations in paragraph 1.

     2.    Denies the allegations in paragraph 2, except admits that Defendant is a Delaware

corporation authorized to do business in New York with a place of business at 1301 Avenue of

the Americas in New York City, and that plaintiff was employed by Defendant at those offices.

     3.    Denies the allegations in paragraph 3, except admits that Defendant is a registered

broker-dealer that does business in New York City.

     4.    Denies the allegations in paragraph 4, except admits that plaintiff began

employment with Defendant on or about July 9, 2007 and had the title of Vice President –

Alternative Execution Services until April 10, 2008, when she was terminated for cause pursuant to her employment letter.

5.      Denies the allegations in paragraph 5, except admits that Ian Peacock was Defendant's chief executive officer during plaintiff's employment by Defendant.

6.      Denies the allegations in paragraph 6, except admits that plaintiff reported to Ian Peacock during her employment with Defendant.

7.      Denies the allegations in paragraph 7.

8.      Denies the allegations in paragraph 8.

9.      Denies the allegations in paragraph 9.

10.     Denies the allegations in paragraph 10.

11.     Denies the allegations in paragraph 11.

12.     Denies the allegations in paragraph 12.

13.     Denies the allegations in paragraph 13.

14.     Denies the allegations in paragraph 14.

15.     Denies the allegations in paragraph 15.

16.     Denies the allegations in paragraph 16.

17.     Denies the allegations in paragraph 17.

18.     Denies the allegations in paragraph 18.

19.     Denies the allegations in paragraph 19.

20.     Denies the allegations in paragraph 20.

21.     Denies the allegations in paragraph 21.

22.     Denies the allegations in paragraph 22, except admits that plaintiff's performance was criticized.

23.     Denies the allegations in paragraph 23.

24.     Denies the allegations in paragraph 24, except admits that Peacock met with plaintiff on April 10, 2008 and, among other things, told her as he had in the past that her performance was substandard.

25.     Denies the allegations in paragraph 25.

26.     Denies the allegations in paragraph 26, except admits that Peacock told plaintiff that her employment was terminated on April 10, 2008.

27.     Denies the allegations in paragraph 27, except admits that plaintiff's employment was terminated on April 10, 2008.

28.     Denies the allegations in paragraph 28.

29.     Denies the allegations in paragraph 29.

30.     In response to paragraph 30, repeats its responses to the enumerated paragraphs as if fully set forth herein.

31.     Denies the allegations in paragraph 31.

32.     Denies the allegations in paragraph 32.

33.     Denies the allegations in paragraph 33.

34.     Denies the allegations in paragraph 34.

35.     Denies the allegations in paragraph 35, except admits that Defendant maintained policies and procedures that complied with all applicable laws and avers that plaintiff was not subjected to any unlawful conduct during her employment by Defendant.

36.     Denies the allegations in paragraph 36.

37.     Denies the allegations in paragraph 37.

38.     Denies the allegations in paragraph 38.

39.    Denies the allegations in paragraph 39.

40.    Denies the allegations in paragraph 40.

41.    Denies the allegations in paragraph 41, except admits that plaintiff purports to seek the monies described therein.

42.    In response to paragraph 42, repeats its responses to the enumerated paragraphs as if fully set forth herein.

43.    Denies the allegations in paragraph 43.

44.    Denies the allegations in paragraph 44.

45.    Denies the allegations in paragraph 45.

46.    Denies the allegations in paragraph 46.

47.    Denies the allegations in paragraph 47.

48.    Denies the allegations in paragraph 48.

49.    Denies the allegations in paragraph 49.

50.    Denies the allegations in paragraph 50.

51.    Denies the allegations in paragraph 51.

52.    Denies the allegations in paragraph 52.

53.    Denies the allegations in paragraph 53, except admits that plaintiff purports to seek the monies described therein.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's complaint, which contains allegations "all upon information and belief," fails to state a claim upon which relief can be granted.

## THIRD AFFIRMATIVE DEFENSE

Defendants had legitimate, nondiscriminatory business reasons for every decision made with respect to plaintiff.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by her poor job performance.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff was terminated for cause under the terms of her employment letter.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by her failure to utilize internal procedures to seek redress of any complaints she purports to have had.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's "Verified Complaint" violates Federal Rule of Civil Procedure 11.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by her lack of qualification for her job.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, upon information and belief, by her misrepresentations about her prior employment and qualifications.

WHEREFORE, Defendant respectfully requests that this Court deny all relief sought by plaintiff; award it a judgment dismissing the Amended Complaint; award it reasonable costs and attorney's fees incurred in this action, award it relief under Federal Rule of Civil Procedure 11, and

provide it with such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        February 19, 2009

                              Respectfully submitted,

                              HOGAN & HARTSON LLP


                        By:   s/ Barbara M. Roth
                              Barbara Roth (BR 1982)
                              Dori Ann Hanswirth (DAH 9728)
                              Nicole Civita (NC 0727)
                              Hogan & Hartson LLP
                              875 Third Avenue
                              New York, NY  10022
                              Tel: (212) 918-3000
                              FAX: (212) 918-3100
                              *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
RENEE MIHALIK,                                          :
                                                       :
                    Plaintiff,                         :        09 Civ. 1251
                                                       :
        -v-                                             :        AFFIDAVIT OF
                                                       :        SERVICE
CREDIT AGRICOLE CHEUVREUX NORTH                         :
AMERICA, INC.,                                          :
                                                       :
                    Defendant.                         :
-------------------------------------------------------------- x

STATE OF NEW YORK    )
                       ss.:
COUNTY OF NEW YORK  )

        John Nguyen, being duly sworn deposes and says that he resides in the

State of New Jersey, is employed by the law firm Hogan & Hartson LLP, is over the

age of eighteen years and is not a party to this action

        On the 19th day of February, 2009 deponent served a true copy of the

**Answer** upon:

                Matthew Schatz
                Schwartz & Perry, LLP
                295 Madison Avenue
                New York, NY  10017

 by personally delivering and leaving the same with a person of suitable age and

discretion at that office.

                                            _____
                                                    John Nguyen

Sworn to before me this
19th day of February, 2009

_____
        Notary Public

LILLIAN A. MARTINEZ
Notary Public, State of New York
No. 01MA6092520
Qualified in Westchester County
Commission Expires May 19, 2011

\\\NY - 075495/000530 - 1121628 v1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 27 AUG 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENEE MIHALIK,

                          Plaintiff,

    – against –

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.

                          Defendant.

Index No.: 09-CV-01251 (DAB)

**CONFIDENTIALITY AGREEMENT
AND ORDER**

WHEREAS Plaintiff Renee Mihalik ("Mihalik") and Defendant Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux" or "the Company") (collectively "the Parties") are currently engaged in discovery pursuant to the Federal Rules of Civil Procedure; and

WHEREAS some information contained in documents sought by the Parties is considered to be of a confidential and/or proprietary nature; and

WHEREAS the purpose of this Confidentiality Agreement and Order is to permit the Parties to disclose such documents to each other pursuant to procedures that are designed to protect the confidentiality of that material;

IT IS HEREBY AGREED AND ORDERED as follows:

1.    Either Party may designate any non-public document, material or information as "Confidential" under the terms of this Confidentiality Agreement and Order. Confidential information as used herein means any type or classification of document or information, whether it be a document, information contained in a document, electronically memorialized information, information revealed during a deposition, information contained in an interrogatory answer, or any other form of information that a Party believes in good faith contains any personnel, financial, proprietary, medical, confidential or personal information, the disclosure of

which the Party in good faith believes would invade the confidentiality or privacy of any Party or any current or former employee of Defendant. Information designed as Confidential shall (a) be used by the Parties only for the purpose of this action and not for any other purposes whatsoever; and (b) shall not be disclosed, given, shown, discussed, or otherwise communicated or made available to anyone except as provided herein.

2.    In accordance with the provisions of paragraph 4 below, Confidential information may be disclosed only to "Qualified Persons" who shall read this Confidentiality Agreement and Order and who shall agree to maintain said information in confidence and not disclose, discuss, or reveal such information to anyone else. Qualified Persons means (a) counsel to the Parties to this proceeding and the paralegal, clerical and secretarial staff employed by such counsel; (b) the Parties (and any corporate successor or affiliate) to the action, which in the case of corporate Parties shall include the officers, directors and employees of such corporate Parties deemed necessary to aid counsel in the defense of the action; (c) witnesses and potential witnesses including expert witnesses (whether or not retained to testify) utilized by counsel in connection with the litigation; (d) court reporters; and (e) the United States District Court for the Southern District of New York and if requested, the U.S. Court of Appeals for the Second Circuit ("the Court") and its staff. The foregoing definition of Qualified Persons is without prejudice to a redefinition of such term by agreement of the Parties at an appropriate future time so as to include additional categories of persons.

3.    Any information, whether oral or written, designated Confidential may be disclosed only to Qualified Persons who, prior to such disclosure, shall have read this Confidentiality Agreement and Order and signed their individual names to a copy of Exhibit A attached hereto, except that (i) counsel for the Parties may sign this Confidentiality Agreement

2

and Order on behalf of the Party they represent and those Qualified Persons who are members of or employed by their respective firms, and (ii) Confidential information may be disclosed to those qualified persons described in paragraph 3(e) immediately upon execution of this Confidentiality Agreement without further action on their part. By signing Exhibit A, each Qualified Person agrees that he or she shall be bound by the terms of this Confidentiality Agreement and Order. All endorsed copies of Exhibit A shall be retained by the Party's counsel that requested the Qualified Person's endorsement, and need not be disclosed to the opposing Party or their counsel unless an issue arises in good faith concerning any Qualified Person's compliance with this Confidentiality Agreement and Order.

4.   Each Qualified Person shall maintain all Confidential information disclosed to him or her in confidence, shall not reveal the same to anyone other than another Qualified Person, and shall not use the Confidential information except in connection with the preparation for any pretrial proceeding (including, for example, any and all motions or discovery requests, as well as all papers submitted to the Court) or the trial of this action; except that nothing shall prevent disclosure beyond the terms of this Confidentiality Agreement and Order prior to trial if the producing Party consents in writing to such disclosure, or if such disclosure is accomplished with the approval of the Court.

5.   Unless otherwise agreed in writing in advance by counsel for the producing Party, in the event the receiving Party files with the Court any motion, exhibit or other paper containing or reflecting Confidential information, such page in the motion, exhibit or paper containing the Confidential information shall be filed under seal by hand in accordance with the rules of the Court and bear the following legend:

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION

3

A redacted copy of the document shall be filed in the public record. All materials kept under seal shall be available to the court in which they are filed and to counsel for the Parties for viewing and/or copying. A Party that files any motion, exhibit or other paper containing or reflecting Confidential information pursuant to this paragraph shall deliver two courtesy copies to Chambers: one in unredacted form with the term "Unredacted" on the top of the document, together with one copy of the document in redacted form with the term "Redacted" on the top of the document. If a Party contends that a court filing is improperly redacted, the Party shall notify the Court in writing of the basis of its contention. Nothing in this paragraph shall require a Party to deviate from applicable court rules regarding the filing of documents under seal. Nothing in this paragraph shall require a producing Party to file its own court filings containing Confidential information under seal.

6.    In the event that a Party objects to the designation of certain information as Confidential, counsel for the Parties shall attempt to resolve such dispute in good faith on an informal basis. If a resolution is not reached, either Party may ask the Court to resolve the dispute. Pending resolution by the Court, the documents or information subject to the dispute shall be treated as Confidential under the terms of this Confidentiality Agreement and Order.

7.    A producing Party's inadvertent failure to designate material as Confidential in accordance with the terms of this Confidentiality Agreement and Order will not preclude a later designation that such materials are Confidential provided, however, that if another Party treats such information as non-confidential before being informed that that information should have been designated as Confidential such pre-designation treatment shall not be a violation of this Confidentiality Agreement and Order.

8.    The inadvertent production or disclosure of any document, material or

information that a producing Party claims is subject to the attorney-client privilege, attorney-work product privilege, or any other applicable privilege or is confidential or proprietary shall not be deemed a waiver, in whole or in part, of any claim of privilege or confidentiality. The Parties further agree that all such documents or materials inadvertently disclosed (and all copies of such materials) shall be returned by the Party in possession to the producing Party promptly after receipt of a written demand for such return by the non-producing Party, after which the non-producing Party shall not make any use or disclosure of such documents or materials and shall delete all such documents/materials (including all copies thereof) from all electronic databases and the like and shall certify in writing that all copies have been returned or destroyed.

   9. Nothing in this Confidentiality Agreement and Order shall prejudice any Party from seeking any modification of this Confidentiality Agreement and Order.

   10. At the conclusion of this proceeding, including all appeals, each Party and their counsel shall, upon request return to the other Party's counsel all Confidential information, including all copies thereof. Receipt of such documentary material, if requested shall be acknowledged by each Party's counsel in writing. The Parties may comply with this paragraph by agreeing upon an appropriate method of destruction of such Confidential information.

   11. This Confidentiality Agreement and Order shall be binding on all Qualified Persons. It is enforceable by any sanction deemed appropriate by the Court.

12.   The terms of this Confidentiality Agreement and Order shall survive and remain in full force and effect after the termination of this Case.

SO ORDERED:

_Deborah A. Batts_
U.S.D.J.        8/26/09

AGREED:

HOGAN & HARTSON LLP

By: _____
Barbara M. Roth, Esq. (BR 1982)
Don Ann Hanswirth, Esq. (DH 9728)
Christopher N. Franciose, Esq. (CF 0919)
875 Third Ave.
New York, NY 10022
Tel:  (212) 918-3000
Fax:  (212) 918-3100
*Attorneys for Defendant*

SCHWARTZ & PERRY, LLP

By: _____
Matthew Schatz, Esq.
295 Madison Avenue
New York, New York 10017
(212) 889-6565
*Attorneys for Plaintiff*

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENEE MIHALIK,

                                    Plaintiff,          Index No.: 09-CV-01251 (DAB)

        – against –

                                                        CONFIDENTIALITY AGREEMENT
CREDIT AGRICOLE CHEUVREUX                                AND ORDER
NORTH AMERICA, INC.

                                    Defendant.

## EXHIBIT A

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that he or she has read the Confidentiality

Agreement and Order dated August __, 2009, in the action entitled *Renee Mihalike v. Credit*

*Agricole Cheuvreux North America, Inc., Case. No. 09-CV-01251 (DAB)*, understands the

terms thereof and agrees to be bound by those terms as if a signatory thereto.  The undersigned

hereby consents to the jurisdiction of the U.S. District Court for the Southern District of New

York with respect to any controversy arising out of an alleged violation of the Confidentiality

Agreement and Order.


_____                    _____
Date                                       Signature


                                           _____
                                           Name Printed

**A-50**

**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENEE MIHALIK,

                Plaintiff,

        – against –

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

                Defendant.

Index No.
09-CV-01251 (DAB)

**NOTICE OF MOTION**

      **PLEASE TAKE NOTICE THAT,** upon the accompanying Declaration of Frank Boer, dated October 29, 2010; Declaration of Melissa Franzen, dated October 29, 2010; Declaration of John Palazzo, dated October 27, 2010; Declaration of Ian Peacock, dated October 30, 2010; Declaration of Timothy Randall, dated October 28, 2010; Declaration of Dominic Romano, dated October 26, 2010; Declaration of Barbara M. Roth, dated November 1, 2010; and Declaration of David Zack, dated October 28, 2010; and the exhibits attached thereto; the Local Rule 56.1 Statement Of Undisputed Facts By Defendant Credit Agricole Cheuvreux North America, Inc., submitted herewith; the Memorandum of Law in Support of Defendant's Motion for Summary Judgment, submitted herewith; and upon all of the pleadings and papers heretofore served in this action, Defendant Credit Agricole Cheuvreux North America, Inc. will move this honorable Court at the United States District Court, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York, on such date and time as the Court sets, for an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting summary judgment in its favor and dismissing the claims against it, with prejudice, awarding Defendant costs and attorneys' fees, and for such other relief as the Court deems just and proper.

Case 1:09-cv-01251-DAB   Document 21   Filed 11/01/10   Page 2 of 2

As set forth in the Court's September 17, 2010 scheduling order for this motion, any

opposition papers must be served and filed so that they are received by the undersigned by the

close of business on December 16, 2010.

Dated:  New York, New York        HOGAN LOVELLS US LLP
        November 1, 2010


                                  By:        /s/ Barbara M. Roth
                                             _____
                                        Barbara M. Roth
                                        Dori Ann Hanswirth
                                        Christopher N. Franciose
                                        875 Third Avenue
                                        New York, NY  10022
                                        Tel:  (212) 918-3000
                                        Fax:  (212) 918-3100
                                        Barbara.Roth@hoganlovells.com
                                        *Attorneys for Defendant Credit Agricole
                                        Cheuvreux North America, Inc.*



TO:     Matthew T. Schatz, Esq.
        SCHWARTZ & PERRY LLP
        295 Madison Avenue
        New York, NY 10017
        Tel: (212) 889-6565
        Fax: (212) 779-8208
        mschatz@schwartzandperry.com
        *Attorneys for Plaintiff Renee Mihalik*

**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RENEE MIHALIK,

Plaintiff,

– against –

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

Defendant.

---

Index No.:  09-CV-01251 (DAB)

**DECLARATION OF
BARBARA M. ROTH**

**BARBARA M. ROTH** declares as follows:

1.      I am a partner in the law firm Hogan Lovells US LLP, attorneys for Defendant Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux") in the above-captioned action.  I submit this declaration in support of Cheuvreux's motion for summary judgment.  I have personal knowledge of the facts and circumstances stated herein.

2.      Annexed hereto as Exhibit 1 is a true and correct copy of the Verified Complaint submitted in this action.

3.      Annexed hereto as Exhibit 2 is a true and correct copy of the Answer submitted in this action.

4.      Annexed hereto as Exhibit 3 is a true and correct copy of excerpts of the deposition of Plaintiff Renee Mihalik, taken on February 1, 2010.

5.      Annexed hereto as Exhibit 4 is a true and correct copy of excerpts of the deposition of Altan Yenicay, taken on May 19, 2010.

6.      Annexed hereto as Exhibit 5 is a true and correct copy of excerpts of the deposition of David Zack, taken on June 14, 2010.

7.      Annexed hereto as Exhibit 6 is a true and correct copy of excerpts of the deposition of Ian Peacock, taken on June 16, 2010.

8.      Annexed hereto as Exhibit 7 is a true and correct copy of excerpts of the deposition of Mark Powers, taken on June 29, 2010.

9.      Annexed hereto as Exhibit 8 is a true and correct copy of excerpts of the Rule 30(b)(6) deposition of Citigroup by Tracy Platt Beach, taken on July 16, 2010 and September 17, 2010.

10.     In the course of discovery, Cheuvreux collected documents from its files.  Copies of all responsive and non-privileged documents were produced to Plaintiff.

11.     Annexed hereto as Exhibit 9 is a true and correct copy of Plaintiff's trip report, dated 4/2/2008, which was produced to Plaintiff during discovery and bears the production number DEF00000009.

12.     Annexed hereto as Exhibit 10 is a true and correct copy Plaintiff's commissions report, which was produced to Plaintiff during discovery and bears the production numbers DEF00000012 - DEF00000014.  This document was also marked as Defendant's Deposition Exhibit 3 at the Deposition of Plaintiff, taken on February 1, 2010.

13.     Annexed hereto as Exhibit 11 is a true and correct copy of a log of Plaintiff's incoming and outgoing telephone calls on her Cheuvreux telephone line for the period of March 24, 2008 to April 1, 2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00000021 - DEF00000022.

14.     In the course of discovery, Cheuvreux conducted searches of its email servers and computer systems, and collected emails, computer files and other electronically-stored

information. A copy of all responsive and non-privileged electronic materials was produced to Plaintiff.

15.    Annexed hereto as Exhibit 12 is a true and correct copy of an email between Plaintiff and Ian Peacock, Jerry Lees, Malcolm Ford, Matthew McClean, Boris Komljenovic, Jonathan Carp, Ian Hunt, Ludovic Blanquet, Wakim Najjar, dated 1/30/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00000034 - DEF00000037. This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

16.    Annexed hereto as Exhibit 13 is a true and correct copy of an email between Ian Peacock and Plaintiff, dated 3/20/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00000127 - DEF00000135. This document was also marked as Defendant's Deposition Exhibit 6 at the Deposition of Plaintiff, taken on February 1, 2010.

17.    Annexed hereto as Exhibit 14 is a true and correct copy of an email chain between Melissa Crilley and Ian Peacock, dated 1/28/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00000151 - DEF00000152. This document was also marked as part of Defendant's Deposition Exhibit 24 at the Deposition of Plaintiff, taken on February 1, 2010.

18.    Annexed hereto as Exhibit 15 is a true and correct copy of an email between Plaintiff and Melissa Crilley, dated 9/18/2007, which was produced to Plaintiff during discovery and bears the production number DEF00000824.

19.    Annexed hereto as Exhibit 16 is a true and correct copy of an email chain between Gary Rosenbach and Plaintiff, dated 9/24/2007, which was produced to Plaintiff during discovery and bears the production number DEF00000865.

3

20.    Annexed hereto as Exhibit 17 is a true and correct copy of an email chain between Greg Solometo and Plaintiff, dated 3/5/2008, which was produced to Plaintiff during discovery and bears the production number DEF00002084.

21.    Annexed hereto as Exhibit 18 is a true and correct copy of an email chain between Gregory Solometo and Plaintiff, dated 11/30/2007, which was produced to Plaintiff during discovery and bears the production number DEF00001195.

22.    Annexed hereto as Exhibit 19 is a true and correct copy of an email chain between Malcolm Ford and Plaintiff, dated 1/11/2008, which was produced to Plaintiff during discovery and bears the production number DEF00001536.  This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

23.    Annexed hereto as Exhibit 20 is a true and correct copy of an email chain between Jeffrey C. Tanner and Plaintiff, dated 8/17/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00001539 - DEF00001540.

24.    Annexed hereto as Exhibit 21 is a true and correct copy of an email between Plaintiff and Altan Yenicay, dated 4/8/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00001818 - DEF00001819.  This document was also marked as Defendant's Deposition Exhibit 28 at the Deposition of Plaintiff, taken on February 1, 2010.

25.    Annexed hereto as Exhibit 22 is a true and correct copy of an email chain between Plaintiff and Ian Peacock, dated 10/3/2007, which was produced to Plaintiff during discovery and bears the production number DEF00002227.  This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

4

26.     Annexed hereto as Exhibit 23 is a true and correct copy of an email between Plaintiff and Tom Sullivan, dated 4/8/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00002525 - DEF00002526.

27.     Annexed hereto as Exhibit 24 is a true and correct copy of an email chain between Plaintiff and Clifford Titus, dated 4/8/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00002538 - DEF00002539.

28.     Annexed hereto as Exhibit 25 is a true and correct copy of an email chain between Plaintiff and Terry Flynn, dated 11/26/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00002818.

29.     Annexed hereto as Exhibit 26 is a true and correct copy of an email chain between Katarina Bouzalis and Plaintiff, dated 9/11/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00002951 - DEF00002953.  This document was also marked as Yenicay Deposition Exhibit 9 at the Deposition of Altan Yenicay, taken on May 19, 2010.

30.     Annexed hereto as Exhibit 27 is a true and correct copy of an email chain between Ian Peacock and Plaintiff, dated 10/17/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00003404 - DEF00003405.

31.     Annexed hereto as Exhibit 28 is a true and correct copy of an email chain between Plaintiff and Malcolm Ford, dated 1/14/2008, which was produced to Plaintiff during discovery and bears the production number DEF00003502.  This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

32.     Annexed hereto as Exhibit 29 is a true and correct copy of an email chain between Plaintiff and Patrick Egan, dated 11/29/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00003988 - DEF00003989.

33.     Annexed hereto as Exhibit 30 is a true and correct copy of an email chain between Ian Peacock and Plaintiff, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004293.

34.     Annexed hereto as Exhibit 31 is a true and correct copy of an email chain between David N. Shapiro and Plaintiff, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00004380 - DEF00004382.

35.     Annexed hereto as Exhibit 32 is a true and correct copy of an email chain between Chris Anderson and Plaintiff, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00004385 - DEF00004387.

36.     Annexed hereto as Exhibit 33 is a true and correct copy of an email between Plaintiff and Ian Peacock, dated 3/20/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004475.  This document was also marked as part of Defendant's Deposition Exhibit 24 at the Deposition of Plaintiff, taken on February 1, 2010.

37.     Annexed hereto as Exhibit 34 is a true and correct copy of an email chain between Plaintiff and Dominic Romano, dated 8/9/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00004485 - DEF00004487.

38.     Annexed hereto as Exhibit 35 is a true and correct copy of an email chain between Plaintiff and Ian Peacock, dated 8/9/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00004515 - DEF00004516.

39.     Annexed hereto as Exhibit 36 is a true and correct copy of an email chain between Douglas Erb and Plaintiff, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004580.

40.     Annexed hereto as Exhibit 37 is a true and correct copy of an email chain between Plaintiff and Brian Nathan, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004602.

41.     Annexed hereto as Exhibit 38 is a true and correct copy of an email chain between Patrick Egan and Plaintiff, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00004628 - DEF00004630.

42.     Annexed hereto as Exhibit 39 is a true and correct copy of an email chain between Plaintiff and Douglas Erb, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004631.

43.     Annexed hereto as Exhibit 40 is a true and correct copy of an email chain between Plaintiff and Gregory Solometo, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004635.

44.     Annexed hereto as Exhibit 41 is a true and correct copy of an email between Plaintiff and Timothy Randall, dated 1/30/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004684. This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

45.     Annexed hereto as Exhibit 42 is a true and correct copy of an email chain between Altan Yenicay and Plaintiff, dated 4/3/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004815.

7

46.     Annexed hereto as Exhibit 43 is a true and correct copy of an email between Plaintiff and Joe Rundle, dated 1/30/2008, which was produced to Plaintiff during discovery and bears the production number DEF00004980.  This document was also marked as part of Defendan's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

47.     Annexed hereto as Exhibit 44 is a true and correct copy of an email chain between Plaintiff and Sarah Port, dated 7/30/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00005004 - DEF00005006.

48.     Annexed hereto as Exhibit 45 is a true and correct copy of an email chain between Plaintiff and Cecile Gilbeau, dated 7/30/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00005202 - DEF00005204.

49.     Annexed hereto as Exhibit 46 is a true and correct copy of an email chain between Plaintiff and Terry Flynn, dated 8/3/2007, which was produced to Plaintiff during discovery and bears the production number DEF00005330.

50.     Annexed hereto as Exhibit 47 is a true and correct copy of an email chain between Plaintiff and Boris Komljenovic, dated 1/24/2008, which was produced to Plaintiff during discovery and bears the production number DEF00005454.  This document was also marked as part of Defendant's Deposition Exhibit 24 at the Deposition of Plaintiff, taken on February 1, 2010.

51.     Annexed hereto as Exhibit 48 is a true and correct copy of an email between Plaintiff and Ian Peacock, dated 8/10/2007, which was produced to Plaintiff during discovery and bears the production number DEF00005523.

52.    Annexed hereto as Exhibit 49 is a true and correct copy of an email between Plaintiff and Ian Peacock, dated 8/10/2007, which was produced to Plaintiff during discovery and bears the production number DEF00005539.

53.    Annexed hereto as Exhibit 50 is a true and correct copy of an email between Plaintiff and Richard Baumann, dated, which was produced to Plaintiff during discovery and bears the production numbers DEF00005907 - DEF00005908.

54.    Annexed hereto as Exhibit 51 is a true and correct copy of an email chain between Plaintiff and Matthew McClean, dated 8/14/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00005972 - DEF00005973.

55.    Annexed hereto as Exhibit 52 is a true and correct copy of an email chain between Plaintiff and Robert Macchi, dated 7/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006057 - DEF00006062.

56.    Annexed hereto as Exhibit 53 is a true and correct copy of an email chain between Cliff Titus and Plaintiff, dated 3/14/2008, which was produced to Plaintiff during discovery and bears the production number DEF00006107.

57.    Annexed hereto as Exhibit 54 is a true and correct copy of an email chain between Plaintiff and Patrick Egan, dated 10/30/2007, which was produced to Plaintiff during discovery and bears the production number DEF00006135.

58.    Annexed hereto as Exhibit 55 is a true and correct copy of an email between Plaintiff and Robert Macchi, dated 7/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006177 - DEF00006182.

59.    Annexed hereto as Exhibit 56 is a true and correct copy of an email chain between Plaintiff and Ian Peacock, dated 10/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006197 - DEF00006199.

60.    Annexed hereto as Exhibit 57 is a true and correct copy of an email chain between Plaintiff and Robert Macchi, dated 7/16/2007, which was produced to Plaintiff during discovery and bears the production number DEF00006316.

61.    Annexed hereto as Exhibit 58 is a true and correct copy of an email chain between Gerry Domanski and Plaintiff, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00006434 - DEF00006436.

62.    Annexed hereto as Exhibit 59 is a true and correct copy of an email chain between Plaintiff and Melissa Crilley, dated 8/14/2007, which was produced to Plaintiff during discovery and bears the production number DEF00006445.

63.    Annexed hereto as Exhibit 60 is a true and correct copy of an email chain between Simon Bradley and Plaintiff, dated 10/3/2007, which was produced to Plaintiff during discovery and bears the production number DEF00006458.

64.    Annexed hereto as Exhibit 61 is a true and correct copy of an email chain between Plaintiff and Gregory Solometo, dated 1/9/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00006466 - DEF00006467.

65.    Annexed hereto as Exhibit 62 is a true and correct copy of an email chain between Ian Peacock and Jerry Lees, with copies to Ian Peacock and Jonathan Carp, dated 1/7/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00006505 - DEF00006506.  This document was also marked as Defendant's Deposition Exhibit 19 at the Deposition of Plaintiff, taken on February 1, 2010.

10

66.    Annexed hereto as Exhibit 63 is a true and correct copy of an email chain between Plaintiff and Richard Baumann, dated 12/21/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006511 - DEF00006513.

67.    Annexed hereto as Exhibit 64 is a true and correct copy of an email chain between Plaintiff and David N. Shapiro, dated 4/9/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00006520 - DEF00006531.

68.    Annexed hereto as Exhibit 65 is a true and correct copy of an email chain between Plaintiff and Ian Peacock, dated 8/14/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006569 - DEF00006570.  This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

69.    Annexed hereto as Exhibit 66 is a true and correct copy of an email chain between Ian Peacock and Dominic Romano and Timothy Randall, dated 9/5/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006571 - DEF00006572. This document was also marked as Yenicay Deposition Exhibit 8 at the Deposition of Altan Yenicay, taken on May 19, 2010.

70.    Annexed hereto as Exhibit 67 is a true and correct copy of an email chain between Plaintiff and Adam Hartzell, dated 8/23/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006573 - DEF00006580.

71.    Annexed hereto as Exhibit 68 is a true and correct copy of an email chain between Plaintiff and Richard Baumann, dated 1/3/2008, which was produced to Plaintiff during discovery and bears the production number DEF00006581.

72.     Annexed hereto as Exhibit 69 is a true and correct copy of an email chain between Plaintiff and Frank Boer, dated 8/6/2007, which was produced to Plaintiff during discovery and bears the production number DEF00006615.

73.     Annexed hereto as Exhibit 70 is a true and correct copy of an email chain between Ian Peacock and Dominic Romano and Plaintiff, dated 8/8/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00006640 - DEF00006642.

74.     Annexed hereto as Exhibit 71 is a true and correct copy of an email chain between Ian Peacock and Melissa Crilley, dated 1/3/2008, which was produced to Plaintiff during discovery and bears the production number DEF00006643.  This document was also marked as part of Defendant's Deposition Exhibit 24 at the Deposition of Plaintiff, taken on February 1, 2010.

75.     Annexed hereto as Exhibit 72 is a true and correct copy of an email between Plaintiff and Plaintiff, dated 3/25/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00006696 - DEF00006697.

76.     Annexed hereto as Exhibit 73 is a true and correct copy of an email chain between David N. Shapiro and Plaintiff, dated 4/9/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00006738 - DEF00006746.

77.     Annexed hereto as Exhibit 74 is a true and correct copy of an email chain between Jonathan Carp and Ian Peacock, dated 1/15/2008, which was produced to Plaintiff during discovery and bears the production number DEF00006771.  This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

78.    Annexed hereto as Exhibit 75 is a true and correct copy of an email chain between Jonathan Carp and Ian Peacock, dated 1/15/2008, which was produced to Plaintiff during discovery and bears the production number DEF00006771. This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

79.    Annexed hereto as Exhibit 76 is a true and correct copy of an email between Plaintiff and Jonathan Carp, dated 1/30/2008, which was produced to Plaintiff during discovery and bears the production number DEF00006773. This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

80.    Annexed hereto as Exhibit 77 is a true and correct copy of an email chain between Plaintiff and Ian Peacock, dated 1/30/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00006776 - DEF00006777.

81.    Annexed hereto as Exhibit 78 is a true and correct copy of an email chain between Plaintiff and Boris Komljenovic, dated 2/26/2008, which was produced to Plaintiff during discovery and bears the production number DEF00007102 This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

82.    Annexed hereto as Exhibit 79 is a true and correct copy of an email chain between Plaintiff and Boris Komljenovic, dated 2/26/2008, which was produced to Plaintiff during discovery and bears the production number DEF00007102. This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

83.     Annexed hereto as Exhibit 80 is a true and correct copy of an email between Plaintiff and Jonathan Carp, dated 8/6/2007, which was produced to Plaintiff during discovery and bears the production number DEF00007200. This document was also marked as part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

84.     Annexed hereto as Exhibit 81 is a true and correct copy of an email chain between Plaintiff and Gregory Solometo, dated 1/2/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00007220 - DEF00007221. This document was also marked as Yenicay Deposition Exhibit 14 at the Deposition of Altan Yenicay, taken on May 19, 2010.

85.     Annexed hereto as Exhibit 82 is a true and correct copy of an email chain between Plaintiff and Gregory Solometo, dated 1/2/2010, which was produced to Plaintiff during discovery and bears the production numbers DEF00007226 - DEF00007227.

86.     Annexed hereto as Exhibit 83 is a true and correct copy of an email chain between Plaintiff and Cliff Titus, dated 1/21/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00007385 - DEF00007386.

87.     Annexed hereto as Exhibit 84 is a true and correct copy of an email chain between Plaintiff and Deb Mitten, dated 10/22/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00007409 - DEF00007410.

88.     Annexed hereto as Exhibit 85 is a true and correct copy of an email between Plaintiff and Melissa Crilley, dated 11/15/2007, which was produced to Plaintiff during discovery and bears the production number DEF00007424. This document was also marked as part of Defendant's Deposition Exhibit 24 at the Deposition of Plaintiff, taken on February 1, 2010.

**A-66**

89.    Annexed hereto as Exhibit 86 is a true and correct copy of an email between Plaintiff and Altan Yenicay, dated 3/26/2008, which was produced to Plaintiff during discovery and bears the production number DEF00007425.

90.    Annexed hereto as Exhibit 87 is a true and correct copy of an email between Plaintiff and Ian Peacock, dated 12/5/2007, which was produced to Plaintiff during discovery and bears the production number DEF00007672.

91.    Annexed hereto as Exhibit 88 is a true and correct copy of an email between Plaintiff and Altan Yenicay, dated 12/17/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00007809 - DEF00007810.

92.    Annexed hereto as Exhibit 89 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 11/16/2007, which was produced to Plaintiff during discovery and bears the production number DEF00007812 .

93.    Annexed hereto as Exhibit 90 is a true and correct copy of an email between Plaintiff and Ian Peacock, dated 11/28/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00007829 - DEF00007841.

94.    Annexed hereto as Exhibit 91 is a true and correct copy of an email between Plaintiff and Melissa Crilley, dated 4/9/2008, which was produced to Plaintiff during discovery and bears the production number DEF00007842.

95.    Annexed hereto as Exhibit 92 is a true and correct copy of an email chain between Plaintiff and Jerry Lees, dated 11/2/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00007845 - DEF00007846.

96.     Annexed hereto as Exhibit 93 is a true and correct copy of an email chain between Plaintiff and Young Kang, dated 10/23/2007, which was produced to Plaintiff during discovery and bears the production number DEF00007947.

97.     Annexed hereto as Exhibit 94 is a true and correct copy of an email between Plaintiff and Geoffrey Bernard, dated 4/9/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00007961 - DEF00007962.

98.     Annexed hereto as Exhibit 95 is a true and correct copy of an email chain between Plaintiff and Monica Ramirez, dated 12/3/2007, which was produced to Plaintiff during discovery and bears the production number DEF00007969.

99.     Annexed hereto as Exhibit 96 is a true and correct copy of an email between David Zack and Plaintiff, dated 11/30/2007, which was produced to Plaintiff during discovery and bears the production number DEF00007977.

100.    Annexed hereto as Exhibit 97 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 11/16/2007, which was produced to Plaintiff during discovery and bears the production number DEF00008061.

101.    Annexed hereto as Exhibit 98 is a true and correct copy of an email between Plaintiff and Ian Peacock, dated 12/5/2007, which was produced to Plaintiff during discovery and bears the production number DEF00008093.

102.    Annexed hereto as Exhibit 99 is a true and correct copy of an email chain between Altan Yenicay and Plaintiff, dated 3/27/2008, which was produced to Plaintiff during discovery and bears the production number DEF00008174.

103.    Annexed hereto as Exhibit 100 is a true and correct copy of an email chain between Plaintiff and reneeshome@hotmail.com (Plaintiff's personal email address), dated

1/17/2008, which was produced to Plaintiff during discovery and bears the production numbers

DEF00008178 - DEF00008181.

104.    Annexed hereto as Exhibit 101 is a true and correct copy of an email between

Plaintiff and Peter@intanamanagement.com, dated 4/8/2008, which was produced to Plaintiff

during discovery and bears the production numbers DEF00008237 - DEF00008238.

105.    Annexed hereto as Exhibit 102 is a true and correct copy of an email chain

between Plaintiff and Ertan F. Yenicay, dated 3/13/2008, which was produced to Plaintiff during

discovery and bears the production number DEF00008262.

106.    Annexed hereto as Exhibit 103 is a true and correct copy of an email between

Plaintiff and Peter@intanamanagement.com, dated 4/8/2008, which was produced to Plaintiff

during discovery and bears the production numbers DEF00008266 - DEF00008267.

107.    Annexed hereto as Exhibit 104 is a true and correct copy of an email chain

between Ian Peacock and Plaintiff, dated 11/13/2007, which was produced to Plaintiff during

discovery and bears the production numbers DEF00008302 - DEF00008304.

108.    Annexed hereto as Exhibit 105 is a true and correct copy of an email between Ian

Peacock and Ellen Haas, dated 2/19/2008, which was produced to Plaintiff during discovery and

bears the production number DEF00008306.

109.    Annexed hereto as Exhibit 106 is a true and correct copy of an email chain

between Plaintiff and Monica Ramirez, dated 12/28/2007, which was produced to Plaintiff

during discovery and bears the production number DEF00008308.

110.    Annexed hereto as Exhibit 107 is a true and correct copy of an email chain

between Plaintiff and Elaine Panichi, dated 11/21/2007, which was produced to Plaintiff during

discovery and bears the production number DEF00008309.  This document was also marked as

part of Defendant's Deposition Exhibit 17 at the Deposition of Plaintiff, taken on February 1, 2010.

111.    Annexed hereto as Exhibit 108 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 1/17/2008, which was produced to Plaintiff during discovery and bears the production number DEF00008334.

112.    Annexed hereto as Exhibit 109 is a true and correct copy of an email chain between Ian Peacock and Melissa Crilley, dated 2/25/2008, which was produced to Plaintiff during discovery and bears the production number DEF00008352.

113.    Annexed hereto as Exhibit 110 is a true and correct copy of an email between Plaintiff and cgwon@libertyview.com, dated 4/8/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00008364 - DEF00008365.

114.    Annexed hereto as Exhibit 111 is a true and correct copy of an email chain between Plaintiff and Richard Baumann, dated 11/7/2008, which was produced to Plaintiff during discovery and bears the production number DEF00008441.

115.    Annexed hereto as Exhibit 112 is a true and correct copy of an email chain between Robert Macchi and Plaintiff, dated 12/6/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00008449 - DEF00008450.

116.    Annexed hereto as Exhibit 113 is a true and correct copy of an email chain between Ian Peacock and Plaintiff, dated 11/8/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00010409 - DEF00010410.

117.    Annexed hereto as Exhibit 114 is a true and correct copy of an email chain between tsullivan and Plaintiff, dated 3/24/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00010434 - DEF00010435.

118.    Annexed hereto as Exhibit 115 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 1/3/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00010457 - DEF00010458.

119.    Annexed hereto as Exhibit 116 is a true and correct copy of an email chain between Plaintiff and Gerry Domanski, dated 4/10/2008, which was produced to Plaintiff during discovery and bears the production number DEF00011951.

120.    Annexed hereto as Exhibit 117 is a true and correct copy of an email chain between Plaintiff and Dominic Romano, dated 1/16/2008, which was produced to Plaintiff during discovery and bears the production number DEF00011961.

121.    Annexed hereto as Exhibit 118 is a true and correct copy of an email chain between Plaintiff and Ian Peacock, dated 11/12/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00012064 - DEF00012065.

122.    Annexed hereto as Exhibit 119 is a true and correct copy of an email between Plaintiff and Ian Peacock and Timothy Randall, dated 11/5/2007, which was produced to Plaintiff during discovery and bears the production number DEF00012077.

123.    Annexed hereto as Exhibit 120 is a true and correct copy of an email chain between Richard Baumann and Plaintiff, dated 11/6/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00002468 –DEF00002469.

124.    Annexed hereto as Exhibit 121 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 12/17/2007, which was produced to Plaintiff during discovery and bears the production number DEF00012078.

125.    Annexed hereto as Exhibit 122 is a true and correct copy of an email between Plaintiff and Altan Yenicay, dated 3/31/2008, which was produced to Plaintiff during discovery and bears the production number DEF00012280.

126.    Annexed hereto as Exhibit 123 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 4/8/2008, which was produced to Plaintiff during discovery and bears the production number DEF00012347.

127.    Annexed hereto as Exhibit 124 is a true and correct copy of an email between Plaintiff and Altan Yenicay, dated 4/1/2008, which was produced to Plaintiff during discovery and bears the production number DEF00012426.

128.    Annexed hereto as Exhibit 125 is a true and correct copy of an email between Plaintiff and Altan Yenicay, dated 3/31/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00012507 - DEF00012508.  This document was also marked as Yenicay Deposition Exhibit 24 at the Deposition of Altan Yenicay, taken on May 19, 2010.

129.    Annexed hereto as Exhibit 126 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 12/31/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00012630 - DEF00012631.  This document was also marked as Yenicay Deposition Exhibit 13 at the Deposition of Altan Yenicay, taken on May 19, 2010.

130.    Annexed hereto as Exhibit 127 is a true and correct copy of an email chain between Plaintiff and Frank Boer, dated 7/18/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00012948 - DEF00012949.

131.    Annexed hereto as Exhibit 128 is a true and correct copy of an email between Plaintiff and Timothy Randall, dated 8/13/2007, which was produced to Plaintiff during discovery and bears the production number DEF00012972.  This document was also marked as part of Defendant's Deposition Exhibit 24 at the Deposition of Plaintiff, taken on February 1, 2010.

132.    Annexed hereto as Exhibit 129 is a true and correct copy of an email chain between Peter J. Young and Plaintiff, dated 9/6/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013000 - DEF00013001.

133.    Annexed hereto as Exhibit 130 is a true and correct copy of an email chain between Plaintiff and Robert Macchi, dated 8/1/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013048 - DEF00013049.

134.    Annexed hereto as Exhibit 131 is a true and correct copy of an email between Plaintiff and Deb Mitten, dated 8/22/2007, which was produced to Plaintiff during discovery and bears the production number DEF00013056.

135.    Annexed hereto as Exhibit 132 is a true and correct copy of an email chain between Plaintiff and Richard Baumann, dated 9/10/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013058 - DEF00013059.

136.    Annexed hereto as Exhibit 133 is a true and correct copy of an email chain between Plaintiff and Jayne Tighe, dated 7/18/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013348 - DEF00013355.

137.    Annexed hereto as Exhibit 134 is a true and correct copy of an email chain between Plaintiff and Robert Macchi, dated 7/17/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013401 - DEF00013402.

A-73

138.    Annexed hereto as Exhibit 135 is a true and correct copy of an email chain between Plaintiff and Ian Peacock, dated 10/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013448 - DEF00013449.

139.    Annexed hereto as Exhibit 136 is a true and correct copy of an email between Plaintiff and David Zack, with a copy to Elaine Panichi, dated 10/18/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013595.

140.    Annexed hereto as Exhibit 137 is a true and correct copy of an email chain between Gregory Solometo and Plaintiff, dated 8/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013647 - DEF00013649.

141.    Annexed hereto as Exhibit 138 is a true and correct copy of an email chain between Plaintiff and Jason Goodman, dated 9/6/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00013672 - DEF00013673.

142.    Annexed hereto as Exhibit 139 is a true and correct copy of an email between Plaintiff and Adam Hartzell, dated 7/10/2007, which was produced to Plaintiff during discovery and bears the production number DEF00013738.

143.    Annexed hereto as Exhibit 140 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 8/10/2007, which was produced to Plaintiff during discovery and bears the production number DEF00014017.  This document was also marked as Defendant's Deposition Exhibit 29 at the Deposition of Plaintiff, taken on February 1, 2010.

144.    Annexed hereto as Exhibit 141 is a true and correct copy of an email chain between Jason Goodman and Plaintiff, dated 8/10/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00014060 - DEF00014062.

145.    Annexed hereto as Exhibit 142 is a true and correct copy of an email between Plaintiff and Timothy Randall, dated 7/31/2007, which was produced to Plaintiff during discovery and bears the production number DEF00014154. This document was also marked as part of Defendant's Deposition Exhibit 24 at the Deposition of Plaintiff, taken on February 1, 2010.

146.    Annexed hereto as Exhibit 143 is a true and correct copy of an email chain between Plaintiff and Monica Ramirez, dated 1/4/2008, which was produced to Plaintiff during discovery and bears the production number DEF00014498.

147.    Annexed hereto as Exhibit 144 is a true and correct copy of an email chain between Plaintiff and Terry Flynn, dated 7/20/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00014506 - DEF00014511.

148.    Annexed hereto as Exhibit 145 is a true and correct copy of an email chain between David Zack and Ian Peacock, dated 10/18/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00014654 - DEF00014658. This document was also marked as Defendant's Deposition Exhibit 18 at the Deposition of Plaintiff, taken on February 1, 2010.

149.    Annexed hereto as Exhibit 146 is a true and correct copy of an email chain between Plaintiff and Monica Ramirez, dated 1/4/2008, which was produced to Plaintiff during discovery and bears the production number DEF00014685.

150.    Annexed hereto as Exhibit 147 is a true and correct copy of an email between Ian Peacock and Cheuvreux's New York office distribution list, dated 3/6/2008, which was produced to Plaintiff during discovery and bears the production number DEF00014755.

151.    Annexed hereto as Exhibit 148 is a true and correct copy of an email between reneeshome@hotmail.com (the Plaintiff's personal email address) and Plaintiff's work email address, dated 7/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00014834 - DEF00014851.

152.    Annexed hereto as Exhibit 149 is a true and correct copy of an email between reneeshome@hotmail.com (the Plaintiff's personal email address) and Plaintiff's work email address, dated 7/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00014957 - DEF00014980.

153.    Annexed hereto as Exhibit 150 is a true and correct copy of an email between reneeshome@hotmail.com (the Plaintiff's personal email address) and Plaintiff's work email address, dated 7/16/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00015039 - DEF00015070.

154.    Annexed hereto as Exhibit 151 is a true and correct copy of an email chain between Plaintiff and Matthew McClean, dated 3/27/2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00015305 - DEF00015308.

155.    Annexed hereto as Exhibit 152 is a true and correct copy of an email chain between Robert Macchi and Plaintiff, dated 12/6/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00015832 - DEF00015834.

156.    Annexed hereto as Exhibit 153 is a true and correct copy of an email chain between Melissa Crilley and Krystal Murray, dated 3/10/2008, which was produced to Plaintiff during discovery and bears the production number DEF00016154.

157.    Annexed hereto as Exhibit 154 is a true and correct copy of an email chain (with attachment) between Plaintiff and skravitz@lmppg.com, dated 9/7/2007, which was produced to

24

Plaintiff during discovery and bears the production number DEF00016671. This document was also marked as Defendant's Deposition Exhibits 10A and 10B at the Deposition of Plaintiff, taken on February 1, 2010.

158.    Annexed hereto as Exhibit 155 is a true and correct copy of an email chain between Plaintiff and reneeshome@hotmail.com (the Plaintiff's personal email address), dated 11/29/2007, which was produced to Plaintiff during discovery and bears the production number DEF00016693.

159.    Annexed hereto as Exhibit 156 is a true and correct copy of an email chain between Plaintiff and Altan Yenicay, dated 2/1/2008, which was produced to Plaintiff during discovery and bears the production number DEF00016695. This document was also marked as Yenicay Deposition Exhibit 18 at the Deposition of Altan Yenicay, taken on May 19, 2010.

160.    Annexed hereto as Exhibit 157 is a true and correct copy of an email chain between Philip Puccio and dhegarty@bloomberg.net, dated 7/19/2007, which was produced to Plaintiff during discovery and bears the production numbers DEF00024563.

161.    Annexed hereto as Exhibit 158 is a true and correct copy of an email between kbeydoun1@bloomberg and Khaled Beydoun, dated 7/23/2007, which was produced to Plaintiff during discovery and bears the production number DEF00026984.

162.    Annexed hereto as Exhibit 159 is a true and correct copy of an email chain between Richard Leighton and Frank Boer, dated 7/20/2007, which was produced to Plaintiff during discovery and bears the production number DEF00030073.

163.    Annexed hereto as Exhibit 160 is a true and correct copy of Plaintiff's trip report for January 2008, which was produced to Plaintiff during discovery and bears the production numbers DEF00031575 - DEF00031576.

164.    Annexed hereto as Exhibit 161 is a true and correct copy of Plaintiff's offer letter from Citigroup, dated March 1, 2005.  Citigroup produced this document to Cheuvreux pursuant to subpoena, dated April 2, 2010, and it was marked as Defendant's Citi Deposition Exhibit 7 at the Rule 30(b)(6) deposition of Citigroup, taken on July 16, 2010.

165.    Annexed hereto as Exhibit 162 is a true and correct copy of emails concerning Plaintiff, produced by Citigroup to Cheuvreux pursuant to subpoena, dated April 2, 2010. Citigroup authenticated these emails at its Rule 30(b)(6) deposition, taken on July 16, 2010, and stipulated that they are business records of Citigroup.  These emails were collectively marked as Defendant's Citi Deposition Exhibit 6.

166.    Annexed hereto as Exhibit 163 is a true and correct copy of emails concerning Plaintiff or between Plaintiff and Citigroup employees, produced by Citigroup to Cheuvreux pursuant to subpoena, dated April 2, 2010.  Citigroup authenticated these emails at its Rule 30(b)(6) deposition, taken on September 17, 2010, and stipulated that they are business records of Citigroup.  These emails were collectively marked as Defendant's Citi Deposition Exhibit 9.

167.    Annexed hereto as Exhibit 164 is a true and correct copy of a note dated April 2, 2008, which was produced by Plaintiff to Defendant during discovery.  This document was also marked as Defendant's Deposition Exhibit 5 at the Deposition of Plaintiff, taken on February 1, 2010.

168.    Annexed hereto as Exhibit 165 is a true and correct copy of an email chain between Altan Yenicay and Plaintiff, dated 11/14/2007, which was produced to Plaintiff during discovery and bears the production number DEF00008446.

169.    During discovery, Plaintiff's counsel, Matthew T. Schatz, Esq., represented to the undersigned counsel that Ms. Mihalik could not recall which hospital emergency room she

visited on or about September 4, 2007.  Likewise, Plaintiff did not produce any documents

confirming that Ms. Mihalik visited a hospital emergency room on that date.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
         November 1, 2010

BARBARA M. ROTH

Page 1

1

2     UNITED STATES DISTRICT COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     -------------------------------)

5     RENEE MIHALIK,                  )Index No.

6                                     )100808/09

7                     Plaintiff,      )

8                                     )

9              vs.                    )

10                                    )

11    CREDIT AGRICOLE CHEUVREUX       )

12    NORTH AMERICA, INC.             )

13                                    )

14                     Defendant.     )

15    -------------------------------)

16

17

18

19              DEPOSITION OF RENEE MIHALIK

20                 New York, New York

21               Monday, February 1, 2010

22

23

24    Reported by:

      JOMANNA DeROSA, CSR

25    JOB NO. 27451

Page 14

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 16

```
1                MIHALIK
2   working on.  So, a total of over -- a little over
3   two years.
4        Q.   Okay.  And at Lava were you also in
5   AES sales?
6        A.   It's the same position.  I just got
7   changed over to Citigroup.
8        Q.   Okay.  So -- so, when you got -- is
9   it fair to say you were laid off by Citi?
10        A.   Downsizing.  I guess if you want to
11   call that laid off, yes.
12        Q.   And what -- that was in April of
13   what year?
14        A.   2007.
15        Q.   And did -- how many people were
16   doing the same job you were doing at Citi in the
17   period right before the downsizing?
18        A.   At least 18.
19        Q.   When you were selected for
20   downsizing, were you told why you were selected?
21        A.   Low man on the totem pole.  And
22   also not an original Citigroup employee.
23        Q.   Okay.  Let's go through that.  What
24   does "low man on the totem pole" mean?
25        A.   There the least amount of time.
```

Page 15

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 17

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5 (Pages 14 to 17)

Page 26

MIHALIK

2    Q.  Okay.  Anybody else other than
3 Lehman?
4    A.  I don't recall, actually.
5    Q.  Okay.  And, obviously, Cheuvreux
6 made you an offer.  Correct?
7    A.  Yes.
8    Q.  Okay.  Is -- is Sanj a person or
9 the name of a company?
10    A.  It's a person.
11    Q.  And where does this person work?
12    A.  At Staffing Global.
13    Q.  Staffing Global.  Okay.
14    So, when you referred to Sanj up to
15 this point, you were referring to Staffing Global.
16    Correct?
17    A.  Yes.  That is the person at
18 Staffing Global I was referring to.
19    Q.  Okay.  And where is Staffing Global
20 located?
21    A.  I don't know.  He called me.
22    Q.  Okay.  And you never met with him
23 at his office?
24    A.  No.
25    Q.  Did you ever meet with him at all?

Page 27

MIHALIK

2    A.  Yes.
3    Q.  Okay.  Where did you meet with him?
4    A.  We had coffee at Starbucks or
5 something for him to meet me and to go over my
6 résumé.
7    Q.  Okay.
8    A.  It was because he lived in the same
9 town.
10    Q.  In New Jersey?
11    A.  In Hoboken, yes.  He worked up the
12 street.  So, let's meet for coffee, let's go over
13 your résumé and see what we can come up with.
14    Q.  So, Staffing Global is in Hoboken?
15    A.  No.  He did something else on the
16 side.
17    Q.  So, is it your testimony he was not
18 a full-time employee of Staffing Global?
19    A.  No, he was a full-time employee of
20 Staffing Global.
21    Q.  What do you mean he did something
22 else on the side?
23    A.  He had something else he was in
24 Hoboken for.
25    Q.  I see.  He didn't live in Hoboken?

Page 28

MIHALIK

2    A.  No.
3    Q.  Oh, okay.  I thought you said he
4 lived in Hoboken.  Sorry.
5    All right.  So, when -- do you
6 recall approximately when you had an interview at
7 Cheuvreux?
8    A.  June 2007.
9    Q.  Okay.  And who did you meet during
10 this interview?
11    A.  I met with Ian Peacock and
12 Khaled -- I'm not sure how to say his name --
13 Beydoun.  And I met with Tim Randall.  I believe
14 that's it.
15    Q.  Okay.  Did you meet with them
16 altogether or separately?
17    A.  I also had -- I'm sorry.  I also
18 had a video conference with France after my first
19 interview with the people at the office.
20    Q.  Who in France?
21    A.  Francois Simone.  And I think
22 that's it, as far as I can recall.
23    Q.  Okay.  And who -- did you meet with
24 these people together or separately?
25    A.  Separately.

Page 29

MIHALIK

2    Q.  Each one separately?
3    A.  Ian Peacock brought me in first,
4 spoke to me.  Then he had me back a second time,
5 and he had wanted me to meet with their -- with
6 Khaled and then the rest of the team that I'd be
7 working with.
8    Q.  Okay.  Tell me everything you
9 remember that Ian Peacock said to you and that you
10 said to him during this first meeting?
11    A.  He told me that he had been through
12 a lot of applicants, and I was the first person
13 that he thought could actually fill the role that
14 he was trying to create.  He thought I had the
15 knowledge and the confidence and the contacts that
16 he was looking for to help him get a kick start on
17 the U.S. trading that Cheuvreux was looking to get
18 into because they had been like 95 percent
19 European at this time.  They had European
20 research.  They didn't have any U.S. research.
21 And they were trying to build their U.S. trading
22 department.  And he was really interested in all
23 the contacts that I had to get them into U.S.
24 trading.
25    Q.  Okay.  You said that Mr. Peacock

8 (Pages 26 to 29)

Page 30

MIHALIK

1  told you were the first person who could fill
2  the role he was trying to create.
3          What role was that?
4      A.   The role was he wanted me to act as
5  liaison between European accounts and salespeople
6  and the U.S. to teach them and train them and make
7  them feel more comfortable with U.S. trading, and
8  also with the contacts that I had to bring those
9  clients -- to try to bring those clients on as
10  well, teach them U.S. trading, and --
11     Q.   What contacts did you tell him you
12  had?
13     A.   All the contacts that I had:
14  Galleon, Citigroup, Lehman, Deutsche. I mean --
15  BlackRock, Wachovia, Galleon, Legg Mason and
16  probably some others that I can't recall at this
17  time.
18     Q.   Did you indicate to Mr. Peacock
19  that the -- that these companies you just named
20  were the source of potential business for
21  Cheuvreux?
22     A.   No.
23     Q.   What did you understand to be the
24  significance of your having these contacts?

Page 31

MIHALIK

1      A.   He looked at my résumé and he said
2  I would like to try to get into these companies.
3  And seeing I have contacts, senior contacts at the
4  companies, we could get into those companies to
5  try to sell them on U.S. trading or European
6  sales.
7      Q.   Okay. Did you tell Mr. Peacock
8  that you had already made sales to any of these
9  companies?
10     A.   Yes.
11     Q.   Which ones?
12     A.   Galleon.
13     Q.   Any others?
14     A.   Legg Mason.
15     Q.   Any others?
16     A.   BlackRock.
17     Q.   Anyone else?
18     A.   LibertyView.
19     Q.   Anyone else?
20     A.   No, not that I can recall.
21     Q.   At -- at Citi had you produced
22  revenues from Galleon, BlackRock, Legg Mason, and
23  LibertyView?
24     A.   Yes.

Page 32

MIHALIK

1      Q.   In the year before you left Citi,
2  do you know approximately how much those revenues
3  were?
4      A.   I don't recall.
5      Q.   Do you know if it was in the six
6  figures?
7      A.   Definitely.
8      Q.   Was it in the seven figures?
9      A.   It's possible.
10     Q.   Do you have any way of narrowing in
11  on this?
12     A.   I don't. I don't.
13     Q.   Do you have any records in your
14  possession that would tell you this information?
15     A.   Citigroup didn't give out records
16  like that with clients or revenue.
17     Q.   Okay. Did you tell Mr. Peacock
18  that you expected to be able to do business with
19  all the companies you listed when you -- if and
20  when you joined Cheuvreux?
21     A.   I didn't tell him to expect any
22  business from anybody. I told him that I could
23  get a meeting with him and these people because I
24  had senior contacts at these companies.

Page 33

A-83

Page 42

```
1              MIHALIK
2       A.   I recall him asking me about my
3  previous employers, if I knew what Cheuvreux did
4  and if I understood his position and why I wanted
5  to work at Cheuvreux.
6           And I said I thought I could help
7  out with trying to build up the U.S. trading
8  department.  And I have prior experience in
9  research sales and prior experience in trading and
10  prior experience in AES sales and service, at
11  least ten years.
12          And not much more.  I asked him
13  what his role was and, you know, how he felt the
14  market was and stuff.  Just 15 minutes only.
15      Q.   Where did you obtain your initial
16  training and experience in AES sales?
17      A.   At -- let's see.  Well, alternative
18  execution itself, I learned of the platforms when
19  I traded at Spear Leeds.  I was an
20  over-the-counter trader, so I actually used the
21  alternative execution systems along with trading,
22  so I traded.  I learned how to use them there.
23  And once you learn how to use something, it's
24  training, and the sales came later.  So I first
25  started using the platforms and the electronic
```

Page 44

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 43

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 45

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

12 (Pages 42 to 45)

Page 46

Page 47

MIHALIK
2 met with you in Mr. Peacock's office.
3          Why did the meeting not take place
4 in Mr. Randall's office?
5      A.   Mr. Randall did not have an office.
6      Q.   Okay. Did you have an
7 understanding of why Mr. Randall didn't have an
8 office?
9      A.   He wasn't the CEO or he wasn't a
10 manager or -- there's only -- it was a very small
11 office. There was only two offices there really,
12 so --
13     Q.   There were only two offices there?
14     A.   Well, two offices for the people
15 aside from the compliance officer.
16     Q.   Okay. And who occupied those two
17 offices?
18     A.   Ian Peacock and Khaled Beydoun.
19     Q.   Okay.
20     A.   Ian had an office, but he mostly
21 sat on the floor.
22     Q.   Okay. Is it a fair statement that
23 Ian's office was the place that was sort of used
24 as a conference room as well?
25     A.   No.

Page 48

MIHALIK
2      Q.   No?
3          So at the end of this second
4 meeting at Cheuvreux, did you meet with anyone
5 else other than -- withdrawn. That was a terrible
6 question.
7          Other than the -- other than the
8 three people you've talked about during your
9 second meeting at Cheuvreux, did you see anyone
10 else?
11     A.   Probably the HR. I think her name
12 was -- I'm not sure what her name was. There was
13 an HR girl there that had no longer been there.
14 She brought me in.
15     Q.   Is this Simone Charles?
16     A.   Yes. She had just brought me in to
17 meet with the, you know, people.
18          And other than that, I did not meet
19 privately with anybody else one-on-one. I might
20 have seen other people around, but I didn't meet
21 one-on-one with anybody else that I can recall.
22     Q.   Okay. Did you say anything to
23 Ms. Charles or did she say anything to you other
24 than hello?
25     A.   She wasn't very talkative. No, I

Page 49

13 (Pages 46 to 49)

**Page 50**

1             MIHALIK
2     A.   Not more than a half an hour.
3     Q.   And tell me everything you said to
4  him and he said to you.
5     A.   He asked me what I thought I had to
6  offer Cheuvreux.
7         And I said I had senior level
8  contacts at some big firms and that I had a lot of
9  U.S. trading knowledge.  I had been a trader.  I
10  had experience for ten years.  I thought I could
11  offer Cheuvreux experience and contacts.
12         And as far as I can recall, just --
13  he had not that many questions, but I believe he
14  had spoken with Ian.
15     Q.   And what leads you to believe he
16  had spoken with Ian?
17     A.   Ian told me that he had told
18  Francois Simone that he wanted to meet with or,
19  you know, interview me because he had told him
20  about me.
21     Q.   Okay.
22     A.   So he told me -- Ian Peacock told
23  me that he had spoke to him and that he was
24  interested in speaking to me.
25     Q.   Did there come a time when you

**Page 51**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 52**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 53**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

14 (Pages 50 to 53)

Page 54

Page 56

MIHALIK

2 to -- in the office to take that list of clients
3 that we already had and to build that up as well,
4 trying to get the people that are trading only
5 European stocks to trade U.S., or people that are
6 trading U.S. to trade more.
7      Q.   Okay.  So the last thing you said
8 was similar to the first thing.  First thing, I
9 think, was try to get European clients to trade
10 U.S.
11           And the last thing was working with
12 the research people to try to get existing clients
13 to trade U.S.  Correct?
14      A.   Right.  My first endeavor,
15 according to Ian Peacock, was for me to take the
16 existing clientele, European clientele and
17 European sales, to try to get them to trade U.S.
18      Q.   Okay.
19      A.   Using existing clients to generate
20 new business.
21      Q.   Okay.  Is it a fair statement that
22 you were comfortable with these duties that were
23 set forth for you?
24      A.   Yes.
25      Q.   Okay.  When you got to Cheuvreux,

Page 55

Page 57

MIHALIK

2 what did you do to try to get European clients to
3 trade U.S.?
4      A.   I visited Europe: France, London,
5 Germany.  I worked with the U.S. sale -- European
6 sales department to get a list of their clients,
7 try to set up -- have them help me set up meetings
8 to meet with them and explain to them U.S. markets
9 and alternative execution platforms and the
10 algorithms that we had at the time and to try to
11 generate new business.
12      Q.   Okay.  When did you go to Europe
13 the first time?
14      A.   Within the first two months that I
15 was there.
16      Q.   And how long did you spend?
17      A.   I think the first time I went, I
18 was there for a week.
19      Q.   Okay.  You went to France, London
20 and Germany?
21      A.   Not the first time.  The first time
22 I went, I just went to France and London.
23      Q.   Did there come a point when you
24 went to Germany?
25      A.   Yes.

15 (Pages 54 to 57)

Page 58

MIHALIK

1
2  Q.   Okay. All right. So focusing on
3  the first trip, you went to France and -- Paris?
4      A.   Yes.
5      Q.   Paris and to London.
6          Prior to that trip, did you set up
7  meetings with people in Paris and London?
8      A.   I had sent out what I proposed
9  would be my plan with how I was going to approach
10 my duties. So I sent out an e-mail with -- it's a
11 rudimentary sort of business plan, stating that --
12 what I was going to do with my bimonthly visits to
13 Europe to work with the salespeople.
14         They were supposed to be calling
15 their clients and say, Hey, you know, I have an
16 expert here in the U.S. markets, you know.
17         They're already their clients, so
18 for me to call up their clients, that wasn't -- I
19 wasn't supposed to do that. I was supposed --
20 they were supposed to help me get in there because
21 they were their clients already, and I was
22 supposed to work with them to try to get them on
23 the page that they understood, the U.S. markets
24 and such. So I didn't personally call their
25 clients.

Page 59

MIHALIK

1
2          The salespeople were supposed to
3  say, Hey, I have a girl coming. She understands.
4  She's an expert in U.S. markets. I know you're
5  not trading in U.S. markets. If you have any
6  questions or whatnot.
7      Q.   Who told you that the European
8  salespeople were supposed to be setting up
9  meetings for you?
10     A.   Ian Peacock told me that I was
11 supposed to call and introduce myself and meet
12 with the sales teams from the other offices
13 overseas. I was supposed to introduce myself to
14 them, and then from there I was supposed to work
15 with them and their clients to try to generate
16 U.S. trading business.
17     Q.   Okay. Did you call the people in
18 London and Paris, the salespeople, to introduce
19 yourself?
20     A.   I did.
21     Q.   Did you ask them to set up meetings
22 for you?
23     A.   I did.
24     Q.   What did they say?
25     A.   They said they would try.

Page 60

MIHALIK

1
2      Q.   Okay. And did they try?
3      A.   Yes.
4      Q.   And did they succeed?
5      A.   Some.
6      Q.   On your first trip to Europe, to
7  Paris and London, with whom did you meet?
8      A.   I met with the whole sales team
9  there.
10     Q.   In each of Paris and London, you
11 met with the whole sales team?
12     A.   As available as -- the people who
13 were available. I met with whoever was available
14 at the time when I was there.
15     Q.   Do you remember the names of people
16 you met?
17     A.   Phillipe Le Prince was in France.
18 Andrew Hawgood.
19         The names are escaping me right
20 now. Sorry.
21     Q.   Okay. About how many people did
22 you meet in Paris?
23     A.   Maybe seven on the floor, sales and
24 trading. And then I met with Francois Simone, the
25 management there, to introduce myself personally.

Page 61

MIHALIK

1
2      Q.   And London?
3      A.   In London I also met with
4  management and the salespeople that were available
5  there.
6      Q.   Okay. Do you remember the names of
7  anyone you met in London?
8      A.   I met with Gerry Lees. I met
9  with -- I'm sorry. The names are escaping me
10 right now.
11     Q.   Okay. Did you meet with any
12 clients in Paris?
13     A.   Yes.
14     Q.   Who?
15     A.   I don't recall.
16     Q.   How many?
17     A.   Maybe two.
18     Q.   And who had set that up for you?
19     A.   The salespeople.
20     Q.   Tell me everything you remember
21 about the meetings with the clients in Paris.
22     A.   The salespeople were, I felt,
23 slightly reluctant to have me in to their clients,
24 to see them.
25     Q.   What made you feel that way?

16 (Pages 58 to 61)

Page 86

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 89

                    MIHALIK
1
2        Q.   Yes.  And why?
3        A.   Because the CEO would trade
4   directly with me U.S. stocks.
5        Q.   Okay.  Through AES?
6        A.   No.  He IM'd me trades, and he
7   e-mailed me with trades.
8        Q.   And you personally did those
9   trades?
10        A.   The traders traded the stock.  I
11   just took the order and told them.
12        Q.   Okay.  How much in trading revenue
13   did you do with Galleon?
14        A.   I don't recall exactly.
15        Q.   Do you have an estimate?
16        A.   I don't.
17        Q.   Okay.  Any other company for which
18   you believe you should have been credited with
19   revenue generation?
20        A.   No.  The companies that I brought
21   on were either in contract or in training.  I
22   mean -- yes, training on the particular platform
23   that they were using.  So, I never saw any of the
24   revenue -- I don't know what happened after I
25   left, but I was only there for eight months and

23 (Pages 86 to 89)

Page 90

MIHALIK

1
2  the clients that I did bring on, or that did
3  agree, they were either in contract or they had
4  just said yes, or I just had a meeting with them.
5       So, aside from the clients that
6  actually sent in the contracts and did trade, and
7  with Galleon did -- doing specific trading with
8  me, there was no other record.
9       Q.   So, is it your testimony that none
10 of the clients did AES training while you were
11 there?
12      A.   Yes.  They didn't have -- the
13 contracts weren't back, and their systems weren't
14 set up yet.  So, they had no way to do that.
15      Q.   Okay.  What does it mean "the
16 contracts weren't back"?
17      A.   You can't trade without -- just
18 like I can't go to work without signing this
19 contract.  They had trading contracts, know your
20 client, you know, due diligence.  Everything had
21 to be filled out and sent back and processed.
22      Q.   How long did it take?
23      A.   It depends on the client, but the
24 larger the client, the longer the process.  And in
25 the same term, the smaller the client, the longer

Page 91

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

MIHALIK

1
2  were at Cheuvreux for nine months.
3       Is that a fair calculation?
4       A.   Eight months.
5       Q.   Let's see.  You started in July.
6       Right?
7       A.   July 9th.
8       Q.   July 9th.  July, August, September,
9  October, November, December, January, February,
10 March, April.  I get nine.
11      A.   Okay.
12      Q.   Is that right?  All right.
13      So, during those nine months, other
14 than introducing these companies with which you
15 had prior contacts, what did you understand you
16 were supposed to be doing while you were at
17 Cheuvreux?
18      A.   Okay.  Learning about Cheuvreux and
19 all of their products, and how to talk about their
20 products.  I was to put together something that
21 didn't exist, a U.S. presentation.  I set up a
22 checklist of -- of how to set up a new client.
23 They had a very precarious way of setting up a new
24 client.  It wasn't step one, two, three, and
25 things would get lost and people, you know, so, I

24 (Pages 90 to 93)

Page 98

Page 99
```
 1                 MIHALIK
 2     Q.   Okay.  Let's start at the top.  We
 3  have Credit Agricole Cheuvreux.  And that's why
 4  we're here.  You've already -- the one below that
 5  is Citigroup Global Markets.  Correct?
 6     A.   Yes.
 7     Q.   And Lava Trading.  I believe you
 8  testified that Lava Trading merged into Citigroup.
 9          Correct?
10     A.   Yes.
11     Q.   And that you were downsized from
12  that organization.  Correct?
13     A.   From Citigroup, not Lava.
14     Q.   Yes.
15     A.   Right.
16     Q.   I'm considering those two together.
17  Below that is something called INET ATS.
18          Do you see that?
19     A.   Yes.
20     Q.   What is that?
21     A.   It's -- it's the same -- it's
22  Instinet.  It's just their alternative trading
23  system.  I don't know why that's -- I don't
24  understand that, why that's there.
25     Q.   Okay.  And you left there on April
```

Page 100
```
 1                 MIHALIK
 2  10th, 2003.  Is that correct?
 3     A.   Yes.
 4     Q.   Okay.  Why did you leave?
 5     A.   Because Instinet took over Island
 6  ECN.  This is when -- this is how I was explaining
 7  before, how their alternative execution platforms
 8  are separate from the companies themselves.
 9          So, Lava was the platform
10  and Citigroup brought them.  Instinet was the
11  platform -- or INET and Instinet have their own
12  platform -- INET and Island were -- were
13  competitors, so, they came one, and that's why
14  they let -- they brought the people from Island to
15  Instinet, and then they let most of the Island
16  people go after that.
17     Q.   So you were terminated by INET?
18     A.   Yes.
19     Q.   Why?
20     A.   Downsizing, because the two
21  companies were put together and there was too many
22  people, and they kept the Instinet people and let
23  most of the Island people go, which is where I
24  originally was.
25     Q.   Okay.  If you look further down the
```

Page 101
```
 1                 MIHALIK
 2  list, it has:
 3          "Goldman Sachs execution and
 4  clearing."
 5          Do you see that?
 6     A.   Yes.
 7     Q.   Okay.  And it says that "full
 8  termination."
 9          What were the circumstances of your
10  departure from that position?
11     A.   Goldman Sachs took over Spear Leeds
12  & Kellogg at the time.  And that was also around
13  the time September 11th happened, so the markets
14  basically crashed and the companies merged.  And
15  again, I wasn't there that long.  And Goldman
16  Sachs used their traders, and the people at Spear
17  Leeds & Kellogg -- most of the people that were
18  there for two years and less were let go.
19     Q.   Okay.  So -- and you were let go --
20     A.   Yes.
21     Q.   -- as well?
22     A.   Yes.
23     Q.   And you worked at UBS Financial
24  Services in February of 2000.
25          What were the circumstances of your
```

26 (Pages 98 to 101)

Page 106

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 108

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 107

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 109

MIHALIK
1
2      A.    No.
3      Q.    So what did you do, then, on your
4   second and third trips to London or Paris?
5      A.    I went to the meetings that they
6   did set up and --
7      Q.    All right.  Then they did set up
8   meetings for you on the second and third trips.
9   Correct?
10     A.    Yes.  Not the same clients as last
11  time.
12     Q.    Okay.  Did you make any efforts to
13  see the clients in London and Paris that -- to
14  whom you had been introduced on your first trip?
15     A.    I left it to the salespeople.  They
16  wanted me to be secondary to their talks to
17  their -- they were their clients and they wanted
18  to have the conversation with them.  I was just
19  there to help them and explain to their clients
20  or, you know, answer any questions.  So I --
21     Q.    Did you let those clients know, by
22  e-mail or any other way, that you were returning
23  to Europe?
24     A.    Yes.
25     Q.    And so you did maintain some

28 (Pages 106 to 109)

Page 110

1              MIHALIK
2  independent contact with those clients that you'd
3  met on the first trip.  Correct?
4          A.    Yeah.
5          Q.    But you did not go back and visit
6  them again.  Correct?
7          A.    Maybe one, but I don't recall.
8          Q.    Who?
9          A.    I don't recall the name.
10         Q.    Now, in paragraph 8 of your
11  complaint, you say:
12              "Peacock knowingly allowed
13  pornography in the office and on employee
14  computers."
15              Do you see that?
16         A.    Yes.
17         Q.    What pornography did Mr. Peacock
18  allow in the office and on employee computers?
19         A.    Women naked.  He would start
20  laughing and say -- and I -- because he sat right
21  next to me.
22              I'd go, What are you looking at?
23              He -- Oh, check this out.
24              And I would just kind of lean over.
25  One time I remember a guy hanging by his genitals.

Page 111

1              MIHALIK
2  That was one thing that stuck out.  But women
3  naked laying there, stuff like that.
4          Q.    Do you -- when did this happen?
5          A.    Throughout the whole time I was
6  there.
7          Q.    How often did this happen?
8          A.    Well, he would call me over, I
9  don't know, once or twice a month, maybe,
10  something like that, with something that was
11  really out of the box, you know.  That's why I
12  remember the guy hanging from his genitals because
13  that was, oh, my God.
14         Q.    Now, let's talk about this guy
15  hanging from his genitals.
16              Do you know -- did Mr. Peacock call
17  you over to see that picture?
18         A.    Yes.
19         Q.    Yes?
20         A.    He was laughing.
21              And I was like, What are you
22  laughing at?
23              He's like, Check this out.
24         Q.    Okay.  So he -- but he -- did he
25  call you over to see that?

Page 112

Page 113

Page 118

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 121

1          MIHALIK
2    there was somebody on the far side of your
3    computer who was facing you and looking at their
4    computer?
5         A.   Yes.
6         Q.   Okay.  And then there was -- is it
7    a fair statement that there was somebody on either
8    side of you facing their computer, somebody to
9    your right and somebody to your left?
10        A.   Facing their computers?
11        Q.   Yes.  Correct?
12        A.   Yes.
13        Q.   And then each of those people, your
14   neighbors, had people facing them with computers
15   across the row.  Correct?
16        A.   Yes.
17        Q.   So if I can try to describe it,
18   there were rows of desks that were two desks deep,
19   and people sat on either side of the rows in front
20   of computers and faced each other -- faced each
21   other across the row.  Correct?
22        A.   That's right.
23        Q.   Okay.  And how many rows like that
24   were there?
25        A.   Three down the center.  Well, the

31 (Pages 118 to 121)

Page 122

MIHALIK

1
2    room was set up where research sales was
3    perpendicular to the trading and AES. So the
4    center of the room was set up with three rows as
5    you described.
6        Q.   Okay. And if I -- withdrawn.
7            If you were sitting in your seat,
8    did your seat swivel?
9        A.   As far as I can recall, it did.
10       Q.   Did you ever swivel around in your
11   seat?
12       A.   Yes.
13       Q.   And when you swiveled around in
14   your seat, could you see the row in back of you
15   and the people facing their computers in that row?
16       A.   Yes.
17       Q.   And could you see their screens?
18       A.   Yes.
19       Q.   Did you ever see any pornography on
20   any of their screens?
21       A.   No.
22       Q.   Do you know if they ever swiveled
23   their chairs around to look at your row?
24       A.   I don't know.
25           MR. SCHATZ: Objection.

Page 123

MIHALIK

1
2        Q.   Did any of them ever tell you that
3    they had seen any pornography on any computer
4    screens in your row?
5        A.   No.
6        Q.   Now, you described -- you said
7    there was pornography all around. Is that
8    correct?
9        A.   Yes.
10       Q.   Tell me everywhere that was "all
11   around." Tell me all the pornography that was all
12   around and where it was.
13       A.   It was in London at Andrew
14   Hawgood's desk. It was in -- next door to me and
15   at Ian's -- Ian -- next door to me at Tim
16   Randall's desk and again at Ian Peacock's desk.
17   That would be -- I would consider that all around
18   me.
19       Q.   Okay. And -- all right. So you
20   saw -- is it a fair statement that you saw
21   pornography on Andrew Hawgood's computer on one
22   occasion? Correct?
23       A.   Yes.
24       Q.   Okay. Did you see pornography on
25   anybody else's computer other than Tim Randall and

Page 124

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 125

MIHALIK

1
2        A.   Can you ask the question a
3    different way.
4        Q.   Well, we've talked about
5    pornography that you saw on computers.
6            Pornography anywhere else other
7    than on computers?
8        A.   As in a magazine?
9        Q.   As in anything.
10       A.   I did not, no.
11       Q.   Okay. Now, when -- let's focus on
12   Mr. Randall for a moment.
13           When Mr. Randall saw pornography,
14   did he draw your attention to it?
15           MR. SCHATZ: Objection.
16       A.   No.
17           MS. ROTH: Okay. What's the basis
18   of your objection?
19           MR. SCHATZ: It was asked and
20   answered.
21       Q.   When -- other than the one time
22   that you've already described, did Mr. Peacock
23   draw your attention to pornography on his computer
24   when he was looking at it?
25       A.   Yes.

32 (Pages 122 to 125)

Page 126

1                    MIHALIK
2        Q.    Okay.  How many times did he do
3    that?
4        A.    I'd have to approximate and say
5    maybe ten to 15 --
6        Q.    Okay.
7        A.    -- throughout the course of the
8    five months for 2007.
9        Q.    Okay.
10       A.    From July to 2007 -- December of
11   2007.
12       Q.    Okay.  Did it stop after December
13   of 2007?
14       A.    Yes.
15       Q.    Okay.  Did -- what stopped after
16   2007?
17              I'm going to rephrase that because
18   I don't want to confuse you at all here.  I'm
19   confusing myself.
20              So it is your testimony that you
21   did not see pornography in the workplace after
22   December of 2007.  Is that correct?
23       A.    Not on Ian Peacock's desk.
24       Q.    Did you see it anywhere else after
25   December of 2007?

Page 128

1                    MIHALIK
2        A.    I didn't complain to anybody.
3        Q.    Okay.  Did you report this to
4    anybody?
5        A.    I reported conduct unbefitting of a
6    CEO to the compliance officer, David Zack, after a
7    lot of stuff had happened.
8        Q.    Okay.  We'll get there.
9        A.    Uh-huh.
10       Q.    Did you -- but it's your testimony
11   that you did not report to -- all right.  Let's
12   focus for a moment on 2007.  I think this is --
13   this makes it easier.
14              Did you report in 2007 to anyone
15   that Mr. Peacock or Mr. Randall was viewing
16   pornography in the workplace?
17       A.    Not -- I didn't complain
18   specifically about "the pornography."  No, I did
19   not.
20       Q.    Okay.  In -- let's talk about the
21   compliance director for a second.
22              Before we go there, did you -- did
23   you socialize with people in the office?
24       A.    Socialize as in --
25       Q.    Did you -- did you spend time with

Page 127

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 129

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

33 (Pages 126 to 129)

Page 130

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1                    MIHALIK
2    you meant or were you just really meaning to refer
3    to Mr. Peacock when you used the term "Cheuvreux"
4    here?
5          A.    No. I also said David Zack.  I had
6    told him as well.  And, actually, I don't have it,
7    but I drafted an e-mail that I was going to send
8    to Ian Peacock regarding his actions as CEO and
9    his actions towards me.
10          Q.    Well, we have it, so we'll talk
11    about it a little bit later.  We'll show it to
12    you.
13          A.    Have what?
14          Q.    That e-mail, I believe.
15          A.    I didn't send the e-mail.
16          Q.    I know, but I believe we have it,
17    and I think it's been produced to you in this
18    case.
19          A.    Okay.
20          Q.    I'll show it to you.  Maybe it is
21    and maybe it is in the e-mail.  You'll tell us.
22    We don't really know what it is.
23                In that paragraph you use a term
24    called "gender hostility."  What do you mean by
25    that?

Page 131

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 133

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

34 (Pages 130 to 133)

Page 134

Page 136

MIHALIK

1 that because you were a woman, you weren't as
2 smart as the men, and that you — and that he said
3 it in front of that guy.  What guy was that?
4      A.   John.
5      Q.   John who?  John Palazzo?
6      A.   Yes, thank you.
7      Q.   It's the only John I know.
8           Who else heard this?
9      A.   I don't think anybody else heard
10 it.  They heard the actual argument after I had
11 protested that I didn't think that was fair.  But
12 the people in the bar, I'm sure, noticed the --
13 the argument.
14      Q.   Okay.  Did you tell anybody about
15 this after it happened?
16      A.   You know, I didn't tell anybody.  I
17 heard rumors in the office of another woman that
18 had been fired before me who actually complained
19 about things, and was harassed and let go, and
20 fired too.  So, I figured, you know, if I said
21 something that I'd be fired, so I --
22      Q.   Who was the other woman?
23      A.   I'm not sure of her name.  She was
24 there prior to my employment.

Page 135

MIHALIK

1 would say that because you were a woman, you
2 weren't as smart as the men.  Correct?
3      A.   Yes.
4      Q.   Tell me the -- when did he say
5 this?
6      A.   He said it to me many times.  He
7 said it in front of that guy.  We actually had an
8 argument.  We were at a whole team gathering in
9 January at The Grove, and we actually got into an
10 argument inside the bar about how he portrayed me,
11 and how I was to respect John because he's male,
12 he's more powerful than I am, and I need to learn
13 stuff from him and he has, you know, more
14 experience than I do, and, you know, that I should
15 respect him because he's more powerful than I am
16 and I need to learn from him.
17      Q.   Who was this in front of?
18      A.   Whoever was at the bar.
19      Q.   Who was there?
20      A.   If I had a list, I could tell you.
21 I can't remember, off the top of my head, of all
22 the people that were standing around the bar.
23      Q.   All right.  You just said, though,
24 that he said that you -- if you were a woman --

Page 137

MIHALIK

1      Q.   In New York?
2      A.   Yes.
3      Q.   Okay.
4      A.   I voiced my concern to Mr. Peacock
5 at the time that he said that to me, and I got
6 aggressive with him, and telling him how I felt
7 about him degrading me at that time, humiliating
8 me in front of the newest employee, John Palazzo,
9 and that he -- you know, his -- his qualifications
10 were so much, you know, greater than mine.
11      Q.   What did -- where did this occur?
12      A.   Where did this conversation occur?
13      Q.   Where did this conversation occur?
14      A.   The Grove in -- in London.
15      Q.   Okay.  And -- and this is at a bar?
16      A.   It was at the bar inside the hotel
17 that we were having the conference or the -- the
18 gathering at.
19      Q.   Okay.  Had you been drinking?
20      A.   No.
21      Q.   And there were other colleagues of
22 yours present at the bar.  Correct?
23      A.   Yes.
24      Q.   Okay.  But it's your testimony that

35 (Pages 134 to 137)

Page 138

1         MIHALIK
2  no one else heard it?
3       A.   They didn't hear our private
4  conversation, us three talking, no.
5       Q.   Okay. But Mr. Palazzo heard the
6  conversation?
7       A.   Of course. He was involved in the
8  conversation.
9       Q.   Okay. All right. Did you -- so --
10 so, it's also your testimony then that you did not
11 complain to anyone about what had been said to you
12 at that conversation at the bar?
13          MR. SCHATZ: Objection.
14      A.   I complained to Ian.
15      Q.   Yes. And other than Ian, did you
16 complain to anyone else?
17      A.   People asked me what I was arguing
18 about, and I just said that me and Ian had a --
19 had a conflict of interest. I didn't want to say
20 anything. I was afraid to say something. I
21 thought that I was going to be harassed further
22 and fired, and I didn't want to lose my job. I
23 loved my job.
24      Q.   And when did you speak to Ian about
25 it?

Page 139

1
2
3
4
5
6
7
8
9
10
11
12                                    ,
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

36 (Pages 138 to 141)

Page 146

Page 148

MIHALIK

2    A.    By making the comments themselves,
3    he did -- he encouraged others around to the same
4    act, the same type of discriminating --
5        Q.    Please listen to my question.
6            During what period of time did
7    Mr. Peacock make these comments?
8        A.    Like from month-to-month?
9        Q.    You -- you arrived in July 2007.
10    You departed in April of 2008. During what time,
11    during what dates, at what time during your tenure
12    at Cheuvreux did Mr. Peacock make these comments
13    to you and encourage others to make similar
14    comments?
15        A.    Between when I first started in
16    July until about the end of December 2007.
17        Q.    Okay. And did you tell anybody
18    that Mr. Peacock was doing this during the period
19    of July through December of 2007?
20        A.    Yes. I told David Zack.
21        Q.    Okay. And we'll get to your
22    conversations with Mr. Zack.
23            You next allege that Mr. Peacock
24    intimidated and humiliated you by repeatedly
25    commenting on your appearance in the workplace,

Page 147

MIHALIK

2        Q.    Do you -- do you think that that --
3    that calling someone a chick is a discriminatory
4    or harassing comment?
5        A.    I believe so, yes.
6        Q.    Okay. Who heard -- who heard
7    Mr. Peacock make sexually degrading comments to
8    you?
9        A.    Andrew Hawgood, Khaled and Tim
10    Randall.
11        Q.    Anyone else?
12        A.    Not that I know of.
13        Q.    Now, you said that -- that
14    Mr. Peacock made comments in daily meetings.
15    Correct?
16        A.    He made -- not specifically towards
17    how I was dressed, but comments.
18        Q.    Okay. Now, the -- I think we've
19    already talked about the pornography -- oh,
20    withdrawn.
21            Before we leave the first subject,
22    during what period of time did Mr. Peacock make
23    these comments about your -- your appearance and
24    encourage associates to make similarly degrading
25    comments?

Page 149

MIHALIK

2    stating on one occasion "that dress makes you look
3    good" with lots of O's, and:
4            "You should dress like that every
5    day. You might get more clients in turn."
6            Who heard Mr. Peacock say these
7    things to you?
8        A.    I don't know who heard him say that
9    to me.
10        Q.    Who was present when he said these
11    things to you?
12        A.    Nobody was present. He sat right
13    next to me.
14        Q.    So, this was -- this was said on
15    the desk. Is that correct?
16        A.    Yes.
17        Q.    Okay. And during what period of
18    time -- withdrawn.
19            Can you give me a date on which
20    Mr. Peacock said this to you?
21        A.    I can't give you a specific date.
22    He said it multiple times. He humiliated me. He
23    would critique how I dressed almost daily, whether
24    he liked something, whether he didn't like
25    something, whether it made me look more feminine,

Page 150

Page 152

Page 151

MIHALIK

1  you know, that's humiliating.  I can't believe
2  that you're telling me that because I have red
3  shoes on that I'm promiscuous, and that equates to
4  anything.
5      Q.    And what did he say to you when you
6  said that to him?
7      A.    Nothing.
8      Q.    Can you give me a time frame during
9  which this was said to you?
10     A.    I would say probably around
11  October/November of 2007.
12     Q.    Okay.  Any other time?
13     A.    No.  I never wore the red shoes
14  again.
15     Q.    Okay.  You allege that Mr. Peacock
16  asked you "Do you know what dogging is?"  And
17  then: "Do you fancy dogging?  To express his
18  desire for a sexual relationship with Mihalik,
19  which Peacock knew was unwelcome to Mihalik."
20     A.    Right.
21     Q.    When did this happen?
22     A.    Around the same time frame, between
23  October and November of 2007.
24     Q.    And did you tell anybody about it?

Page 153

MIHALIK

1  Mihalik in a group outing in London, which was
2  demeaning to her."
3         Was this the -- the off-site in
4  January of 2008?
5      A.    Yes, it was.
6      Q.    Okay.  Who were the business
7  associates in front of whom Mr. Peacock allegedly
8  said this?
9      A.    Phillipe Le Prince, myself, John
10 Palazzo, Andrew Hawgood.  I believe Tim Randall
11 was there, and possibly Dominic Romano was there.
12 And they just stood around and were laughing about
13 the comment that was actually made in the off-site
14 by Phillipe Le Prince, and they were laughing
15 about how funny it was that it got brought up in
16 this big conference.
17     Q.    And what was the comment?
18     A.    We were supposed to draw something
19 that represented the company, and Phillipe Le
20 Prince thought that drawing a globe that looked
21 like a cat because we were Cheuvreux alternative
22 trading systems, and he said cats, because nobody
23 forgets a pussy, and everybody thought that was
24 hilarious, and they were around talking about it.

39 (Pages 150 to 153)

---

Page 154

MIHALIK

1
2      It was disgusting and humiliating,
3  and it's inappropriate for anybody to sit around
4  and talk about that.
5      Q.    Okay. So, was this something that
6  Mr. Peacock said or that someone else said?
7      A.    He was laughing and discussing it
8  with Phillipe Le Prince. And everybody else
9  around were laughing it up as well.
10     Q.    And what did Mr. Peacock say to
11 Phillipe Le Prince?
12     A.    I can't believe what you brought up
13 in this big conference room. You brought pussy
14 up. That's hilarious. I can't believe that you
15 came up with that. That's really, you know --
16     Q.    That's really what?
17     A.    Creative, I guess. Cats.
18     Q.    You allege that:
19         "Mr. Peacock made inappropriate
20 comments about your personal life, humiliating you
21 in front of your coworkers, including statements
22 such as why aren't you married, and suggesting
23 that you must be a cougar."
24         When did Mr. Peacock allegedly say
25 this to you?

---

Page 155

MIHALIK

1
2      A.    When I first started working there
3  in July, he would take -- he would pay special
4  attention to me. He would take me out to lunch,
5  where we'd have a glass of wine, that it was a
6  European thing, and barely talked about business,
7  more on your personal life, my age, if I was
8  married, if I was dating. Invaded my privacy. I
9  didn't answer any of his questions.
10         And after that I assumed that
11 Mr. Peacock found out that I was dating -- in
12 fact, dating somebody because then he asked me why
13 I wasn't married, if I just dated, you know, older
14 men, and if I was a cougar. I think he found out
15 through David Zack, who read everybody's e-mail,
16 because I never told him that I was dating or I
17 never told him my age, and I never told him
18 anything, so -- I told him I didn't want to -- I
19 was a private person. I didn't express -- I
20 didn't tell anybody my private life, and I felt
21 like it was an invasion of my privacy that he
22 would ask me my age, and my -- my dating status or
23 my marital status, but he never let it go.
24     Q.    Did he tell you anything about
25 himself?

---

Page 156

MIHALIK

1
2      A.    I didn't ask.
3      Q.    That's not my question.
4         Did he tell you anything about
5  himself?
6      A.    No.
7      Q.    How often would you go out to lunch
8  when you first started?
9      A.    Alone we went out probably about
10 four times without the rest of the team.
11     Q.    In what period of time?
12     A.    Two months.
13     Q.    Okay. After he asked you these
14 questions, did you tell anybody at Cheuvreux about
15 it?
16     A.    No. Actually, after he found out
17 that I was dating somebody, I asked David Zack,
18 you know, how did he find out? Like what did you
19 do? Did you tell him? Did he ask you? Because
20 there would be no other way for him to find out
21 unless somebody was, you know, looking into my
22 e-mails or inquiring otherwise.
23     Q.    And what did Mr. Zack say to you?
24     A.    He declined.
25     Q.    He declined. He said no?

---

Page 157

MIHALIK

1
2      A.    He said I didn't tell him anything.
3  I said I didn't believe him because there was not
4  any other way that he would have found out.
5      Q.    Okay. And what did Mr. Zack say
6  when you said you didn't believe him?
7      A.    Nothing.
8      Q.    Okay. Who was present when
9  Mr. Peacock inappropriate comments about your
10 personal life, such as why aren't you married?
11     A.    The people on the desk.
12     Q.    So, who heard it?
13     A.    Probably Tim Randall.
14     Q.    Do you know if Mr. Randall heard
15 it?
16     A.    I don't know if he heard it, no.
17     Q.    Did you ever discuss it with
18 Mr. Randall?
19     A.    No, I didn't discuss my personal
20 matters with Mr. Randall.
21     Q.    Okay. You allege that:
22         "Mr. Peacock humiliated you by
23 suggesting she should appear more feminine,
24 stating, on one occasion, are pants suits a U.S.
25 thing, they are very masculine."

40 (Pages 154 to 157)

Page 158

Page 159

MIHALIK

2 "Are pants suits a U.S. thing, they
3 are very masculine?"
4    A.    That's humiliating to be judged on
5 what I'm wearing and telling me that I look
6 masculine because I have pants on versus the short
7 skirt that, you know, I should be wearing, or
8 heels or, you know, whatnot.
9    Q.    And when did Mr. Peacock tell you
10 you look very sexy today?
11    A.    He would tell me that when he
12 thought I looked sexy.
13    Q.    During what period of time?
14    A.    Between July of 2007 and December
15 2007.
16    Q.    How often?
17    A.    Once a week, as far as I can
18 remember.
19    Q.    And did anyone hear him say that to
20 you?
21    A.    I don't know.
22    Q.    Was anyone present when he said
23 that to you?
24    A.    He sat right next to me, so I don't
25 think so. I don't know who heard.

Page 160

MIHALIK

2    Q.    Okay. You allege that Mr. Peacock
3 repeatedly returned from afternoon meetings in a
4 drunken state, particularly around the December
5 holidays. Correct?
6    A.    Yes.
7    Q.    And how did you know that
8 Mr. Peacock was in a drunken state at that time?
9    A.    I smelled alcohol on his breath.
10 He had told me he came back from a luncheon and he
11 smelled like alcohol.
12    Q.    Okay. Did you ever drink alcohol
13 during the workday?
14    A.    Only with him on the occasions
15 where he took me to lunch and he had it.
16    Q.    Are you a heavy drinker?
17    A.    No.
18    Q.    Did you take a number of --
19 withdrawn.
20         Did you have hangovers on several
21 occasions while you were employed by Cheuvreux?
22    A.    No.
23    Q.    No? You allege that Mr. Peacock
24 propositioned you to stay in a hotel room with him
25 which was maintained by Cheuvreux. Correct?

Page 161

MIHALIK

2    A.    Right.
3    Q.    When did this happen?
4    A.    This happened in December of 2007
5 on a couple of occasions. He came back and he
6 asked me if after our dinner meeting if I would
7 like to stay in the company flat after the meeting
8 was over with him, have a drink and stay
9 overnight, even though he knew I had a short
10 commute to Hoboken.
11         And it was -- I was -- I was
12 appalled. It was disgusting that he would ask me
13 that, and humiliated that he would lower himself
14 to that level to ask me to stay with him. I said,
15 you know, you're married, this is -- it's
16 inappropriate for you to say that, and I turned
17 him down. I said I didn't have any interest in
18 him personally in that way, and that he should
19 never speak to me like that again or ask me
20 anything like that again. And I think he got
21 angry after the second time that I had turned him
22 down for the proposition.
23    Q.    Did you tell anybody about this?
24    A.    I told David Zack.
25    Q.    Okay. Other than David Zack, did

**Page 162**

1          MIHALIK
2  you tell anybody about this?
3          A.    No.
4          Q.    Was anyone present when he said
5  these things to you?
6          A.    No.
7          Q.    Where is Cheuvreux's flat?
8          A.    I don't know.
9          Q.    Other -- do you know if Cheuvreux
10  does have a flat?
11          A.    Mr. Peacock said that they
12  maintained a flat for various reasons, whether
13  it's for clients or whatnot. He said he had a
14  flat in the city maintained by Cheuvreux. That
15  was all I know.
16          Q.    Where did Mr. Peacock live?
17          A.    I'm assuming he lived in the city
18  somewhere.
19          Q.    Well, why are you assuming that?
20          A.    As far as I can remember, he lived
21  in the city.
22          Q.    And what makes you say that?
23          A.    Because he stayed in the city.
24          Q.    How do you know?
25          A.    He had mentioned getting -- when

**Page 163**

1          MIHALIK
2  we'd leave, he would get into a cab and go
3  downtown. I don't know exactly where he lived,
4  but he maintained a flat downtown or an apartment
5  downtown somewhere.
6          Q.    Is that where he and his family
7  lived?
8          A.    I believe so, yeah.
9          Q.    Do you know if he had children?
10          A.    I don't know.
11          Q.    Do you know if he was married?
12          A.    Usually in -- when I was
13  interviewing, I didn't -- I didn't notice any
14  pictures or anything around, whether he had a
15  family or -- he never spoke about wife, kids. The
16  only reason I knew he had a wife was because she
17  had come into the office once. And he was
18  shopping for -- he had told Linda Noel to shop for
19  a gift for his son, looking for something. So
20  round about I found out that he was married and
21  had family later on.
22          Q.    You allege that Mr. Peacock told
23  you to schedule your trip to Europe to coincide
24  with his so they can -- so that you could travel
25  together.

**Page 164**

1          MIHALIK
2          When was this?
3          A.    This was when I first started.
4          He said, "We can enjoy traveling
5  together, get to know each other," almost like a
6  sleazy kind of way, not in a business type way. I
7  thought that he wanted to travel to get to know me
8  better, like dating, personally, that kind of
9  stuff. That's how I got the -- that feeling, the
10  impression he was being not business but sleazy,
11  in a way.
12          Q.    Well, what was sleazy about it?
13          A.    The way he -- the way he asked me.
14  He didn't -- you know, the way he asked me.
15          Q.    Did you travel with him?
16          A.    I did not.
17          Q.    Did he complain that you didn't
18  travel with him?
19          A.    Yes.
20          Q.    What did he say?
21          A.    He said that I should have
22  scheduled my trip to coincide with his trip so
23  that we could travel.
24          Q.    Can you think of any business
25  reason he might have wanted to travel with you?

**Page 165**

Page 170

Page 172

MIHALIK

A. She left, I think, a couple of months after I started, if I can recall correctly.

Q. Okay. Prior to the time she left, did you report to her any conduct that you were experiencing at Cheuvreux that you felt was discriminatory, harassing or otherwise inappropriate?

A. I didn't tell her. I just thought it would stop.

Q. What made you think it would stop?

A. Constantly telling somebody that it was unwelcome and inappropriate and unbefitting of a CEO to conduct themselves like that. I thought that he would have gotten the hint and stopped.

Q. So it's your testimony, then, that you never said anything to Ms. Charles about Mr. Peacock's conduct. Correct?

A. That's right.

Q. Okay. Now, what -- on what facts do you base your assertion that Cheuvreux had no human resources function after Ms. Charles left?

A. They didn't bring anybody on board. I was unaware that there was a human resources department after Simone Charles was let go. There

Page 171

MIHALIK

Q. When?

A. Between January of 2008 and my termination in April of 2008.

Q. Okay. Did Mr. Peacock --

withdrawn.

Now, let's talk about your conversations with Mr. Zack.

Who is Mr. Zack?

A. Compliance officer at Cheuvreux.

Q. Okay. And why did you go to Mr. Zack?

A. There was no HR department, and he was compliance, and I had somewhat of a -- I don't know. It was more than a business relationship. It was -- I complained to him about things, and I thought because he was compliance, he would be neutral. And I thought I could tell him something, and that maybe he would say something to somebody and it would stop.

Q. What -- you say that there was no human resource department?

A. Right. Simone Charles had been let go, and nobody replaced her.

Q. When did she leave?

Page 173

MIHALIK

was no person that -- nobody said, We have a replacement for Simone Charles. Nobody said, This is our new human resources person. If you have any -- whatever, go and talk to her. There was nobody in the department. The office was closed down. I assumed no human resources.

Q. Do you know if Ms. Charles' function in human resources was delegated to any other person when Ms. Charles departed?

A. No.

Q. Did you ask?

A. No.

Q. Did there come a point when someone did occupy the specific position of human resources representative at Cheuvreux during your employment?

A. As far as I know from when Simone Charles was let go, nobody was filling her position, was acting in her position or nobody was hired to fill that position that was -- that was terminated at that time.

And I went to David Zack because I didn't think there was anybody with that position. And I would assume that if I was telling him the

44 (Pages 170 to 173)

Page 190

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 191

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 193

1           MIHALIK
2    regarding leaves of absence.
3         Q.   Okay.  Do you recall a conversation
4    with Mr. Zack about the notice period that takes
5    place before someone leaves the company?
6         A.   No, I don't.  I don't -- I'm not
7    sure I understand the question.
8         Q.   Okay.  Do you recall a conversation
9    with Mr. Zack about any aspect of your offer
10   letter?
11        A.   Yes.  Schedule 1 or A or whatever
12   the last -- the last page is, because Ian Peacock
13   had sent me an e-mail that seemed like -- he had
14   never sent me such an enormous writing e-mail.
15   Every other e-mail he had sent me was one or two
16   words.  And this was towards the end of -- it was
17   towards April and at the height of my -- at the
18   height of his harassing me.
19           He had sent me an e-mail that was
20   very lengthy, last minute, was never spoken about,
21   and in it was a request by him for me to call 140
22   clients by a certain amount of time, and that I
23   was to report to him that I had done what he had
24   asked me to do.
25           And I felt that it was a setup to

49 (Pages 190 to 193)

Page 194

1         MIHALIK
2 fail because he had never sent me an e-mail like
3 that before. It was not how business is generally
4 conducted. And I felt like he was trying to set
5 me up to fail so that he could say -- because up
6 until that point I hadn't done anything wrong. He
7 needed something for me to do wrong or to not
8 complete so that it seemed like I wasn't following
9 his order as CEO.
10      So that I believe the last page of
11 my contract says if I disobey a direct order of a
12 CEO, I will be terminated.
13      So I felt like this lengthy e-mail
14 was a setup to fail because it was almost -- it
15 was out of nowhere, nobody else had the e-mail,
16 nobody else got sent the e-mail and we had never
17 spoke about it before.
18      And it was an absurd amount of work
19 for one person to do. And even if I got to half
20 of what it was that he wanted, I still would have
21 failed. So no matter what I could have done, it
22 was -- it seemed like it was a setup to fail.
23      (Exhibit D-6 marked for
24 identification.)
25      MS. ROTH: Ms. Mihalik, I've shown

Page 196

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 195

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 197

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

50 (Pages 194 to 197)

Page 202

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 204

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 203

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 205

```
1              MIHALIK
2      A.   No. I told Mr. Peacock.
3      Q.   What did you tell Mr. Peacock?
4      A.   I rejected Mr. Peacock's advances,
5  and I told him it was disgusting and degrading,
6  and not to treat me like that.
7      Q.   Well, the last words of Paragraph
8  21, saying that -- say that:
9           "Mr. Peacock began to retaliate
10 against you for 'reporting his conduct'."
11          Do you see those words?
12     A.   Yes.
13     Q.   To whom did you report
14 Mr. Peacock's conduct?
15     A.   I reported it to Dave Zack, David
16 Zack. And I -- I feel like he -- maybe after I
17 had rejected him, he seemed like he got angry with
18 me after I did, and then when I started to
19 frequent Mr. Zack's office, it just -- everything
20 escalated and it got worse.
21     Q.   How do you know that Mr. Peacock
22 knew -- well, withdrawn.
23          Do you know for a fact that
24 Mr. Zack told Mr. Peacock that you had complained
25 to him?
```

52 (Pages 202 to 205)

Page 206

MIHALIK
1
2     A.   I don't believe that Mr. Zack
3  wanted to get involved, so I do not believe that
4  he said anything to Mr. Peacock about what I had
5  complained to him about.  Mr. Zack told me that he
6  felt like he would think that I was complaining to
7  him, which is why -- that he thought that I was
8  complaining to him because we had the door shut,
9  and we were talking, and that's why he told me to
10  leave the door open.  He didn't want him to think
11  that I was saying anything to him.
12     Q.   I understand.  But you say, in
13  Paragraph 21, that your:
14          "Complaints to Zack became known to
15  Peacock."
16          Do you see that?  Perhaps that's
17  just an inaccurate statement.  And if it is, I'd
18  like to just know that.  But if it's accurate, I'd
19  like to understand the basis for your assertion
20  that your complaints to Zack became known to
21  Peacock.
22     A.   I don't know if David Zack told him
23  specifically that I had complained to him.
24     Q.   All right.  Well, this may just
25  be -- but you understand my question.

Page 207

Page 208

Page 209

Page 210

Page 212

MIHALIK

1  from him.
2
3          This happened to be -- if you look
4  at it, when it was sent, March 20th. He wanted me
5  to call and have 20 quality conversations -- call
6  and have 20 quality conversations, 20 -- 20 per
7  day for seven days. That would be 140 quality
8  conversations. We never discussed this e-mail.
9  It's a set-up-to-fail. He -- he was trying to set
10  me up to not be able to complete a task it seemed
11  like to me, because I had never -- we had never
12  spoken about this objective. Nobody else in the
13  office -- my male counterparts never received
14  anything of the such. We never discussed it in
15  any meetings.
16          And that would be 140 clients that
17  I'd have to talk to in a seven-day period. And
18  even if I did half of that, like I said earlier,
19  it wouldn't have been enough for him, and he was
20  just looking to set me up to fail so that I had
21  disregarded a direct order of a CEO, which is what
22  he said after he said I did not complete this
23  task, and I told him that I tried.
24      Q.   Do you -- when -- when he sent you
25  this e-mail that's Defendant's Exhibit 6, where

Page 211

MIHALIK

2      A.   I believe that Ian Peacock started
3  to retaliate against me because I rejected him in
4  December of 2007, and he got angry with me after
5  that, and that's when everything started to get
6  worse, and he retaliated against me and humiliated
7  me and degraded me --
8      Q.   I get that. It's just not --
9      A.   -- from that point on.
10      Q.   That's -- that's not what Paragraph
11  21 alleges. I just wanted to get that straight.
12          Now, Paragraph 22. Paragraph 22
13  lists things that you believe constituted
14  retaliation against you by Ian Peacock for your
15  rejecting his repeated advances. Correct?
16      A.   Yes.
17      Q.   Okay. The first one alleges that
18  Mr. Peacock assigned you absurd tasks. Tell me
19  all the facts on which you base this assertion.
20      A.   If you look at Exhibit D-6,
21  that's -- I believe is extreme. That's now how
22  business is conducted. Ian never sent me an
23  e-mail to this extent before, where he said Renee
24  stated all this, and then, you know, signed his
25  name. More than two words is the most I ever got

Page 213

MIHALIK

2  were you?
3      A.   I believe I was in the office.
4      Q.   Would it refresh your recollection
5  if I told you that you were stuck in an airport?
6          Is that possible?
7      A.   No.
8      Q.   Did you try to fulfill what
9  Mr. Peacock asked you to do in Exhibit 6?
10      A.   Yes.
11      Q.   Okay. How many calls did you make
12  a day in the following seven days?
13      A.   I don't recall how many phone calls
14  I made each day.
15          (Exhibit D-7 marked for
16  identification.)
17          MS. ROTH: I'm showing you what has
18  been marked for identification as Defendant's
19  Exhibit 7.
20      Q.   Have you ever seen this before?
21      A.   Yes. He showed this to me the day
22  that I was fired.
23      Q.   And what did he tell you it was?
24      A.   The phone record for the e-mail
25  time frame which he had assigned me that task to

54 (Pages 210 to 213)

**Page 214**

MIHALIK

1  
2 do.  
3      Q.    And do you have any reason to  
4 believe that anything contained on this telephone  
5 record is inaccurate?  
6      A.    I don't have any reason to believe  
7 that it is. I don't.  
8      Q.    Okay. Did you -- at -- at the time  
9 that Mr. Peacock showed this to you, Exhibit 7,  
10 what did he say to you?  
11     A.    Well, he threw it at me, and said  
12 this is unacceptable. You didn't even come close  
13 to what I had asked you to do. Excuse my French,  
14 it was fucking unacceptable. He had asked me to  
15 do something, and I didn't even take -- take  
16 regard to what he said to do. It seemed like I  
17 didn't attempt it at all.  
18     Q.    What did you say to him?  
19     A.    I said that I did. I said that I  
20 did try to attempt it. What he had asked me to do  
21 was something that had never been asked of me  
22 before, and why now would he ask me to do -- call  
23 140 different people -- try to call 140 different  
24 people in a week while he was gone, and why nobody  
25 else had this task assigned to them. And that I

**Page 215**

MIHALIK

1  
2 had other clients awaiting my service. I was  
3 trying to get contacts, trying to get training,  
4 and then -- then I have this to do.  
5      And on top of that, you know, seven  
6 days to call 140 different prospects, first of  
7 all, you have to prospect. So, that takes time.  
8 You have to find appropriate clients to actually  
9 call, ones that would be appropriate for the  
10 business that you're trying to sell.  
11     So, on top of that, you have to --  
12 you have to prospect, deal with the clients that  
13 you already have, deal with the contracts you're  
14 trying to do, do all the training. And I told him  
15 that that was a lot of work to do for a short  
16 amount of time, but I did try.  
17     Q.    Now, after you received the e-mail  
18 from Mr. Peacock that is Exhibit 6, dated March  
19 20th, 2008, did you make any comments to him about  
20 what he was asking you to do?  
21     A.    He wasn't in the office.  
22     Q.    You weren't in the office either, I  
23 believe. This was done by e-mail. Do you -- did  
24 you respond to Mr. Peacock's e-mail?  
25     A.    I don't believe I wasn't in the

**Page 216**

MIHALIK

1  
2 office or what that has anything to do with  
3 anything, but the -- I did not respond to him. I  
4 just did what he -- I started to do what he asked  
5 me to do, and I tried to complete the task as best  
6 I could.  
7      Q.    Okay. Did you have any  
8 pre-existing prospects for business at the time he  
9 gave you this assignment?  
10     A.    Ones that I had already called?  
11     Q.    Well, did you have any prospects  
12 for business? Were there any people in your  
13 personal pipeline of business contacts that you  
14 could call and have a conversation with to make a  
15 renewed effort for business?  
16     A.    I might have had a few. I had a --  
17 a list of people that I had been working on trying  
18 to sell. You can see it in the -- in the sales  
19 exhibit. So, I'd have to prospect brand new  
20 clients to fulfill his 140 different --  
21     Q.    Well, around March 20th, 2008, when  
22 you got this assignment, did you say to him this  
23 is really an unrealistic assignment, how about if  
24 I do this instead, do something else?  
25     A.    I was, at that point, almost scared

**Page 217**

**Page 234**

(blank)

**Page 235**

(blank)

**Page 236**

MIHALIK

Q.   And why do you refer it to as a postdated warning letter?

A.   Because he handed it to me on April 10th, and the date on the letter is April 11th. So I was terminated on April 10th, and this was dated April 11th, so it was the next day.

Q.   Okay. Is it possible that was just a clerical error?

Do you know why it says April 11th?

A.   I don't know why it says April 11th.

Q.   Okay.

A.   He also spelled my name wrong and spelled the company name wrong a couple of occasions in the letter as well.

Q.   Okay. Let's talk about the April 10th meeting. Tell me everything you recall about the April 10th meeting, everything Mr. Peacock said to you, everything you said to him, when it took place, where it took place, if anyone else was present.

MR. SCHATZ:   I'm just going to object to all of those questions. But I'm

**Page 237**

MIHALIK

sure you can --

MS. ROTH:   I am trying --

MR. SCHATZ:   I know, I know.

Q.   And if you forget any of them, I'll ask you again.

A.   Okay. I sent Mr. Peacock -- I'm sorry. I'll rephrase that.

I forwarded Mr. Peacock the e-mail that I got from Nicholas Applegate, the client that I had visited in California who agreed to Cheuvreux services, that he was going to try them. And I forwarded that e-mail on April 10th to Mr. Peacock, showing him that I had signed a new client.

And my -- the reply back from that e-mail was, Meeting in my -- something along the lines of, Meet me in my office at this time. That was it.

So I went into the office. He started throwing things. He threw this -- I told you to do this. He threw this at me. Why didn't you do it?

Q.   When you say "this" --

A.   I'm sorry. He threw -- he threw

Page 238

MIHALIK

1  MIHALIK
2  the e-mail at me and told me --
3      Q.   And the e-mail you're referring to
4  is Exhibit D-6. Correct?
5      A.   D-6, right.
6      Q.   Okay. He threw that at you?
7      A.   And then he threw Exhibit D-7 at me
8  and said I didn't even come close to what I was
9  told to do. What do I have to say for myself?
10  This is fucking unacceptable. I told you on
11  several occasions that your work was unacceptable.
12  You haven't improved. You haven't done anything
13  that I told you to do.
14          I told him, I just sent you an
15  e-mail showing you that I just signed a new
16  client, Nicholas Applegate, that you had been
17  trying to get for a few years now. Is that not
18  acceptable? Is that not a new client? What about
19  Galleon? What about BlackRock? What about
20  Crossway Partners? What about Tradition? I told
21  him all of the things that I had done.
22          And he just kept referring back to
23  his D-6 e-mail to me and this phone list and
24  saying that I didn't do what he told me to do and
25  that -- and then he threw this D-8 formal warning

Page 239

1  MIHALIK
2  at me, and I guess it has to do with me not
3  finishing the tasks that he had told me to finish.
4  And he said, This is a warning. And he said, This
5  is not working out.
6          I said, What's not working out, me
7  and you, or me at the company?
8          He said, We are not working out.
9  This is not working out. We need to come to some
10  sort of agreement or something.
11          And I said, I don't understand
12  what's not working out. I am doing what you told
13  me to do. I am signing new clients. I've brought
14  on the clients that I told you I would bring on,
15  and I've gotten you into the meetings that I told
16  you I would get you into. And I don't know -- I
17  did not finish the task. You're right. And this
18  is the first time that you've even said anything
19  to me. I asked you for a performance review back
20  in February before I got my bonus check handed to
21  me. You didn't tell me anything, I was not
22  doing what you told me to do, that I wasn't
23  generating the revenue that you told me to
24  generate.
25          It was never told to me -- he never

Page 240

1  MIHALIK
2  told me what he expected quotawise or revenuewise.
3  He didn't say anything.
4          And then he threw this at me and
5  got very aggravated and started swearing at me and
6  told me, This isn't working out. And he said that
7  that was it. He just -- that was it. He just
8  didn't want me in the company anymore.
9      Q.   You said that he got aggravated at
10  you and started swearing at you.
11          Tell me what he said.
12      A.   He said that I wasn't performing.
13  I told you on several occasions that you weren't
14  performing. You haven't done anything.
15          And I think he got angry at me
16  because I told him that, Yes, I did do what you
17  told me to do.
18          And then he said, This isn't
19  working out.
20          I said, We're not working out, me
21  and you, or me at the company is not working out?
22  Because I am doing what you asked me to do. I am
23  bringing on new clients and I did do -- and bring
24  you to the clients that I told you that I had
25  contacts at. I don't understand what else you

Page 241

1  MIHALIK
2  want from me.
3          And then he said, That's it. This
4  isn't working out. I'm letting -- I'm getting rid
5  of you.
6          And he brought in the HR woman that
7  I had never seen.
8      Q.   Ellen Haas. Correct?
9      A.   Yes.
10      Q.   What time of day did this take
11  place?
12      A.   The afternoon.
13      Q.   Did you -- when he first called you
14  in, did he ask you whether you had done the
15  calling of possible clients that he had asked you
16  to do in Exhibit 6?
17      A.   He said that I did not complete the
18  tasks that he had assigned to me.
19      Q.   And did he tell you how he knew you
20  had not completed the task?
21      A.   Yes. He threw the phone list at me
22  and said, You didn't even come close to 140
23  contacts here. And he threw the list at me.
24  That's what he said.
25      Q.   And did you tell him that this is

61 (Pages 238 to 241)

Page 242

1          MIHALIK
2  not how you do business?
3       A.    It's generally known that's not how
4  business is conducted because when I was hired, I
5  was hired for my senior contacts at companies and
6  references that I could get from them because it's
7  easy to -- easier to get into a company that you
8  know somebody rather than cold calling somebody
9  that has no idea who you are or who Cheuvreux is.
10  And I told him that it's not the best way to
11  create new contacts.
12       Q.    Had you gotten some business from
13  cold calling --
14       A.    Yes.
15       Q.    -- since you had been at Cheuvreux?
16       A.    Yes.
17       Q.    Did you begin doing some cold
18  calling almost as soon as you arrived at
19  Cheuvreux?
20       A.    No.
21            (Exhibit D-9 marked for
22  identification.)
23            MS. ROTH:  I'm showing you what's
24  been marked as Exhibit 9.
25       Q.    Have you seen this before?

Page 243

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 244

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 245

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1

1
2    UNITED STATES DISTRICT COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    Index No. 09-CV-01251 (DAB)
5    ----------------------------x
     RENEE MIHALIK,
6
                    Plaintiff,
7
            vs.
8
     CREDIT AGRICOLE CHEUVREUX
9
     NORTH AMERICA, INC.,
10
                    Defendant.
11   ----------------------------x
12
13
14                  May 19, 2010
15                  11:22 a.m.
16
17          Videotaped deposition of
18   ALTAN YENICAY, M.D., held at the offices
19   of Hogan Lovells US LLP, 875 Third Avenue,
20   New York, New York, pursuant to subpoena,
21   before Cary N. Bigelow, RPR, a Notary
22   Public of the State of New York.
23
24
25

Page 22

1            A. Yenicay
2   any of those e-mails that I sent her.
3       Q.   Do you know if Renee was engaged to
4   that person that she had been going out with,
5   like --
6       A.   Prior?
7       Q.   Two years before you started dating
8   her, yes.
9       A.   All I know, from what Renee said, they
10  dated for about three years and she -- he was
11  moving to California and she didn't want to go
12  with him.  If they were engaged, she never told
13  me.
14      Q.   Is his name Terry?
15      A.   Maybe.  I don't remember.
16      Q.   Okay.
17           Where was -- was Renee working at the
18  time that the two of you started going out with
19  each other?
20      A.   No.  She was looking for jobs.
21           Oh, I think she was at Chase or Citi
22  before, made redundant or volunteered to be fired
23  or whatever it was when they were downsizing and
24  I don't remember how long she was out of work,
25  but she started looking for jobs right in the

Page 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7 (Pages 22 to 25)

Page 34

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 36

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 35

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 37

```
 1                    A. Yenicay
 2      Q.   The same question with the trip that
 3   you took to Alaska.
 4      A.   After the beginning few months, I mean,
 5   she would maybe pay for dinner every once in a
 6   while as a token gesture, but I pretty much
 7   insisted on paying for everything.
 8      Q.   Why did you do that?
 9      A.   That's the way that my mom taught me to
10   do it, the woman never pays.  Ask her.
11      Q.   So during the time that Renee was
12   working at Cheuvreux, did the two of you have
13   arguments about anything?
14      A.   Sure.
15      Q.   Like what?
16      A.   I don't remember.  We fought a lot
17   towards the end, you know, and that's what I
18   remember the most.
19      Q.   What about in the beginning?  Did you
20   fight then too?
21      A.   A little bit.  It was -- I remember the
22   biggest obstacle when we first started out was --
23   because I was single and I was single for a while
24   and I have a lot of female friends and, you know,
25   for example, one friend Sarah I went and had
```

10 (Pages 34 to 37)

Page 38

A. Yenicay
1
2  lunch with her, you know, and I think Renee has
3  -- her picture of men is a little jaded from her
4  experiences prior to this.  I think she thinks
5  all guys cheat on their wives, so -- now Sarah is
6  married, you know, and she's a friend of mine and
7  I was just having lunch with her and I have
8  plenty of platonic female friends that I enjoy,
9  you know, being friends with, so I stay in touch,
10 but in the beginning she's, like, oh, this is
11 another girlfriend, and that was an obstacle at
12 first because to me it was just, you know, like,
13 driven by an insecurity, but I -- you know, after
14 I had gotten her to meet everybody and she
15 realized that all these women were not threats to
16 her, that kind of passed.  I'd say in the
17 beginning that was the thing.
18    Q.    I think you said that Renee was jaded
19 in her view of men, something along those lines.
20       What do you mean by that?
21    A.    Well, I guess maybe at Chase or Citi or
22 whatever bank it was she was at before, the
23 particular people that she was in contact with
24 were all married and they were all, I don't know,
25 either -- of course I can't generalize by saying

Page 40

Page 39

Page 41

VERITEXT REPORTING COMPANY
www.veritext.com

(212) 279-9424                                                                (212) 490-3430

A-118

Page 54

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 55

```
1              A. Yenicay
2      Q.    Did you spend time with Renee
3   immediately after you got back from Alaska or did
4   she go to her apartment and you go to yours?
5      A.    I don't remember.  It could have been
6   either.  I don't remember what we did the day we
7   got back from Alaska.
8      Q.    Did Renee ever complain to you about
9   work that she was asked to do at Cheuvreux?
10     A.    The cold-calling thing she absolutely
11  hated.
12     Q.    Tell me everything you remember about
13  that.
14     A.    I just remember that she was -- you
15  know, to call someone up out of the blue and say
16  hi, you know, you get hung up a lot or maybe you
17  get mistreated on.  I believe in that industry it's
18  considered the lowest form of work.  I remember
19  telling her, I'm, like, Look, you have to do it,
20  and she didn't like it.  I don't think anyone who
21  cold calls likes it.  That's it.
22     Q.    Do you know if she did do it?
23     A.    I think she did, yeah, I think she did.
24     Q.    Did she tell you that she did?
25     A.    I remember her -- I remember her -- I
```

Page 56

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 57

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

15 (Pages 54 to 57)

Page 66

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 69

1          A. Yenicay
2    regress.  Regression means if you look at the
3    path of progress from -- okay, you just move
4    backwards on that path, so decompensation is that.
5        Q.   So somebody could compensate by using
6    alcohol but they could also use alcohol and
7    decompensate?
8        A.   Well, yeah.
9        Q.   Or anything.
10         Could you do that with sports,
11    exercise, any of the other things that people do
12    to relieve stress?
13        A.   Yeah, you can do anything.  It could be
14    a coping mechanism and it can also be a sign of
15    not coping, you know?  You can't -- it's not that
16    black and white.  You have to realize, I guess,
17    which one it is.
18         You know, a lot of people in this city,
19    in my opinion, subscribe to the work-hard/play-
20    hard theory and some people can channel that
21    stress into more productive actions, like
22    triathlons or -- you know, some people do it
23    differently.
24         So when I say decompensated, you know,
25    she had this stuff about her childhood and her

18 (Pages 66 to 69)

**Page 70**

1                A. Yenicay
2    relationship with her father that, you know, she
3    was fine, she was getting along, I mean, you
4    can't say that all of us don't do that to some
5    extent, you know, so I don't know anyone who had
6    the perfect upbringing or anything like that, but
7    most people have gotten by it and, you know, it
8    just -- I don't know if this is entirely
9    accurate, but the closest thing I can maybe offer
10   is, you know, that euphemism the straw that
11   breaks the camel's back or something, but just,
12   in my opinion, it certainly made her worse than
13   she was prior to then.
14       Q.    You're saying what made her worse?
15       A.    The whole experience at Cheuvreux.
16             It was really at that point that I was
17   convinced that she needed to see someone
18   professionally whereas prior to that it wasn't
19   my -- that was not my impression.
20       Q.    So it was right after she lost her job
21   you thought that she needed to see somebody
22   professionally?
23       A.    Right after -- it was after she lost
24   her job. If you mean right after the next day,
25   no, but I thought that I wasn't able to help the

**Page 71**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 72**

1                A. Yenicay
2    needed to go?
3       A.    I think that's fair, yeah.
4       Q.    What about Renee -- you mentioned that
5    she had some limitations, you mentioned again a
6    problem with the relationship with her father.
7             What can you say today with the benefit
8    of hindsight, you are not in the moment of that
9    relationship anymore, what were the limitations
10   that she had and how do you think therapy might
11   have helped with that?
12       A.    She admitted to me in the beginning
13   that she was insecure and -- no, it wasn't
14   insecure. Self-esteem? One or the other. I am
15   almost certain it was self-esteem issues.
16       Q.    That she had low self-esteem?
17       A.    Yeah.
18             How could she have benefited from
19   therapy? I don't know enough about therapy to
20   answer that question. All I know is that I
21   couldn't help her with it.
22       Q.    Did that make you feel bad that you
23   felt like you couldn't help her?
24       A.    I felt bad not because I felt like I
25   was failing. I mean, I hate to see anyone go

**Page 73**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

19 (Pages 70 to 73)

Page 94

```
 1              A. Yenicay
 2    maybe a dirty joke or --
 3        A.   The subject matter?
 4        Q.   Yes, something like that.
 5        A.   No.  She never would get all bent out
 6    of shape over it, you know, like that's gross or
 7    that's not funny, but, you know, she would never
 8    say I can't believe you would make humor at this
 9    person or, you know, this animal or this situation
10    or something.
11        Q.   Same type of questions about pornography.
12             Did she ever talk with you about
13    pornography?
14        A.   That's -- she has a big problem with it.
15        Q.   Tell me everything you know about that.
16        A.   She had found, like, a URL or something
17    on one of my computers of one of these sites and,
18    man, did I get a -- and this was in the
19    beginning, you know, and she just feels that even
20    strip joints -- I don't know if you would lump
21    the two together, but let's just categorize it
22    as, like, the objectification of women, all
23    right, so anything like that she was extremely
24    like, really, like, absolutely no.
25             Like there was this other big -- I was
```

Page 95

```
 1              A. Yenicay
 2    going to go to a bachelor party in New Orleans
 3    for one of my closest friends and I don't care, I
 4    never go out of my way to go to a strip joint,
 5    but if my best friend wants to go and it's his
 6    bachelor party, how do you say no?  And she was
 7    just, like, I don't want you to go, I don't want
 8    you to go, to the point where I said to myself,
 9    you know, if it means that much to her, I'm not
10    going to go, although I thought she was being
11    ridiculous, you know, it was -- you know, that's
12    one of those situations where it's better to keep
13    the civil, you know, peace, you know, than to
14    fight for what I thought was right, you know, it
15    was, of my two options, the less unpleasant of my
16    two, you know, but she was -- that was one thing
17    she was really, really, really conservative, like
18    just completely intolerant of.
19        Q.   Did you think that was rational on her
20    part?
21        A.   Did I think it was rational?
22             I didn't agree with her.  You know,
23    everyone's got their opinion on things.  I think
24    that's a little on the conservative side.
25             I'm more of a, like, live and let live,
```

Page 96

```
 1              A. Yenicay
 2    you know, "as long as no one's getting hurt, why
 3    do you care?" type thing.
 4        Q.   But she --
 5        A.   I didn't agree with her.  I thought if
 6    my choice is between rational or only between
 7    rational and irrational, I think it's closer to
 8    irrational than it is rational for the reasons I
 9    just said, you know?  But she was extremely
10    intolerant of it.
11        Q.   Did she tell you why other than she
12    said it was the objectification of women?
13        A.   She never said that, that's my --
14        Q.   She never even said that to you?
15        A.   No.
16        Q.   What did she say other than I don't
17    want --
18        A.   It's disgusting.
19        Q.   It's disgusting?
20        A.   She also said how would you like it if
21    I went to a strip joint and had some -- I will
22    spare you the graphics of it, but, you know, a
23    similar thing.
24             You know, of course, I wouldn't be
25    happy about it.  You know, that's really not a
```

Page 97

```
 1              A. Yenicay
 2    fight that you drag out and I'm sorry, you know,
 3    if -- you know, you're not going to win that one.
 4        Q.   You mean as a guy?
 5        A.   Yeah.  You just, you can hope that
 6    she'll be lenient, but, you know, if you're going
 7    to draw a line in the sand and pick a fight
 8    that's not -- it's going to be a massacre nine
 9    times out of 10.
10             So she said it, you know, I got a
11    little bit of a ribbing for it, I'm sure --
12        Q.   You mean from your friends or --
13        A.   I ended up going anyway and I never
14    told her.
15             But yeah, you're going to either get it
16    from your friends, which are fine, they're my
17    friends, they're going to still be my friends
18    afterwards and I can take my licks like anybody
19    else, you know, but, you know, like I said, of my
20    two options it was the less -- I guess I thought
21    of a third option which was telling her I wasn't
22    going to go and I ended up going anyway.
23             You know, that's -- we never went deep
24    into the conversation what's your problem with
25    it.  I mean, she, like, you have to see Renee
```

25 (Pages 94 to 97)

Page 98

A. Yenicay

1
2    when she's angry, man, she's, like, on the war
3    path. She's small but like mighty, you know, and
4    there's -- you know, I knew that there was no way
5    I was going to -- there was no point to me
6    pursuing that line of reasoning so I just stopped.
7    I mean, she went absolutely bananas.
8       Q.   This was early on in your relationship?
9       A.   Yeah, yeah, yeah.
10      Q.   Tell me, what did she say and how did
11   she say it?
12      A.   She not only thought it was disgusting
13   I think she felt that I was disgusting for not
14   thinking it was disgusting.
15      Q.   But what did she say?
16      A.   It's "f" disgusting and along those
17   lines.
18      Q.   And how did she come to see --
19      A.   This is what she said: You know what,
20   I remember she said, she equated it with cheating
21   and that, I think, was her big -- looking at
22   other women naked is the same thing as cheating
23   on her.
24      Q.   And there was no distinction in her own
25   mind between the two of those activities; correct?

Page 99

A. Yenicay

1
2       A.   Yes. I mean, I never cheated on her,
3    so I don't know if one is a shade better or not,
4    but that's what she said, it's like cheating and
5    she used those words.
6       Q.   How did it come to pass that she saw a
7    URL on, you said, one of your computers?
8       A.   Yeah, because it was on there.
9       Q.   It was just there?
10      A.   She was typing in something and then I
11   guess in the browser history she had noticed it.
12   I don't know if she was snooping or what. I
13   don't feel like she ever snooped on my computer,
14   but it came up and I'm not going to even tell you
15   how it got there because --
16      Q.   I don't care.
17      A.   Exactly. It's not as bad as it seems,
18   but it was there and yes, that was a beating.
19      Q.   And then did you -- did the two of you
20   ever talk about pornography ever again?
21           Put aside the bachelor party thing,
22   just talking about it like --
23      A.   Did we ever talk about it?
24      Q.   Yes.
25      A.   I don't think so.

Page 100

A. Yenicay

1
2       Like in what capacity?
3       Q.   In any capacity.
4       A.   Did the word "pornography" ever come up?
5       Q.   No, not the word, but the subject.
6           Did you have a discussion of any
7    substance about pornography?
8       A.   About if it's -- no. I'm not trying
9    to -- like the virtues or the --
10      Q.   No. Whether you consuming it, somebody
11   else consuming it, anything.
12      A.   She was always concerned about me
13   consuming it, and I'll be honest, before we were
14   going out, of course, a single guy there's no one
15   to tell you that you can't.
16           There were other things. There was one
17   other instance she found a disc and then that was
18   -- I don't remember if it was before or after.
19      Q.   Before or after this URL sighting?
20      A.   Yeah.
21           Then she just basically looked at me
22   like I was some kind of filthy animal, that's
23   really -- I mean, I -- that's not an
24   exaggeration, like, she thinks it's that vile.
25      Q.   So she made this known to you more

Page 101

Page 110

```
1              A. Yenicay
2      Q.    Were you aware that during your
3  relationship with Renee that she was in touch
4  with her ex-boyfriend Terry Flynn?
5      A.    If I was -- anyway, it didn't bother
6  me.  Maybe they talked once.  I don't know.
7  Maybe you know more about it than I do.
8      Q.    Do you know that she saw him?
9      A.    I don't remember knowing that.
10     Q.    I think what I'm going to do now is I
11 have -- I've gotten a bunch of e-mails that have
12 been taken from my client's computer system and I
13 want to go over them with you to try to help put
14 some dates and times onto some things.
15     A.    Okay.
16     Q.    So we could do that now, we could take
17 a break for a couple of minutes, it's totally up
18 to you.
19     A.    Let's go.
20     Q.    Okay.
21         MS. HANSWIRTH:  Can we go off the
22 record for a second?
23         THE VIDEOGRAPHER:  Going off the
24 record.  The time is 2:12.
25         (Recess taken.)
```

Page 111

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 112

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 113

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

29 (Pages 110 to 113)

Page 130

1              A. Yenicay
2  remembered if Renee got sick after you guys came
3  back from Alaska.
4     A.   Right.
5     Q.   Does this e-mail exchange jog your
6  memory at all about that?
7     A.   All right.
8         So this is the week that we got back
9  and yes, I guess she did get sick.
10    Q.   Were you aware of that at the time?
11        If you don't remember, it's okay.
12    A.   Yeah, but something like this wouldn't
13 stand out in my mind for any reason.  There's a
14 couple of times I remember, you know, she had
15 gotten sick and I had to hold her hair while she
16 threw up and I actually stuck my finger down her
17 throat once to make it, but I don't remember what
18 days they were, sorry.
19    Q.   That's okay.
20        But she does say at the bottom of the
21 page she says to -- she says "Ian heading to ER
22 right now."
23    A.   Yeah.
24    Q.   Do you think you would have remembered
25 if she visited the emergency room?

Page 131

1              A. Yenicay
2     A.   Yeah.  I don't remember that.
3     Q.   So you weren't there with her?
4     A.   I wasn't with her, no.
5     Q.   And you don't remember her telling you
6  that she went to the emergency room?
7     A.   No.
8     Q.   That's okay.
9     A.   I feel like a terrible boyfriend.
10        MR. SCHATZ:  It's three years ago.
11    Q.   I'm actually skipping a few of them.
12    A.   How many do we have left?
13    Q.   This many other than the ones I don't,
14 you know, I decide not to show you.
15        (Yenicay Exhibit 9, documents bearing
16    production Nos. DEF00002949 through
17    DEF00002965, marked for identification, as
18    of this date.)
19    A.   Okay.
20    Q.   Do these -- does this document appear
21 to be an exchange of e-mails between Renee and
22 Katerina?
23    A.   Mm-hm.
24    Q.   Do you recall a time of -- the top, the
25 last of these e-mails is from Tuesday, September

Page 132

Page 133

Page 150

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 151

```
1              A. Yenicay
2  alcohol you should get for the evening; is that
3  correct?
4     A.   Yeah.
5     Q.   And does she write back to you saying
6  "Just get some soda and the best vodka with some
7  limes for me then.  I would say make me some
8  martinis, but I may lose a shoe or something
9  tonight.  What do you think?"
10    A.   Yeah.
11    Q.   Did you respond to her at all?  It
12 doesn't have to be by e-mail.
13    A.   I imagine I did, I don't know what it
14 was.  Maybe I didn't -- I don't have any of these
15 e-mails saved.  The text messages, if it was a
16 text, the texts are long gone.  If it was a phone
17 conversation -- are you asking what does this
18 lose a shoe mean?
19    Q.   Yes, I was just going to ask you that.
20    A.   The only thing that rings a bell about
21 that is the night that her and Erinn were so
22 drunk they were falling over the -- they actually
23 switched shoes accidentally.  That's the only
24 thing that comes to mind.
25    Q.   Do you recall getting tickets to see a
```

Page 153

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

39 (Pages 150 to 153)

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    Action No. 09-CV-01251 (DAB)
      -----------------------------------------x
 4
 5    RENEE MIHALIK,
 6                        Plaintiff,
 7
              - against -
 8
 9    CREDIT AGRICOLE CHEUVREAUX
      NORTH AMERICA, INC.,
10
                        Defendant.
11
      -----------------------------------------x
12
              875 Third Avenue
13            New York, New York 10022
14            June 29, 2010
              10:52 p.m.
15
16            DEPOSITION of MARK R. POWERS,
17    taken by the Defendant, pursuant to
18    Subpoena, held before Vicki Livings, a
19    Notary Public of the State of New York.
20
21
22
23
24
25
```

Page 18

Page 19

1    M. Powers
2  with you as well?
3       A    Yes, she was an employee of
4  Lava when I was hired.
5       Q    Can you tell me, from the
6  time you met Ms. Mihalik -- withdrawn.
7            At the time you met
8  Ms. Mihalik, you and she were both
9  employees of Instinet, correct?
10      A    Yes.
11      Q    At that time when was the
12  last time you saw Ms. Mihalik?
13      A    When she was terminated by
14  Citigroup.
15      Q    Between the time you first
16  met Ms. Mihalik at Instinet in
17  about 2003, and the time Ms. Mihalik was
18  terminated by Citigroup, can you tell me
19  who both of your employers were?
20      A    Can you repeat.
21      Q    I'll rephrase the question.
22  Did Citi buy Instinet?
23      A    No, they tried.
24      Q    What were the circumstances
25  pursuant to which you and Ms. Mihalik

Page 20

1    M. Powers
2  left Instinet and went to Citi?
3       A    My understanding is that she
4  was terminated, or they had a reduction
5  in force in 2003.  My circumstances were
6  for a better opportunity.
7       Q    Did she leave Instinet
8  before you left Instinet?
9       A    Yes.
10      Q    When you got to Citi, was
11  she already at Citi?
12      A    Yes.
13      Q    Was it just a coincidence
14  that the two of you were at the same
15  employers at two different times?
16      A    Yes.
17      Q    When you were at Citi,
18  Mr. Mannarino, you testified, was your
19  partner, correct?
20      A    Yes.
21      Q    What does that mean?
22      A    We cohead the desk.
23      Q    What desk?
24      A    Sales and trading for
25  Citigroup electronic.  When we use Lava,

Page 21

1    M. Powers
2  it's the electronic trading entity of
3  Citi.  That's how it's referred to.
4       Q    When you were at Citi, what
5  was Ms. Mihalik doing at Citi?
6       A    She was, I believe, a
7  coverage person on the desk.
8       Q    What does that mean?
9       A    That means her job was to
10  cover accounts.
11      Q    What do you mean?
12      A    On a day-to-day trading
13  basis, her job was to try to grow
14  revenue, and from different aspects of
15  electronic trading.
16      Q    What would she do to grow
17  revenue?  I don't mean she specifically.
18  I mean what would a person in the job
19  that she held do to grow revenue?
20      A    It's a sales position.  In
21  order to do that -- it's a component of
22  client service.  It's knowing various
23  intricacies of electronic trading in the
24  market.  Lava was -- they were very high
25  profile institutional accounts.  Covering

6 (Pages 18 to 21)

Page 30

Page 32

|  |  |
|---|---|
| 1 | M. Powers |
| 2 | A    I believe so, yes. |
| 3 | Q    Do you recall whether she |
| 4 | always disagreed with her ranking? |
| 5 | A    I think in the beginning she |
| 6 | didn't because she was probably ranked a |
| 7 | little higher.  As time progressed, she |
| 8 | was ranked lower. |
| 9 | Q    Is it a fair statement that |
| 10 | her performance declined as she |
| 11 | progressed in her career at Citi? |
| 12 | A    I'd say that's fair. |
| 13 | Q    How did Ms. Mihalik's |
| 14 | performance change over the time that you |
| 15 | supervised her at Citi? |
| 16 | A    I felt Renee had potential. |
| 17 | She wasn't a non-intelligent girl.  I |
| 18 | think sometimes her work ethic wasn't the |
| 19 | best. |
| 20 | Q    What does that mean? |
| 21 | A    She had trips that there |
| 22 | were only one or two meetings on the west |
| 23 | coast, and she would be out for a week. |
| 24 | She had a knee operation and she didn't |
| 25 | show up for five to six weeks. |

Page 31

Page 33

|  |  |
|---|---|
| 1 | M. Powers |
| 2 | And progressively things |
| 3 | like that which affected her overall |
| 4 | performance and account growth, |
| 5 | et cetera. |
| 6 | Q    Did you find that she had a |
| 7 | lot of absenteeism? |
| 8 | A    I would say it was sporadic, |
| 9 | but definitely we had to manage her |
| 10 | pretty hard. |
| 11 | Q    What do you mean manage her |
| 12 | pretty hard? |
| 13 | A    There was a calendar.  We |
| 14 | had to know where people were.  We had |
| 15 | growth targets to meet.  And like I said, |
| 16 | she wasn't a non-intelligent girl.  She |
| 17 | did know the product, but I think there |
| 18 | was conflicting things going on that I |
| 19 | didn't know about. |
| 20 | Q    What was the product? |
| 21 | A    It's an overall |
| 22 | electronic -- how stocks are traded is |
| 23 | electronically.  And we offer |
| 24 | institutional, community, mutual fund |
| 25 | managers, hedge funds, people like that, |

9 (Pages 30 to 33)

Page 34

1          M. Powers
2   mechanisms to trade in the open market
3   through a variety of very complex
4   products.
5          And that's what her job and
6   the team's job is, to have mutual fund
7   XYZ trade through us, through education,
8   through coverage, service, whatever.
9       Q     Were there aspects of her
10  job that she was not performing well,
11  specifically?
12      A     I think one of the main
13  complaints we had on her was absenteeism.
14  And I think if she had fully committed,
15  she would be very good. It was kind of a
16  seesaw effect, when she would be engaged
17  and when she wouldn't be engaged.
18      Q     So there were times she was
19  not engaged, correct?
20      A     If I remember correctly,
21  yes.
22      Q     How frequently would those
23  times be?
24      A     I can't put a finger on
25  that.

Page 35

1          M. Powers
2       Q     You testified that her
3   performance declined during her tenure at
4   Citi, correct?
5       A     Yes.
6       Q     In what respect did it
7   decline?
8       A     As I mentioned, it would be
9   from a production standpoint, who we
10  felt -- if we gave accounts and if they
11  grew, that would be a very good
12  benchmark. I don't remember specifics.
13  What I do know is that there were
14  multiple factors that -- the reason why
15  she was let go is obviously performance
16  based.
17      Q     What were the factors that
18  caused her to be let go?
19      A     I think a lot of it was,
20  like I mentioned, she didn't show up for
21  work for long periods of time. When she
22  had a knee operation, she didn't come to
23  work for six to eight weeks. We found
24  that she went on trips without any
25  meetings. Those are the two instances I

Page 36

1          M. Powers
2   remember.
3       Q     Was she terminated by Citi
4   as part of a reduction in force?
5       A     Yes.
6       Q     But the reason she was
7   selected for termination in the reduction
8   in force was because of sub-standard
9   performance; is that correct?
10      A     From a compliance
11  standpoint, that would be incorrect.
12      Q     I understand that's not what
13  you put on her U5, correct?
14      A     Yes.
15      Q     But you as a manager had to
16  select who would be retained and who
17  would be discharged in the reduction of
18  force, correct?
19      A     Correct.
20      Q     So was her performance,
21  relative to her peers, the reason that
22  you and Mr. Mannarino selected Renee
23  Mihalik as one of the people to be
24  terminated in the reduction of force?
25      A     It was a component.

Page 37

1          M. Powers
2       Q     What else was a component?
3       A     I think her absenteeism and
4   we probably had a redundancy in what her
5   skill was.
6          In Citigroup, for the
7   record, we have a very strict policy if
8   there is going to be a termination of an
9   employee, specifically a woman. There
10  has to be a very, very good reason for
11  it.
12      Q     Did you believe that there
13  was a good reason for the termination of
14  Ms. Mihalik?
15      A     We had too many people, and
16  the revenues were not substantive. The
17  folks who weren't going to add a large
18  component to the significant contribution
19  to the bottom line of our revenue, it's
20  effective to say, were put in the
21  reduction of force.
22      Q     At the time of the reduction
23  in force in which Ms. Mihalik was
24  terminated, how many other people were
25  terminated, if you recall?

10 (Pages 34 to 37)

Page 38

1        M. Powers
2     A     I believe two or three
3  others.
4     Q     And there were a total of 15
5  people on the desk at that time; is that
6  accurate?
7     A     I don't know.  It went down,
8  I believe, in the reduction of force --
9  I'm not sure of the amount.  There was
10  also the emerging of a couple groups into
11  one, and the lower tier were put in that.
12  It's fair to say that the ranking system
13  I spoke of before is a judge as to how
14  people entered the reduction of force.
15     Q     To clarify, is it a fair
16  statement that Ms. Mihalik was one of the
17  lowest performers in her group at the
18  time she was selected for termination in
19  the reduction in force at Citi?
20     A     Lower.  I wouldn't say
21  lowest.
22     Q     You said there were two or
23  three people terminated, or two or three
24  others?
25     A     Two or three others were

Page 39

1        M. Powers
2  included in that group of either three or
3  four.  I don't remember.
4     Q     How many people were in the
5  total group from whom the people to be
6  terminated were selected?
7     A     Fourteen -- actually, no.
8  It had to be like 20 something.
9     Q     So there were more than 20
10  people in the group that included
11  Ms. Mihalik at the time of her selection
12  for participation in the reduction in
13  force, correct?
14     A     Yes.
15     Q     And there were a total of
16  approximately four people, Ms. Mihalik,
17  plus two or three others who were
18  terminated in the Citi reduction in
19  force, correct?
20     A     Yes.  And why I am tepid in
21  my response is that there were multiple
22  reductions in force.  I don't remember
23  who was in what.
24     Q     Attempting to focus --
25     A     Attempting to focus, I would

Page 40

1        M. Powers
2  say three or four.
3     Q     Whether three or four,
4  you're not clear, but it was one or the
5  other, correct?
6     A     Right.
7     Q     Can we go through the
8  factors that, in your mind and
9  Mr. Mannarino's mind -- first of all, was
10  it up to you and Mr. Mannarino to select
11  the people who would be terminated in the
12  Citi's reduction in force?
13     A     We made the recommendations
14  to the heads of equity, yes.
15     Q     Were your recommendations
16  accepted?
17     A     Almost always, yes.
18     Q     Did you and Mr. Mannarino
19  recommend that Ms. Mannarino be terminated
20  in the reduction in force?
21     A     Yes, we did.
22     Q     Can you tell me the factors
23  that entered into your decision to
24  recommend that Ms. Mihalik be included in
25  the termination by Citi?

Page 41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

11 (Pages 38 to 41)

Page 42

Page 44

1    M. Powers
2    who were not terminated do better than
3    Ms. Mihalik?
4        A    It can be a wide range.
5    Maybe they knew technology better. Maybe
6    they had better accounts. Maybe there
7    was more revenue attached to them.
8        Q    Would these factors that
9    went into your decision and
10    Mr. Mannarino's decision to discharge
11    Ms. Mihalik be reflected in the
12    performance reviews that you did on her?
13        A    Yes.
14        Q    So if we were able to see
15    those performance reviews, is it your
16    testimony that we would be able to get a
17    better understanding of what she was not
18    doing as well as other people?
19        A    Yes, because the reduction
20    in force was based on the performance
21    reviews, if that's what you are looking
22    for.
23        Q    Thank you for telling me
24    that. That's important.
25            When you and Mr. Mannarino

Page 43

Page 45

1    M. Powers
2    sat down to decide whom to terminate in
3    the reduction in force, did you have the
4    performance reviews in front of you?
5        A    We knew them.
6        Q    Because you had written
7    them?
8        A    Correct.
9        Q    After you recommended that
10    Ms. Mihalik be among those to participate
11    in the reduction of force, did you
12    communicate that to somebody specific?
13        A    We communicated it to human
14    resources. And then the appropriate
15    action is to go to a room like this with
16    human resources. She is terminated,
17    given a package, and that's it.
18        Q    Did you have a discussion
19    with anybody at Citigroup, either human
20    resources or Mr. Steinmatz about the
21    individuals whom you selected for the
22    reduction in force?
23        A    Yes, there are various
24    people that this chain flowed through.
25    So there is a pool on the U.S. equity

12 (Pages 42 to 45)

Page 46

```
1              M. Powers
2  trading desk of the people who are going
3  to be put into the reduction of force.
4  Those people are submitted by the desk
5  managers, and that went up to a various
6  hierarchy in the organization, and that
7  was submitted.
8      Q     Was Ms. Mihalik one of
9  people who was on -- you called it the
10 trading desk; is that right?
11     A    Yes.
12     Q     Was she one of the people on
13 the trading desk at Citi, first of all,
14 at that time?
15     A    Yes.
16     Q     Was she one of people whose
17 name was given to the hierarchy by you
18 and Mr. Mannarino for ratification of
19 your decision to include her in the
20 people to be terminated?
21     A    Right, and our ratification
22 was taken as good to go.
23     Q     Did anyone have a
24 conversation with you about your
25 recommendation that Ms. Mihalik be
```

Page 47

```
1      . . .
```

Page 48

Page 49

```
1              M. Powers
2  in connection with her selection for the
3  reduction in force?
4      A    Not at Citigroup.
5      Q     Did there come a time during
6  your tenure at Citi when you worked with
7  Mr. Mannarino, when Mr. Mannarino and/or
8  you were asked to keep any records about
9  Ms. Mihalik?
10     A    Yes.
11     Q     When was that?
12     A    We were asked to keep, by
13 human resources, meticulous records on
14 her actions.
15     Q     Who asked you to do that?
16     A    The attorneys at Citigroup
17 and human resources. They didn't ask.
18 We were told. We inquired as to our
19 availability in terms of her termination,
20 and we were told -- and this was more
21 Mr. Mannarino than me. But we were told
22 to keep a record of her behavior. And
23 due to the fact that Ms. Mihalik was --
24 we were looking to terminate her prior to
25 the reduction in force, but we didn't.
```

13 (Pages 46 to 49)

Page 50

```
1                    M. Powers
2    She was just included in the reduction in
3    force.
4        Q      So is it a fair statement
5    that you were considering terminating
6    Ms. Mihalik for performance reasons
7    before the reduction in force was
8    announced, but then you decided it would
9    be the easiest thing just to include her
10   in the reduction in force?
11       A      That is correct.
12       Q      Why were you considering
13   discharging Ms. Mihalik before the
14   reduction in force for performance
15   reasons?
16       A      Everything I outlined
17   before, and I don't remember the
18   particulars, but I will tell you that it
19   was due to absenteeism, I guess, and
20   performance associated with that, things
21   of that nature.
22       Q      If somebody has surgery and
23   is out for four, six weeks or whatever it
24   takes to recover, that is a permissible
25   thing for them to do; isn't it?
```

Page 51

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 52

```
1                    M. Powers
2        Q      When she came back, did she
3    work hard?
4        A      I think she would work hard
5    sometimes and not hard other times.  And
6    for the record, when she applied herself,
7    she was a good employee.
8        Q      Other than that time, the
9    knee surgery -- do you know the nature of
10   the knee surgery?
11       A      I do know she had an ACL.
12       Q      Other than the knee surgery,
13   there were -- I believe you testified
14   that there were other times when she had
15   excessive absenteeism, correct?
16       A      Correct.
17       Q      Tell me the other times that
18   you recall of excessive absenteeism.
19       A      There were days that she was
20   gone when she said she had a meeting.
21   And we followed up, and she didn't have
22   meetings.  One trip she went to
23   California for a week, and she had one
24   meeting, if that.  That's the example I
25   remember.
```

Page 53

```
1                    M. Powers
2        Q      Anything else you remember?
3        A      There were days she would
4    call up and just not come in.
5        Q      She did this -- withdrawn.
6            Is it a fair statement that
7    she was generally absent more than other
8    people on the desk?
9        A      I guess, in the collective,
10   but, you know, from a performance
11   standpoint she wasn't up to par.
12       Q      She was in a revenue
13   generating position, correct?
14       A      Correct.
15       Q      And she was judged by how
16   much revenue she produced, right?
17       A      She was judged on growth.
18       Q      Was she given accounts to
19   grow?
20       A      Correct.
21       Q      Was she required to get
22   accounts on own?
23       A      That was not really her
24   position.  She was given accounts.
25       Q      Tell me how she did at
```

14 (Pages 50 to 53)

Page 54

```
 1              M. Powers
 2  growing accounts?
 3      A     A few she did very well.
 4  And that seemed to subside towards the
 5  latter part, and trail off.  In the
 6  beginning she did very well.
 7      Q     About at what point into her
 8  employment did she stop doing very well?
 9      A     After three-quarters.
10      Q     Focus, if you can, on the
11  last year of her employment at Citi.  Can
12  you tell me how she was doing in growing
13  revenue?
14      A     I can't.  I don't remember.
15      Q     Would that be reflected in
16  her performance evaluations?
17      A     It would be.
18      Q     But it is a fair statement
19  that from the beginning of her employment
20  at Citi to the end, her performance
21  markedly declined, correct?
22      A     It declined.
23      Q     Did it decline to a level
24  where it became unsatisfactory?
25      A     I would probably just say
```

Page 55

```
 1              M. Powers
 2  satisfactory.
 3      Q     Did it decline to a level
 4  where you were considering terminating
 5  for performance reasons?
 6      A     I think it was one of the
 7  components that went into the termination
 8  inquiry.
 9      Q     So the answer is yes, then?
10      A     The answer is it was a
11  component.
12      Q     Going back to the point
13  where you and Mr. Mannarino began to keep
14  records of Ms. Mihalik, when was that?
15      A     2007.
16      Q     How long before her
17  discharge, a year or so?
18      A     I don't know when her
19  discharge was.  Probably eight months.
20      Q     Who initiated the request to
21  keep records about Ms. Mihalik's daily
22  activities?
23      A     We had inquired into human
24  resources the appropriate actions to
25  take, and we were dictated by legal and
```

Page 56

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 57

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

15 (Pages 54 to 57)

Page 58

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 60

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 59

```
1                M. Powers
2   weren't.
3       Q      Do you remember any
4   incidents -- withdrawn.
5              What incidents were
6   memorialized in the records made by
7   Mr. Mannarino and reviewed by you?
8       A      As I told you, the
9   California trip I know for a fact.  The
10  absenteeism, the associated knee surgery
11  and various other absenteeisms -- I don't
12  know.  I'd have to talk to Mr. Mannarino.
13  I don't know.
14      Q      Do you remember did you see
15  more than five documents created by
16  Mr. Mannarino?
17      A      I don't recall.
18      Q      Do you recall if it was a
19  very small number or very large number?
20      A      I think from the incident
21  standpoint, there were more than a few.
22      Q      So there were probably more
23  than five, you think?
24      A      Maybe.
25              MS. ROTH:  Off the record.
```

Page 61

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

16 (Pages 58 to 61)

Page 86

Page 88

1        M. Powers
2  could definitely tell something was
3  bothering her.
4      Q      How often would this happen?
5      A      Sporadically.
6      Q      What was she like when she
7  was having a good day?
8      A      Very friendly, good at her
9  job.
10     Q      Would you describe your own
11  behavior as consistent or erratic?
12     A      Consistent at the workplace.
13     Q      Would you describe the
14  behavior of other people on the trading
15  desk at Citi as consistent or erratic?
16     A      It's pretty individually
17  based, but mostly consistent.
18     Q      Were other people behaving
19  in a way that you would characterize as
20  being erratic?
21     A      A few.
22     Q      What was their behavior
23  like?
24     A      I don't know.  Kind of
25  goofy.  Everybody has a bad day.

Page 87

1        M. Powers
2      A      I don't know what happened,
3  but that's what I heard.
4      Q      When you were on the desk
5  with Ms. Mihalik, was her behavior pretty
6  consistent every day or would you
7  consider it to be erratic?
8      A      It was erratic.
9      Q      What was erratic about it?
10     A      Mood swings.
11     Q      Can you describe these mood
12  swings?
13     A      Not really.
14     Q      What was she like on some
15  days, and what was she like on other
16  days?
17     A      She had some bad days and
18  she had some good days.
19     Q      What characteristics would
20  she exhibit on a bad day?
21     A      Like she was a little angry.
22     Q      What would she do to
23  manifest that anger?
24     A      Not talk to anyone.  I don't
25  know.  I forgot what she did, but you

Page 89

1        M. Powers
2      Q      Did she have occasional bad
3  days or frequent bad days?
4      A      They were sporadic.
5      Q      When she had a bad day,
6  would she behave differently toward
7  colleagues?
8      A      Sometimes yes, sometimes no.
9      Q      Did you have any negative
10  impressions of her interaction with any
11  colleagues on the desk?
12     A      I think sometimes she acted
13  pretty erratic toward some individuals.
14     Q      Give me an example.
15     A      This was a long time ago.
16  She thought she was right.  She thought
17  she was right.  She would get in pretty
18  heated arguments with people.
19     Q      Did you have an opinion in
20  those cases whether she was right?
21     A      I don't remember the
22  particulars, but sometimes yes, she might
23  have been right, or maybe...
24     Q      Did you view her arguments
25  as inappropriate?

Page 90

1        M. Powers
2     A    I think it was a difference
3 of opinion sometimes.
4     Q    That's not the question.
5     A    I don't remember, if that's
6 what you're asking.
7     Q    I'm asking --
8     A    If you are asking if her
9 behavior was erratic sometimes, yes. I
10 don't remember the particulars.
11     Q    Do you remember if you
12 considered her behavior to be
13 inappropriate?
14     A    I use the context of the
15 trading desk to have a high threshold for
16 inappropriate behavior. You have to work
17 as a team, and sometimes she wasn't part
18 of a team.
19     Q    When she wasn't being part
20 of a team, what did she do contrary to
21 being part of a team?
22     A    She maybe acted not as a
23 team member.
24     Q    What do you mean acted not
25 as a team member?

Page 91

1        M. Powers
2     A    I don't know. Not work
3 within the confines of the structures
4 that exist. Overly yelled at people.
5     Q    So it's your testimony that
6 Ms. Mihalik did yell at the team?
7     A    On occasion. Which so did
8 other people.
9     Q    Was she ever reprimanded for
10 yelling at people?
11     A    I assume -- I don't know,
12 actually.
13     Q    Were other people
14 reprimanded for yelling?
15     A    Yeah.
16     Q    Drawing your attention to
17 the time you were both at Citi, did she
18 dress like other people on the desk?
19     A    You mean the girls?
20     Q    Girl or boys. Was she --
21 withdrawn.
22        Did she dress -- were there
23 other women on the desk?
24     A    There were five or six other
25 women.

Page 92

Page 93

Page 1

1
2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3
       Index No. 09-CV-01251 (DAB)
4      - - - - - - - - - - - - - - - - - -x
5      RENEE MIHALIK,
6                            Plaintiff,
7             -against-
8      CREDIT AGRICOLE CHEUVREUX
       NORTH AMERICA, INC.,
9
                             Defendant.
10
       - - - - - - - - - - - - - - - - - -x
11
12                           July 16, 2010
                             10:12 a.m.
13
14                    Deposition of CITI GROUP BY TRACY
15     PLATT BEACH, taken pursuant to 30(b)(6)
16     subpoena, held at the offices of Hogan Lovells
17     US LLP, 875 Third Avenue, New York, New York,
18     before Helen Mitchell, a Shorthand Reporter and
19     Notary Public.
20
21
22
23
24
25

Page 22

```
1                   Platt
2         MR. SANTANGELO:  Yes or no.
3         THE WITNESS:  Yes.
4         I'm sorry.
5     Q    Can you tell us what that document
6  is?
7     A    This is our standard separation
8  agreement.
9     Q    A standard separation agreement?
10    A    Um-hum.
11    Q    Do you see on the second line it
12 refers to a reduction in force; is that correct?
13    A    Yes.
14        (Ms. Roth enters)
15    Q    Is that the standard way that Citi
16 terminates its employees?
17    A    I'm not sure I understand your
18 question.
19    Q    Well, I'm just going from what you
20 said about -- that this document is the standard
21 separation agreement.
22    A    And release.
23    Q    And I'm just wondering if every
24 one of these separation agreements refers to a
25 reduction in force?
```

Page 23

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 24

```
1                   Platt
2  inappropriate conduct.
3     Q    Did you become aware at any point
4  that Renee Mihalik's managers wanted to
5  terminate her employment?
6     A    I was aware that there were
7  performance issues with Renee.  We did not
8  discuss termination.
9     Q    Do you remember what the
10 performance issues were?
11    A    Yes.
12    Q    What were they?
13    A    Renee had attendance issues, and
14 she had -- there was -- it was mainly around
15 attendance.
16    Q    Do you remember anything else?
17    A    Regarding the attendance?
18    Q    Sure, regarding her attendance.
19    A    Yes.
20    Q    What do you remember?
21    A    We had attendance issues, and it
22 was brought to my attention, and we began to
23 discuss what those attendance issues were.
24    Q    Who brought it to your attention?
25    A    She had two managers at the time,
```

Page 25

```
1                   Platt
2  Andy Mannarino and Mark Powers.
3     Q    Did they both bring Renee's
4  attendance issues to your attention?
5     A    Andy Mannarino had brought that to
6  my attention, and then together, since him and
7  Mark were co-managers, we discussed jointly.
8     Q    When for the first time did
9  Mr. Mannarino raise Renee's attendance issues
10 with you?
11    A    I believe it was August of
12 2007-September of 2007 time frame.
13    Q    So that was about -- about five
14 months after she started working at Citi?
15    A    No, she began working for us in
16 2005.
17    Q    Oh, I'm sorry.  I'm sorry, 2005.
18    A    It's okay.
19    Q    Did you say August of 2007?
20    A    Um-hum.
21        MR. SANTANGELO:  Yes or no.
22    A    Yes.
23        THE WITNESS:  Sorry.
24    Q    Would you take a look again at
25 Exhibit 8, and tell me if you --
```

7 (Pages 22 to 25)

Page 30

Platt

1
2    Q    Let's look at the first page of
3  this exhibit.  It appears to be, at least the
4  first three e-mail backs and forths look like
5  they're exchanges among you and Mr. Powers and
6  Mr. Mannarino, and possibly someone named Sharon
7  Lawrance, on January 22nd, 2007.
8        Is that correct?
9    A    That is correct.
10    Q    Can you tell us what you remember
11  about what was going on with Renee that day?
12    A    I don't recall that particular
13  day.  I recall that at that time Renee had been
14  calling out sick, and it had -- and this was one
15  of the instances where she had called out sick,
16  and they were looking for advice on how to speak
17  with her.
18    Q    If you look at the second -- it's
19  a short e-mail, it says it's from you to Andy
20  Mannarino, and it says, "Did you speak with her?
21  We have already discussed with her that she
22  cannot just send e-mails like this."
23        Do you see that?
24    A    Um-hum.
25    Q    When you were saying, "we have

Page 31

Platt

1
2  already discussed with her," who was the "we"
3  that you were referring to?
4    A    Andy and Mark.
5    Q    Did you ask them to inform Renee
6  that she could not just send out e-mails like
7  this?
8    A    Correct.
9    Q    When you said "e-mails like this,"
10  what were you referring to?
11    A    I was referring to her bottom
12  e-mail here, where Renee sends her manager,
13  Andy, an e-mail that says, "Subject: Out sick."
14    Q    Was it your understanding that she
15  was simply sending a note to her supervisor that
16  she wasn't coming in to work that day?
17    A    I'm sorry, can you repeat the
18  question?
19        MS. HANSWIRTH:  I'll change the
20  question.
21        THE WITNESS:  Okay.
22    Q    What is it about this particular
23  e-mail from Renee that is to Mr. Mannarino, with
24  the subject "out sick," what is, I guess, wrong
25  with that?

Page 32

Platt

1
2    A    What was the issue that we had?
3    Q    Yes.
4    A    At this time Renee had used all of
5  her sick time, as I recall, and we had asked her
6  if she was going to be out, to give her manager
7  a call, because oftentimes these managers were
8  not in the office, so they wouldn't see it, they
9  were client-facing managers.  So we had said to
10  her, "You need to give them a call, and respond
11  appropriately with them."
12    Q    So the point was that she was not
13  supposed to be sending an e-mail that she was
14  out sick, she was supposed to call; is that
15  correct?
16    A    As I recall, we had asked her to
17  speak directly with her managers, correct.
18    Q    All we can find out is what you
19  recall, so this is all whatever you remember.
20    A    I preface everything.
21    Q    I know.  No one remembers
22  everything.
23        What would happen, typically, in a
24  situation when an employee had already used up
25  his or her sick days or vacation days?

Page 33

Platt

1
2    A    We typically will sit them down
3  and let them know.  We usually do that in
4  advance of them using all of their time, just to
5  remind them that they're coming up, approaching
6  the maximum amount of time.  And if it gets to a
7  point where they're exceeding the days, we then
8  need to discuss what the next steps are and what
9  the reason is behind it.  So there's not a one
10  answer for all.
11    Q    Could poor attendance be a grounds
12  for terminating an employee?
13    A    It could.
14    Q    Who is Sharon Lawrance?
15    A    Sharon is -- was a manager of
16  Citi's that worked in our equities department,
17  and at the time, right around this time, in
18  January, she began managing Mark and Andy.
19    Q    And who is David Lawlor?
20    A    David is another manager — excuse
21  me, a generalist in HR, that at that time
22  covered the equities business of Citi Group.
23    Q    Is that something that Lava was
24  part of?
25    A    Yes.  So Lava, when we started to

9 (Pages 30 to 33)

Page 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 35

1               Platt
2      Q     The page number at the bottom is
3   one.
4      A    Okay.
5      Q     If you just read what's on this
6   page, and let us know what the issue is with
7   Renee that's being discussed.
8          (Witness complying)
9      A    They're discussing, again, her
10  calling out sick. And as you can read in the
11  third paragraph down, Andy informs her that
12  she's out of sick time and vacation time.
13     Q    Is it more than just that she's
14  out sick that Andy's having a problem with?
15     A    Well, she had no more time. She
16  had exhausted all of her vacation time and all
17  of her sick time. I can't say what he was
18  thinking.
19     Q    That's fair enough.
20         He does say that she was an hour
21  and a half late.
22         Was lateness also an issue with
23  Renee?
24     A    Yes.
25     Q    When is the last time you spoke to

Page 37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

10 (Pages 34 to 37)

Page 38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 39

Platt
1
2     Q    Okay.
3          And the last line of his e-mail
4   says, "Soon after this trip Renee was relieved
5   of her west coast accounts."
6          Do you see that?
7     A    Um-hum -- yes.
8     Q    What's your understanding of what
9   that means?
10     A    Well, what the understanding is is
11   their roles, where they covered accounts, based
12   on this product, LavaFlow, and as I understand
13   it, the accounts that we had on the west coast
14   she no longer was covering.
15     Q    I didn't understand the first part
16   of your answer --
17     A    Sure.
18     Q    -- about that there -- who was
19   covering accounts that --
20     A    Renee Mihalik had, as it states
21   here, had west coast accounts for the product
22   LavaFlow she supported.  And after these trips,
23   she was relieved of those -- of supporting those
24   accounts.
25     Q    And would that mean that somebody

Page 40

Platt
1
2   else on that team would then take up the
3   responsibility for those accounts?
4     A    I would assume.  We would need
5   coverage of the accounts, I would assume that.
6     Q    Can you tell from looking at
7   Mr. Powers' e-mail why Renee was relieved of
8   these accounts?
9     A    I am assuming, reading this
10   e-mail, that she was relieved because of the
11   fact that she was taking extended periods of
12   time to go to the accounts.
13     Q    What specifically in the e-mail
14   leads you to make that assumption?
15     A    Where Mark says, "During each of
16   these trips Renee's use of company time is very
17   poor and extremely inefficient."
18     Q    If you go on to the next e-mail,
19   it looks like an e-mail from Mr. Mannarino
20   written to you, and copied to Mark Powers, also
21   on January 22nd, 2007.
22          Would you -- it's a bit lengthy,
23   but if you wouldn't mind just reading it
24   through, and then just letting us know when
25   you're done --

Page 41

Platt
1
2     A    Sure.
3     Q    -- I'll ask you a few questions.
4     A    Okay.
5          (Witness complying)
6     A    Okay.
7     Q    First of all, do you remember what
8   led both Mr. Mannarino and Mr. Powers to send
9   you an e-mail about Renee's performance on the
10   same day, January 22nd, 2007?
11     A    Well, one was -- what I had asked
12   them to do was to document the timeline they had
13   of Renee, and her attendance.  And since the two
14   of them had covered her at different periods of
15   time, Andy took the first lead, and then Mark,
16   as you saw, sent the e-mail directly after with
17   his -- his management of her prior.
18     Q    Why did you ask them to do that?
19     A    They had come to me and informed
20   me that Renee had been out sick, and had used
21   all of her days, exhausted her vacation time.
22     Q    But according -- is it correct
23   that Renee had exhausted her vacation time and
24   sick days by August of 2006; is that correct?
25     A    It is.  And looking at this, I

11 (Pages 38 to 41)

Page 42

Platt

1
2  believe -- I don't recall the time frame, I
3  believe I was informed after -- afterwards.  I
4  wasn't informed before she had exhausted her
5  time, it was after, and it had gone through the
6  end of 2006 and began again in 2007.
7      Q    Who would have kept track of
8  Renee's vacation days at that time?
9      A    Her managers.
10     Q    How many vacation days did she
11 get?
12     A    I don't recall.
13     Q    Would it be in her offer letter?
14     A    I don't believe we put the number
15 of vacation days, no.
16     Q    So at some point --
17     MS. HANSWIRTH:  Let me change that
18 question.
19     Q    It is correct that Renee was done
20 with all of her time off that she could take in
21 August of 2006; correct?
22     A    From looking at these e-mails, it
23 looks as if that's correct.
24     Q    Would her year, in terms of
25 calculating how much time off she'd be able to

Page 43

Platt

1
2  take, would that start on January 1st and end on
3  December 31st?
4      A    Correct.
5      Q    Do you remember the incident that
6  Mr. Mannarino discusses regarding a wedding in
7  California that Renee wanted to go to in
8  September of 2006?
9      A    I recall our conversation, yes.
10     Q    Tell me everything you remember
11 about that.
12     A    I recall Andy phoning me and
13 letting me know that she had requested time off,
14 and she had a wedding in California.  And we
15 discussed that she had no more time, and I asked
16 him to go back and tell her she had no more time
17 and we weren't going to approve it.
18         I was unaware of the conversation
19 that he had previously had with her earlier,
20 that she had informed him a few weeks prior.  So
21 he then came back to me, after speaking with
22 Renee, and said she's already booked her trip
23 and, you know, I didn't give her enough -- ample
24 time.  I was not aware of the time frame she was
25 requesting.  He just said she was going to a

Page 44

Platt

1
2  wedding in San Diego and wants to have time off,
3  there were no dates discussed.
4      Q    He says, "Towards the end of
5  August, I instructed Renee, after speaking with
6  Tracy, that she was out of days and could take
7  no more days for the rest of the year."
8          Do you see that?
9      A    Um-hum.
10     Q    Did you become aware in August of
11 2006 that Renee had exhausted all of her
12 vacation days for the year?
13     A    As per this e-mail, it looks as
14 if -- yes.
15     Q    How did you become aware of that?
16     A    I don't recall.  I don't know if
17 it was e-mail or phone.
18     Q    Was it in conjunction with a
19 discussion about whether she could have
20 additional time off to go to a wedding?
21     A    I don't recall.
22     Q    Do you recall any conversations
23 with Sharon Lawrance about this issue?
24     A    I didn't speak to Sharon directly,
25 but at that time she had recently taken over

Page 45

Platt

1
2  management.  I didn't speak with her directly.
3      Q    Do you recall any conversation or
4  communications to the effect that Renee insisted
5  on attending this wedding because she had
6  already paid for her transportation?
7      A    Yes.  Andy had come back to me and
8  informed me of his conversation with Renee, and
9  her concern on the financial aspect of already
10 booking this trip.
11     Q    And so what was the outcome?
12     A    I believe it's in the paragraph
13 here; we agreed that she could take the time off
14 without pay.
15     Q    Did you become aware around that
16 time, which appears to be the end of August of
17 2006, that Renee was complaining about her job?
18     A    No.
19     Q    Did Mr. Mannarino around that
20 time -- end of August of 2006 -- tell you in any
21 fashion that he did not believe that Renee was
22 committed to her career?
23     A    Yes, he in an e-mail to me
24 informed me that she felt unfulfilled in her
25 job, and he was concerned about that.

VERITEXT REPORTING COMPANY
www.veritext.com

(212) 279-9424                                    (212) 490-3430

Page 46

Page 48

2  he starts with August --
3       A    Um-hum.
4       Q    -- and is it correct that Renee
5  did not work much at all in August of 2006?
6            MR. SCHATZ: Objection.
7            MS. HANSWIRTH: You can answer.
8            THE WITNESS: Okay.
9       A    From this e-mail, she was out on
10 disability for part of August, and then was on
11 vacation.
12      Q    Where are Renee's attendance
13 records?
14      A    When you say "attendance records,"
15 what do you mean by that?
16      Q    Well, somebody must have been
17 keeping a record of the days that she was not in
18 the office.
19      A    That would have been her managers,
20 Andy and Mark.
21      Q    Where would they keep those
22 records?
23      A    I have no idea.
24      Q    If you needed to look for those
25 records, where would you look?

Page 47

Page 49

2       A    I don't believe so. I don't
3  recall speaking to Joel directly about Renee.
4       Q    If you go to the top of the next
5  page of this e-mail, Mr. Mannarino says, "Toward
6  the end of October, Tracy made it clear that we
7  needed to begin documenting everything with
8  respect to Renee."
9            Do you see that?
10      A    Um-hum, yes.
11      Q    Does that at all jog your memory
12 as to what discussions or communications you
13 participated in concerning Renee in October of
14 2006?
15      A    Yes, it goes back to the fact that
16 we had had continuous attendance issues with
17 her, and she was just coming back from the trip,
18 it was unpaid, from her wedding, and so when she
19 came back -- I don't recall that was the end of
20 August, I don't remember it being that time
21 frame -- that we said we need to begin to
22 document the time out and look at the timeline
23 of her absentees, her time out of the office.
24      Q    If you go back to the prior page,
25 Mr. Mannarino is discussing the time period --

Page 48 (continued)

1            Platt
2       A    I don't know. I honestly would
3  not know where to start to look for their
4  personnel records.
5       Q    So you're getting from Andy that
6  Renee did not work much at all in August;
7  correct?
8       A    Correct.
9       Q    And that that led her to be out of
10 time off for the year; correct?
11      A    Correct.
12      Q    And then, even though that had
13 happened and she was out of time, she still went
14 on another -- or she still took five additional
15 days off; is that correct?
16      A    Correct.
17      Q    And she was not paid for that;
18 correct?
19      A    Correct.
20      Q    And then what would have happened
21 had she wanted to take even more time off for
22 that year?
23      A    We had a discussion with her that
24 any other time would not be approved, and if she
25 took it, it would be insubordination, of

Page 50

Platt

1
2  leaving. So when we agreed to allowing her to
3  take the trip to San Diego unpaid, we said this
4  would be the last time she would be allowed to
5  take unpaid time off that's not approved.
6      Q    And what if she did that anyway,
7  what would have happened?
8      A    I can't speculate on what would
9  have happened. I don't -- I don't know at that
10 time.
11     Q    When you say "insubordination,"
12 what exactly do you mean?
13     A    Well, insubordination in the fact
14 that her managers told her that she was not
15 allowed to take any more time off.
16     Q    Is insubordination grounds for
17 termination?
18     A    It can be.
19     Q    So even though she was told --
20         MS. HANSWIRTH: Let me back up.
21     Q    I think you said, "we told her"
22 that she couldn't take any more time off.
23         Who is the "we" who told her that?
24     A    The "we" is Mark and Andy, her
25 managers. I never spoke with Renee.

Page 51

Platt

1
2      Q    So if you look back to the next
3  page that starts with, "Toward of end of
4  October" --
5      A    Yep.
6      Q    -- does it appear that Renee, in
7  fact, did take more time off that year?
8      A    By reading this, it would look
9  like she did. She called out sick a few more
10 days.
11     Q    Did she call in sick the day after
12 Halloween?
13     A    Per this e-mail, yes.
14     Q    Were you made aware on or about
15 November 1, 2006 that Renee called in sick?
16     A    I don't recall when I was made
17 aware of -- if there was any prior awareness to
18 this e-mail.
19     Q    Did Renee take any additional days
20 off after November 1, 2006?
21     A    She did. She took off December
22 8th, 2006, where she called in sick.
23     Q    Was that the day after the company
24 holiday party?
25     A    I don't recall the date, but

Page 52

Platt

1
2  looking at this e-mail, Andy does specify that
3  it was the day after the company holiday party.
4      Q    Did you ever attend any social
5  functions where Renee was present?
6      A    I don't know.
7      Q    Did you ever observe Renee
8  drinking alcohol?
9      A    I don't know.
10     Q    Was Renee paid for the days that
11 she called in sick in November and
12 December 2006?
13     A    I don't know that.
14     Q    Would there be a way to find out?
15     A    Absolutely.
16     Q    Could you find that out for me?
17         THE WITNESS: Can you find that
18 out?
19         MR. SANTANGELO: We could find
20 that out, yes.
21         MS. HANSWIRTH: Thank you.
22         And, also, if there's any way to
23 determine what her attendance was for
24 the time that she worked at Citi, I
25 reiterate that request.

Page 53

Platt

1
2      Q    If you look at the, like, the
3  bottom -- there's a long paragraph at the bottom
4  of this page.
5      A    Um-hum.
6      Q    Can you explain in your own words
7  the situation that Mr. Mannarino is talking
8  about.
9      A    What I recall of this conversation
10 was Andy phoned me to let me know that he --
11 Renee had approached him and told him there was
12 an incident on the desk. I instructed him to go
13 back and get more details.
14         Let me retract.
15         When Andy told me he had spoken to
16 Renee and she informed him, she did not want to
17 give him any details and she did not want to
18 discuss it.
19         And I asked Andy to go back and
20 speak with her again, and she specifically
21 stated she did not want to talk to anyone
22 regarding it.
23     Q    Can I interrupt you for a minute?
24     A    Yes, absolutely.
25     Q    Are you telling me -- and just

14 (Pages 50 to 53)

Page 54

1        Platt
2   tell me if I'm right or wrong, but are you
3   telling me that Renee went to her manager, Andy
4   Mannarino, and said that there was an incident
5   at the trading desk, but that she would not tell
6   him anything about it; is that correct?
7       A    Did she call it an "incident"?
8            I believe, yes, she said there was
9   an incident, and she did not want to discuss it,
10  correct.
11      Q    So at that point in time did
12  Mr. Mannarino contact you?
13      A    He did.
14      Q    Tell me -- you can continue with
15  your own recollection of what is going on here.
16  Thanks.
17      A    Okay.
18           He informed me that she had told
19  him just that. And I instructed -- I instructed
20  him to go back and speak with her again and just
21  reiterate our company policy and get as much
22  information as he could from her regarding
23  whatever incident it was -- we weren't aware of
24  what it was. And she again reiterated to him
25  that she didn't want to discuss it, nor did she

Page 55

1        Platt
2   want anyone to talk to her about it.
3            And so I then instructed Andy that
4   we needed to continue to address it.
5            He spoke with Lori Orr, who was a
6   peer of Renee's on the desk, they sat in a small
7   room, and Lori spoke with Andy about it. And as
8   you can see, she tells him that -- that,
9   actually, Renee was using profanity and using
10  inappropriate language on the desk. And so I
11  asked Andy to go back and remind everyone of the
12  company policy and the code of conduct and
13  workplace profession.
14      Q    So just tell me if I'm correct,
15  Ms. Orr told her manager, Mr. Mannarino, that it
16  was -- that Renee was using profanity; is that
17  correct?
18      A    That is correct.
19      Q    And what company policy are you
20  referring to?
21      A    We have a personal code of
22  conduct, and I don't know it off the top of my
23  head, but --
24      Q    Basically what does it say?
25      A    We need to act appropriately, in a

Page 56

1        Platt
2   professional manner.
3       Q    So no cursing -- limited cursing?
4       A    Yeah.
5       Q    Is that -- I don't know.
6       A    The code of conduct -- excuse me,
7   it was simply our code of conduct, and how we
8   expect employees to conduct themselves in the
9   workplace.
10      Q    So was it your understanding that
11  it was Renee who was violating the code of
12  conduct?
13      A    From Andy's conversation with
14  Lori, she informed him that he -- that Renee
15  was, you know, using inappropriate language in
16  the workplace.
17      Q    So when Renee was referring to an
18  incident at the desk that she didn't want to
19  tell anybody about, is it your understanding
20  that the reason she didn't want to tell anybody
21  about it is because she was the person who was
22  responsible for doing something wrong?
23           MR. SANTANGELO:  Objection.
24      A    I don't know.
25           MS. HANSWIRTH:  You can answer.

Page 57

1        Platt
2       A    I don't know.
3       Q    Was it commonplace for Citi
4   employees to use the F word --
5       A    No.
6       Q    -- generally in business?
7       A    No.
8            MR. SANTANGELO:  I was swatting a
9       fly, but I was going to interrupt and
10      say let her finish asking her questions
11      before you answer.
12      Q    So after you learned about this
13  incident, could you just tell us again what you
14  instructed Mr. Mannarino to do about this.
15      A    After -- I'm sorry, can you --
16  when I learned of what Lori said, or what
17  Renee --
18      Q    What Lori said.
19      A    I instructed him to have -- during
20  his staff meeting, to pass out the code of
21  conduct and remind everyone of their
22  responsibility, and conduct themselves in a
23  professional manner.
24      Q    Do you see the part of this
25  e-mail, this big paragraph, where Renee -- it

15 (Pages 54 to 57)

Page 58

Platt

1
2   looks like Renee has told Mr. Mannarino that she
3   put a phony appointment in her calendar?
4         MR. SCHATZ: Objection.
5         Q    Do you see that?
6         A    Yes.
7         Q    Can you tell us what that's about,
8   to your best recollection?
9         A    I have no idea. From reading the
10  e-mail, I believe she put an appointment in
11  there, and she told him -- she, Renee, went to
12  her manager and told him it wasn't a real
13  appointment.
14        Q    Do you see where it says that
15  Renee says that she left the office to speak to
16  an attorney?
17        A    Yes.
18        Q    Did you have any discussions or
19  communications with Mr. Mannarino about Renee's
20  statement that she went to see an attorney
21  around the time that this happened?
22        A    I don't recall if I specifically
23  asked him about the attorney.
24        Q    Was there any point during Renee's
25  employment that Citi consulted any legal counsel

Page 59

Page 60

Platt

1
2   to their attention.
3         Q    But you do recall that at some
4   point before Renee left the employ of Citi that
5   you discussed some aspect of Renee's employment
6   with counsel; is that correct?
7         A    Correct.
8         Q    When was it --
9         MS. HANSWIRTH: Strike that.
10        Q    When was the decision made to do a
11  reduction in force with respect to the unit that
12  Renee worked in, even if that's the correct --
13  if that was the reduction in force?
14        A    I guess it's a little bit of a
15  different -- I'm going to answer in a different
16  manner --
17        Q    Sure.
18        A    -- because it was a firm-wide
19  reduction we were going through, so it was not
20  just her group.
21        Q    There was a firm-wide reduction in
22  force for the entire --
23        A    Lava had more than just LavaFlow
24  reductions.
25        Q    This was a Lava reduction in

Page 61

Platt

1
2   force, is that what you're saying? Or was this
3   a -- when you say "firm-wide," do you mean the
4   entire Citi?
5         A    Not entire Citi. Parts of Citi
6   Group were going through reductions, certain
7   businesses were being exited.
8         Q    Is the Lava business still
9   operational?
10        A    Pieces of it, certain pieces.
11        Q    I really don't understand the
12  whole reduction in force concept, or how --
13        A    Okay.
14        Q    -- it was administered in this
15  situation.
16        A    Okay.
17        Q    So just tell me what you remember
18  about this particular reduction in force.
19        A    So April 2007, on or about that
20  time -- maybe it was January -- we were starting
21  to see a downturn in the market, and we began
22  exiting certain businesses, and with that we
23  reduced expenses, and some of that is head
24  count. And there was a decision made that there
25  was a certain number of head count that we had

16 (Pages 58 to 61)

Page 62

Platt

1
2  to reduce, and based upon what business you were
3  supporting.  So...
4       Q    When you say "based upon what
5  business you were supporting," what do you mean
6  by that?
7       A    So, for example -- I'm not saying
8  in this particular case -- say, for example,
9  that in HR you have three generalists and you're
10  reducing head count, you only need two, so that
11  means it's elimination of a position, it's a
12  reduction in force.
13      Q    And what about the part where you
14  say it would depend on what business you were
15  supporting, what did that mean?
16      A    Well, it depends on what business
17  you were in.  Because you were -- because you
18  had asked before if it was firm-wide.
19      Q    I see.
20      A    I don't want to make a blanket
21  statement that it was across Citi.
22      Q    So would you say it was a targeted
23  reduction in force, that certain business --
24  that certain parts of the business going to
25  have a reduced head count; is that --

Page 63

Platt

1
2       A    Yes.
3       Q    Do you remember how many -- how
4  many employees were impacted or were part of the
5  reduction in force?
6       A    I don't.
7       Q    Who made the decisions as to who
8  would be terminated as part of this reduction in
9  force?
10      A    The business.
11      Q    The managers?
12      A    The managers.
13      Q    Was it in their sole discretion?
14      A    It's discussed with counsel and
15  HR.
16      Q    So in the case of Renee as being
17  part of the reduction in force, was the decision
18  made by Mr. Mannarino and Mr. Powers, with
19  consultation from human resources and the legal
20  department?
21      A    They were not the sole decision
22  makers.  It was their manager, and I don't
23  recall who was the -- I don't recall who was the
24  person that was -- had given the names for the
25  roles that were being eliminated.

Page 64

Platt

1
2       Q    Did you participate in the
3  decision making to make Renee part of the
4  reduction in force?
5       A    I did not discuss -- no, I was not
6  in the decision making process.
7       Q    When did you first become aware
8  that Renee would be part of the reduction in
9  force?
10      A    I believe it was end of
11  February-beginning of -- excuse me, end of
12  March-beginning of April.
13      Q    I think that you -- I could be
14  wrong about this, but did you testify earlier
15  that you became aware that there would be a
16  reduction in force in January of 2007?
17      A    No.
18      Q    I'm sorry.
19           When did you become aware that the
20  company was going to be doing a reduction in
21  force?
22      A    I don't recall the date of when I
23  became aware of the reduction in force.
24      Q    I see that these e-mails that Citi
25  produced end -- or the last date --

Page 65

Platt

1
2           MS. HANSWIRTH:  Actually, I'm not
3  sure I'm right about this.
4       Q    They look like they're all from
5  January 22nd, 2007, and some of them forward
6  something that's from December -- I'm sorry --
7  yes, 2007, and they forward something from
8  December 2006.
9           I'm wondering if there were any
10  subsequent e-mails to you from either
11  Mr. Mannarino or Mr. Powers concerning Renee.
12      A    What do you mean by that?
13      Q    Well, what I'm getting at is that
14  Renee left Citi in April of 2007.  The last
15  e-mail that you have here is from January 22nd,
16  2007, and it's fair to say that this was --
17  there were still ongoing issues in 2007
18  regarding Renee's attendance, according to
19  Mr. Mannarino.  So I'm wondering if there were
20  any further e-mails after January 22nd, 2007
21  regarding Renee's work issues.
22           MR. SCHATZ:  Objection.
23           MS. HANSWIRTH:  Go ahead.
24      A    None that I could find.  I can't
25  comment that there were, I didn't find any in my

17 (Pages 62 to 65)

Page 89

```
 1
 2      UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
 3
        Index No. 09-CV-01251 (DAB)
 4      - - - - - - - - - - - - - - - - - - -x
 5      RENEE MIHALIK,
 6                              Plaintiff,
 7              -against-
 8      CREDIT AGRICOLE CHEUVREUX
        NORTH AMERICA, INC.,
 9
                                Defendant.
10
        - - - - - - - - - - - - - - - - - - -x
11
                        September 17, 2010
12                      11:22 a.m.
13
14              Continued deposition of CITI GROUP
15      by TRACY PLATT BEACH, taken pursuant to 30(b)(6)
16      subpoena, held at the offices of Hogan Lovells
17      US LLP, 875 Third Avenue, New York, New York,
18      before Helen Mitchell, a Shorthand Reporter and
19      Notary Public.
20
21
22
23
24
25
```

Page 110

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 112

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 113

1                    Platt
2      A    What do you mean by that?
3      Q    Did Miss Lawrance state to you --
4          MR. FRANCIOSE:  Strike that, I'm
5    going to move on.
6      Q    Looking at the top level of the
7    chain, which is an e-mail from you, Tracy Platt,
8    to Andrew Mannarino, sent at 8:26 a.m. --
9          MR. SCHATZ:  Sorry, I think you've
10    got that backwards.
11          MR. FRANCIOSE:  Strike that.
12      Q    An e-mail from Mr. Mannarino to
13    you, Tracy Platt, with the text, "Tracy, please
14    see chain below.  What do you recommend?  I'm
15    going to ask for a doctor's note."
16          Tell me everything you remember
17    about the conversation or any communications you
18    had with Mr. Mannarino regarding this incident.
19      A    I know we spoke.  I don't know
20    what we discussed.  I don't recall the specific
21    conversation around this.
22      Q    Do you recall giving Mr. Mannarino
23    any advice on how to handle this situation from
24    an HR perspective?
25      A    Not around this specific incident.

7 (Pages 110 to 113)

Page 114

Platt

1
2     Q     And what is Citi's policy with
3  respect to employee absences due to health
4  ailments, such as pink eye?
5     A     If they have -- if there is a
6  legitimate sickness, then they have sick days
7  that they're able to use.
8     Q     Is there a requirement that in
9  certain situations Citi employees provide a
10 doctor's note?
11    A     Yes.
12    Q     And what is that requirement?
13    A     If you've stated to your manager
14 that you've gone to the doctor, we need to have
15 a release from your doctor that you're able to
16 come back to work.
17    Q     Just so I understand you clearly,
18 every time a Citi employee goes to the doctor,
19 they need a doctor's note to return to work?
20    A     No. I stated any time an employee
21 informs their manager they've been to the doctor
22 for an illness, they need to then provide a
23 doctor's note to say they've been released.
24    Q     Would that be an illness that has
25 kept them out a work either for a partial day or

Page 115

Platt

1
2  full day or several days?
3     A     It depends on what the illness
4  was.
5     Q     But it would be an illness that
6  has kept them out --
7     A     Out of the office.
8     Q     -- or away from work?
9     A     Yes, correct.
10    Q     What do you mean by "released"?
11    A     Well, if they're telling us
12 they've been to their doctor, the doctor needs
13 to release them, to say that they're able to
14 return to work.
15    Q     And by "able to return to work,"
16 you mean that the employee will be safely able
17 to --
18    A     Correct.
19    Q     -- work in the office?
20    A     Correct.
21    Q     I'd like to direct your attention
22 to the next document, bearing the document ID
23 0000465, from the following day, September 20th,
24 2006.
25        Please tell me what this is.

Page 116

Platt

1
2     A     This is an e-mail from Renee to
3  her manager, Andy, saying that her eyes are
4  still puffy and red, asking him if he wants her
5  to come in to work.
6     Q     And what was Mr. Mannarino's
7  response to Miss Mihalik?
8     A     He advised her to go see a doctor
9  and have a formal diagnosis of her pink eye.
10    Q     Did Mr. Mannarino act on your
11 advice or the advice of any other HR
12 professional at Citi in telling Miss Mihalik to
13 seek a formal diagnosis of pink eye?
14    A     I don't know if he acted on anyone
15 else's advice. I don't recall speaking to him
16 about that.
17    Q     Turning to the next page, bearing
18 the document ID 0000466, there's an e-mail from
19 Mr. Mannarino to Miss Mihalik --
20        MR. FRANCISOE: Strike that.
21    Q     -- an e-mail from Miss Mihalik to
22 Mr. Mannarino, stating simply, "Will do,"
23 following Mr. Mannarino's request that she seek
24 a formal diagnosis of pink eye.
25        Do you know if Miss Mihalik ever

Page 117

Platt

1
2  did provide any evidence, including a doctor's
3  note, regarding her pink eye?
4     A     I don't recall.
5     Q     Did Mr. Mannarino ever tell you
6  that Miss Mihalik had provided a doctor's note?
7     A     I don't recall.
8     Q     If Miss Mihalik had provided a
9  doctor's note, is that the type of document that
10 would have been placed in her personnel file?
11    A     It would have been had it been
12 provided to HR. So she would have brought it to
13 her manager, and they provide it to HR to be
14 placed in her file.
15    Q     To the best of your recollection,
16 is there a doctor's note of any sort in Miss
17 Mihalik's personnel file?
18    A     No, there is not.
19    Q     Directing your attention to the
20 e-mail bearing the document ID 0000001. It's a
21 few pages ahead.
22    A     Okay.
23    Q     Please look at this e-mail and
24 tell me what it is.
25    A     This is an e-mail from Andy to

8 (Pages 114 to 117)

**Page 118**

```
 1              Platt
 2  myself, letting me know that Renee has no days
 3  left and she's asked for time off to go to a
 4  wedding.
 5      Q     And, Miss Platt, you responded,
 6  "Left you a message. Please give me a call when
 7  you have a chance to discuss."
 8          Please tell me everything you
 9  remember about your discussion with
10  Mr. Mannarino regarding Miss Mihalik requesting
11  time off to go to a wedding.
12      A     From what I recall, Andy had let
13  me know that she had no more days off. She had
14  requested time to go to a wedding in California.
15  I believe we originally had said to her that she
16  would not be granted the time off. And then she
17  came back and said she had already booked the
18  tickets and was going to be out money. So her
19  manager went back and said, "You could take the
20  time, but you have no more time off the rest of
21  this year."
22      Q     And was the time off that Miss
23  Mihalik was granted to attend this wedding paid
24  or unpaid?
25      A     I don't recall. I believe it was
```

**Page 120**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 119**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 121**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

9 (Pages 118 to 121)

Page 126

Page 128

1    Platt
2    with you Miss Mihalik getting upset on or about
3    February 6th, 2007?
4        A    I don't recall.
5        Q    Directing your attention to the
6    top level of the chain, where Mr. Mannarino
7    writes to Mr. Powers and Sharon Lawrance, "Of
8    course let's discuss this morning. As you know,
9    the PIP is prepared. I am considering delaying
10    delivering it, and I want to discuss."
11            Miss Platt, what is a PIP?
12        A    It's a performance improvement
13    plan.
14        Q    And what is a performance
15    improvement plan?
16        A    We oftentimes also call written
17    warnings.
18        Q    And when are PIPs or written
19    warnings issued to employees?
20        A    When it's appropriate. I don't
21    know that there's a specific -- when it's
22    appropriate to give, and the manager has spoken
23    with us.
24        Q    And what are a set of
25    circumstances in which it would be deemed

Page 127

Page 129

1    Platt
2    appropriate? Please give me an example.
3        A    If someone has acted
4    inappropriately, gross misconduct, they can give
5    them a written warning.
6        Q    Would it be appropriate to issue a
7    PIP if an employee was not performing according
8    to the requirements of his or her job?
9        A    Yes.
10        Q    And what is the purpose of the PIP
11    in that instance?
12        A    It's to then let them know that
13    there is an issue with their performance, and
14    help rectify the issue, and give them warning
15    that they have time to rectify it.
16        Q    And in this instance, do you know
17    if a PIP was ever issued to Miss Mihalik?
18        A    I don't.
19        Q    You don't know if one was ever
20    issued, or no, one was never issued?
21        A    I don't know if one was ever
22    issued.
23        Q    Do you know where the PIP that
24    Mr. Powers --
25            MR. FRANCIOSE: Strike that.

11 (Pages 126 to 129)

Page 130

1        Platt
2        Q    -- Mr. Mannarino states he
3  prepared, do you know where that PIP exists?
4        A    I don't know.
5        Q    Do you know who prepared the PIP
6  that Mr. Mannarino refers to?
7        A    I don't.
8        Q    Do you know if Mr. Powers prepared
9  the PIP?
10       A    I don't know if he did.
11       Q    Is it the general practice of Citi
12 to provide an employee with a PIP prior to
13 terminating their employment?
14       A    Yes.  That's not to say that if
15 they're given a warning that they're then going
16 to be fired, but that would be something that
17 would be required before it happens.
18       Q    Directing your attention to the
19 next e-mail chain, bearing the document ID
20 0000638.
21            Please look at this e-mail chain
22 and tell me what it is.
23       A    This is an e-mail from Renee to
24 her managers, Mark and Andy, letting them know
25 she's running late.

Page 131

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1        Platt
2        Q    And do you know if Miss Mihalik
3  had fully expended her personal days prior to
4  March 26th, 2007?
5        A    I don't know.
6        Q    Do you have any recollection of
7  discussions with Mr. Mannarino or Mr. Powers
8  regarding Miss Mihalik taking a personal day on
9  March 27th, 2007?
10       A    I don't recall.
11       Q    Miss Platt, if I could direct your
12 attention to the last page in our stack here,
13 bearing the document ID 0000652.
14            If you could look at this e-mail
15 chain and tell me what it is.
16            (Pause)
17       Q    In fact, I'd like you to read the
18 message Miss Mihalik sent to Andrew Mannarino on
19 April 4th, 2007, at 6:38 a.m.  If you could just
20 read that message, please.
21       A    Out loud?
22       Q    Read it out loud, yes.
23       A    "Hi, Andy.  Okay, call it what you
24 want, personal day, vacation day, sick day, but
25 I was up all night upset, my eyes are swollen, I

Page 133

1        Platt
2  look like shit and I'm exhausted.  I am not in
3  the work mindset right now, nor do I look the
4  part.  It's not that I don't care.  I hope you
5  can see that this is not the case due to my
6  attendance and involvement this year so far.  I
7  just need to not be there today.  I am sorry.  I
8  will be back tomorrow.  Thanks, Renee."
9        Q    Do you have any knowledge as to
10 why Miss Mihalik was "not in the work mindset
11 right now"?
12       A    I don't.
13       Q    Did Mr. Mannarino speak to you
14 about this e-mail message from Miss Mihalik?
15       A    I don't recall.
16       Q    Do you know if Miss Mihalik had
17 any vacation days left to use on April 4th,
18 2007?
19       A    I don't know.
20       Q    Is it commonplace for Citi
21 employees to use profanity in e-mails to their
22 managers?
23       A    No.
24       Q    As an HR professional, would you
25 consider this e-mail an appropriate message to

12 (Pages 130 to 133)

Case 1:09-cv-01251-DAB   Document 26   Filed 11/01/10   Page 1 of 2

**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENEE MIHALIK,

                         Plaintiff,

           – against –

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

                      Defendant.

Index No.:  09-CV-01251 (DAB)

**DECLARATION OF
DAVID ZACK**

**DAVID ZACK** declares as follows:

1.     I am the Chief Compliance Officer of Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux") and held that position at all times during the employment of Renee Mihalik. I have personal knowledge of the facts stated herein.

2.     I report directly to the Chairman of the Board of Credit Agricole Cheuvreux, S.A. in Paris.  If an employee complained to me that Cheuvreux's Chief Executive Officer was engaged in conduct that was unlawful, including sexual harassment or unlawful discrimination or retaliation of any type, I would report it directly to the Chairman.  Though Renee Mihalik told me on several occasions that she thought Ian Peacock was a tough boss, I never understood this – or anything that Ms. Mihalik said to me – to be related to sex discrimination or sexual harassment, or any other form of unlawful discrimination.

3.     The telephone lines of Cheuvreux are recorded for business reasons, and each employee signs a document memorializing his or her understanding that telephone conversations will be recorded.  Employees are not permitted to conduct firm business on mobile telephones.

4.      In or about early April 2008, Ian Peacock, the CEO, asked me to obtain a record of all telephone calls to or from Ms. Mihalik, including duration of each call and the phone number of the other party to the call, during the period of March 24 through 31. I did so and gave the telephone log to Mr. Peacock.

5.      In connection with discovery in this lawsuit, I retrieved the recordings of all conversations conducted on taped lines by Ms. Mihalik during the period of March 24 through 31, 2008 and gave them to counsel. I have verified that the transcripts of a selection of these calls that are attached to this declaration as Exhibit A are transcripts of the recordings I retrieved from Cheuvreux's recording system.

6.      At all times during Ms. Mihalik's employment, Cheuvreux employed an internet content blocking system that prevented access to pornographic or sexually-oriented websites.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
         October 28, 2010

DAVID ZACK

**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENEE MIHALIK,

                Plaintiff,

       – against –

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.

              Defendant.

Index No.: 09-CV-01251 (DAB)

**DECLARATION OF
JOHN PALAZZO**

**JOHN PALAZZO** declares as follows:

1.     I am employed as a Managing Director and Head of Alternative Execution Services ("AES") for Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux"). I have personal knowledge of the facts set forth herein.

2.     I began work for Cheuvreux as a Managing Director and AES salesperson in late January 2008. Renee Mihalik was also an AES salesperson at that time with the rank of Vice President.

3.     Before joining Cheuvreux, I was in charge of the New York office of UNX Corp.; before that I was in charge of the New York office of Pulse Trading; and before that I worked in electronic trading sales at Brut (a Sungard company). I have more than 25 years of experience in the securities industry and hold a number of securities licenses (Series 4, 7, 24, 55 and 63).

4.     Shortly before I began work at Cheuvreux, I attended a business retreat at a conference center located outside London called The Grove. Ian Peacock, who was then the Chief Executive Officer of Cheuvreux and also the head of AES in New York, and Ms. Mihalik were also in attendance. The three of us had a conversation at The Grove's bar, where I was

discussing what I believed was an effective way to sell Cheuvreux's services to clients. Ms.

Mihalik told me that my ideas were "crap." She then told Mr. Peacock that the only reason

clients do business is because of a person's appearance. Mr. Peacock disagreed with her, saying

that credibility and knowledge were the important factors, not appearance. I was disgusted by

Ms. Mihalik's statements and walked away from the conversation. This was my first interaction

with Ms. Mihalik. Mr. Peacock later apologized to me in private for Ms. Mihalik's statements

and said he was quite embarrassed; he also said he had told Ms. Mihalik after I walked away that

she should respect colleagues who know more than she and who can help her grow, and that she

should also respect herself and change her attitude because Cheuvreux wanted her to succeed.

5.      I have made cold calls throughout my career, including my tenure at Cheuvreux.

It is an accepted way of soliciting business and it produces results.

6.      Although I did not supervise her work, my interactions with and observations of

Ms. Mihalik during the two-plus months we both worked at Cheuvreux caused me to conclude

that she did not understand electronic trading of global equities and was performing extremely

poorly in her job. For example, when asked by Peacock at regular team sales meetings what she

had accomplished in the preceding week with respect to business development and client contact,

Mihalik had little to report and often simply declined to answer his question. Similarly, the U.S.

daily commission run, which was sent around to all the team members and showed client activity,

consistently showed that Mihalik had generated few revenues or new clients.

7.      In early April, I attended a scheduled meeting of the AES sales team. At the

previous month's meeting, Ms. Mihalik had been told to prepare her business plan for

presentation to the group. Ms. Mihalik had made no secret of the fact that she had not been

successful in generating revenues to date. At the April meeting, Ms. Mihalik clearly had not

prepared a business plan and attempted to ad-lib her presentation. It was immediately evident, however, that Mihalik had not thought through her approach to securing new clients and fundamentally did not understand our business. I told Mr. Peacock after the meeting that I was embarrassed to be part of a team with such an ill-prepared and poorly informed colleague.

8.    Though I was an experienced salesperson, Peacock frequently made suggestions about how I could improve my sales skills and ability to bring in business. I felt that Peacock's criticisms were sometimes harsh but always fair; he was a demanding boss who had high expectations with respect to business production.

9.    I never observed Ms. Mihalik being treated differently from any other person on our team.

10.    I never saw pornography on the AES desk or elsewhere in the office. My understanding is that Cheuvreux's computer system prevents the accessing of sexually explicit websites.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
         October 27, 2010

JOHN PALAZZO

**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENEE MIHALIK,

                                    Plaintiff,

                    – against –

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

                                    Defendant.

Index No.: 09-CV-01251 (DAB)

**DECLARATION OF
TIMOTHY RANDALL**

**TIMOTHY RANDALL** declares as follows:

1.      I have been employed by Credit Agricole Cheuvreux North America, Inc.

("Cheuvreux") since 2004 as a Vice President and then a Senior Vice President in Alternative

Execution Services ("AES").  I have personal knowledge of the facts stated herein.

2.      As a member of the AES team, I sat on the AES desk.  During her employment,

Renee Mihalik sat directly next to me on my left, and Dominic Romano, an AES salesperson, sat

directly next to me on my right.  Ian Peacock, who was Cheuvreux's Chief Executive Officer and

the Head of AES in the United States, sat next to Ms. Mihalik, as she was the most junior

member of the team.

3.      I was not surprised when Ms. Mihalik was discharged for performance because

our revenue figures were circulated to the whole team and Ms. Mihalik's were virtually

nonexistent.  In addition, we had sales meetings in which we reviewed revenue projections,

account prospects and sales methods; Ms. Mihalik's list of prospects was small.

4.      Ms. Mihalik and I visited one of her clients, Tradition Asiel, in the early months of her employment. She behaved professionally but did not talk about the services Cheuvreux could provide, and I believe she obtained no business from that client.

5.      I was at a team meeting in April 2008 where Ms. Mihalik was attempting to present her business plan. She seemed unprepared for the presentation, and Mr. Peacock told her so.

6.      I observed that Mr. Peacock treated Ms. Mihalik the same as he treated every other member of the AES team. He was a demanding boss to all of us and was critical of all members of the team if and when we were unprepared, unproductive or uninformed.

7.      Mr. Peacock has asked me to cold-call potential clients. I have used this technique and gained new clients and business from it.

8.      I never heard Mr. Peacock make any comments about any staff members' clothing or appearance.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
          October 28, 2010

TIMOTHY RANDALL

FILED ELECTRONICALLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RENEE MIHALIK, | Index No.: 09-CV-01251 (DAB) |
| Plaintiff, | |
| – against – | **DECLARATION OF**<br>**DOMINIC ROMANO** |
| CREDIT AGRICOLE CHEUVREUX<br>NORTH AMERICA, INC., | |
| Defendant. | |

**DOMINIC ROMANO** declares as follows:

1.      I am a Vice President – Alternative Execution Services ("AES") at Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux") and have worked for Cheuvreux and its affiliates since January 2006.  I have personal knowledge of the fact stated herein.

2.      Renee Mihalik and I did the same job when she and I both worked at Cheuvreux. As an AES salesperson, I sat next to Tim Randall, and one seat away from Renee Mihalik, during Ms. Mihalik's employment at Cheuvreux.  I never saw any images of naked or scantily clad women, men, or any other pornographic images on Mr. Randall's computer.  At all times during Ms. Mihalik's tenure, Cheuvreux utilized an Internet content blocking system that denied access to pornographic or sexually oriented websites.  In fact, the blocking software even prevented us from accessing Facebook or YouTube.

3.      I was friendly with Ms. Mihalik during her employment.  We discussed both business and personal matters.  She never told me that she believed Ian Peacock treated her differently from anyone else because of her gender, or that she believed she had been sexually harassed by him or any other person at Cheuvreux.

4.      Ms. Mihalik did tell me that she felt Mr. Peacock was excessively demanding because he required her to provide quick turnarounds on reports, to follow up quickly on business leads, and to produce business. I shared Ms. Mihalik's view that Mr. Peacock was a demanding supervisor, as I and the rest of the AES team had been subjected to identical demands from him. Mr. Peacock expected results and was not interested in excuses from any member of the team for failing to produce results.

5.      Mr. Peacock has required me to make cold calls to potential clients. I have often done cold calling, and those calls have produced business.

6.      I brought Ms. Mihalik into meetings with potential clients.

7.      I attended the team meeting at which Ms. Mihalik was supposed to present her business plan. She was unable to do so; she had not prepared anything in writing (which, in my experience, is necessary when preparing and presenting a business plan) and failed to set forth any specific plans for business development. Mr. Peacock expressed his displeasure with her unpreparedness – in the same way that he did with any of us who did not fulfill his expectations. It appeared to me at the time that she had not taken the assignment seriously.

8.      My personal opinion of Ms. Mihalik is that she was bright but unqualified for her job.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        October 26, 2010

DOMINIC ROMANO

**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RENEE MIHALIK, | |
| Plaintiff, | Index No.: 09-CV-01251 (DAB) |
| – against – | **DECLARATION OF** |
| CREDIT AGRICOLE CHEUVREUX | **FRANK BOER** |
| NORTH AMERICA, INC., | |
| Defendant. | |

**FRANK BOER** declares as follows:

1.      I am a Senior Vice President, and before that was a Vice President, at Credit Agricole Cheuvreux North America, Inc. ("Cheuvreux"), where I have worked since June 2004. I have personal knowledge of the facts stated herein.

2.      I sat on the same trading floor as Renee Mihalik when she worked at Cheuvreux.

3.      In or about October or November 2007, a group of about 10 Cheuvreux employees went out for drinks after work at around 5:30 p.m. Ms. Mihalik ordered a martini and then said she was not going to drink a lot because she did not want to "get into trouble." At around 8 p.m., I was sitting on a sofa next to another employee, Margaret Boyle, and Ms. Mihalik was sitting next to Ms. Boyle. As we sat and talked, I rested my arm across the top of the sofa behind Ms. Boyle. I then felt something on my hand, and I looked in that direction and saw Ms. Mihalik sucking on my fingers. Another colleague also saw this occurring, and we spoke about it afterward. As soon as I realized what was happening, I immediately pulled my hand away from Ms. Mihalik's mouth and said, "Renee, that's not a good idea."

4.      I frequently observed Ms. Mihalik shopping online on her Cheuvreux computer during business hours.

5.      I never heard Mr. Peacock comment on the appearance of Ms. Mihalik – or of anyone else on the desk.

6.      I never saw any pornography in the workplace.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       October 29, 2010

_____
FRANK BOER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RENEE MIHALIK,

                              Plaintiff,                    Index No.: 09-CV-01251 (DAB)

        – against –

                                                           **CERTIFICATE OF SERVICE**

CREDIT AGRICOLE CHEUVREUX
NORTH AMERICA, INC.,

                              Defendant.

I, Christopher N. Franciose, Esq., hereby certify that on November 1, 2010, I caused true and correct unredacted copies of the following documents, which were filed under seal on November 1, 2010:

- Notice Of Motion;
- Declaration Of Frank Boer;
- Declaration Of Melissa Franzen, and the exhibits annexed thereto;
- Declaration Of John Palazzo;
- Declaration Of Ian Peacock, and the exhibits annexed thereto;
- Declaration Of Timothy Randall;
- Declaration Of Dominic Romano;
- Declaration Of Barbara M. Roth, and the exhibits annexed thereto;
- Declaration Of David Zack, and the exhibit annexed thereto;
- Local Rule 56.1 Statement Of Undisputed Facts By Defendant Credit Agricole Cheuvreux North America, Inc.; and
- Defendant's Memorandum Of Law In Support Of Its Motion For Summary Judgment

to be served via Federal Express upon:

        Matthew T. Schatz, Esq.
        SCHWARTZ & PERRY LLP
        295 Madison Avenue
        New York, NY 10017
        Tel:  (212) 889-6565
        Fax: (212) 779-8208
        mschatz@schwartzandperry.com
        *Counsel for Plaintiff Renee Mihalik.*

I further certify that on November 1, 2010, I electronically filed redacted versions of the aforementioned documents via the Court's ECF system, which sent notification of such filing to counsel for Plaintiff Renee Mihalik.

Dated:  November 1, 2010

CHRISTOPHER N. FRANCIOSE

A-168 - A-199

**LEFT BLANK INTENTIONALLY**

Page 1

1

ORIGINAL

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - )

5    RENEE MIHALIK,                        ) Index No.

6                                          ) 100808/09

7                        Plaintiff,        )

8                                          )

9                vs.                       )

10                                         )

11   CREDIT AGRICOLE CHEUVREUX             )

12   NORTH AMERICA, INC.                   )

13                                         )

14                        Defendant.       )

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - )

16

17

18

19              DEPOSITION OF RENEE MIHALIK

20                   New York, New York

21               Monday, February 1, 2010

22

23

24   Reported by:

     JOMANNA DeROSA, CSR

25   JOB NO. 27451

1              MIHALIK

2      working on.  So, a total of over -- a little over

3      two years.

4              Q.    Okay.  And at Lava were you also in

5      AES sales?

6              A.    It's the same position.  I just got

7      changed over to Citigroup.

8              Q.    Okay.  So -- so, when you got -- is

9      it fair to say you were laid off by Citi?

10             A.    Downsizing.  I guess if you want to

11     call that laid off, yes.

12             Q.    And what -- that was in April of

13     what year?

14             A.    2007.

15             Q.    And did -- how many people were

16     doing the same job you were doing at Citi in the

17     period right before the downsizing?

18             A.    At least 18.

19             Q.    When you were selected for

20     downsizing, were you told why you were selected?

21             A.    Low man on the totem pole.  And

22     also not an original Citigroup employee.

23             Q.    Okay.  Let's go through that.  What

24     does "low man on the totem pole" mean?

25             A.    There the least amount of time.

1                              MIHALIK

2            Q.    Okay.  Anybody else other than

3      Lehman?

4            A.    I don't recall, actually.

5            Q.    Okay.  And, obviously, Cheuvreux

6      made you an offer.  Correct?

7            A.    Yes.

8            Q.    Okay.  Is -- is Sanj a person or

9      the name of a company?

10           A.    It's a person.

11           Q.    And where does this person work?

12           A.    At Staffing Global.

13           Q.    Staffing Global.  Okay.

14                 So, when you referred to Sanj up to

15     this point, you were referring to Staffing Global.

16                 Correct?

17           A.    Yes.  That is the person at

18     Staffing Global I was referring to.

19           Q.    Okay.  And where is Staffing Global

20     located?

21           A.    I don't know.  He called me.

22           Q.    Okay.  And you never met with him

23     at his office?

24           A.    No.

25           Q.    Did you ever meet with him at all?

1                        MIHALIK

2          A.     Yes.

3          Q.     Okay.  Where did you meet with him?

4          A.     We had coffee at Starbucks or

5    something for him to meet me and to go over my

6    résumé.

7          Q.     Okay.

8          A.     It was because he lived in the same

9    town.

10         Q.     In New Jersey?

11         A.     In Hoboken, yes.  He worked up the

12   street.  So, let's meet for coffee, let's go over

13   your résumé and see what we can come up with.

14         Q.     So, Staffing Global is in Hoboken?

15         A.     No. He did something else on the

16   side.

17         Q.     So, is it your testimony he was not

18   a full-time employee of Staffing Global?

19         A.     No, he was a full-time employee of

20   Staffing Global.

21         Q.     What do you mean he did something

22   else on the side?

23         A.     He had something else he was in

24   Hoboken for.

25         Q.     I see.  He didn't live in Hoboken?

1                          MIHALIK

2          A.    No.

3          Q.    Oh, okay.  I thought you said he

4    lived in Hoboken.  Sorry.

5                All right.  So, when -- do you

6    recall approximately when you had an interview at

7    Cheuvreux?

8          A.    June 2007.

9          Q.    Okay.  And who did you meet during

10   this interview?

11         A.    I met with Ian Peacock and

12   Khaled -- I'm not sure how to say his name --

13   Beydoun.  And I met with Tim Randall.  I believe

14   that's it.

15         Q.    Okay.  Did you meet with them

16   altogether or separately?

17         A.    I also had -- I'm sorry.  I also

18   had a video conference with France after my first

19   interview with the people at the office.

20         Q.    Who in France?

21         A.    Francois Simone.  And I think

22   that's it, as far as I can recall.

23         Q.    Okay.  And who -- did you meet with

24   these people together or separately?

25         A.    Separately.

MIHALIK

1

2          Q.      Each one separately?

3          A.      Ian Peacock brought me in first,

4    spoke to me.   Then he had me back a second time,

5    and he had wanted me to meet with their -- with

6    Khaled and then the rest of the team that I'd be

7    working with.

8          Q.      Okay.  Tell me everything you

9    remember that Ian Peacock said to you and that you

10   said to him during this first meeting?

11         A.      He told me that he had been through

12   a lot of applicants, and I was the first person

13   that he thought could actually fill the role that

14   he was trying to create.  He thought I had the

15   knowledge and the confidence and the contacts that

16   he was looking for to help him get a kick start on

17   the U.S. trading that Cheuvreux was looking to get

18   into because they had been like 95 percent

19   European at this time.  They had European

20   research.  They didn't have any U.S. research.

21   And they were trying to build their U.S. trading

22   department.  And he was really interested in all

23   the contacts that I had to get them into U.S.

24   trading.

25         Q.      Okay.  You said that Mr. Peacock

1              MIHALIK

2         A.    I recall him asking me about my

3    previous employers, if I knew what Cheuvreux did

4    and if I understood his position and why I wanted

5    to work at Cheuvreux.

6              And I said I thought I could help

7    out with trying to build up the U.S. trading

8    department.  And I have prior experience in

9    research sales and prior experience in trading and

10   prior experience in AES sales and service, at

11   least ten years.

12             And not much more.  I asked him

13   what his role was and, you know, how he felt the

14   market was and stuff.  Just 15 minutes only.

15        Q.    Where did you obtain your initial

16   training and experience in AES sales?

17        A.    At -- let's see.  Well, alternative

18   execution itself, I learned of the platforms when

19   I traded at Spear Leeds.  I was an

20   over-the-counter trader, so I actually used the

21   alternative execution systems along with trading,

22   so I traded.  I learned how to use them there.

23   And once you learn how to use something, it's

24   training, and the sales came later.  So I first

25   started using the platforms and the electronic

1                        MIHALIK

2    platforms at Spear Leeds & Kellogg, and that was

3    1999, 2001, so that's when I initially started

4    working with the platforms.

5                    And then the sales came after when

6    I first started at Revere Data.

7            Q.    At Revere Data did you work in AES

8    sales?

9            A.    Yes.

10           Q.    So after you finished meeting with

11   Mr. Beydoun -- I think you said that was about a

12   15-minute meeting or so?

13           A.    Yes.  It wasn't that long.

14           Q.    Okay.  With whom did you meet next

15   and where?

16           A.    I met with Tim Randall in Ian

17   Peacock's office.

18           Q.    And who is Mr. Randall?

19           A.    He is part of the AES sales team

20   for Europe sales, European sales.

21           Q.    Okay.  And did you have an

22   understanding of why you were meeting with him?

23           A.    Yes.  I would be working alongside

24   him in conjunction with Dominic Romano.  That was

25   our full team, as I was -- understood.  So I'd be

1                    MIHALIK

2   don't remember saying anything to her.

3          Q.    You don't recall saying anything to

4   her, either?

5          A.    No.

6          Q.    Okay.  All right.  So have you

7   completely described your second meeting with

8   Cheuvreux?

9          A.    As far as I can recall.

10         Q.    Okay.  What happened next?

11         A.    I got a call from the recruiter,

12  and he said that they liked me and they wanted me

13  to come in for a video conference with the head

14  office.

15         Q.    And did you do that?

16         A.    I did.

17         Q.    And where did this video conference

18  take place?

19         A.    In the conference room at

20  Cheuvreux.

21         Q.    Okay.  And this is when you spoke

22  with Francois Simone?

23         A.    Yes.

24         Q.    And tell me, how long did this

25  video conference last?

1                              MIHALIK

2              A.    Actually, you know what, I rescind

3      that.

4                    He -- my recruiter told me verbally

5      the offer, and then Cheuvreux sent me this, and

6      then I printed it and faxed it back to Cheuvreux.

7              Q.    So you printed it, signed it and

8      faxed it back to Cheuvreux, but had no discussion

9      about the contents with anyone at Cheuvreux or

10     with your recruiter.  Correct?

11             A.    No.

12             Q.    Okay.  Now, I believe you testified

13     earlier that in your job hunt you also received an

14     offer from another company.  Is that correct?

15             A.    Yes.

16             Q.    Which company was that?

17             A.    Lehman.

18             Q.    Lehman.

19                   Why did you not accept Lehman's

20     offer?

21             A.    It wasn't as much money as this

22     offer, and I didn't believe that the position

23     would offer me as much leeway and -- not

24     progress -- I was looking for a position that I

25     could actually make an impact.  And Lehman is a

1          MIHALIK
2     big company, similar to a Citigroup type company.
3     And I thought that the position here would offer
4     me a chance to make an impact more so and have a
5     longer stay than I did at a larger company where
6     I'd be a smaller person in a really big pool.  I
7     thought this was a smaller company where I could
8     offer more.
9          Q.    And what did you think that you
10    could offer at Cheuvreux that you couldn't offer
11    at Lehman?
12         A.    I could offer the same.  But they
13    were a European company and they were looking to
14    bring on U.S. clients, and that was my focus,
15    so --
16         Q.    Did you feel confident that you
17    could bring on U.S. clients at Cheuvreux?
18         A.    I felt confident that I could get
19    meetings with the people that I had senior
20    contacts with at the big companies, but I never
21    guaranteed any business.  As you can imagine, you
22    can't really guarantee anything.  You can only put
23    forth the best effort you can.
24         Q.    So at the time you accepted
25    Cheuvreux's offer, what was your understanding of

1                          MIHALIK

2    to -- in the office to take that list of clients

3    that we already had and to build that up as well,

4    trying to get the people that are trading only

5    European stocks to trade U.S., or people that are

6    trading U.S. to trade more.

7            Q.    Okay.  So the last thing you said

8    was similar to the first thing.  First thing, I

9    think, was try to get European clients to trade

10   U.S.

11            And the last thing was working with

12   the research people to try to get existing clients

13   to trade U.S.  Correct?

14            A.    Right.  My first endeavor,

15   according to Ian Peacock, was for me to take the

16   existing clientele, European clientele and

17   European sales, to try to get them to trade U.S.

18            Q.    Okay.

19            A.    Using existing clients to generate

20   new business.

21            Q.    Okay.  Is it a fair statement that

22   you were comfortable with these duties that were

23   set forth for you?

24            A.    Yes.

25            Q.    Okay.  When you got to Cheuvreux,

1                        MIHALIK

2    what did you do to try to get European clients to

3    trade U.S.?

4            A.     I visited Europe:  France, London,

5    Germany.  I worked with the U.S. sale -- European

6    sales department to get a list of their clients,

7    try to set up -- have them help me set up meetings

8    to meet with them and explain to them U.S. markets

9    and alternative execution platforms and the

10   algorithms that we had at the time and to try to

11   generate new business.

12           Q.     Okay.  When did you go to Europe

13   the first time?

14           A.     Within the first two months that I

15   was there.

16           Q.     And how long did you spend?

17           A.     I think the first time I went, I

18   was there for a week.

19           Q.     Okay.  You went to France, London

20   and Germany?

21           A.     Not the first time.  The first time

22   I went, I just went to France and London.

23           Q.     Did there come a point when you

24   went to Germany?

25           A.     Yes.

1           MIHALIK

2           Q.    Okay.  All right.  So focusing on

3      the first trip, you went to France and -- Paris?

4           A.    Yes.

5           Q.    Paris and to London.

6                 Prior to that trip, did you set up

7      meetings with people in Paris and London?

8           A.    I had sent out what I proposed

9      would be my plan with how I was going to approach

10     my duties.  So I sent out an e-mail with -- it's a

11     rudimentary sort of business plan, stating that --

12     what I was going to do with my bimonthly visits to

13     Europe to work with the salespeople.

14                They were supposed to be calling

15     their clients and say, Hey, you know, I have an

16     expert here in the U.S. markets, you know.

17                They're already their clients, so

18     for me to call up their clients, that wasn't -- I

19     wasn't supposed to do that.  I was supposed --

20     they were supposed to help me get in there because

21     they were their clients already, and I was

22     supposed to work with them to try to get them on

23     the page that they understood, the U.S. markets

24     and such.  So I didn't personally call their

25     clients.

1                    MIHALIK

2            The salespeople were supposed to

3    say, Hey, I have a girl coming.  She understands.

4    She's an expert in U.S. markets.  I know you're

5    not trading in U.S. markets.  If you have any

6    questions or whatnot.

7            Q.    Who told you that the European

8    salespeople were supposed to be setting up

9    meetings for you?

10           A.    Ian Peacock told me that I was

11   supposed to call and introduce myself and meet

12   with the sales teams from the other offices

13   overseas.  I was supposed to introduce myself to

14   them, and then from there I was supposed to work

15   with them and their clients to try to generate

16   U.S. trading business.

17           Q.    Okay.  Did you call the people in

18   London and Paris, the salespeople, to introduce

19   yourself?

20           A.    I did.

21           Q.    Did you ask them to set up meetings

22   for you?

23           A.    I did.

24           Q.    What did they say?

25           A.    They said they would try.

1                          MIHALIK

2           Q.    Okay.  And did they try?

3           A.    Yes.

4           Q.    And did they succeed?

5           A.    Some.

6           Q.    On your first trip to Europe, to

7    Paris and London, with whom did you meet?

8           A.    I met with the whole sales team

9    there.

10          Q.    In each of Paris and London, you

11   met with the whole sales team?

12          A.    As available as -- the people who

13   were available.  I met with whoever was available

14   at the time when I was there.

15          Q.    Do you remember the names of people

16   you met?

17          A.    Phillipe Le Prince was in France.

18   Andrew Hawgood.

19                The names are escaping me right

20   now.  Sorry.

21          Q.    Okay.  About how many people did

22   you meet in Paris?

23          A.    Maybe seven on the floor, sales and

24   trading.  And then I met with Francois Simone, the

25   management there, to introduce myself personally.

Page 61

1                          MIHALIK

2              Q.     And London?

3              A.     In London I also met with

4    management and the salespeople that were available

5    there.

6              Q.     Okay.  Do you remember the names of

7    anyone you met in London?

8              A.     I met with Gerry Lees.  I met

9    with -- I'm sorry.  The names are escaping me

10   right now.

11             Q.     Okay.  Did you meet with any

12   clients in Paris?

13             A.     Yes.

14             Q.     Who?

15             A.     I don't recall.

16             Q.     How many?

17             A.     Maybe two.

18             Q.     And who had set that up for you?

19             A.     The salespeople.

20             Q.     Tell me everything you remember

21   about the meetings with the clients in Paris.

22             A.     The salespeople were, I felt,

23   slightly reluctant to have me in to their clients,

24   to see them.

25             Q.     What made you feel that way?

1                          MIHALIK

2    belief?

3              A.    Same thing; contracts came through.

4              Q.    Okay.  So it's --

5              A.    And they -- I'm sorry -- they

6    questioned me on certain things, and the interest

7    was piqued, and contracts came in after my visit.

8              Q.    Okay.  So is it a fair statement,

9    then, that you understood that contracts with

10   clients in London and Paris to trade in the U.S.

11   resulted from your trip to -- your first trip to

12   Europe?

13             A.    I would have to say yes.

14             Q.    Okay.  And is it also a fair

15   statement that after your first trip to Europe,

16   that there -- that you had e-mail exchanges with

17   clients in London about you -- about doing

18   business in the U.S.?

19             A.    Yes.

20             Q.    Okay.  Did you have an impression

21   when you returned from your first trip to Europe

22   how it went?

23             A.    Yes.  I didn't think that the sales

24   team was quite on board as Ian Peacock told me

25   that they would be.  They weren't as welcoming.

1                           MIHALIK

2    There was very few people around to take me out

3    and get to know me, to ask me questions.  And I

4    didn't think that they tried their best to get me

5    in to see their clients.

6                    I thought I gave them enough

7    preparation time to try to make contact with their

8    clients to tell them that I was on my way there,

9    and I would be there to help them out and answer

10   questions.

11                   And like I said, I had sent an

12   e-mail saying, This is what I propose.  This is

13   what I need from sales.  This is what I'm going to

14   do.  And I needed their help as -- according to

15   what Ian Peacock told me my plan was.

16                   And I didn't really think that they

17   were quite on board as they should be.  That was

18   my impression.

19       Q.    Okay.  So there was just an

20   impression on your part?

21       A.    On top of that, lack of meetings.

22   I thought I would have a lot more meetings set up

23   for me when I got there.

24       Q.    And what led you to believe that

25   you would have a lot more meetings set up?

1              MIHALIK

2        A.    Because the salespeople said they

3  would try to get as many meetings as possible.

4        Q.    Okay.

5        A.    And Ian told them to work with me.

6  And I thought that everybody was on board with me

7  coming and getting ready and bringing me in front

8  of all their clients.  It just seemed like they

9  didn't try, I didn't think, as hard as I expected.

10        Q.    Okay.

11        A.    I thought the effort would have

12  been more to push the U.S., but it didn't seem

13  like they wanted to stir the waters with their

14  clients.

15        Q.    Well, what leads you to believe

16  that they didn't try as hard as you thought they

17  would?

18        A.    Lack of meetings, lack of people

19  around when -- I told them when I was going to be

20  there to introduce myself and to be there for

21  their clients, to help their clients.

22        Q.    Okay.  Did this make you angry?

23        A.    No.

24        Q.    Okay.  Did you write a report of

25  your first trip?

1                          MIHALIK

2              And the way they were different was

3    that they weren't up to speed as much as the U.S.

4    giant companies and a lot of small companies too.

5         Q.    Did you do this research before or

6    after you accepted the offer from Cheuvreux?

7         A.    Both.

8         Q.    When you accepted the offer from

9    Cheuvreux, were you aware that Cheuvreux was a

10   much smaller operation than the ones you had

11   worked for in the past?

12        A.    Yes, definitely.  That was one of

13   the reasons why I wanted to work there, because I

14   felt like I'd have a very big impact, and I would

15   be able to help out a lot with the knowledge that

16   I had to help them go where they wanted to go with

17   the U.S. markets.

18        Q.    And what knowledge was it that you

19   had that would help them go where they wanted to

20   go?

21        A.    Ten years of trading experience

22   with alternative execution systems and trading

23   itself and research sales and clients and working

24   with clients and servicing clients.  That was my

25   experience that I was bringing to the table.

1                    MIHALIK
2          Q.    Well, what was it that you thought
3    Cheuvreux should be doing that it wasn't doing?
4          A.    What they should be doing?
5    Building a competent back office to do clearing,
6    setting up things to be more electronic.  A lot of
7    stuff was paper still.  They needed to put
8    Cheuvreux on -- like other big companies,
9    electronic execution platforms, which I helped
10   them do.
11              One of the instances would be
12   BlackRock.  As soon as I got there, they said they
13   had been trying to get on BlackRock's alternative
14   execution platform, and I had a contact there, and
15   I got Cheuvreux on that platform for them.
16         Q.    What does it mean to get Cheuvreux
17   on somebody's alternative execution platform?
18         A.    Do you know what a drop down is?
19         Q.    Tell me.
20         A.    Okay.  A drop down is you click on
21   a button and it has a bunch of choices.  And when
22   you have one trading platform, let's just use
23   Bloomberg, you use a specific company that you
24   want to pay, and you use them, and then that
25   company offers, let's just say, five algorithms.

1                          MIHALIK

2    that -- and the first thing.  Do you know somebody

3    at BlackRock?  I do.  Can you get us on there?  I

4    can.

5              Q.    So, as of the time you left

6    Cheuvreux, you don't know whether there was any

7    business actually performed for Cheuvreux through

8    BlackRock.  Correct?

9              A.    I would -- I would say that --

10             Q.    I'm just asking what you know.

11             A.    No, they -- they did not -- no

12   business was conducted because they had to put it

13   on there, and they had to test it.  And by the

14   time I left, it had not been even completed.

15   Cheuvreux's IT department and the other IT

16   department didn't even do their testing yet.  So,

17   it was on, but it wasn't used because everything

18   is a long, drawn out process with testing and

19   training and -- so --

20             Q.    Okay.  By what means did you --

21   withdrawn.

22             You said you got Cheuvreux's name

23   added to BlackRock's platform by calling someone

24   you knew at BlackRock.  Correct?

25             A.    That's right.

1                    MIHALIK

2    the process too.  It's -- it's a long process in

3    general, or a very short process.  I mean, it

4    could -- it could be both.  It depends.  It

5    depends on what you come across, if there's legal

6    problems, or, you know, if Cheuvreux didn't find,

7    you know, the company, whatever they gave, you

8    know, sufficient.  It kind of goes back and forth.

9           Q.    So, it's your testimony that

10   Galleon, BlackRock, Legg Mason and LibertyView

11   were clients that you brought to Cheuvreux?

12          A.    I brought other clients as well.

13          Q.    And what other clients did you

14   bring?

15          A.    Crossway Partners, Tradition Asiel

16   Partners, Marathon Asset Management, Nicholas

17   Applegate, Nicholas Investment Partners.

18          Q.    Did those companies trade AES?

19          A.    Their contracts were not back yet.

20          Q.    Okay.  Did all of those companies

21   sign contracts with Cheuvreux?

22          A.    Most.

23          Q.    Most?  Who didn't?

24          A.    Legg Mason did not.  That was one

25   of the last companies that said yes.

MIHALIK

1
2    cold calls.

3            Q.    During the nine months that you
4    were at Cheuvreux, did anyone along the way tell
5    you that you should be doing things differently
6    from the way you were doing them to try to
7    generate business?

8            A.    No.

9            Q.    So, it's your testimony that you
10   received no criticism of what you were doing to
11   try to generate revenue?

12           A.    No.  Actually, I received praise.

13           Q.    From whom did you receive praise?

14           A.    My colleagues and --

15           Q.    Who?

16           A.    Richard, for once -- for one.

17           Q.    Richard Layton?

18           A.    Yes.

19           Q.    What did he say?

20           A.    He thanked me for getting him that
21   account, via e-mail.  Julie-Ann thanked me for
22   getting Galleon for her because I brought her in
23   to see the CEO, and Ian as well.  There's nobody
24   else, really.

25                 And the European sales thanked me

1                         MIHALIK

2        independent contact with those clients that you'd

3        met on the first trip.  Correct?

4              A.     Yeah.

5              Q.     But you did not go back and visit

6        them again.  Correct?

7              A.     Maybe one, but I don't recall.

8              Q.     Who?

9              A.     I don't recall the name.

10             Q.     Now, in paragraph 8 of your

11       complaint, you say:

12                    "Peacock knowingly allowed

13       pornography in the office and on employee

14       computers."

15                    Do you see that?

16             A.     Yes.

17             Q.     What pornography did Mr. Peacock

18       allow in the office and on employee computers?

19             A.     Women naked.  He would start

20       laughing and say -- and I -- because he sat right

21       next to me.

22                    I'd go, What are you looking at?

23                    He -- Oh, check this out.

24                    And I would just kind of lean over.

25       One time I remember a guy hanging by his genitals.

1                           MIHALIK

2    That was one thing that stuck out.  But women

3    naked laying there, stuff like that.

4              Q.    Do you -- when did this happen?

5              A.    Throughout the whole time I was

6    there.

7              Q.    How often did this happen?

8              A.    Well, he would call me over, I

9    don't know, once or twice a month, maybe,

10   something like that, with something that was

11   really out of the box, you know.  That's why I

12   remember the guy hanging from his genitals because

13   that was, oh, my God.

14             Q.    Now, let's talk about this guy

15   hanging from his genitals.

16                   Do you know -- did Mr. Peacock call

17   you over to see that picture?

18             A.    Yes.

19             Q.    Yes?

20             A.    He was laughing.

21                   And I was like, What are you

22   laughing at?

23                   He's like, Check this out.

24             Q.    Okay.  So he -- but he -- did he

25   call you over to see that?

MIHALIK

1

2      A.      He didn't have to call me over.  I
3   was sitting right next to him, and he said, Hey,
4   take a look at this.

5      Q.      Okay.  Who else saw that picture,
6   do you know?

7      A.      He sits on the end of the -- I am
8   assuming nobody else saw it.  He sits on the end
9   of the row like this, so there's nobody to the
10   left of him.  And it's just me to the right, so --
11   and his computers were like this, and everybody
12   else's back was --

13      Q.      Do you know if -- do you know where
14   that photo came from?

15      A.      I don't know.

16      Q.      Do you know if that photo was
17   something that Mr. Peacock received from somebody
18   else and that he opened and there it was?

19      A.      Could have been.

20      Q.      Okay.  What other -- withdrawn.

21              Tell me -- you sat right next to
22   Mr. Peacock.  Correct?

23      A.      Yes.

24      Q.      And --

25      A.      He made sure of that.

```
 1                        MIHALIK
 2            Q.    Okay.  And did Mr. Peacock -- did
 3     Mr. Peacock spend the bulk of his time on the
 4     desk?
 5            A.    Yes, for the -- for the rest of
 6     2007 until -- yes, he was on the --
 7            Q.    For what period of time?
 8                  I'm sorry.  I'm -- that --
 9            A.    Up until the end of December 2007,
10     he was mostly on the desk.
11            Q.    Okay.  And what happened at the
12     beginning of 2008?
13            A.    He spent most of his time in his
14     office.
15            Q.    Okay.  Do you know why?
16            A.    I'm assuming that --
17            Q.    I don't want you to assume.  I want
18     you to tell me what you know.
19            A.    Well, I can't tell you what he was
20     thinking.  But after I declined his proposals to
21     stay overnight at a flat from -- Cheuvreux's flat
22     in New York City, he seemed angry with me, and it
23     was very awkward.  And from that point on he was
24     mostly in his office.  He didn't sit next to me
25     anymore.
```

1                        MIHALIK

2               MR. SCHATZ:  Objection.

3          A.    I don't know how many times I saw

4     it.  It was a general presence in the office.  It

5     was a -- it was a boys club.  People talked about

6     strip clubs, going to hotels specifically that

7     models would go to.  That's how they would set up

8     their business travels.  And, you know, it was --

9     it was general atmosphere, environment at

10    Cheuvreux.  So how many times I actually saw it, I

11    can't recall, but it was general in the office.

12          Q.    Who else saw what you saw?

13          A.    I don't know who else saw what I

14    saw.

15          Q.    Well, when you saw pornography in

16    the office, was it shown to you by an individual?

17          A.    Yes.  It was shown to me by Ian

18    Peacock.

19          Q.    Every time?

20          A.    Yes.

21          Q.    So nobody showed you pornography

22    except for Ian Peacock.  Is that your testimony?

23               MR. SCHATZ:  Objection.

24          Q.    In New York?

25          A.    In New York?

1                          MIHALIK

2              Q.    Okay.  How many times did he do

3      that?

4              A.    I'd have to approximate and say

5      maybe ten to 15 --

6              Q.    Okay.

7              A.    -- throughout the course of the

8      five months for 2007.

9              Q.    Okay.

10             A.    From July to 2007 -- December of

11     2007.

12             Q.    Okay.  Did it stop after December

13     of 2007?

14             A.    Yes.

15             Q.    Okay.  Did -- what stopped after

16     2007?

17                   I'm going to rephrase that because

18     I don't want to confuse you at all here.  I'm

19     confusing myself.

20                   So it is your testimony that you

21     did not see pornography in the workplace after

22     December of 2007.  Is that correct?

23             A.    Not on Ian Peacock's desk.

24             Q.    Did you see it anywhere else after

25     December of 2007?

1                      MIHALIK

2          A.    I mean that he said things against

3    me as a woman.  He kept me out of meetings.  He

4    said degrading things to me.  He would -- he

5    would -- he would say that because I was a woman

6    that I wasn't as smart as the men, my

7    counterparts, and I didn't have the authority that

8    they possessed, I guess, if you will.

9          Q.    Anything else?

10         A.    He would make comments about how I

11   dressed, my cleavage, how a shirt accentuated my

12   cleavage, how if I wore a pants suit, how that

13   made me more masculine than the females that --

14   than would make a female look.

15         Q.    Let me ask you some questions about

16   the things you've just said.

17                You said he said things against you

18   as a woman.  What did Mr. Peacock say against you

19   as a woman?

20         A.    That I wasn't as qualified as my

21   male counterparts.

22         Q.    When did he say this?

23         A.    He said it many times.

24         Q.    What words did he use?

25         A.    That my male counterparts were more

1          MIHALIK
2    would say that because you were a woman, you
3    weren't as smart as the men.  Correct?
4          A.     Yes.
5          Q.     Tell me the -- when did he say
6    this?
7          A.     He said it to me many times.  He
8    said it in front of that guy.  We actually had an
9    argument.  We were at a whole team gathering in
10   January at The Grove, and we actually got into an
11   argument inside the bar about how he portrayed me,
12   and how I was to respect John because he's male,
13   he's more powerful than I am, and I need to learn
14   stuff from him and he has, you know, more
15   experience than I do, and, you know, that I should
16   respect him because he's more powerful than I am
17   and I need to learn from him.
18          Q.     Who was this in front of?
19          A.     Whoever was at the bar.
20          Q.     Who was there?
21          A.     If I had a list, I could tell you.
22   I can't remember, off the top of my head, of all
23   the people that were standing around the bar.
24          Q.     All right.  You just said, though,
25   that he said that you -- if you were a woman --

**A-233**

1                          MIHALIK

2              Q.    But he was a member of your team.

3        Correct?

4              A.    Yes.

5              Q.    Did you observe him working at all?

6              A.    No. He had just gotten there maybe

7        a few weeks prior, and that's -- I just met him,

8        so --

9              Q.    Do you know what his experience

10       was?

11             A.    Experience with what?

12             Q.    Well, his -- his professional

13       experience.

14             A.    He came from a company that I

15       didn't know, I've never heard of.

16             Q.    Okay.  Do you know what his

17       experience with AES was prior to joining

18       Cheuvreux?

19             A.    I'm assuming it was --

20             Q.    Just tell me what you know.

21             A.    I know that he had some experience,

22       as much as I did.

23             Q.    Okay.  Do you know if he had more

24       than you?

25             A.    I don't -- he was older, so he

Page 142

1                        MIHALIK

2          A.     I discussed it with David Zack.

3          Q.     Okay.

4          A.     He was the only one.  There was no

5    HR department or anybody else that I trusted who I

6    could discuss it with.  And like I said earlier, I

7    was afraid, because of the rumor that I heard, if

8    you said anything, more than likely, you know,

9    you're just going to be terminated, so --

10         Q.     Who told you that rumor?

11         A.     I don't recall.

12         Q.     When did you hear that rumor?

13         A.     Late December.

14         Q.     Did you take any steps to verify if

15   it was true?

16         A.     I asked somebody if there was

17   somebody there that got fired for, you know, any

18   reason than -- yes.

19         Q.     I'm sorry.  I can't follow your

20   answer.

21                Did you take any steps to verify if

22   it was -- if the rumor you had heard was true?

23         A.     I asked somebody at the company

24   what happened.  I don't know if they verified it

25   or whatnot, but I asked what happened.

Page 143

                              MIHALIK

1

2        Q.    Who did you ask?

3        A.    Linda Noel.

4        Q.    Okay.  And what did Linda Noel tell

5    you?

6        A.    She said that she didn't want to

7    talk about it, that she just knows -- nobody

8    wanted talk about it.  Nobody wanted to say

9    anything about it.  It was just a rumor.  And she

10   said she didn't want to be involved in anything,

11   and she was just letting me know that if I had

12   spoke up, I probably would be in the same shoes.

13              She didn't tell me the person's

14   name, she didn't tell me the circumstances.  She

15   just told me that underneath Khaled and Ian, she

16   was there prior, and she had an issue, and she

17   complained, and she was harassed, and then she was

18   fired, so --

19       Q.    Did -- did anyone, including, but

20   not limited to Linda Noel, tell you what this

21   employee's issue had been?

22       A.    No. Nobody wanted to get involved

23   in speaking to me about anything.  They didn't

24   want to get -- they didn't want to be involved in

25   anything, that she was just saying, you know what,

1                         MIHALIK

2    stating on one occasion "that dress makes you look

3    good" with lots of O's, and:

4                         "You should dress like that every

5    day.  You might get more clients in turn."

6                         Who heard Mr. Peacock say these

7    things to you?

8              A.    I don't know who heard him say that

9    to me.

10             Q.    Who was present when he said these

11   things to you?

12             A.    Nobody was present.  He sat right

13   next to me.

14             Q.    So, this was -- this was said on

15   the desk.  Is that correct?

16             A.    Yes.

17             Q.    Okay.  And during what period of

18   time -- withdrawn.

19                   Can you give me a date on which

20   Mr. Peacock said this to you?

21             A.    I can't give you a specific date.

22   He said it multiple times.  He humiliated me.  He

23   would critique how I dressed almost daily, whether

24   he liked something, whether he didn't like

25   something, whether it made me look more feminine,

1                        MIHALIK

2      whether it made me look more masculine, whether he

3      liked my shoes.

4                  ──At one point I had a pair of red

5      shoes on, and he was like, oh, I really like those

6      shoes.  Do you know what that means?  I don't know

7      what that means, Mr. Peacock.  What does that

8      mean?  Well, it means you're promiscuous.  Okay.

9      Great.  So, I tried to change how I dressed to --

10     I was trying to be more conservative so that he

11     wouldn't make me feel like I was there, you know,

12     displaying anything or, you know, dressing in any

13     specific way to, you know, try to get him to say

14     these things.  I tried to dress differently so

15     that he would not comment on how I dressed.  So, I

16     changed my appearance for him.

17              Q.     Did he say to you that -- that red

18     shoes meant you were promiscuous?

19              A.     Yes.  He said do I know what they

20     mean.  I said I don't know what you mean -- what

21     they mean.  What do they mean?  And he said that

22     it means that you're promiscuous if you wear red

23     shoes.

24              Q.     And what did you say?

25              A.     I said I didn't know that.  I said,

1               MIHALIK

2         A.    No, not this specific do you know

3    what fancy dogging -- no, I didn't -- I didn't ask

4    anybody what that was.  I didn't tell anybody that

5    he asked me.

6         Q.    When he said this to you in October

7    or November of 2007, did you say anything to him

8    in response?

9         A.    I told him I didn't know what

10   dogging was, and he told me what dogging was.  I

11   told him that was disgusting.  I can't believe you

12   would even ask me -- and I can't believe that he

13   asked me a question such as that.

14        Q.    And what did he say?

15        A.    He didn't say anything.  He just

16   laughed.

17        Q.    And you didn't tell anybody about

18   this comment.  Correct?

19        A.    No. I didn't talk to anybody about

20   dogging.  I was disgusted and I just didn't think

21   it would be appropriate to talk to anybody about

22   that.

23        Q.    Okay.  You allege that:

24             "Mr. Peacock made comments about

25   'pussy' in front of business associates and

1               MIHALIK

2    Mihalik in a group outing in London, which was

3    demeaning to her."

4               Was this the -- the off-site in

5    January of 2008?

6         A.    Yes, it was.

7         Q.    Okay.  Who were the business

8    associates in front of whom Mr. Peacock allegedly

9    said this?

10        A.    Phillipe Le Prince, myself, John

11   Palazzo, Andrew Hawgood.  I believe Tim Randall

12   was there, and possibly Dominic Romano was there.

13   And they just stood around and were laughing about

14   the comment that was actually made in the off-site

15   by Phillipe Le Prince, and they were laughing

16   about how funny it was that it got brought up in

17   this big conference.

18        Q.    And what was the comment?

19        A.    We were supposed to draw something

20   that represented the company, and Phillipe Le

21   Prince thought that drawing a globe that looked

22   like a cat because we were Cheuvreux alternative

23   trading systems, and he said cats, because nobody

24   forgets a pussy, and everybody thought that was

25   hilarious, and they were around talking about it.

1                           MIHALIK

2              It was disgusting and humiliating,

3       and it's inappropriate for anybody to sit around

4       and talk about that.

5              Q.    Okay.  So, was this something that

6       Mr. Peacock said or that someone else said?

7              A.    He was laughing and discussing it

8       with Phillipe Le Prince.  And everybody else

9       around were laughing it up as well.

10             Q.    And what did Mr. Peacock say to

11      Phillipe Le Prince?

12             A.    I can't believe what you brought up

13      in this big conference room.  You brought pussy

14      up.  That's hilarious.  I can't believe that you

15      came up with that.  That's really, you know --

16             Q.    That's really what?

17             A.    Creative, I guess.  Cats.

18             Q.    You allege that:

19             "Mr. Peacock made inappropriate

20      comments about your personal life, humiliating you

21      in front of your coworkers, including statements

22      such as why aren't you married, and suggesting

23      that you must be a cougar."

24             When did Mr. Peacock allegedly say

25      this to you?

1                    MIHALIK

2           A.     When I first started working there

3    in July, he would take -- he would pay special

4    attention to me. He would take me out to lunch,

5    where we'd have a glass of wine, that it was a

6    European thing, and barely talked about business,

7    more so about my personal life, my age, if I was

8    married, if I was dating.  Invaded my privacy.  I

9    didn't answer any of his questions.

10                    And after that I assumed that

11   Mr. Peacock found out that I was dating -- in

12   fact, dating somebody because then he asked me why

13   I wasn't married, if I just dated, you know, older

14   men, and if I was a cougar.  I think he found out

15   through David Zack, who read everybody's e-mail,

16   because I never told him that I was dating or I

17   never told him my age, and I never told him

18   anything, so -- I told him I didn't want to -- I

19   was a private person.  I didn't express -- I

20   didn't tell anybody my private life, and I felt

21   like it was an invasion of my privacy that he

22   would ask me my age, and my -- my dating status or

23   my marital status, but he never let it go.

24           Q.     Did he tell you anything about

25   himself?

1                          MIHALIK

2                  "Are pants suits a U.S. thing, they

3        are very masculine?"

4            A.    That's humiliating to be judged on

5        what I'm wearing and telling me that I look

6        masculine because I have pants on versus the short

7        skirt that, you know, I should be wearing, or

8        heels or, you know, whatnot.

9            Q.    And when did Mr. Peacock tell you

10       you look very sexy today?

11           A.    He would tell me that when he

12       thought I looked sexy.

13           Q.    During what period of time?

14           A.    Between July of 2007 and December

15       2007.

16           Q.    How often?

17           A.    Once a week, as far as I can

18       remember.

19           Q.    And did anyone hear him say that to

20       you?

21           A.    I don't know.

22           Q.    Was anyone present when he said

23       that to you?

24           A.    He sat right next to me, so I don't

25       think so.  I don't know who heard.

1                              MIHALIK

2         A.     Right.

3         Q.     When did this happen?

4         A.     This happened in December of 2007

5    on a couple of occasions.  He came back and he

6    asked me if after our dinner meeting if I would

7    like to stay in the company flat after the meeting

8    was over with him, have a drink and stay

9    overnight, even though he knew I had a short

10   commute to Hoboken.

11               And it was -- I was -- I was

12   appalled.  It was disgusting that he would ask me

13   that, and humiliated that he would lower himself

14   to that level to ask me to stay with him.  I said,

15   you know, you're married, this is -- it's

16   inappropriate for you to say that, and I turned

17   him down.  I said I didn't have any interest in

18   him personally in that way, and that he should

19   never speak to me like that again or ask me

20   anything like that again.  And I think he got

21   angry after the second time that I had turned him

22   down for the proposition.

23        Q.     Did you tell anybody about this?

24        A.     I told David Zack.

25        Q.     Okay.  Other than David Zack, did

1                              MIHALIK

2                        When was this?

3            A.        This was when I first started.

4                      He said, "We can enjoy traveling

5      together, get to know each other," almost like a

6      sleazy kind of way, not in a business type way.    I

7      thought that he wanted to travel to get to know me

8      better, like dating, personally, that kind of

9      stuff.    That's how I got the -- that feeling, the

10     impression he was being not business but sleazy,

11     in a way.

12           Q.        Well, what was sleazy about it?

13           A.        The way he -- the way he asked me.

14     He didn't -- you know, the way he asked me.

15           Q.        Did you travel with him?

16           A.        I did not.

17           Q.        Did he complain that you didn't

18     travel with him?

19           A.        Yes.

20           Q.        What did he say?

21           A.        He said that I should have

22     scheduled my trip to coincide with his trip so

23     that we could travel together.

24           Q.        Can you think of any business

25     reason he might have wanted to travel with you?

1                          MIHALIK

2    toward you.

3                    Is that something different from

4    what you've testified to before?

5         A.    Yes.

6         Q.    Okay.  Tell me.

7         A.    Specifically the incidents that I'm

8    talking about here.  When their -- when the

9    foreign counterparts would come to the U.S., he

10   would disrespect me in front of them; would tell

11   me that I didn't have anything of value to say.

12   And it seemed that they were picking up on how he

13   was treating me.

14                    And at one point Andrew Hawgood

15   took a pen -- he was sitting at my desk as I was

16   away from my desk.  He had used my desk.  And I

17   got up -- he got up when I got back and he was

18   like, Oh, yeah.  He was like, By the way, I had my

19   pen in your ass.

20                    Just totally disrespectful,

21   humiliating and degrading to me.

22        Q.    He had --

23        A.    My pen off my desk.

24        Q.    Right.

25        A.    He had said, Oh, by the way -- he

Page 172

1                          MIHALIK
2          A.    She left, I think, a couple of
3     months after I started, if I can recall correctly.
4          Q.    Okay.  Prior to the time she left,
5     did you report to her any conduct that you were
6     experiencing at Cheuvreux that you felt was
7     discriminatory, harassing or otherwise
8     inappropriate?
9          A.    I didn't tell her.  I just thought
10    it would stop.
11         Q.    What made you think it would stop?
12         A.    Constantly telling somebody that it
13    was unwelcome and inappropriate and unbefitting of
14    a CEO to conduct themselves like that.  I thought
15    that he would have gotten the hint and stopped.
16         Q.    So it's your testimony, then, that
17    you never said anything to Ms. Charles about
18    Mr. Peacock's conduct.  Correct?
19         A.    That's right.
20         Q.    Okay.  Now, what -- on what facts
21    do you base your assertion that Cheuvreux had no
22    human resources function after Ms. Charles left?
23         A.    They didn't bring anybody on board.
24    I was unaware that there was a human resources
25    department after Simone Charles was let go.  There

1                          MIHALIK

2    anything to anybody, that I would just be -- the

3    spotlight would be on me even more and I'd be

4    harassed more and I would eventually be

5    terminated.

6            Q.    Are there any other instances in

7    which you believe Mr. Peacock harassed you,

8    degraded you or otherwise acted inappropriately

9    toward you?

10           A.    Yes.  Multiple times in meetings in

11   front of my male counterparts on my sales -- on

12   the team -- sales team, he would say I add nothing

13   of value, that I have no fucking clue what I am

14   doing.  I am pretty much useless.  What I say adds

15   no value.  I'm not helping out the team.  And he

16   would say this in front of everybody.

17           Q.    Who is "everybody"?

18           A.    Tim Randall, and Dominic Romano,

19   and John Palazzo.

20           Q.    Okay.

21           A.    All the males on my team.  I was

22   the only girl on the team.

23           Q.    Okay.  Any other instances of that

24   type of behavior from Mr. Peacock?

25           A.    He did that at several meetings.

1                          MIHALIK

2          Q.    When?

3          A.    Between January of 2008 and my

4    termination in April of 2008.

5          Q.    Okay.  Did Mr. Peacock --

6    withdrawn.

7                Now, let's talk about your

8    conversations with Mr. Zack.

9                Who is Mr. Zack?

10         A.    Compliance officer at Cheuvreux.

11         Q.    Okay.  And why did you go to

12   Mr. Zack?

13         A.    There was no HR department, and he

14   was compliance, and I had somewhat of a -- I don't

15   know.  It was more than a business relationship.

16   It was -- I complained to him about things, and I

17   thought because he was compliance, he would be

18   neutral.  And I thought I could tell him

19   something, and that maybe he would say something

20   to somebody and it would stop.

21         Q.    What -- you say that there was no

22   human resource department?

23         A.    Right.  Simone Charles had been let

24   go, and nobody replaced her.

25         Q.    When did she leave?

1                              MIHALIK

2       was no person that -- nobody said, We have a

3       replacement for Simone Charles.  Nobody said, This

4       is our new human resources person.  If you have

5       any -- whatever, go and talk to her.  There was

6       nobody in the department.  The office was closed

7       down.  I assumed no human resources.

8               Q.    Do you know if Ms. Charles'

9       function in human resources was delegated to any

10      other person when Ms. Charles departed?

11              A.    No.

12              Q.    Did you ask?

13              A.    No.

14              Q.    Did there come a point when someone

15      did occupy the specific position of human

16      resources representative at Cheuvreux during your

17      employment?

18              A.    As far as I know from when Simone

19      Charles was let go, nobody was filling her

20      position, was acting in her position or nobody was

21      hired to fill that position that was -- that was

22      terminated at that time.

23                    And I went to David Zack because I

24      didn't think there was anybody with that position.

25      And I would assume that if I was telling him the

```
1                         MIHALIK
2      friendly.  But I felt like we -- I felt that
3      because he was the compliance officer, I felt, I
4      guess, I could talk to him behind closed doors.
5              Q.    Okay.  Did you -- what did you
6      understand Mr. Zack's function to be?
7              A.    The compliance officer.
8              Q.    And what did you understand that to
9      entail?
10             A.    Legal aspects with contracts, going
11     through e-mails to make sure that there wasn't
12     anything illegal going on, trading issues,
13     problems, you know, compliance for the company.
14             Q.    Okay.  Anything else?
15             A.    No.
16             Q.    Had -- did you have any work
17     relationship with Mr. Zack?
18                   By that, I mean in your job, did
19     you interact with Mr. Zack for any reason?
20             A.    Yes, a lot of times.  That's how I
21     got to know him.
22             Q.    Describe those interactions.
23             A.    More so with contracts, going back
24     and forth with contracts, trying to get contracts
25     back from clients.  We dealt with FINRA a lot with
```

1                    MIHALIK

2    November 2007.

3              Q.    And what did you tell Mr. Zack and

4    when?

5              A.    I told him that Ian had been

6    treating me disrespectfully.  I told him some of

7    the things that he said to me.

8              Q.    Tell me exactly what you told him.

9              A.    How I looked and how he critiqued

10   my appearance and how he said, you know, how sexy

11   I looked wearing a specific outfit.  That he asked

12   me -- I told you earlier about the boyfriend, him

13   reading my e-mails and telling Mr. Peacock my

14   private information.  I told him, you know, about

15   that, and that now he's using that to say, you

16   know, I'm a cougar because I'm not married but I'm

17   dating, you know.  I told him --

18             Q.    And we're just focusing on the

19   first meeting you had to complain with David Zack.

20   Let's limit it to that.  Okay?

21             A.    Oh, okay.  The first meeting, I

22   don't believe I went into that great detail.

23             Q.    Okay.

24             A.    I think I was more broad.

25             Q.    All right.  Let's -- I -- it's

1          MIHALIK

2    important to get this in as detailed a way as

3    possible.

4              So I'd like you to focus on your

5    first meeting with Mr. Zack, which I think you

6    said was in the November/December time frame.

7    Correct?

8         A.    Yes.

9         Q.    Okay.  Can you put it -- an

10   approximate date on that meeting?

11        A.    I would say mid-November.

12        Q.    Did you make an appointment with

13   Mr. Zack or just go into his office?

14        A.    No, I just went into his office.

15   It might even have been in conjunction with

16   another meeting where I would just add in my

17   concerns and what I should do.  What should I do

18   about this?  Because it's really starting to

19   affect my work.

20              I mean, at some points I would be

21   on my way in to work and I'd just want a car to

22   hit me just so I didn't have to go into the

23   office.  You know, I started to -- it affected my

24   life, my work there.  I felt awkward every day

25   coming in.  I had to sit next to this gentleman

1                        MIHALIK

2           A.    From what I can recall, I was very

3    broad in my statement, saying that Ian was

4    demeaning me, making me feel awkward, saying

5    things that were inappropriate and unbefitting of

6    a CEO.  What should I do?

7           Q.    Anything else you remember saying

8    to David Zack in that meeting?

9           A.    Not on the first meeting, no.

10          Q.    Okay.  And what did Mr. Zack say to

11   you, if anything, in that first meeting?

12          A.    Can you prove it?

13          Q.    And what did you say to him?

14          A.    No.

15          Q.    What did he say to you, that you

16   recall; just what you recall?

17          A.    I -- something along the lines of,

18   You can't prove it.  He's the CEO, and nobody is

19   going to back you up.

20          Q.    Is that verbatim what Mr. Zack said

21   to you?

22          A.    Not verbatim.  I can't remember two

23   years ago what exactly was said, but along those

24   lines, yes, basically, that he said -- I told him

25   how awkward and demeaning and how he was treating

Page 182

1                          MIHALIK
2      me and how unbefitting of a CEO it was.  What
3      should I do about this?
4                  And he said, not verbatim, but
5      basically, Can you prove it?  If you can't prove
6      it, nobody else is going to back you up, and I
7      don't know what to tell you to do.
8            Q.    Okay.  When was your next -- is
9      that everything you recall from this first
10     conversation with Mr. Zack?
11           A.    As far as I can recall.  If I go
12     home and think about it some more, I might be able
13     to remember more.  But as far as I can recall
14     right now, that's -- I was -- I was more broad.  I
15     wasn't specific in --
16           Q.    Okay.
17           A.    -- exactly what he was doing to me.
18           Q.    Did you go to see -- and did
19     this -- did this first discussion take place in
20     Mr. Zack's office?
21           A.    Yes.
22           Q.    Okay.  With the door closed?
23           A.    Actually, that's a good question
24     because at first, he did tell me to shut the door.
25     One time Ian had opened the door and saw us in

Page 183

1                              MIHALIK

2      there with the door shut.

3                     And I think David Zack felt

4      uncomfortable because the next time I was in there

5      talking to him, he told me to leave the door open

6      because he felt uncomfortable with Ian if he had

7      saw us in the office together; that if the door

8      was shut, he would feel like we were talking about

9      him or whatnot.  So he said to leave the door

10     open.

11                    So at first I was like, Can I talk

12     to you?  And I shut the door.  But subsequent

13     meetings after that, we had left the door open.

14            Q.     Do you know if there was human

15     resources in Paris?

16            A.     I don't know.

17            Q.     What -- tell me when your second

18     meeting with Mr. Zack occurred.

19            A.     Probably a week or two after the

20     first meeting.

21            Q.     So in December, would you say?

22            A.     Probably, yes.

23            Q.     Okay.  December of 2007.  Correct?

24            A.     Yes, yes.

25            Q.     Okay.  And this meeting also took

1                          MIHALIK

2       place in Mr. Zack's office?

3               A.    Yes.

4               Q.    And tell me, to the best of your

5       recollection, everything you said to Mr. Zack and

6       everything he said to you.  I want you to tell me

7       as much as possible exactly how the script, if we

8       can call it that, of this meeting occurred.

9               A.    Verbatim, I don't recall what was

10      said.  Generally, I voiced my concern with how he

11      was making me feel with his conduct in the office,

12      and I asked him what I should do about it.

13              Q.    Do you remember any more

14      specifically what you said to him?

15              A.    No.

16              Q.    Okay.  What did he say to you?

17              A.    He said similar statements as that

18      first meeting, that, Do you have anybody that's

19      going to back you up?  Did anybody else see it?

20      If not, you're probably -- if you complain, more

21      than likely he's going to get angry and you'll

22      probably be let go.

23              Q.    Okay.  And what did you -- do you

24      remember anything else Mr. Zack said?

25              A.    No.

1          MIHALIK

2          Q.    Did you respond to Mr. Zack?

3          A.    Yes.  I said, Well, what am I

4    supposed to do with that information?  How is that

5    supposed to help me?

6          Q.    And what did Mr. Zack say?

7          A.    I don't know.  I can't help you.

8          Q.    Do you remember anything else

9    either of you said during that meeting?

10          A.    He said that he did not want to get

11    involved.

12          Q.    Okay.

13          A.    He -- I -- in not so many words, he

14    said he feared for his job, too.  He and Ian

15    Peacock, I don't think, got along that great, so

16    he didn't want to ruffle any feathers by taking my

17    side or really even -- he almost didn't even seem

18    like he wanted to acknowledge that I was even

19    telling him anything because he did not want to

20    get involved.

21          Q.    Do you remember anything else that

22    either of you said during this second meeting?

23          A.    No.

24          Q.    Okay.  Then I think we have a third

25    meeting.  Is that correct?

1                          MIHALIK

2    said all the things that I had complained about

3    and was concerned about, and I put it in an e-mail

4    that I wanted to send to Ian.

5                    And I showed it to him and I said,

6    Seeing that nobody else is going to say

7    anything -- meaning him -- here's what I feel.

8    Here's my concerns.  Here's what I want.  I want

9    it to stop.  And I showed it to him.

10                    And he said, Yes.  Send that to him

11   if you want to get fired.

12                    (Exhibit D-5 marked for

13       identification.)

14                    MR. SCHATZ:  Just take a minute and

15       read it.

16           Q.     Yes, please.

17                    Ms. Mihalik, have you had an

18   opportunity to read this?

19           A.     Yes.

20           Q.     Do you recognize what has been

21   marked as Defendant's Exhibit 5?

22           A.     Yes.

23           Q.     What is it?

24           A.     This is the e-mail that I had

25   drafted.

1                          MIHALIK

2              Q.    Correct?

3                    And other than showing Defendant's

4     Exhibit 5 to Mr. Zack, tell me everything you

5     recall saying to Mr. Zack in the meeting where you

6     showed him Defendant's Exhibit 5 and everything

7     you recall Mr. Zack saying to you in that meeting.

8              A.    I showed him this e-mail.  I said,

9     Read it.  Tell me what you think.  Should I send

10    this to him?

11                   And he said, If you want to get

12    fired, you can send it.

13             Q.    Okay.  Do you recall anything else

14    being said in that meeting by either you or

15    Mr. Zack?

16             A.    I said, So I shouldn't send it?

17                   And he said, If you want to get

18    fired, you can send it.

19             Q.    Anything else you remember being

20    said by either of you in that meeting?

21             A.    No.

22             Q.    Okay.  Do you recall another

23    meeting with Mr. Zack?

24             A.    I'm sure there was another meeting

25    after that.

1                           MIHALIK

2    fail because he had never sent me an e-mail like

3    that before.  It was not how business is generally

4    conducted.  And I felt like he was trying to set

5    me up to fail so that he could say -- because up

6    until that point I hadn't done anything wrong.  He

7    needed something for me to do wrong or to not

8    complete so that it seemed like I wasn't following

9    his order as CEO.

10                   So that I believe the last page of

11   my contract says if I disobey a direct order of a

12   CEO, I will be terminated.

13                   So I felt like this lengthy e-mail

14   was a setup to fail because it was almost -- it

15   was out of nowhere, nobody else had the e-mail,

16   nobody else got sent the e-mail and we had never

17   spoke about it before.

18                   And it was an absurd amount of work

19   for one person to do.  And even if I got to half

20   of what it was that he wanted, I still would have

21   failed.  So no matter what I could have done, it

22   was -- it seemed like it was a setup to fail.

23                   (Exhibit D-6 marked for

24        identification.)

25                   MS. ROTH:  Ms. Mihalik, I've shown

1                    MIHALIK

2    question, Ms. Mihalik, because we've had this

3    complaint, I believe, since around -- I guess it's

4    a year now, and I assume you've had it now for

5    about a year.  And this is really our only

6    opportunity to speak with you and get all of the

7    information that you have for us and all of your

8    recollections.

9              So, I am asking you to tell me

10   everything that you remember.  We can't wait

11   until, you know, something else might come to you.

12   And, of course, as time passes, memories grow dim.

13   So, I'm asking you to think and just tell me if

14   there's anything else that comes to your mind now.

15             A.    Okay.  I -- I was singled out as

16   the only person at Cheuvreux to not receive a

17   bonus check through direct deposit.  I -- I did

18   not get a performance review after asking him am I

19   going to get a performance review.  He would make

20   it more difficult for me to set up meetings.   I

21   would have to call Germany to try to find new

22   clients, try to set up my own meetings.

23             Q.    Let me ask you about what you just

24   said.  How did he make it more difficult for you

25   to set up meetings?

                              MIHALIK

1   the instruction to disregard your accounts?

2        A.    Tim Randall and Dominic Romano.

3        Q.    And what did he say to them?

4        A.    He said that you can go ahead and

5   schedule meetings and not include Mihalik in the

6   meetings.  And before that, everybody, meaning Tim

7   Randall and Dominic Romano and everybody would say

8   is this your account or is this your account, can

9   I call them, or do you have anything going on, and

10  after all this happened, it didn't matter if it

11  was my account, they would call, they would set up

12  meetings.

13              Specifically I remember BlackRock

14  being one of them.  And I found out that they were

15  having a meeting, and I wasn't even informed at

16  all.  And I had mentioned it to one of my -- one

17  of the traders at BlackRock, and he said that he

18  would -- he didn't realize that I wasn't

19  unavailable at the time, and that he would

20  reschedule the meeting for me so that I actually

21  could go with them.

22        Q.    You allege that he reprimanded you

23  for your work performance, and stated on one

24  occasion:

1                              MIHALIK

2              Q.     Okay.  Now, do you -- you next

3      allege that he used profanities to degrade your

4      work.  Who heard him use these profanities to

5      degrade your work?

6              A.     Tim Randall and Dominic Romano and

7      John Palazzo.

8              Q.     Okay.  When did he say that a

9      12-year-old -- excuse me.  When did he say:

10                     "A fucking 12-year-old could have

11     written this"?

12              A.     The day he fired me.

13              Q.     Okay.  You next allege that he:

14                     "Spoke negatively of you in front

15     of your coworkers, saying you have no idea what

16     you're talking about.  If it existed, then how

17     come we don't know about it."

18                     When did this occur?

19              A.     This occurred on or about March

20     2008.  I referred to it earlier.  I had

21     information on U.S. markets and progression

22     towards certain points in the U.S. market, and he

23     didn't know about it, and I had brought it up in

24     the meeting, and he said I didn't know what I was

25     fucking talking about.  And if it existed, how

1                     MIHALIK

2    intelligent, and that if you had a British accent,

3    you would sound more sophisticated and people

4    might take you seriously.  Correct?

5         A.    Yes.

6         Q.    When was that said?

7         A.    That was said on or about February

8    of 2008.

9         Q.    To whom was it said?

10        A.    To me it was said.

11        Q.    Was anyone else present?

12        A.    I don't recall.

13        Q.    Do -- where was it said?

14        A.    At my desk.

15        Q.    Were -- are any of the other people

16   who are on your team -- Mr. Palazzo, Mr. Randall

17   or Mr. Romano -- are they British?

18        A.    No.

19        Q.    You then allege that you were

20   singled out as the only Cheuvreux employee not to

21   receive a performance review, so that you were not

22   given formal notice of any performance problems so

23   you could improve.

24        A.    Right.

25        Q.    How do you know you were the only

Page 193

1                          MIHALIK

2    regarding leaves of absence.

3            Q.    Okay.  Do you recall a conversation

4    with Mr. Zack about the notice period that takes

5    place before someone leaves the company?

6            A.    No, I don't.  I don't -- I'm not

7    sure I understand the question.

8            Q.    Okay.  Do you recall a conversation

9    with Mr. Zack about any aspect of your offer

10   letter?

11           A.    Yes.  Schedule 1 or A or whatever

12   the last -- the last page is, because Ian Peacock

13   had sent me an e-mail that seemed like -- he had

14   never sent me such an enormous writing e-mail.

15   Every other e-mail he had sent me was one or two

16   words.  And this was towards the end of -- it was

17   towards April and at the height of my -- at the

18   height of his harassing me.

19                    He had sent me an e-mail that was

20   very lengthy, last minute, was never spoken about,

21   and in it was a request by him for me to call 140

22   clients by a certain amount of time, and that I

23   was to report to him that I had done what he had

24   asked me to do.

25                    And I felt that it was a setup to

                    MIHALIK

1

2       sure you can --

3                   MS. ROTH:  I am trying --

4                   MR. SCHATZ:  I know, I know.

5           Q.    And if you forget any of them, I'll

6    ask you again.

7           A.    Okay.  I sent Mr. Peacock -- I'm

8    sorry.  I'll rephrase that.

9                   I forwarded Mr. Peacock the e-mail

10   that I got from Nicholas Applegate, the client

11   that I had visited in California who agreed to

12   Cheuvreux services, that he was going to try them.

13   And I forwarded that e-mail on April 10th to

14   Mr. Peacock, showing him that I had signed a new

15   client.

16                   And my -- the reply back from that

17   e-mail was, Meeting in my -- something along the

18   lines of, Meet me in my office at this time.  That

19   was it.

20                   So I went into the office.  He

21   started throwing things.  He threw this -- I told

22   you to do this.  He threw this at me.  Why didn't

23   you do it?

24          Q.    When you say "this" --

25          A.    I'm sorry.  He threw -- he threw

Page 238

```
 1                        MIHALIK
 2     the e-mail at me and told me --
 3           Q.    And the e-mail you're referring to
 4     is Exhibit D-6.  Correct?
 5           A.    D-6, right.
 6           Q.    Okay.  He threw that at you?
 7           A.    And then he threw Exhibit D-7 at me
 8     and said I didn't even come close to what I was
 9     told to do.  What do I have to say for myself?
10     This is fucking unacceptable.  I told you on
11     several occasions that your work was unacceptable.
12     You haven't improved.  You haven't done anything
13     that I told you to do.
14                 I told him, I just sent you an
15     e-mail showing you that I just signed a new
16     client, Nicholas Applegate, that you had been
17     trying to get for a few years now.  Is that not
18     acceptable?  Is that not a new client?  What about
19     Galleon?  What about BlackRock?  What about
20     Crossway Partners?  What about Tradition?  I told
21     him all of the things that I had done.
22                 And he just kept referring back to
23     his D-6 e-mail to me and this phone list and
24     saying that I didn't do what he told me to do and
25     that -- and then he threw this D-8 formal warning
```

1                          MIHALIK

2    at me, and I guess it has to do with me not

3    finishing the tasks that he had told me to finish.

4    And he said, This is a warning.  And he said, This

5    is not working out.

6              I said, What's not working out, me

7    and you, or me at the company?

8              He said, We are not working out.

9    This is not working out.  We need to come to some

10   sort of agreement or something.

11             And I said, I don't understand

12   what's not working out.  I am doing what you told

13   me to do.  I am signing new clients.  I've brought

14   on the clients that I told you I would bring on,

15   and I've gotten you into the meetings that I told

16   you I would get you into.  And I don't know -- I

17   did not finish the task.  You're right.  And this

18   is the first time that you've even said anything

19   to me.  I asked you for a performance review back

20   in February before I got my bonus check handed to

21   me.  You didn't tell me anything, that I was not

22   doing what you told me to do, that I wasn't

23   generating the revenue that you told me to

24   generate.

25             It was never told to me -- he never

MIHALIK

1  told me what he expected quotawise or revenuewise.

2  He didn't say anything.

3              And then he threw this at me and

4  got very aggravated and started swearing at me and

5  told me, This isn't working out.  And he said that

6  that was it.  He just -- that was it.  He just

7  didn't want me in the company anymore.

8          Q.    You said that he got aggravated at

9  you and started swearing at you.

10              Tell me what he said.

11          A.    He said that I wasn't performing.

12  I told you on several occasions that you weren't

13  performing.  You haven't done anything.

14              And I think he got angry at me

15  because I told him that, Yes, I did do what you

16  told me to do.

17              And then he said, This isn't

18  working out.

19              I said, We're not working out, me

20  and you, or me at the company is not working out?

21  Because I am doing what you asked me to do.  I am

22  bringing on new clients and I did do -- and bring

23  you to the clients that I told you that I had

24  contacts at.  I don't understand what else you

1                        MIHALIK

2    want from me.

3              And then he said, That's it.  This

4    isn't working out.  I'm letting -- I'm getting rid

5    of you.

6              And he brought in the HR woman that

7    I had never seen.

8         Q.    Ellen Haas.  Correct?

9         A.    Yes.

10        Q.    What time of day did this take

11   place?

12        A.    The afternoon.

13        Q.    Did you -- when he first called you

14   in, did he ask you whether you had done the

15   calling of possible clients that he had asked you

16   to do in Exhibit 6?

17        A.    He said that I did not complete the

18   tasks that he had assigned to me.

19        Q.    And did he tell you how he knew you

20   had not completed the task?

21        A.    Yes.  He threw the phone list at me

22   and said, You didn't even come close to 140

23   contacts here.  And he threw the list at me.

24   That's what he said.

25        Q.    And did you tell him that this is

Page 319

MIHALIK

1

2      A.      In April of 2009.

3      Q.      And you began nursing school when?

4      A.      May of 2009.

5      Q.      So, you decided and -- and began

6   within a month.  Is that right?

7      A.      I had to take prerequisite classes.

8      Q.      And you took those before you

9   decided to go to nursing school.  Correct?

10     A.      That's correct.

11     Q.      Okay.  So, looking at -- so, April

12   2009 or May -- let's call it May 2009.  From April

13   of 2008 to May of 2009, I'd like to focus on that

14   time period.  Did you look for employment during

15   that entire time period?

16     A.      I was in school, so, no, I did not.

17     Q.      When -- when did you begin school?

18     A.      In September of 2009.

19     Q.      What courses did you take beginning

20   in September 2009?

21     A.      Chemistry, microbiology.  I don't

22   recall the order that I took them in.  Anatomy and

23   Physiology I and II.

24     Q.      For how many -- is -- is the school

25   you went to on a semester program?

Page 321

1                          MIHALIK

2        A.    Yes.

3        Q.    Did -- when -- withdrawn.

4              Did you look for employment only in

5    the financial services industry?

6        A.    Yes.

7        Q.    Did you apply -- did you have any

8    interviews during that time?

9        A.    No, I did not.

10        Q.    Did you send any letters to

11   employers during that time?

12        A.    No, I did not.

13        Q.    Potential employers?

14        A.    No, I did not.

15        Q.    What -- tell me everything you did

16   during that period of time to look for a job?

17        A.    I contacted my recruiters.

18        Q.    And that was whom, again?

19        A.    Teeman Perley.

20        Q.    Teeman Perley.  What else did you

21   do?

22        A.    I looked through newspapers and got

23   into contact with some of my old colleagues to see

24   if there were any job openings anywhere.

25        Q.    Okay.  Now, was the only

Yenicay M.D., Altan
page 1

```
1  00001:
2          UNITED STATES DISTRICT COURT
3          SOUTHERN DISTRICT OF NEW YORK
4          Index No. 09-CV-01251 (DAB)
5          ---------------------------x
           RENEE MIHALIK,
6
                      Plaintiff,
7
                vs.
8
           CREDIT AGRICOLE CHEUVREUX
9
           NORTH AMERICA, INC.,
10
                      Defendant.
11         ---------------------------x
12
13
14                May 19, 2010
15                11:22 a.m.
16
17              Videotaped deposition of
18         ALTAN YENICAY, M.D., held at the offices
19         of Hogan Lovells US LLP, 875 Third Avenue,
20         New York, New York, pursuant to subpoena,
21         before Cary N. Bigelow, RPR, a Notary
22         Public of the State of New York.
23
24
25
```

Yenicay M.D., Altan
page 70

```
 1  00070:
 2          relationship with her father that, you know, she
 3          was fine, she was getting along, I mean, you
 4          can't say that all of us don't do that to some
 5          extent, you know, so I don't know anyone who had
 6          the perfect upbringing or anything like that, but
 7          most people have gotten by it and, you know, it
 8          just -- I don't know if this is entirely
 9          accurate, but the closest thing I can maybe offer
10          is, you know, that euphemism the straw that
11          breaks the camel's back or something, but just,
12          in my opinion, it certainly made her worse than
13          she was prior to then.
14          Q.   You're saying what made her worse?
15          A.   The whole experience at Cheuvreux.
16              It was really at that point that I was
17      convinced that she needed to see someone
18      professionally whereas prior to that it wasn't
19      my -- that was not my impression.
20          Q.   So it was right after she lost her job
21      you thought that she needed to see somebody
22      professionally?
23          A.   Right after -- it was after she lost
24      her job. If you mean right after the next day,
25      no, but I thought that I wasn't able to help the
```

Yenicay M.D., Altan
page 71

1  00071:
2         situation. Our relationship had grown to the
3         point where, like, I was, like I said before, I
4         was every single day I was, like, I have to break
5         up with her, the next fight I have to break up
6         with her.
7               It was not like we were having a
8         healthy relationship at that point either and I'm
9         not going to say that's not a hundred percent
10        her; of course, you know, I share some of that
11        blame, you know, I'm getting killed at work,
12        maybe I wasn't as supportive as I should have
13        been, you know, you can paint that picture any
14        way you want to paint it. But it was after that,
15        in my opinion, that, you know, we were both
16        making each other miserable, I clearly was not
17        helping the situation and I felt at that point it
18        was out of my hands and there was nothing that I
19        could do and that she needed to get herself
20        better before she could have any kind of
21        functional relationship with anybody.
22        Q.   As you sit here today, it's a few years
23        later, looking back, do you think that Renee
24        could have benefited from therapy even before the
25        time that you became convinced that she really

Yenicay M.D., Altan
page 101

1  00101:
2      than -- like, there was one time with, I guess,
3      some DVD or something and another time with a
4      URL, she made this known to you more than those
5      two occasions?
6          A.   I don't think it ever -- did it come up
7      after that?  Possibly.  I don't remember getting
8      yelled at for it, though.
9              She, I think, always -- Renee had a
10     couple suspicions, I think that was one of them,
11     and, you know, I'm not going to trash a
12     relationship over pornography, so basically in
13     those areas Renee laid down the law and I just
14     followed it as best I could, you know.  In that
15     instance it was, you know, it's not -- she's 100
16     percent correct.
17             I mean, I'm not agreeing with the
18     cheating part, but if your girlfriend doesn't
19     want you to look at the stuff, she has every --
20     you know, that's fine, you know, I'm not going to
21     argue with her over that.
22         Q.   Did she ever talk about pornography
23     with you in any context other than she was
24     concerned that you were looking at it?
25         A.   I don't remember that she did.  Maybe.

Yenicay M.D., Altan
page 102

1   00102:
2        Q.   All I want to know is what you -- I
3   just want to know everything you remember.
4        A.   I don't remember, I don't remember.  I
5   remember getting yelled at twice for it and
6   that's really all I can say about it.
7        Q.   That's fair enough.
8             So you said Renee had a couple of
9   suspicions.  I think what you were saying is she
10   was suspicious that you or whatever guy she was
11   with might be cheating on her and she was also
12   suspicious that whatever guy she was with might
13   be looking at porno.
14            Did she have any other suspicions?  And
15   am I right about -- am I right in interpreting
16   what you said?
17        A.   I don't know what she felt about her
18   other boyfriends cheating and stuff like that.  I
19   know that she was concerned about these
20   friendships that I had with these other women,
21   the natural extension of that being she's afraid
22   I'm involved with one of these women.  The
23   pornography thing we've already talked about.
24            Renee -- Renee always was afraid that I
25   was doing drugs and I believe the reason she did

Yenicay M.D., Altan
page 130

```
 1  00130:
 2         remembered if Renee got sick after you guys came
 3         back from Alaska.
 4           A.   Right.
 5           Q.   Does this e-mail exchange jog your
 6         memory at all about that?
 7           A.   All right.
 8                So this is the week that we got back
 9         and yes, I guess she did get sick.
10           Q.   Were you aware of that at the time?
11                If you don't remember, it's okay.
12           A.   Yeah, but something like this wouldn't
13         stand out in my mind for any reason.  There's a
14         couple of times I remember, you know, she had
15         gotten sick and I had to hold her hair while she
16         threw up and I actually stuck my finger down her
17         throat once to make it, but I don't remember what
18         days they were, sorry.
19           Q.   That's okay.
20                But she does say at the bottom of the
21         page she says to -- she says "Ian heading to ER
22         right now."
23           A.   Yeah.
24           Q.   Do you think you would have remembered
25         if she visited the emergency room?
```

Page 1

1

2     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK

3
      Index No. 09-CV-01251 (DAB)
4     - - - - - - - - - - - - - - - - - - - -x
5     RENEE MIHALIK,
6                            Plaintiff,
7              -against-
8     CREDIT AGRICOLE CHEUVREUX
      NORTH AMERICA, INC.,
9
                             Defendant.
10
      - - - - - - - - - - - - - - - - - - - -x
11
12                         July 16, 2010
                           10:12 a.m.
13
14                  Deposition of CITI GROUP BY TRACY
15    PLATT BEACH, taken pursuant to 30(b)(6)
16    subpoena, held at the offices of Hogan Lovells
17    US LLP, 875 Third Avenue, New York, New York,
18    before Helen Mitchell, a Shorthand Reporter and
19    Notary Public.
20
21
22
23
24
25

Page 22

Platt
1
2      MR. SANTANGELO:  Yes or no.
3      THE WITNESS:  Yes.
4      I'm sorry.
5   Q    Can you tell us what that document
6   is?
7   A    This is our standard separation
8   agreement.
9   Q    A standard separation agreement?
10  A    Um-hum.
11  Q    Do you see on the second line it
12  refers to a reduction in force; is that correct?
13  A    Yes.
14     (Ms. Roth enters)
15  Q    Is that the standard way that Citi
16  terminates its employees?
17  A    I'm not sure I understand your
18  question.
19  Q    Well, I'm just going from what you
20  said about -- that this document is the standard
21  separation agreement.
22  A    And release.
23  Q    And I'm just wondering if every
24  one of these separation agreements refers to a
25  reduction in force?

Page 23

Platt
1
2   A    No.
3   Q    So what are the different ways
4   that somebody who is employed by Citi ends up
5   leaving that employment?
6   A    It depends on the individual.  In
7   this case, for Renee, this was a reduction in
8   force.  The business was exiting that product,
9   and so positions were being eliminated, which
10  then went into a reduction in force.
11  Q    Are employees of Citi ever
12  terminated --
13  A    Yes.
14  Q    -- fired?
15  A    Yes.
16  Q    Do you participate in those types
17  of decisions?
18  A    Yes.
19  Q    Can you tell us generally what
20  type of conduct might result in an employee
21  being fired?
22  A    Just a generality of --
23  Q    Yes, just general terms.
24  A    Gross misconduct is something that
25  we would fire somebody for, and someone who --

Page 24

Platt
1
2   inappropriate conduct.
3   Q    Did you become aware at any point
4   that Renee Mihalik's managers wanted to
5   terminate her employment?
6   A    I was aware that there were
7   performance issues with Renee.  We did not
8   discuss termination.
9   Q    Do you remember what the
10  performance issues were?
11  A    Yes.
12  Q    What were they?
13  A    Renee had attendance issues, and
14  she had -- there was -- it was mainly around
15  attendance.
16  Q    Do you remember anything else?
17  A    Regarding the attendance?
18  Q    Sure, regarding her attendance.
19  A    Yes.
20  Q    What do you remember?
21  A    We had attendance issues, and it
22  was brought to my attention, and we began to
23  discuss what those attendance issues were.
24  Q    Who brought it to your attention?
25  A    She had two managers at the time,

Page 25

Platt
1
2   Andy Mannarino and Mark Powers.
3   Q    Did they both bring Renee's
4   attendance issues to your attention?
5   A    Andy Mannarino had brought that to
6   my attention, and then together, since him and
7   Mark were co-managers, we discussed jointly.
8   Q    When for the first time did
9   Mr. Mannarino raise Renee's attendance issues
10  with you?
11  A    I believe it was August of
12  2007-September of 2007 time frame.
13  Q    So that was about -- about five
14  months after she started working at Citi?
15  A    No, she began working for us in
16  2005.
17  Q    Oh, I'm sorry.  I'm sorry, 2005.
18  A    It's okay.
19  Q    Did you say August of 2007?
20  A    Um-hum.
21     MR. SANTANGELO:  Yes or no.
22  A    Yes.
23     THE WITNESS:  Sorry.
24  Q    Would you take a look again at
25  Exhibit 8, and tell me if you --

7 (Pages 22 to 25)

Page 62

Platt
1
2    to reduce, and based upon what business you were
3    supporting. So...
4        Q    When you say "based upon what
5    business you were supporting," what do you mean
6    by that?
7        A    So, for example -- I'm not saying
8    in this particular case -- say, for example,
9    that in HR you have three generalists and you're
10   reducing head count, you only need two, so that
11   means it's elimination of a position, it's a
12   reduction in force.
13       Q    And what about the part where you
14   say it would depend on what business you were
15   supporting, what did that mean?
16       A    Well, it depends on what business
17   you were in. Because you were -- because you
18   had asked before if it was firm-wide.
19       Q    I see.
20       A    I don't want to make a blanket
21   statement that it was across Citi.
22       Q    So would you say it was a targeted
23   reduction in force, that certain business --
24   that certain parts of the business were going to
25   have a reduced head count; is that --

Page 63

Platt
1
2        A    Yes.
3        Q    Do you remember how many -- how
4    many employees were impacted or were part of the
5    reduction in force?
6        A    I don't.
7        Q    Who made the decisions as to who
8    would be terminated as part of this reduction in
9    force?
10       A    The business.
11       Q    The managers?
12       A    The managers.
13       Q    Was it in their sole discretion?
14       A    It's discussed with counsel and
15   HR.
16       Q    So in the case of Renee as being
17   part of the reduction in force, was the decision
18   made by Mr. Mannarino and Mr. Powers, with
19   consultation from human resources and the legal
20   department?
21       A    They were not the sole decision
22   makers. It was their manager, and I don't
23   recall who was the -- I don't recall who was the
24   person that was -- had given the names for the
25   roles that were being eliminated.

Page 64

Platt
1
2        Q    Did you participate in the
3    decision making to make Renee part of the
4    reduction in force?
5        A    I did not discuss -- no, I was not
6    in the decision making process.
7        Q    When did you first become aware
8    that Renee would be part of the reduction in
9    force?
10       A    I believe it was end of
11   February-beginning of -- excuse me, end of
12   March-beginning of April.
13       Q    I think that you -- I could be
14   wrong about this, but did you testify earlier
15   that you became aware that there would be a
16   reduction in force in January of 2007?
17       A    No.
18       Q    I'm sorry.
19            When did you become aware that the
20   company was going to be doing a reduction in
21   force?
22       A    I don't recall the date of when I
23   became aware of the reduction in force.
24       Q    I see that these e-mails that Citi
25   produced end -- or the last date --

Page 65

Platt
1
2            MS. HANSWIRTH: Actually, I'm not
3    sure I'm right about this.
4        Q    They look like they're all from
5    January 22nd, 2007, and some of them forward
6    something that's from December -- I'm sorry --
7    yes, 2007, and they forward something from
8    December 2006.
9            I'm wondering if there were any
10   subsequent e-mails to you from either
11   Mr. Mannarino or Mr. Powers concerning Renee.
12       A    What do you mean by that?
13       Q    Well, what I'm getting at is that
14   Renee left Citi in April of 2007. The last
15   e-mail that you have here is from January 22nd,
16   2007, and it's fair to say that this was --
17   there were still ongoing issues in 2007
18   regarding Renee's attendance, according to
19   Mr. Mannarino. So I'm wondering if there were
20   any further e-mails after January 22nd, 2007
21   regarding Renee's work issues.
22            MR. SCHATZ: Objection.
23            MS. HANSWIRTH: Go ahead.
24       A    None that I could find. I can't
25   comment that there were, I didn't find any in my

17 (Pages 62 to 65)

**Page 66**

1               Platt
2 e-mails.
3     Q   Do you any recollection of
4 discussing Renee after January 22nd, 2007?
5     A   No. I don't recall if I did or
6 not.
7     Q   Who told Renee that her employment
8 was going to be terminated as a result of a
9 reduction in force?
10     A   I don't recall which manager had a
11 conversation with her. I don't know at that
12 time who had -- who actually sat down with her
13 and had the conversation.
14         MS. HANSWIRTH: I just want to
15     take a break for a couple minutes and
16     gather some thoughts.
17         (Recess taken)
18 BY MS. HANSWIRTH:
19     Q   Was Renee Mihalik an employee at
20 will when she worked at Citi?
21     A   Yes.
22     Q   Were performance reasons part of
23 the --
24         MS. HANSWIRTH: I'm sorry, strike
25     that.

**Page 67**

1               Platt
2     Q   Were Renee's performance issues
3 part of the reason that she was selected to be
4 in the reduction in force?
5         MR. SCHATZ: Objection.
6     A   I don't recall the reason she was
7 selected. As I recall, it was based on the job
8 function.
9     Q   Did you participate in any
10 discussions regarding whether Renee would be
11 part of the reduction in force?
12     A   Not Renee particularly; with
13 regards to anyone who was involved in the
14 reductions.
15     Q   When you say "job function," what
16 exactly do you mean?
17     A   Her actual job function, what she
18 did. She was a client covering — excuse me,
19 she was covering client accounts.
20     Q   And were there other people who
21 were also performing that same job function?
22     A   I believe so, yes.
23     Q   And is it correct that some of
24 them were not part of the reduction in force?
25     A   That is correct.

**Page 68**

1               Platt
2     Q   So then the job function alone was
3 not the reason why somebody would be selected
4 for the reduction in force; correct?
5     A   I wouldn't say that's correct.
6 While she had a similar role, they all covered
7 different accounts. So based on what accounts
8 they covered and the product they sold, there's
9 lots of different things that go into
10 determining someone for a reduction in force --
11 eliminating their position, excuse me.
12     Q   Would it be fair to say that
13 somebody who covered more accounts than someone
14 else would be more likely to be able to keep
15 their job when there is a reduction in force?
16     A   I wouldn't say.
17         No. I don't know what that has to
18 do with the number of accounts.
19     Q   Is the fact that Renee had
20 accounts taken away from her part of the reason
21 that she was made part of the reduction in
22 force?
23     A   No.
24     Q   But you didn't participate in any
25 discussions about whether she should be part of

**Page 69**

1               Platt
2 the reduction in force? Not her business unit,
3 but her personally.
4     A   No. After the list -- when we saw
5 the list, we discussed each person. So there
6 was a discussion on -- on her, but it wasn't
7 just her alone.
8     Q   So you received a list of people
9 that other people were saying should be part of
10 the reduction in force; is that correct?
11     A   When a business is tasked with
12 going to a reduction in force and eliminating
13 head count, they then provide a list of
14 employees that are going to be impacted on that,
15 and their roles, and I did see the list of the
16 employees that would be impacted by this
17 reduction in force. Renee's name was on there.
18 And we go through and we discuss the business
19 rationale behind each one.
20     Q   Who's the "we" who discusses the
21 business rationale?
22     A   The manager and I, and then we --
23 then the last step is to go with counsel.
24     Q   So there was a discussion among
25 you and Mr. Powers and Mr. Mannarino about

18 (Pages 66 to 69)

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424         (212) 490-3430

ORIGINAL

Page 1

1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   Action No. 09-CV-01251 (DAB)
    ------------------------------------------x
4
5   RENEE MIHALIK,
6                        Plaintiff,
7
         - against -
8
9   CREDIT AGRICOLE CHEUVREAUX
    NORTH AMERICA, INC.,
10
                         Defendant.
11
    ------------------------------------------x
12
         875 Third Avenue
13   New York, New York 10022
14   June 29, 2010
     10:52 p.m.
15
16       DEPOSITION of MARK R. POWERS,
17   taken by the Defendant, pursuant to
18   Subpoena, held before Vicki Livings, a
19   Notary Public of the State of New York.
20
21
22
23
24
25

A-284

1            M. Powers

2    could definitely tell something was

3    bothering her.

4        Q       How often would this happen?

5        A       Sporadically.

6        Q       What was she like when she

7    was having a good day?

8        A       Very friendly, good at her

9    job.

10       Q       Would you describe your own

11   behavior as consistent or erratic?

12       A       Consistent at the workplace.

13       Q       Would you describe the

14   behavior of other people on the trading

15   desk at Citi as consistent or erratic?

16       A       It's pretty individually

17   based, but mostly consistent.

18       Q       Were other people behaving

19   in a way that you would characterize as

20   being erratic?

21       A       A few.

22       Q       What was their behavior

23   like?

24       A       I don't know.  Kind of

25   goofy.  Everybody has a bad day.